UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:13-CR-221-CDP |
| | ) |
| ROBERT WASHINGTON, | ) |
| DARYL WARREN, | ) |
| | ) |
| Defendants. | ) |



PRETRIAL CONFERENCE


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


MARCH 3, 2014



**APPEARANCES:**
For Plaintiff:       Cristian M. Stevens, AUSA
                     Allison H. Behrens, AUSA
                     **OFFICE OF U.S. ATTORNEY**

For Defendant        John M. Lynch, Esq.
Robert Washington    Tania Aldaddah, Esq.
                     **LAW OFFICES OF JOHN M. LYNCH, LLC**

For Defendant        Herman L. Jimerson, Esq.
Daryl Warren         **JIMERSON LAW FIRM**

*REPORTED BY:*       *Gayle D. Madden, CSR, RDR, CRR*
                     *Official Court Reporter*
                     *United States District Court*
                     *111 South Tenth Street, Third Floor*
                     *St. Louis, MO  63102*
                     *(314) 244-7987*

```
 1          (Proceedings began at 8:39 a.m.)

 2          (The following proceedings were held in open court and

 3   with the Defendants present.)

 4          (The following proceedings were held outside the hearing

 5   and presence of the jury panel.)

 6              THE COURT:  We are here in the case of United States

 7   of America versus Robert Washington and Daryl Warren, and I

 8   see Mr. Lynch and Ms. Aldaddah --

 9              MS. ALDADDAH:  Yes.

10              THE COURT:  -- with Mr. Washington and then

11   Mr. Jimerson with Mr. Warren, and I also see that we've

12   rearranged the courtroom tables, and so this -- this looks

13   likes it's acceptable to you all and to the Marshals Service.

14   Okay.

15              MR. JIMERSON:  Yes, ma'am.

16              THE COURT:  Yes.

17              MR. JIMERSON:  Later on, Judge, we might try to add

18   another monitor here, so we can both view all the -- any

19   exhibits as well.

20              THE COURT:  Okay.  And I don't know how many exhibits

21   the -- now, I'll tell you, Mr. Jimerson, one thing; although

22   that's not very close, from where you're sitting, you can

23   probably see them on the screen at the -- at the lectern, and

24   so you all might adjust that in the meantime --

25              MR. JIMERSON:  Yes, ma'am.
```

3

1          THE COURT:  -- to try to make it a little easier.

2          MR. JIMERSON:  Yes, ma'am.

3          THE COURT:  Okay.  And then Mr. Stevens and

4    Ms. Behrens.  We have a number of items to discuss in the

5    pretrial, and there's a number of motions and other things

6    that have been filed.  The first thing I wanted to ask

7    everyone, though -- I do not believe -- I do not recall and I

8    don't see any evidence of it in the court file -- that we've

9    ever made any record of any plea offers that were made to

10   these Defendants, and so, Mr. Stevens, if you wouldn't mind

11   standing up at the lectern and just stating for the record

12   what, if any, concessions were offered, what and when of any

13   concessions were offered, and then I'll ask defense counsel if

14   you agree this is what was offered and then if you

15   communicated that to your clients, and then I'll ask each

16   client the same thing.

17         MR. STEVENS:  Thank you, Judge.  Last June, shortly

18   after this case was indicted, I sent to Mr. Lynch a proposed

19   Plea Agreement regarding Mr. Washington.  We had various

20   conversations about that and some negotiations.  It's my

21   understanding that Mr. Washington rejected our offer, but

22   my -- my offer, essentially, was Mr. Washington is charged in

23   five counts in this case -- two counts of distribution of

24   cocaine, one count of conspiracy to possess with intent to

25   distribute cocaine, one count of possession of a firearm in

3/3/2014 Pretrial Conference

4

1   furtherance of a drug trafficking crime, and felon in

2   possession of a firearm as well.  I offered a plea to Counts

3   II, III, and IV of the indictment, which would be,

4   essentially, a 15-year mandatory minimum.  Mr. Lynch and I had

5   some discussions about agreeing possibly to a lower amount of

6   cocaine that would get Mr. Washington to the 15-year mandatory

7   minimum, and that, effectively, would have been the agreed

8   upon sentence between the parties.

9           THE COURT:  All right.  And, Mr. Lynch, is that a

10  correct summary of -- of what was -- what was offered?

11          MR. LYNCH:  Yes, Your Honor.  And for the record, I

12  would just put to the Court that I have met with Mr. Stevens

13  as a representative of the Government on a number of occasions

14  where we've gone through the Plea Agreement.  I've asked for

15  concessions.  I believe the Government made certain

16  concessions, but my client has rejected all of those.

17          THE COURT:  Okay.  And I guess there was some -- at

18  some point, this offer expired, right, Mr. Stevens?

19          MR. STEVENS:  That's correct, Judge.  On --

20          THE COURT:  In any event, it's expired?

21          MR. STEVENS:  I believe it was February 6th.  It was

22  the week of February 3rd I asked for any response if they

23  intended to accept the Plea Agreements.  I did not receive a

24  response that following week.  I believe that following Monday

25  I talked with defense counsel.  They confirmed that their

5

1  clients were rejecting that offer.  That was approximately

2  three weeks ago.

3           THE COURT:  Okay.  So, Mr. Washington, I just want to

4  ask you this.  Did -- and I'm not asking for any discussions,

5  but did your attorney communicate to you that this was what

6  the Government was offering you if you chose to plead guilty?

7           DEFENDANT WASHINGTON:  Yes, ma'am.

8           THE COURT:  And did you choose to reject that?

9           DEFENDANT WASHINGTON:  Yes, ma'am.

10           THE COURT:  Okay.  And then I'll ask the same thing

11  for Mr. Warren.

12           MR. STEVENS:  Yes, Judge.  Again, at approximately

13  the same time, I sent a plea agreement to Mr. Warren's

14  attorney.  I believe at that time he had a different lawyer

15  initially.  Mr. Jimerson entered shortly after that, and it's

16  my understanding that that same Plea Agreement made it to

17  Mr. Jimerson.  Mr. Warren is charged in three counts --

18  conspiracy to possess with intent to distribute cocaine,

19  possession of a firearm in furtherance of a drug trafficking

20  crime, and being a felon in possession of a firearm.  I sent

21  an offer over offering to dismiss Count V of the indictment

22  and Mr. Warren would plead guilty to Counts III and IV, the

23  conspiracy and the 924(c) count.  We had -- Mr. Jimerson and I

24  have had some discussions, although Mr. Jimerson has made

25  clear for quite some time that he didn't think his client

6

1   intended to accept the Plea Agreement, and again, the week of

2   February 3rd, I asked Mr. Jimerson to confirm or deny whether

3   his client would accept the Plea Agreement, and we

4   subsequently talked, and it's my understanding that Mr. Warren

5   has rejected the Plea Agreement.  Mr. Jimerson continued to

6   contact me as late as, I believe, last Friday and confirmed

7   that he did not believe his client would plead guilty in this

8   case.

9         THE COURT:  And let me just -- what would be the

10  effect or do you know what the -- you know, did you have an

11  estimate of what the sentence would be if -- if he -- if he

12  accepted that Plea Agreement?

13        MR. STEVENS:  Judge, again, there would be a 15-year

14  mandatory minimum.  Considering the amount of cocaine alleged

15  in the indictment, the Guideline sentence would be

16  substantially above that.  Although Mr. Jimerson and I have

17  had conversations about potentially getting that lower, those

18  did not proceed because, apparently, Mr. Warren was not

19  interested in a plea in this case.  I would also point out,

20  Judge, based on this -- this Defendant's, Mr. Warren's prior

21  convictions, he has five qualifying prior drug convictions

22  that would permit an enhancement pursuant to § 851(a), and

23  Mr. Jimerson and I discussed that, but my office -- in

24  reviewing the case, we've determined that we would not file

25  those enhancements in any event despite that Mr. Warren is

1    enhanceable to life in prison.

2            THE COURT:  Are you saying you won't file them even

3    if he goes to trial and is convicted?

4            MR. STEVENS:  That's correct, Judge.

5            THE COURT:  Okay.  So, basically, it would have been

6    the Government was contemplating or at least at some point it

7    could have gone to a 15-year but not below the 15 years?

8            MR. STEVENS:  That's correct, Judge.

9            THE COURT:  Okay.  So the Government was never

10   offering anything below the 15-year mandatory minimum?

11           MR. STEVENS:  That's correct, Your Honor.

12           THE COURT:  Okay.  Mr. Jimerson, has -- has counsel

13   correctly summarized the Plea Agreements?

14           MR. JIMERSON:  Yes, ma'am, Mr. Stevens has.  In fact,

15   we've had a few conversations as well.  I conveyed both offers

16   in terms of that in my earlier seeing Mr. Warren as well as as

17   late as -- I believe it was Thursday or Friday when I spoke

18   with you.  So he has not -- Mr. Warren has rejected all those

19   types of offers to plead guilty, Your Honor.

20           THE COURT:  Okay.  And so, Mr. Warren, let me ask you

21   the same thing.  Did your -- that I asked your Codefendant.

22   Did your lawyer convey to you that the -- or tell you that the

23   Government was making concessions that could result in a

24   sentence of not lower than 15 years?

25           DEFENDANT WARREN:  Yes, ma'am.

8

1      THE COURT:  And did you reject those Plea Agreements?

2      DEFENDANT WARREN:  Yes, ma'am.

3      THE COURT:  And you chose to go to trial?

4      DEFENDANT WARREN:  Yes, ma'am.

5      THE COURT:  Okay.  Thank you.

6      All right.  Now let's talk about the -- what we're

7  going to do at this trial.  I think -- did you all have some

8  *Old Chief* stipulations?

9      MR. STEVENS:  Yes, Judge.  I filed those suggested

10  stipulations several weeks ago.  This morning, Mr. Washington

11  has signed that.  I have that here, and I will mark that as an

12  exhibit for trial.  I've also, again, presented a paper copy

13  this morning to Mr. Warren and his attorney.  He has rejected

14  the opportunity to sign that, that stipulation.

15      THE COURT:  Okay.  So what do you intend to do --

16  well, I -- let's -- then let's take up, first, Mr. Warren's

17  prior convictions, and there are several motions that would be

18  directed to those because at this point you'll have to prove

19  up a felony to prove Count V, right?

20      MR. STEVENS:  That's right, Your Honor.

21      THE COURT:  So -- so hold on.  Let me find the right

22  motions and responses.

23      MR. JIMERSON:  Your Honor, may we have one moment?

24      THE COURT:  Yeah, you may.  You want to turn on the

25  white noise just to . . .

1          (Attorneys conferring.)

2               THE COURT:  All right.

3               MR. JIMERSON:  We're going to sign, Your Honor.

4               THE COURT:  You're going to sign the *Old Chief*

5     stipulation.  Okay.  Go ahead and do that, and then we'll --

6               Okay.  So now let me then start with

7     Mr. Washington's -- well, the pretrial motions that relate to

8     Mr. Washington.  So there's a Government motion.  Well, the

9     first one, I guess, is the Defendant's motion to preclude

10    404(b) evidence, and like I said, I've got a big stack of

11    these, so let me find the right one.  Okay.  So the Defendant

12    has moved to preclude evidence of his prior convictions as

13    anticipating, of course, that the Government would seek to

14    admit these under 404(b), and I would like to just right now

15    confine myself to the 404(b) discussion, and then we can

16    discuss the 609 issues in a moment, and as I understand -- so

17    what -- what exactly is the Government intending to introduce

18    as 404(b) evidence?  Do I understand correctly it's the 2002

19    conviction for residential burglary and felony theft?

20              MR. STEVENS:  That's correct, Your Honor.  We did --

21    we gave notice of other convictions.  I don't intend to pursue

22    those under 404(b).  It's just the burglary and theft.

23              THE COURT:  Okay.  So, Mr. Lynch, I'll hear anything

24    you wish to say about that.  I have read your brief, of

25    course.

1          MR. LYNCH:  Yeah, and, Your Honor, I'll rest

2    primarily on what I introduced in the brief.  I would note,

3    Your Honor, first, the age of this particular conviction and,

4    more particularly, the facts and circumstances underlying

5    those two charges.  It's from Arkansas, from 2002.  It

6    involved a burglary and theft of a residence for which my

7    client received a suspended imposition of sentence.  I'm not

8    saying that for purposes of whether or not it's a conviction

9    but just so the Court knows what the punishment was, and more

10   applicable to this case, there's no evidence to suggest it

11   involved any type of violent actions, possession of a handgun,

12   theft of narcotics, so I don't think it's sufficiently

13   analogous with the present charges such that it should be

14   introduced under 404(b), and then I'll rest on what I issued

15   in writing, Judge.

16          THE COURT:  All right.  All right.  And so,

17   Mr. Stevens, why -- why would that be appropriate 404(b)

18   evidence?

19          MR. STEVENS:  Well, Judge, in this particular case,

20   we have the -- the charged conspiracy to possess with intent

21   to distribute cocaine involved, as the Court is aware from the

22   briefs, a conspiracy involving these Defendants to forcibly

23   enter a drug stash house and steal cocaine from inside the

24   stash house, which would essentially be a burglary and a

25   theft.

1          THE COURT:  Well, it would be an armed robbery as

2    well, right?

3          MR. STEVENS:  Yes.

4          THE COURT:  I mean that's -- because they were -- as

5    I understand your evidence, you're going to try to prove that

6    they were, you know, going in with guns and fully expecting

7    violence to result and that there was a large quantity of

8    cocaine involved.

9          MR. STEVENS:  That's absolutely right, Judge.  In

10   fact, two firearms were recovered from Mr. Warren's car during

11   the course -- basically, at the end of the conspiracy when

12   they were -- when they were both arrested, but there's --

13   there will be evidence of all kinds of conversation about this

14   drug stash house with armed guards and the amount of cocaine

15   in there.  During the course of the conspiracy, a meeting

16   where Mr. Washington was also present, Mr. Warren indicated he

17   expected this to be a shootout, and so when you look at the

18   actual evidence of the conspiracy, the evidence would be quite

19   similar to a burglary and theft from the house, an armed

20   robbery.

21         THE COURT:  Well, okay, but now let me -- let me find

22   out.  I thought -- this was residential burglary and felony

23   theft?

24         MR. STEVENS:  Yes.

25         THE COURT:  And I don't see anything in there about a

1  gun or violence.  I know that burglary is always considered a

2  crime of violence because there's always a chance that the

3  dwelling will be occupied --

4          MR. STEVENS:  Yes.

5          THE COURT:  -- but, frankly, most burglaries, the

6  burglars -- at least the ones I've heard evidence about --

7  don't really usually anticipate that there will be people in

8  the house, where in this one they did anticipate people would

9  be in the house, so -- and also, was there evidence of a gun

10 in the -- in the burglary and felony theft conviction?

11         MR. STEVENS:  No, there was not, Judge, but --

12         THE COURT:  So we have no gun, no drugs, and we don't

13 know whether the house was occupied or not?

14         MR. STEVENS:  That's correct.

15         THE COURT:  Do we know what was stolen?

16         MR. STEVENS:  I don't know that, Judge.  I do know,

17 obviously, that what it was is an illegal entry into the house

18 for the purpose of committing another felony, which is -- I

19 mean, generically, that's what we have here, entering this

20 stash house for the purpose of committing another felony.

21         THE COURT:  Yeah, I'm trying to remember from what

22 your evidence is going to be that they were planning to do.

23 They were planning to -- the undercover guy was supposed to go

24 in and pick stuff up.  Were they supposed to even be with him

25 when he went in the house?

13

1          MR. STEVENS:  I think what they expected to do was to

2     go in as he was coming out, to enter the house at that time to

3     do the robbery.

4          THE COURT:  Okay.  That's what your evidence --

5     that's what you expect your evidence will show?

6          MR. STEVENS:  Yes, Judge.

7          THE COURT:  So tell me how this proves any of the

8     items that are listed in Rule 404(b).

9          MR. STEVENS:  Well, I think it -- it certainly goes

10     to Mr. Washington's intent and motive regarding this

11     particular conspiracy.

12          THE COURT:  How is that different from propensity in

13     this case?

14          MR. STEVENS:  Well, it's -- essentially, I mean, if

15     we're talking about his motive for going into the house, it's

16     to commit another felony, and I think what that -- what it

17     establishes is that -- and on prior occasions, considering the

18     burglary and the theft, that it shows what his motive would be

19     on entering the house.  It also goes to his knowledge about

20     how similar crimes are committed, and I think for those

21     reasons it's relevant beyond simple propensity evidence.

22          THE COURT:  You know, I don't think it is, and my

23     reason -- I'm going to exclude the evidence and grant the

24     motion to exclude this particular evidence, and here's my

25     reason.  We have no guns, no drugs, no violence involved in

14

1   the prior conviction.  The only thing we have is, as you say,

2   an intent to go into a dwelling and commit a crime.  We don't

3   know more facts about the -- about the residential burglary

4   and felony theft, but we all know that in most cases, a

5   residence is what's intended to be burglarized.  In this case,

6   as I understand it, the plan was to go into what was believed

7   to be a stash house, whether people lived there or not,

8   knowing something's a stash house and you're going in

9   expecting to rob people, expecting violence, expecting a large

10  amount of cocaine, expecting to shoot people.  Those things

11  are really serious, and I simply don't see how committing a

12  residential burglary and felony theft 12 years ago where you

13  get an SIS, which means by definition it must not have been

14  super serious in the view of the court system and the

15  prosecution down in Arkansas, although we don't know more

16  about it -- I don't see that it's -- it's similar enough.  I

17  think that it's really not similar, and therefore, I don't

18  think it -- and I also don't think -- because it's not

19  similar, I don't see how it shows the propensity to commit

20  this crime.  I do recognize that any burglary is a crime of

21  violence and there is always a potential for violence in a

22  burglary, but this case is very different.  This, as I

23  understand the Government's argument, is a planned, you know,

24  an expected violent crime involving large quantities of

25  cocaine and involving guns and, like I say, anticipated

15

1    violence of a stash house, so I don't think it's similar

2    enough, and so because of that, I am going to exclude that

3    conviction.  So I'm granting Defendant's motion, #160, to

4    exclude that evidence as 404(b) evidence.

5          Now let's talk about it as 609 evidence.  The only --

6    one question I had about this, about this then -- this is the

7    Defendant's motion, #161, and the only issue I had about

8    that -- in the Government's response that was filed, I guess,

9    recently, if I find it -- hold on just a second.  Yeah.  Okay.

10   The Government's response says that -- the Government's

11   response doesn't deal with the 609 issue of timing,

12   timeliness, so can you explain your response on the timing

13   issue?

14         MR. STEVENS:  Yeah, Judge, and I think we can

15   shortcut that.  I've already informed Mr. Lynch that I do not

16   intend to get into the 2002 burglary and theft if

17   Mr. Washington testifies, that it is beyond the 10 years, and

18   so I -- I'm not seeking to impeach him with that particular --

19   with those particular convictions from 2001 or 2002, and

20   instead, I would just seek to impeach Mr. Washington with the

21   domestic assault, second degree, convictions, which, of

22   course, are within the 10 years.

23         THE COURT:  And tell me the dates of those domestic

24   assault convictions.

25         MR. STEVENS:  They were three counts in the same

1  case, Judge, and I can give you the precise dates.  They

2  were -- he was convicted on September 2nd of 2009 on three

3  counts of domestic assault, second, felonies, and also on two

4  counts of domestic assault, third, misdemeanors.  Of course,

5  I'm not seeking to impeach him on the misdemeanors from that

6  same case.  It would be the three counts of domestic assault,

7  second degree, from September 2nd of 2009.

8          THE COURT:  And when did those assaults occur?

9          MR. STEVENS:  They occurred on May 22nd of 2009.

10          THE COURT:  And do you know any -- well, Mr. Lynch,

11  I'll hear any argument you wish to make.  I mean your argument

12  was, basically, that domestic assault is going to be unfairly

13  prejudicial because jurors will be -- you know, will hold it

14  against him, not just for his credibility, but, basically,

15  for -- I guess just because they won't like him because of

16  domestic assault convictions, right?

17          MR. LYNCH:  That is correct, Your Honor.

18          THE COURT:  And do you know any circumstances of

19  these domestic assaults?  Three counts that all occurred on

20  one day make me wonder; is it three different victims?

21          MR. LYNCH:  It's one victim, Your Honor.  It was an

22  ex-girlfriend, and being honest with the Court, it involved a

23  physical altercation between the two, and Mr. Washington was

24  punished for it; however, I think that --

25          THE COURT:  Did he plead guilty or go to trial?

3/3/2014 Pretrial Conference

17

1          MR. LYNCH:  He pled guilty, Judge.

2          THE COURT:  Okay.

3          MR. LYNCH:  He received two years' imprisonment for

4    it.  I think if it comes in, Judge, it has to come in under

5    (a)(1), 609(a)(1) obviously.

6          THE COURT:  Hold on just a second.  Okay.  Go ahead.

7          MR. LYNCH:  Judge, my -- obviously, I think my

8    client's going to be prejudiced when jurors, primarily female

9    jurors, hear that he beat up an ex-girlfriend because that's

10   what the case is.  I think that -- so that's the prejudicial

11   effect.  My question is -- and in my motion -- what's the

12   probative value of impeaching him with evidence of a prior

13   domestic assault?  The domestic assault did not involve

14   weapons.  It did not involve drugs.  It involved an act of

15   violence.  My client's not charged with committing an act of

16   violence, and I think an issue in this particular case,

17   Judge -- we are going to strenuously argue that my client was

18   not going to actually go into the Mexican cartel stash house

19   that the ATF offered up, so I think for those issues, it's

20   precluded under 609.  I don't see a value that would do

21   anything other than make the jurors hate my client, and that's

22   not what we're here for.

23         THE COURT:  Well, isn't the theory that if someone is

24   inclined to commit one crime, even if it's not at all similar

25   to the crime he's charged with, that that means he has

18

1  disregard for the penalties of perjury?  I mean I guess that's

2  the generic theory, is that right?

3       MR. LYNCH:  Yes, and I think -- but I still think the

4  Court should conduct a 403 analysis, which is included in the

5  rule as well.

6       THE COURT:  Yeah, I must actually.

7       MR. LYNCH:  And so I think that's there for a reason

8  because if the generic theory regarding 609 was to be

9  applicable all the time there would be no limitation.  So the

10 reason that it was promulgated with that -- I will call it an

11 exemption -- is so the Court can provide limits in its

12 discretion as to when certain cases or certain convictions

13 come into evidence.

14      THE COURT:  All right.  Mr. Stevens, let me hear your

15 response to that on the -- why is the -- I mean, am I -- is

16 there another reason why this is relevant to his truthfulness

17 if he testifies?

18      MR. STEVENS:  Well, it's just the standard reason,

19 Judge, that it impeaches his credibility if he testifies.  If

20 he testifies --

21      THE COURT:  Well, but hold on.

22      MR. STEVENS:  Yes.

23      THE COURT:  That's not an answer.  My question is,

24 why does it impeach his credibility, and the only thing I know

25 of is it's considered to show that he's untruthful to the jury

1  because he committed a crime; therefore, if he committed

2  another crime, he might be or must be or will be -- I don't

3  know -- willing to commit the crime of perjury in testifying

4  falsely to them.  That's the only -- there's no other reason,

5  right?

6        MR. STEVENS:  No.  I mean it's -- as the Eighth

7  Circuit explained in *Hedberg*, Judge, his prior -- the prior

8  convictions are highly probative of his credibility because of

9  the common sense proposition that one who has transgressed

10  society's norms by committing a felony is less likely than

11  most to be deterred from lying under oath, and this

12  evidence -- obviously, when a defendant testifies -- and his

13  credibility will be front and center.  If what Mr. Lynch says

14  is true, that he's going to testify he never intended to go in

15  there or whatever, that will be contrary to what the agent is

16  going to testify to.  His credibility will be directly in

17  question, and that's why this has extremely highly probative

18  value.

19        THE COURT:  Well, extremely highly -- I mean it's not

20  like it was a -- I mean extremely high probative value, seems

21  to me, is some kind of crime of dishonesty, and there's no

22  element of dishonesty in domestic assault.

23        MR. STEVENS:  No, but I think that's a different test

24  under the rule, Judge, under 609 as far as --

25        THE COURT:  Well, but the balancing is I have to

3/3/2014 Pretrial Conference

20

1   weigh the potential for unfair prejudice against the probative

2   value.

3         MR. STEVENS:  Yes.

4         THE COURT:  And so that is where it comes in, and I'm

5   trying -- the probative -- that's -- so I'm trying to do that

6   analysis, which is the same as a 403 analysis, but it's really

7   required under 609(a)(1)(B).

8         MR. STEVENS:  Yes.

9         THE COURT:  So tell me why the potential for

10  prejudice -- you know, the prejudicial effect to the Defendant

11  is outweighed by the probative value.

12        MR. STEVENS:  Well, obviously, anytime you're going

13  to impeach a defendant with his prior felony conviction,

14  there's going to be prejudice, but the question is whether,

15  obviously, that outweighs the probative value and whether it's

16  undue prejudice, and in this case, if he's going to testify

17  that he never intended to go in that house and to be involved

18  in the conspiracy or whatever it is he's going to testify to,

19  then his credibility is directly at issue, and in those types

20  of cases, as in *Hedberg*, the Eighth Circuit has explained that

21  it's -- that the probative value is extremely high for the

22  defendant's prior conviction to impeach him with the prior

23  conviction.

24        THE COURT:  Why do we have the exception in

25  609(a)(1)(2) -- I'm sorry -- 609(a)(1)(B)?  I mean what --

1   what -- what's an instance where the prejudice would outweigh

2   the probative value?  Is it your position that it really can't

3   ever happen --

4           MR. STEVENS:  No.

5           THE COURT:  -- or only if he's like a serial killer

6   or something like that?

7           MR. STEVENS:  Not necessarily, Judge.  I think -- but

8   I think -- in -- I'll say this.  In cases like this, where if

9   he's going to give a version of events that's different from

10  the evidence that we're -- as opposed to, you know, testifying

11  to an affirmative defense or that would apply regardless of

12  what the Government's case-in-chief was, then his credibility

13  is directly at issue.  He puts his own credibility directly at

14  issue because it's contrary to what the Government's case is,

15  and so, certainly, in those cases, like this case, we -- we're

16  entitled to impeach him with his prior felony convictions.

17          THE COURT:  So when would the prejudice -- I mean

18  that's almost all the cases it's going to be -- where a

19  defendant testifies, he's going to be controverting the

20  elements of the Government's case.  There are a few where we

21  have affirmative defenses, but so are you saying this is

22  really just reserved for affirmative defenses --

23          MR. STEVENS:  No.

24          THE COURT:  -- because I think they could have said

25  that if that's what it was.

22

1          MR. STEVENS:  They could have, Judge, but I'll tell

2   you, I mean, you might be right, that that may be essentially

3   every case, and that may be why Mr. Lynch can't cite a case

4   where the court has excluded the defendant's prior felony

5   convictions from impeachment when he testifies.  There's one

6   case I cited in which the -- the court actually overturned the

7   district court's exclusion of the testifying witness' prior

8   convictions.  That was *Cummings versus Malone*, Eighth Circuit

9   in 1993.

10         THE COURT:  Slow down a little bit.

11         MR. STEVENS:  I'm sorry.

12         THE COURT:  The court reporter can't do that.

13         MR. STEVENS:  Yeah.  I'm sorry, Judge.  *Cummings*

14  *versus Malone*, Eighth Circuit in 1993.  The Eighth Circuit

15  reversed a district court's exclusion of a testifying witness'

16  prior convictions.  As I indicated in my brief, the court

17  reasoned that because the parties had testified to

18  contradictory versions of the facts, the jury should have

19  heard that the witness had prior felony convictions.

20  Specifically -- and I quote -- the court stated, "The jury

21  should have heard Cummings' specific convictions because most

22  jurors probably do not understand the range of offenses

23  connoted by the term 'felony'.  They need to know the specific

24  crime in order to evaluate its effect on credibility."  And so

25  the Eighth Circuit concluded that the jury should have heard

1  the specific felonies, and that's *Cummings*, 1993.  I haven't

2  come across any other reported cases where a district court

3  has excluded a defendant's prior convictions for impeachment

4  under 609 and that that's been affirmed.  Now, obviously, it

5  is in the Court's discretion and the Court has to make this

6  determination, but I think what's clear, because those cases

7  really aren't out there and based on the Eighth Circuit's

8  prior rulings, that in cases like this where the defendant

9  testifies to something contrary to the Government's case, then

10  the Government should be entitled to impeach him with his

11  prior convictions, at least the ones within the 10-year limit,

12  and that's simply because the probative value is so high,

13  Judge, when the Defendant's credibility is directly at issue.

14          THE COURT:  Go ahead.

15          MR. LYNCH:  Your Honor, I don't -- I think that the

16  Government articulated properly the overall theory in 609, but

17  to say that because the Eighth Circuit hasn't ruled the other

18  way or the Government hasn't found a case doesn't necessarily

19  mean in this specific instance the Court could find that the

20  prejudicial effect outweighs the probative value.

21          I also don't think the Government provided you with a

22  sufficient response as to what the probative value in this

23  particular instance would be.  I think that the Government

24  conflated the two issues of my client's right to testify, and

25  that automatically conjures up issues of dishonesty or

24

1    truthfulness or credibility?  I don't think that's how the

2    system was created, and I think that's why -- if you look at

3    the legislative history, which I did provide to the Court in

4    writing, that's why the 403 analysis was incorporated in the

5    rule.  So to state that every time a client chooses or

6    exercises his right to testify automatically will invoke an

7    unfettered right to impeach him with everything he's done in

8    his past, I think, operates in derogation of the other rules.

9    If the Defendant gets to impeach a witness, there are rules

10   and limitations on what I can do to the Government's

11   witnesses, and I think it should apply equally in this case,

12   and I think just purely on a 403 analysis, this Court could

13   find that it's more prejudicial than probative.  I still have

14   not heard a specific fact or a factual basis to conclude that

15   the probative value of saying he beat up his ex-girlfriend now

16   shows that he's going to lie to the jury.  If anything, I

17   think you could argue the other way.

18           THE COURT:  Yeah, I think this is pretty close.  I

19   really do.  I'm -- I'm -- I'm unsure on this.  I'm going to

20   look at this and think about it, and I'll let you know before

21   we start the jury selection later today.  I believe it is

22   really close, and it's a -- because it is such a -- well, I'm

23   just -- I'm just worried that the jury would be believing

24   that, you know, he's obviously a bad guy and this would be a

25   propensity type of thing instead of -- what kind of limiting

25

1   instructions do we give for this kind of evidence?

2          MR. STEVENS:  Well, if that's the sole purpose for

3   which it comes in, Judge, the impeachment of the Defendant,

4   then under Rule 609, we would -- we would -- in fact, we

5   submitted, I believe, that instruction --

6          THE COURT:  Yeah.

7          MR. STEVENS:  -- and that would be that the jury can

8   consider it only for determining his credibility and for no

9   other purpose, and it also, I believe, reminds the jury that

10  he's on trial for only the crimes charged.

11         I would also point out, Judge, that, you know, for

12  all the talk of him beating up his girlfriend and everything

13  else, obviously, I can't get into that to impeach him with it.

14  What I can get into is simply the name of the offense and what

15  the sentence was.

16         THE COURT:  Yeah, that's right actually.  That's --

17  that's what -- that's all you can do.

18         MR. STEVENS:  Yeah, and that's all I would -- of

19  course, that's all I would intend to do.

20         THE COURT:  Right.  Well, I'm going to think on this

21  one because I do think -- and it's the nature of the -- of the

22  crime of domestic assault that gives me the pause and, I

23  think, leads to the prejudice because there are a lot of

24  people who do have a very knee-jerk reaction to domestic

25  assault.  You know, I'm trying to think of other crimes for

26

1   which people would have knee-jerk reactions, and I -- you

2   know, obviously, the problem is the other crimes for which the

3   knee-jerk reactions come out are all much more serious violent

4   crimes.  This is a violent crime, but -- yeah, maybe that's

5   the problem.  Maybe I'm thinking of it as less serious.  I

6   will think about this, and so we'll see where we go on that.

7           Okay.  So penalty information.  Do you have any

8   intention of introducing evidence of penalty information?  The

9   Government filed a motion in limine to preclude you from doing

10  so.

11          MR. LYNCH:  No, not specifically with respect to the

12  Government's witnesses; however, Judge, as the Government

13  would probably concede, there are a lot of recordings in issue

14  in this case, Judge, and I would say several of the recordings

15  involved discussions -- some are incorrect because we've all

16  listened to them -- with respect to the potential punishment

17  for being in possession of a firearm.

18          THE COURT:  Explain to me about the recordings.

19          MR. LYNCH:  Well, there are recordings that I

20  anticipate the Government will introduce from an undercover

21  ATF vehicle wherein all three of the Defendants were placed --

22  my client, Mr. Warren, and Michael Twitty.  During the course

23  of, I think it's a 33-minute conversation, Mr. Warren

24  specifically is talking about what he perceives to be the

25  federal Guidelines and the statutes for being in possession of

1   a gun, whether or not these charges run concurrently or not,

2   what he thinks the time would be for possessing a gun versus

3   the drug counts, and I think all of that is fair game because

4   (a) he's not a lawyer and that's not exactly what it is -- I

5   think he's wrong in a lot of respects -- and (b) I'm not

6   eliciting that from a professional witness, such as a law

7   enforcement witness, and the jury's not going to hear that it

8   applies specifically to my client.

9           MR. STEVENS:  Well, Judge, I'm not going to play any

10  clips of any conversations that deal with the amount of time

11  that these Defendants might be looking at, whether they're

12  correct or incorrect.  I just -- I'm not going to do that.

13          THE COURT:  You're not going to play the clips that

14  involve those conversations in the car?

15          MR. STEVENS:  No, no, correct.

16          MR. LYNCH:  Well, Your Honor, that may be an issue

17  then because if we -- that might totally deflate the

18  Defendant's ability -- Mr. Washington's ability to defend

19  against the charges of possession of a firearm under Counts IV

20  and V.  If the Government is allowed to just play clips of

21  that particular conversation I reference, it's going to

22  totally place the entirety of that conversation out of

23  context.  I think it has to be played in its entirety or

24  substantially in its entirety for the jury to comprehend

25  exactly what's going on.

1          MR. STEVENS:  Judge --

2          MR. LYNCH:  I think there's a -- sorry.

3          MR. STEVENS:  Go ahead.

4          MR. LYNCH:  There's going to be a Rule 106 -- a rule

5     of completeness issue if we allow that to happen, Judge, and

6     I'm not saying that -- I think the conversation doesn't start

7     until about seven minutes and 20 seconds into it, and then it

8     ends about four minutes before the tape ends.  So you're only

9     talking about 20 minutes, but I think for contextual reasons,

10    Judge, we have to allow the entirety of that conversation if

11    it's admitted into evidence by the Government to be played

12    before the jury.

13         THE COURT:  Okay.  So, Mr. Stevens, what do you

14    intend to do with those recordings?

15         MR. STEVENS:  Well, Judge, with that particular

16    recording, I think it's unlikely we'll play any of it, but,

17    certainly, I agree with Mr. Lynch that if we do play any

18    portion of it, the rule of completeness would allow them to

19    play other relevant portions.  I think he'd be entitled to do

20    that.  At this point, I doubt that we'll play any of that.  It

21    kind of depends on how things play out here in court.  If we

22    do, then I think certainly other portions of that particular

23    conversation are admissible, assuming they're relevant.  Now,

24    I guess, you know, maybe we can just see if we get there --

25         THE COURT:  Yeah.

1    MR. STEVENS:  -- but -- but I would point out,

2 obviously, at this point, that if we played certain

3 conversations, I'm not -- well, we can see how it all plays

4 out.

5    THE COURT:  Right.  I understand what you're saying.

6    MR. STEVENS:  Yeah.

7    THE COURT:  Okay.  Well, Mr. Jimerson, do you want to

8 step up to the lectern?  You had a similar motion, or the

9 Government's motion was also directed to you.  Do you wish to

10 say anything to this issue of the penalty information, what

11 you intend to introduce or do?

12    MR. JIMERSON:  Your Honor, I believe Mr. Lynch pretty

13 much gave what I think my argument would be on this matter.

14 In response to -- we don't intend to introduce anything

15 regarding penalty or anything of that nature, so -- but I

16 would join Mr. Lynch in his argument regarding the -- what to

17 preclude, Your Honor.

18    THE COURT:  Okay.  Well, I'm going to -- I'm going to

19 grant the Government's motions on penalty, so this is motions

20 16 -- it's motion -- 163 is granted, and the -- I don't

21 believe that it's appropriate to introduce the penalty

22 information.  It's not something for the jury, and so I'm

23 telling everybody they cannot do that.  I will reconsider that

24 if the Government does something that makes it relevant in

25 some way to the jury determination.

1          So then let's talk about while you're there,

2     Mr. Jimerson, there's other -- okay -- your other motions that

3     you have filed, and -- and in particular, let me just take

4     them in order.  The first one was about you sought to

5     preclude -- this is #168.  You sought to preclude the

6     Government from introducing evidence related to, I guess, the

7     success of prior sting operations, and the United States says

8     in response that their witness, when he testifies, will say,

9     "Oh, yeah, I've done this lots of places, and here's what I've

10     done," but that he's not going to say that they were

11     successful or that people pleaded guilty or anything like

12     that.  So I'll hear any arguments you wish to make on that.

13          MR. JIMERSON:  Sure.  Thank you, Your Honor.  I

14     appreciate Mr. Stevens saying what his witness won't do in

15     terms of limiting his witness, but I believe the idea that

16     they're talking at all about prior sting operations, Judge, is

17     unduly prejudicial.  Particularly, what's happened in another

18     matter is not necessarily relevant or pertinent or probative

19     to anything that would happen in this case.  The issue, I

20     believe, is -- is -- is if his witness is going to testify

21     that -- that he had conversations or did such and such, I

22     think it's limited to just what we have here.  To say that in

23     Florida -- and I think that was my concern.  Over the nation,

24     they're beginning to use these models in terms of these

25     stings, you know, just going around particularly, and I

1    believe that that's my concern is that they're beginning to

2    use something here in this district now, you know, that I

3    think is not necessarily -- it's affected my client, but I

4    think it's going to affect other clients to say that this is

5    what we can do regarding a sting operation, you know, we can

6    create fictitious amounts of dope, fictitious amounts of

7    money, fictitious cartels.  Judge, I believe that that is

8    unduly prejudicial to say that this is what we can do.  I

9    believe just limiting the officer to saying that "I've had

10   prior experience in these type of operations" -- I still think

11   that's unduly prejudicial to Mr. Warren and --

12            THE COURT:  Let me -- let me ask you this.  You also

13   had a motion that's somewhat related to this, which is about

14   the amount of drugs.

15            MR. JIMERSON:  Right.

16            THE COURT:  And it's -- it's an interesting argument

17   because, I mean, the Government has -- that's an element of

18   one of their charges, and so what you're saying is that -- at

19   least I thought it was -- is the conspiracy -- oh, it's not.

20   The -- there's not a quantity charged?

21            MR. STEVENS:  There is, Judge.  It's charged --

22            THE COURT:  Which count?

23            MR. STEVENS:  It's Count III.

24            THE COURT:  Yeah, okay.

25            MR. STEVENS:  It's charged as in excess of five

1    kilograms of cocaine.

2           THE COURT:  Right.  And I knew it was there.  I just

3    wasn't finding it.  So Count III.

4           MR. JIMERSON:  And I said 50 in the motion, Judge.

5    That's an error, but --

6           THE COURT:  Right, but still, I mean, that's an

7    element of their case, and so what's your argument for -- that

8    they can't -- should not be able to do that?

9           MR. JIMERSON:  Sure, you know, and, Judge, I believe

10   the issue is -- as we said before, I don't believe the

11   government can create, you know, sufficient quantities of

12   things that they can punish the defendant with, and here, we

13   don't -- this is a fake stash house.  This is a fake amount of

14   drugs.  There's no drugs.  There's no cash ever exchanged

15   between the Government witnesses and -- and my client.

16   There's nothing of that nature that's done.  Of course, we're

17   going to argue that his participation was minor, if anything,

18   but, Judge, I believe if we get to talking to the jury

19   about -- about -- about anything ranging from five kilos to 23

20   kilos -- I think I've heard that number in the tapes or 25

21   kilos -- I think, basically, that is, again, unduly

22   prejudicial, and particularly, when it comes to -- I believe

23   you're looking at it from a sentencing standpoint.  I think it

24   creates a severe punishment to the Defendant when really

25   there's nothing really that ever happened there.  So to start

1    creating these types of crimes, to say that it's five to 15 --

2    we have nothing definite -- it's five to 23 or it's even less

3    than that, Judge, I believe that -- how can you punish when

4    it's not factual?  And that's my concern here is that

5    something has been created, it's not factual, we now have to

6    defend against something that's not factual, and I believe

7    that's unduly -- again, it's unduly prejudicial and really not

8    probative to anything in terms of this case.

9            THE COURT:  Okay.  Well, and that -- that argument is

10   an argument -- it's sort of an overarching argument.  I

11   understand it --

12           MR. JIMERSON:  Yes, ma'am.

13           THE COURT:  -- but I don't think it goes directly to

14   this.  I think it's clear that the Government can introduce

15   evidence of the quantity, whatever evidence it thinks it has,

16   and then that can be challenged, but, Mr. Stevens -- so on the

17   motion regarding the quantity of drugs, the amount of drugs,

18   which is #169, that motion is denied.

19           Mr. Stevens, though, tell me what it is your client

20   is going to -- I mean your witness is going to say about --

21   about these prior operations.

22           MR. STEVENS:  It would be entirely generic, Judge.

23   He wouldn't be referring to any specific case.

24           THE COURT:  So what's he going to say?

25           MR. STEVENS:  He would say that he's been doing these

1   for about 20 years and that what -- that it --

2           THE COURT:  Doing these what?

3           MR. STEVENS:  These sorts of home invasion robbery

4   investigations where he's -- he -- for the last 20 years or

5   so, he's done essentially nothing but undercover

6   investigations.  We'll go through his experience and training

7   regarding those and that at this time his primary

8   undercover -- primarily, his undercover operations are home

9   invasion robbery type investigations, and he'll go through

10  that what they typically do is if they meet somebody who they

11  think may be involved in criminal activity, the investigation

12  proceeds from there where they'll have several meetings to

13  determine whether or not they're interested in doing this kind

14  of home invasion robbery.  He'll talk about the different

15  tactics that they use in connection with these kinds of

16  investigations.  That is multiple meetings.

17          THE COURT:  So why do we care what they normally do

18  and not what they did in this case?

19          MR. STEVENS:  Well, I think it goes to his

20  experience, obviously.  If they're going to attack this tactic

21  that law enforcement uses, I think it's worthwhile for us to

22  show that he's experience with this tactic, that it has

23  evolved over time, and that in this particular case, he's --

24  he's doing this undercover investigation with 20 years of

25  experience in these sorts of investigations, and I think it's

1    going to be important for him to be able to explain why they

2    do what they do.  Obviously, at least part of the defense is

3    going to be to attack this kind of an investigation, and so I

4    think it's -- it's necessary for him to be able to talk about

5    his experience with these sorts of investigations.  I mean

6    he's not going to get anywhere near the rate of success.  He's

7    not going to get anywhere near court outcomes, anything like

8    that.  It's simply, "This is the way we approach these

9    investigations, and I've been doing these for 20 years."

10          And it's also an introduction, Judge, to what we

11   intend to play.  I mean we'll play videos of each of these

12   meetings.  I mean he'll -- he'll say, "The way we conduct

13   these investigations is we have multiple meetings.  We'll have

14   four separate meetings with potential defendants."

15          And then --

16          THE COURT:  Why can't -- why can't he just say what

17   he did in this case?

18          MR. STEVENS:  Well, he -- he --

19          THE COURT:  Why does -- why does he need to say what

20   he usually does?  Why not just say what he did in this case?

21          MR. STEVENS:  Well, I think he'll say, "This is the

22   undercover tactic that we used in this particular case, and

23   this is my experience with it."

24          THE COURT:  But why is his experience relevant if --

25   if -- I mean I know what he did.  I'm just trying to figure

1    out why he gets to go into, "I've been doing this for 20

2    years," because the jury is going to say, well, if he's been

3    doing it for 20 years, you know, everybody does the same

4    thing, they must all be guilty.  Why can't he just say what he

5    did in this case?

6            MR. STEVENS:  Well, I think, Judge, because his

7    experience -- it's for exactly that reason because it's

8    important for them to understand his experience with it.  They

9    are going to attack the -- the tactics that they used in this

10   particular case, and I think it's worthwhile for him to be

11   able to explain, "These are the reasons we do the things we

12   do, and these are the tactics that we use."

13           May I have a moment, Judge?

14           THE COURT:  Yeah.

15           MR. STEVENS:  To take it a step further, Judge,

16   Mr. Jimerson also submitted a proposed instruction on

17   entrapment, and I would expect that, you know, whether --

18   whether they actually in fact at some point request that

19   instruction or not, I think they're going to be arguing,

20   essentially, an entrapment defense, and that is that these

21   agents induced these Defendants to do this, and I think it's

22   important for him to be able to talk about his experience,

23   that he has enough experience to know at what point -- you

24   know, to read people and that kind of thing to not induce

25   people improperly, and I think he's not going to testify to

1    that, that "I have the experience to not induce people," but

2    what he would testify to is that "This is the operation that

3    we used in this particular -- this is the operation we use,

4    and we used it in this particular case," and I think it

5    explains to the jury before they see exactly what was done

6    here what this tactic is and why it's done the way that it is.

7    It's -- it's nowhere -- as far as Mr. Jimerson's motions with

8    the outcomes of these kinds of things, I'm not going to ask

9    him to testify and he won't testify to anything close to the

10   outcomes of these kinds of cases.

11              THE COURT:  He won't need to --

12              MR. STEVENS:  Well --

13              THE COURT:  -- because the jury will understand if

14   you're doing something and you keep doing it for 20 years and

15   you tell the jury, "This is how I do it, and I always do it

16   this way, I've been doing it for 20 years," the jury is going

17   to know that the only reason he does that is because it works,

18   and the only way it works is if people are actually arrested

19   and convicted of this.

20              MR. STEVENS:  Not necessarily, Judge.  I mean, in

21   talking to this agent, there are plenty of instances also

22   where defendants simply walk away and aren't involved.  I mean

23   so it doesn't always --

24              THE COURT:  Is that also part of what you intend to

25   introduce?

1      MR. STEVENS:  No, no, but -- well, I can.  I mean

2  certainly I can ask him that, "At this particular point, you

3  know, have you had defendants in the past who have walked away

4  from this or who" -- but I don't intend to get into outcomes.

5      THE COURT:  Actually, that's part of what

6  Mr. Jimerson is trying to preclude, both sides of it, I think.

7      MR. STEVENS:  I suppose, but I point out, Judge, that

8  it wouldn't be any different from having an undercover agent

9  who's done undercover buys for 20 years, testifying to "Here's

10 how we do an undercover buy.  You know, we wire up the car,

11 and we wire me up, and if there are informants involved, we

12 search them and make sure that there's not anything on them,

13 and then this is how we do these kinds of undercover buys, and

14 that's what we did in this case."  It's clear to me that

15 there's going to be an attack on this type of investigation

16 and this tactic, and I'm not -- as I said, Judge, I'm not

17 interested in getting into outcomes.  I don't think that's

18 fair, but I think it's worthwhile to get into the fact that he

19 has experience with this type of investigation.  I think

20 that's important.

21     MR. JIMERSON:  Thank you, Your Honor.  Your Honor, I

22 think you said it, particularly, much better than I could.

23 Twenty years of doing something does not mean that you

24 continue to do something that fails.  It's going to be

25 inferred that 20 years of doing something means that you're

1    successful at it or there's some reason why you're doing it

2    this way.  If not, you're going to get kicked off the force

3    for continuing to be failing for 20 years.  It doesn't make

4    sense.  So to say -- if he's allowed to say that alone, I

5    believe, gives some -- really some more weight to his

6    testimony than necessary, or also, it broadens the burden that

7    we have here with my client, particularly, to prove his

8    innocence, even though we shouldn't have to do that, but I

9    think it shifts the burden to him about now how he was not

10   doing it.  I think that's really dangerous for him to go into.

11          We will say, Judge, if the witness wants to say, "I

12   have some experience in this," that's limiting.  I may be

13   compromising, but I think that could be limiting sufficiently

14   enough, but to say that he's had 20 years or more doing these

15   raids or whatever, I think, is just really -- it's going to be

16   so overreaching and unfair to Mr. Warren as well as anybody

17   else in this matter.

18          MR. STEVENS:  Judge, if I may, I mean I don't see how

19   it's any different from, based on Mr. Jimerson's argument, a

20   homicide detective testifying he's been a homicide detective

21   for 20 years.  I mean that doesn't mean his investigations

22   always worked out well or that he was always successful,

23   but --

24          THE COURT:  Yeah, but this is a different sort of an

25   operation.  In a homicide investigation, you usually have a

1  real dead person, and in this kind of investigation, you don't

2  really have any, you know, Mexicans and, you know, armed

3  Mexicans with 32 or 23 or however many kilograms of cocaine in

4  a house.

5          MR. STEVENS:  But that's exactly my point, Judge, is

6  I think a large part of their defense is going to be to attack

7  this particular tactic and --

8          THE COURT:  Yeah.

9          MR. STEVENS:  -- I think in most cases a detective or

10 an agent can testify to their experience and the type of

11 operations they do and, particularly, in a case where they're

12 going to attack that.

13         THE COURT:  Yeah, he can clearly testify that he's

14 worked undercover and that, you know, it involves drug and

15 firearm investigations or whatever.  I -- I'm going to

16 withhold ruling on this one as well until I get back this

17 afternoon.  I'll tell you before we start selecting the jury

18 what my ruling is on this.  I am -- you know, this is an

19 unusual situation.  I know there are many other cases where

20 there are, you know, conspiracies that -- that don't actually

21 involve something that's achievable, but I don't know.  This

22 type of case is interesting, and so how far he can go is -- is

23 a problem, and I am concerned that he may say things that will

24 improperly and unfairly imply to the jury that this is a

25 technique that has been successful all these years.

3/3/2014 Pretrial Conference

41

1        Now, on the other hand, I need to know what the

2    Defendants are going to do with regard to this entrapment

3    issue, and so I guess I'd like to hear -- well, no, let me

4    come back to that now because that's a little harder.  Let me

5    deal with the 404(b) evidence.  The Government has filed a

6    motion to admit 404(b) evidence and, I assume, 609, although

7    I'm -- on Mr. Warren.  I don't know if -- if you were going to

8    admit -- seek to admit these under -- well, they'd already be

9    in if they came in under 404(b), and as I understand -- this

10   is motion #173 -- the Government's motion -- and this was just

11   filed on Friday, but it is for Mr. Warren's prior convictions,

12   two counts of possession of a controlled substance in '07,

13   felon in possession of a firearm in '07, drug trafficking,

14   second, and possession in '01, and possession of a controlled

15   substance in 1999, and the other convictions that he has, the

16   Government was not intending to introduce under 404(b).

17        So, Mr. Jimerson, let me just hear any response you

18   have to this request to introduce these other -- these

19   convictions for other acts of drug possession and -- drug and

20   firearm cases.

21        MR. JIMERSON:  Thank you, Your Honor.  First, I'd

22   like to just point out to the Court that my client, other than

23   these charges here, has no prior adult record for violence,

24   okay, and I believe, particularly, the referenced reason the

25   Government wants to use these types of --

3/3/2014 Pretrial Conference

42

1          THE COURT:  Well, these are not juvenile

2    adjudications.  These are adult convictions.

3          MR. JIMERSON:  That's what I'm saying.  There is one

4    juvenile matter that was referred to when he lived in

5    Arkansas, but I heard from Mr. Stevens he's not going to try

6    to introduce that.

7          THE COURT:  Yeah, possession of a firearm by a minor.

8    That's in the footnote.  Okay.  Go ahead.

9          MR. JIMERSON:  Yes, ma'am.  So other than -- other

10   than the convictions listed, there's nothing to indicate

11   violence on the part of my client toward, you know,

12   particularly, like robbery or any assault or anything of that

13   nature that applies to this case.  So to try to use this as

14   some type of plan or some type of mindset by Mr. -- by

15   Mr. Warren is really, again, far-reaching and, I believe, is

16   not applicable to his -- the alleged things that the

17   Government is saying here.  I think if -- however, if

18   Mr. Warren takes the stand, we understand that certain things

19   can come in.  Again, I join the argument as before.  One of

20   the convictions listed, Judge, is more than 10 years old,

21   particularly, the one listed in the drug trafficking, second

22   degree, possession of a controlled substance, 2001.  Again,

23   that is more than -- that is more than 10 years old and, we

24   believe, not -- at this point, unduly prejudicial and not

25   relevant to anything, but -- but in terms of him saying that

1   this is a part of his makeup, Mr. Warren's makeup, his plan or

2   his character to get out and do something because he's a

3   violent person of that nature, in association with this type

4   of case, we don't believe that these cases necessarily

5   indicate that, and one particular thing that I -- and I

6   mentioned it in the other motion -- was that to say -- and

7   it's more for sentencing, but to say that he's involved with

8   this type of drug matters and -- and -- he doesn't have the

9   propensity to carry out that.  I mean it's not been shown, but

10  in this case, Judge, particularly, these -- these charges are

11  not the same as the charges that the Government is alleging

12  here, and I believe just to try to connect them, make that,

13  it's unfair to Mr. Warren.

14          THE COURT:  Okay.  Well, I'm going to overrule your

15  objections, and I will grant the Government's motion, #173, to

16  introduce these four prior convictions that are listed in the

17  motion.  These are things that the Eighth Circuit has clearly

18  held do go to things other than propensity.  They are not so

19  remote in time that they should not be used, and there -- I

20  don't believe that -- you know, there's no unfair prejudice

21  from introducing these things because this -- as he's charged

22  with a crime of, you know, conspiracy to possess controlled

23  substances and also firearm offenses, and so I believe these

24  are all, you know, admissible under 404(b), so I will grant

25  the Government's motion in that regard.

3/3/2014 Pretrial Conference

44

1    MR. JIMERSON:  Yes, ma'am.

2    THE COURT:  Now, I need to ask you all about

3 entrapment, and I guess, Mr. Jimerson and Mr. Lynch, both,

4 tell me what, if anything, your intentions are about

5 entrapment, or if I -- if -- if you don't have to tell me now,

6 you can say, "I don't have to tell you now," but I need to

7 know if we're going to be arguing about entrapment.

8    MR. JIMERSON:  Judge, I have no doubt that I will be

9 arguing about entrapment.

10    THE COURT:  Yeah.

11    MR. JIMERSON:  I can't speak for Mr. Lynch, but I

12 would.  My client definitely believes that but for the

13 improper conduct of government through its agents definitely

14 entrapped him into doing something.  In fact, he would also

15 want me to say that -- that he had voiced his intention not to

16 participate in such an endeavor, and as a result, we have no

17 choice but to try to prove that to the Court.

18    THE COURT:  Okay.  And Mr. Lynch.

19    MR. LYNCH:  Your Honor, I don't believe I'm going to

20 be submitting an entrapment defense.

21    THE COURT:  Okay.  Now, let me ask you about this

22 joint trial.  Hold on.  And, Mr. Stevens, are there any

23 statements that you are introducing against one Defendant that

24 should not be introduced against the other?  Do you have any

25 *Bruton* problems in this case?

1          MR. STEVENS:  No, Judge, no.

2          THE COURT:  Tell me -- before we talk about the joint

3    trial, tell me about the recorded evidence; what is it that

4    you're going to be playing and showing?

5          MR. STEVENS:  Yes, Judge.  We'll be showing there

6    were -- initially, May 21st of 2013, Robert Washington sold

7    about an ounce of cocaine to two ATF confidential informants.

8    We'll play portions of -- that's all video- and audio-recorded

9    in a --

10          THE COURT:  Okay.

11          MR. STEVENS:  It happened in a car, and we'll play

12    portions of that particular deal, three or four clips

13    regarding that.

14          May 23rd of 2013, there's another sale of cocaine by

15    Robert Washington, this time to the undercover agent, Richie

16    Zayas.  We'll play several clips of that particular deal and

17    conversations that occurred then.

18          May 29 of 2013, Robert Washington meets with Agent

19    Zayas again.  They discuss this potential home invasion

20    robbery.  We'll play clips of that particular meeting, the

21    conversation between the two of them.

22          THE COURT:  Video and audio both?

23          MR. STEVENS:  Yes.  All of it is video and audio.

24          THE COURT:  Okay.

25          MR. STEVENS:  And then on June 3rd of 2013, Robert

1   Washington brings along Daryl Warren and Michael Twitty, the

2   other Defendant who's already pled guilty, to meet with Agent

3   Zayas.  They again discuss the home invasion robbery.  That's

4   video and audio as well.

5        The next day, June 4 of 2013, they meet again, a

6   brief meeting between Mr. Warren, Mr. Washington, and Agent

7   Zayas.  Mr. Twitty was not there, and they have a discussion

8   about the pending -- the impending home invasion robbery the

9   next day, set for June 5th of 2013.

10       Then on June 5, Mr. Washington, Mr. Warren, and

11   Mr. Twitty again meet with Agent Zayas on a car wash lot.

12   They discuss the home invasion robbery further and then follow

13   him to the prearranged arrest location.  There's video from

14   the car wash lot, and then they follow him to another location

15   on June 5th where there's more discussion, and then shortly

16   after that, the Special Response Team, the SWAT team moves in

17   and arrests everyone there.

18       THE COURT:  And the whole thing is video and audioed,

19   including the arrest?

20       MR. STEVENS:  Yes.

21       THE COURT:  Okay.  And have you provided the --

22   whatever transcripts or any other things you're going to use

23   to the defense counsel?

24       MR. STEVENS:  Yes, Judge.  All of that video was

25   provided, of course, months ago, and then last week, we

1  provided the transcripts of exactly what it is we're going to

2  play.

3          THE COURT:  So the exact clips have been provided?

4          MR. STEVENS:  Yes.

5          THE COURT:  Okay.  So any issues with regard to this

6  that we need to discuss before the -- before we start?  I mean

7  I -- yeah.

8          MR. LYNCH:  Judge, I did want to bring up a couple of

9  issues that relate to the recordings.  First, with respect to

10  the Government's transcripts, those exhibits they intend to

11  introduce, if the defense counsel chooses to question or

12  cross-examine on remaining portions of those transcripts, I

13  would ask, just because I'm appointed counsel and I know the

14  Government has their tech wizard, that the Government be

15  required to play what we ask, just so I don't have to try to

16  set up our stuff.

17          THE COURT:  Other pieces of the clips?

18          MR. LYNCH:  Yeah, if the Court --

19          THE COURT:  Have you all discussed this with each

20  other --

21          MR. LYNCH:  Kind of.

22          THE COURT:  -- because I don't know if they're

23  prepared to do that?

24          MR. STEVENS:  I'm not, Judge.  I mean, we have the

25  entire disc.  I can play -- I can try to play whatever he

48

1    wants, but I don't have any specific clips that I'm aware he

2    would want.

3              MR. LYNCH:  I can provide them to the Government,

4    too.  These are some things that I just uncovered, that I

5    would like played in detail, last night.

6              THE COURT:  Okay.

7              MR. LYNCH:  So --

8              THE COURT:  If you can -- if you can -- if you can

9    tell him how to find those on there, on the discs --

10             MR. LYNCH:  Yeah, I have them written down exactly

11   what they are, and I'll give you an example.  There's a

12   June 5th conversation.  I think there are several.  On one of

13   the June 5th conversations, there's a video of the undercover

14   officer engaged in conversation with Mr. Washington, Warren,

15   and Twitty, and they're talking about who was going to enter

16   into the residence.  The Government's proposed clip stops, I

17   believe, at the 12-minute mark.  I would like the additional

18   two minutes played after that up to the 14-minute mark because

19   it adds further context to that conversation, and I can give

20   them exactly.  I also have my transcript that, you know, I

21   could also put on the ELMO, just to show what it is as a

22   guide.

23             THE COURT:  Okay.  So I'd like you to do that.

24             MR. LYNCH:  Yeah.

25             THE COURT:  Give them the clips you think you want to

1    use and the transcripts, and then I'll ask the Government to

2    find those.  I think it's appropriate since the Government's

3    introducing this evidence for the Government to have the

4    evidence available for cross-examination if it's other

5    portions.  It's just logistically I'm not exactly sure how to

6    do it, but I think the Government's technician should be

7    prepared to do that, but the defense are going to have to

8    say -- you know, I mean it sounds like you've got times and

9    things.  You can't --

10             MR. LYNCH:  Yes.

11             THE COURT:  It's not going to be just, "Oh, show me

12   that part where he talks about X," right?

13             MR. LYNCH:  Exactly, yes.

14             THE COURT:  Okay.  That sounds good.

15             Mr. Jimerson, anything with you about these, these --

16             MR. LYNCH:  Your Honor, I did have one other issue

17   before we get there.

18             THE COURT:  Okay.  Go ahead.

19             MR. LYNCH:  With respect to Mr. Washington's defense,

20   there are other recorded conversations that I'd like the Court

21   to consider, namely, jail calls from the St. Charles County

22   Department of Corrections.  At this point, I believe it's our

23   intent to try to introduce three of what I believe to be are

24   eight conversations from June 7th to June 8th of 2013, namely,

25   of Mr. Warren engaged in conversation with a brother, so I

1   would ask the Court just so --

2            THE COURT:  Okay.  So you want to enter -- so

3   Mr. Washington wants to introduce clips of Mr. Warren's

4   conversations?

5            MR. LYNCH:  Yes.

6            THE COURT:  And what do they say and why do you want

7   to introduce them?

8            MR. LYNCH:  Well, Mr. Warren repeatedly emphasizes

9   that he is responsible for the guns in issue, using specific

10  references to felon in possession of a firearm, possession of

11  a firearm in furtherance, so I think (a) they're admissible

12  and I think they're relevant, and if the Court asks, I can

13  give my reasons for that.

14           THE COURT:  And is the Government intending to

15  introduce any of these jail calls?

16           MR. STEVENS:  No, Your Honor.

17           THE COURT:  Okay.  So, Mr. Jimerson.

18           MR. JIMERSON:  Thank you, Your Honor.  There is one

19  issue that I think in addition that we would want played.

20  Mr. Washington -- Mr. Warren has indicated that, particularly,

21  there is a disc, basically, where there's a third meeting at a

22  car wash, as you spoke about earlier, that talks about he

23  indicates that he's not going, he's not participating, and --

24  and if that's played, we want the complete portion of that

25  played.

1        MR. STEVENS:  Yeah, if you just give me the minutes.

2        THE COURT:  Yeah, give the count to the Government,

3  and then you can do that in your -- I guess in the

4  cross-examination; is that how we do it?  They have to then

5  say, "Oh, I want to play this part," or can you just agree to

6  play it all in yours?

7        MR. STEVENS:  Well, no, I think on cross-examination

8  they could do that, Judge, and we could arrange to -- but this

9  agent is -- I mean, he's going to be our first witness, so I

10  would just ask that they get those to us as soon as possible,

11  and then if they want to cross-examine him on other portions

12  of that same conversation, they're certainly entitled to do

13  that.

14        MR. JIMERSON:  And here's my problem with it, Judge.

15  When I -- I'm second counsel on this when I came in, and I'm

16  just discovering -- not by, you know, Mr. Stevens, but I'm

17  just discovering that that portion that we're talking about is

18  missing.  You know, in fact, Mr. Warren has indicated to me

19  that there's a disc out there with that information on it from

20  the third meeting, you know, that I don't have.  I'm not

21  saying it was not --

22        THE COURT:  Okay.  Well, you all are going to have a

23  couple hours to discuss this.  You need to discuss this.

24        MR. JIMERSON:  You know, if it's there --

25        MR. STEVENS:  No, I know the meeting you're talking

52

1    about.

2            THE COURT:  Okay.  Hold on.  Not right now.  I've

3    got -- but among yourselves, and then you can tell me if you

4    can reach agreement --

5            MR. JIMERSON:  Yes, ma'am.

6            THE COURT:  -- when I come back.  I don't need to

7    hear about it now.

8            MR. JIMERSON:  Yes, ma'am.

9            THE COURT:  So, Mr. Jimerson, do you have any

10   objection to Mr. Lynch wanting to introduce these clips of the

11   jail conversations?

12           MR. JIMERSON:  Not at all.

13           THE COURT:  Okay.  Okay.

14           MR. STEVENS:  May I address that, Judge?

15           MR. JIMERSON:  May I come back to that, Judge, before

16   you address it?

17           MR. STEVENS:  Yeah.

18           MR. JIMERSON:  Okay.  I just stated something, Judge,

19   I want to withdraw from.  I do have objection to it because --

20           THE COURT:  Yeah.  He says it's your client saying

21   he's responsible for the guns and all that stuff.

22           MR. JIMERSON:  Exactly, and so I -- based on that, I

23   think those are hearsay at best in terms of what's going on,

24   so I do object to him introducing that regarding implicating

25   my client with possession of guns.

53

1          THE COURT:  Mr. Lynch, why aren't they hearsay?

2          MR. LYNCH:  Your Honor, first, I think that it's not

3    the traditional method of introducing these.  It's not the

4    Government introducing.  I think (a) they're not hearsay

5    because their reliability is not an issue.  I think it's an

6    admission in one -- I think there are several ways it could be

7    introduced.  I think it's a pure admission of guilt by a party

8    who is at the core of the charges in issue.  I think also it

9    can be introduced as a statement against interest.  If

10   Mr. Warren is present at trial and he doesn't testify, then

11   he's unavailable, and then I can introduce those statements

12   because they go directly to the heart of the two charges in

13   issue, which would be the 924(c) charge and the 922(g) charge

14   as applied against my client.  I also -- so I think there's no

15   issue with respect to reliability.  I think they come in as a

16   business record.  I'm prepared to have the St. Charles County

17   custodian of records testify as to how those phone calls are

18   recorded, obtained, the same thing the Government would do

19   when it introduces it as far as reliability and foundation;

20   however, it's not a pure 801(d)(2)(E) conversation or

21   admission.

22          I would also point out that, Judge, there's nothing

23   to say that those comments are testimonial.  I think that's a

24   big issue in light of *Crawford*.  I think it's -- United States

25   or *Ohio versus Davis* is the Supreme Court case, and I'll give

1    the Court the case.  Just because those phone calls were made

2    and the Defendants, you'll find out, knew that they were being

3    recorded, there's nothing to indicate that they made those

4    statements knowing that they would be testimonial used against

5    them in court.  So there's nothing to say that this Court has

6    to find that they're testimonial in the first place that will

7    conjure up confrontation issues.  It's not what -- I don't

8    want to be pigeonholed into how the Government introduces

9    those conversations.

10          THE COURT:  No, and that -- it is different when

11   you're doing it, and the first big difference is that they

12   are -- you know, they don't fit the admission by a

13   party-opponent exception or definition of nonhearsay.  They

14   are hearsay because he's not an opponent to your client.  You

15   all are -- this is not being offered by the Government, so --

16   so although the Government might have the ability to introduce

17   those as an admission by Mr. Warren, I don't believe that a

18   Codefendant does, and I don't believe they're made in

19   furtherance of the conspiracy.  At least the problem with

20   that -- well, I'd have to make some findings, and the

21   Defendant's not going to make the findings -- the Government's

22   going to -- I mean make the evidence for the *Bell* findings, so

23   that's a bit of a problem, but let me just go back to your

24   hearsay exceptions.  I mean -- and I don't think the

25   confrontation clause is an issue because these were not --

1    well, it's just not an issue because it's -- he's here, so --

2    and it's not -- well, let me see.  They weren't elicited by

3    law enforcement, but I guess that's a different issue.  I

4    don't know.  I did not see this one coming, so I apologize.

5    And so do you think they fit an exception of the hearsay

6    because he's not available?

7            MR. LYNCH:  Well, I do, Judge.  I would also point to

8    the number of Eighth Circuit cases, *United States versus*

9    *Mahasin*, *362 F.3d 1071*.  I can give you a copy.

10           MR. STEVENS:  I have the case.

11           MR. LYNCH:  And then a Fourth Circuit case, Judge,

12   which just has the overarching principles when another

13   defendant wants to introduce these things.  It's *United States*

14   *versus Jones*, *716 F.3d 851*.  It's a 2013 case.  I would note,

15   Judge, that in the Eighth Circuit, when the Government

16   introduces these things, they're always introduced, and if

17   it's not under 801(d)(2)(E), it's to add context to the rest

18   of the conversations with the defendants or by and between the

19   defendants or by and between the suspects or targets and the

20   officers, so I'd say just to add context, they could be

21   introduced as well, but I think that it's -- I think it's

22   simply a statement against interest, and there's no case law

23   to suggest that I can't or Mr. Washington can't introduce

24   those where the declarant is considered unavailable.

25           THE COURT:  Okay.  I'll look at these cases over the

1   break, and I'll give you a ruling on this.

2          MR. LYNCH:  Can I point out one other case, Judge?

3          THE COURT:  Yeah.

4          MR. LYNCH:  The only other -- there's a caveat to

5   that, and there's an exception, *United States versus Gordon*,

6   which is also an Eighth Circuit case, and I think that's

7   interesting for this Court because it's distinguishable from

8   this case.  Nontestifying codefendants who make statements to

9   agents, those statements are not admissible.  That's not what

10  we have here.  We have a nontestifying defendant, I'm

11  assuming, that made statements at a -- during a recording at a

12  jail holding facility.

13         THE COURT:  Right.  He's making these statements to

14  somebody else.

15         MR. LYNCH:  Right, but what I'm saying is the case

16  law usually with respect to another defendant trying to

17  introduce a codefendant's statements almost always applies to

18  a nontestifying codefendant making statements to agents --

19         THE COURT:  Right.

20         MR. LYNCH:  -- and that's where the hearsay issues

21  become, you know, primary.  This is not the case in this one.

22         THE COURT:  What's the name on that Eighth Circuit

23  case you gave me, the 362 F.3d one?

24         MR. LYNCH:  That's *United States versus Mahasin*, and

25  that's M-A-H-A-S-I-N.

57

1          THE COURT:  Okay.

2          MR. STEVENS:  Can I be heard on that, Judge?

3          THE COURT:  Yeah.

4          MR. STEVENS:  *Mahasin*, by the way, regarding context,

5    that was a case in front of Judge Limbaugh Sr. in which the

6    Government played jail phone calls that had the defendant on

7    them.  There were also substantial statements made by the

8    person he was talking to, and what the defense objected to

9    there was the statements by the person he was talking to.  Of

10   course, Judge Limbaugh let in that conversation.  You can't --

11   you know, it doesn't make any sense to put the defendant's

12   statements in and not know what the other person is saying.

13         THE COURT:  Right, right.

14         MR. STEVENS:  That's what *Mahasin* stands for.  As far

15   as providing context with the meetings between the Defendants

16   and the agent, these calls happened two days after everyone's

17   arrested.  He's in jail, and he's talking to his brother on

18   the phone.  Mr. Lynch was good enough to provide me last week

19   with transcripts of calls on June 7th.  Today, he mentioned

20   calls on June 8th.  I don't know if he plans to play those or

21   not.  I do not have transcripts of them, but I would point

22   out, Judge, in these calls, you have -- and I understand he

23   wants to play the entirety of them.  You have -- again, these

24   are the same calls in which Mr. Warren goes on about what kind

25   of time he's looking at, and in some cases, he's incorrect

1    about that, at least initially. He's talking about all kinds

2    of other issues. Importantly, Mr. Lynch mentions that he

3    thinks that this is not hearsay because it's a statement

4    against interest. In large part, these statements are

5    actually exculpatory. What he's saying is "All I'm good for

6    is the felon in possession of a firearm, not any of the rest."

7    They're exculpatory statements, so they're not -- they're

8    not -- they shouldn't come in as --

9              THE COURT: So you oppose their being introduced?

10             MR. STEVENS: I do. I do. I would point out, Judge,

11   well, for that reason. Obviously, for that particular

12   exception, Judge, they need to establish, first, that he's

13   unavailable -- I think we can assume that -- and that the

14   statements are against the declarant's penal interests. In

15   context, they're simply not. He's saying, "Yeah, I'm good for

16   the felon in possession." He says this multiple times to his

17   brother. "I'm good for felon in possession of a firearm. I'm

18   not good for the rest of it." You know, it's either "They led

19   me down the road" or "I wasn't going to do it" or whatever,

20   but they're not -- they're not statements against penal

21   interest. The other thing is that in order for them to come

22   in for that purpose, you have to have corroborating

23   circumstances that clearly suggest the truthfulness of it.

24   What we have here is we -- and I'm not going to play them, but

25   we have taped statements of Mr. Warren and Mr. Washington to

1   the ATF agents, and in those statements, Mr. Washington claims

2   that one of the guns is his, and in Mr. Warren's statement, he

3   claims that the guns belong to the two other coconspirators,

4   so, clearly, we don't have circumstances that corroborate what

5   Mr. Warren is indicating on these calls.  In fact, the

6   circumstances are entirely contrary to what Mr. Warren is

7   saying on these calls, so I don't see how these can -- can

8   ever meet the exception for a statement against penal

9   interest.  It doesn't meet either of those criteria.

10          I would also point out, Judge, that this is a

11   conspiracy case.  So I mean maybe this goes more to why

12   Mr. Lynch wants to play it or whether there would be any

13   prejudice to Mr. Washington if they're not played, but the

14   simple fact of the matter is Mr. Warren admitting that he has

15   the guns in the course of this -- now, he's denying the

16   conspiracy, but him admitting that he has the guns -- if he

17   possessed them in connection with the conspiracy, that means

18   that Mr. -- Mr. Washington is responsible for anything that's

19   clearly foreseeable in the course of this conspiracy, so I

20   don't know that it even does him all that much good.

21          MR. JIMERSON:  Judge, I know you're trying to get out

22   of here.  If I may just add, basically, first, we don't have

23   reliability of that statement.  What guns are we talking

24   about?  He gives no description of that.  There's anything.

25   Plus we have an outside person who's not a party to this.  I

1    think a bigger issue for you as well, Judge, is if we're

2    getting these Defendants to fight each other and say, "You did

3    this" or whatever, I think you may have a question in terms of

4    whether we're going to jointly try this case as well because

5    if we get to that point where Mr. Washington will have to

6    testify and say, "I didn't say that" or some other person

7    saying, "I didn't say that," because he's -- Mr. Washington --

8    I mean Mr. Warren is being called that by Mr. Washington, I

9    think we open up a whole can of worms, Judge, I believe, that

10   may lead to severing this, severing this trial.

11            THE COURT:  Okay.  Mr. Lynch.

12            MR. LYNCH:  Your Honor, I think -- just as far as the

13   conspiracy goes, I think that there are a number of recorded

14   calls by the Government, namely, this ATF vehicle call,

15   recorded conversation on June 5th, 2013, and context becomes

16   hugely important.  Contrary to what the Government says,

17   there's more to it than Mr. Washington just saying, "The guns

18   are mine."  He did not.  He said, "The rifle was mine."  He

19   did so during the course of this recorded conversation after

20   he and Daryl Warren and Michael Twitty were engaged in

21   conversation for about 20 minutes where Daryl Warren tells

22   them what guns to take and then Mr. Washington asks him,

23   "Well, what was the gun?"  So I think context is hugely

24   important with respect to the facts and circumstances

25   underlying.

1          THE COURT:  Which conversation are you talking about?

2          MR. LYNCH:  This is now the June 5th, 2013,

3    conversation in the undercover ATF vehicle.

4          THE COURT:  Right.

5          MR. LYNCH:  And I think that provides context even

6    with respect to the conspiracy because it shows Mr. Warren

7    urging someone else to take the gun off of him because he's

8    worried about the sentence that goes along with that.  So it's

9    not that just Mr. Washington made a blatant admission that the

10   gun was his.  It's following a sequence of events, and I think

11   that you could even argue that that recorded conversation is

12   part and parcel of the conspiracy, not withstanding what the

13   Government's understanding of my defense is, and that the

14   subsequent phone calls from the jail are still in furtherance

15   of the conspiracy, and that is what *Mahasin* says because

16   Mahasin's attorney argued that, well, hey, he was in jail

17   after the fact, so how can that be in furtherance of the

18   conspiracy, and the Eighth Circuit said, no, you were talking

19   about the substance of the charges in issue, and that's why

20   it's still part of the conspiracy.

21          THE COURT:  Yeah, and I do -- I do recognize that

22   that's -- that that is the law.  So are you saying you want to

23   introduce the car's conversation?

24          MR. LYNCH:  Yes, and that's what I alluded to earlier

25   in our conversation today, and I think that, you know, the

62

1   Government -- the agents drafted reports of investigation

2   regarding these conversations.  It was a setup with respect to

3   putting them in the car.

4            THE COURT:  Okay.  So the penalty stuff, we get into

5   the car, but I understand now the Government is not going to

6   introduce the car statements, but, Mr. Stevens, do you have

7   any objection to Mr. Lynch introducing these?

8            MR. STEVENS:  Absolutely, Judge.  It's the same

9   issues.  I mean what he would be putting in if he put in the

10  June 5th conversation, postarrest conversations in the car, is

11  conversations between Washington, Warren, and Twitty.  I mean,

12  first of all, you know, he can't put in his own statements.

13  It's self-serving, obviously, and he can't put in his

14  Codefendant's statements.  I'm not going to play any of them,

15  and they don't meet any hearsay exception.  They're the same

16  issues.  What we would end up with here is he said -- you

17  know, there's discussion there about who should take the guns

18  and who shouldn't, and then they have postarrest statements to

19  ATF in which Mr. Washington claims one of the guns, Mr. Warren

20  claims he didn't --

21           THE COURT:  Okay.  Hold on.  Here's what -- here's

22  what I'm going to have to do.  Do you all have -- do you have

23  these -- Mr. Lynch, the things you wish to introduce, do you

24  have transcripts of them?

25           MR. LYNCH:  I do.

63

1        THE COURT:  All right.  So I want you to provide

2    those to me, and I will look at them, but here is my ruling

3    for now.  You cannot mention this in opening statement or voir

4    dire.

5        MR. LYNCH:  Okay.

6        THE COURT:  Or at all until I have reviewed them, and

7    I'm not going to be able to do that until tonight.

8        MR. LYNCH:  Okay.

9        THE COURT:  So -- so I am precluding you at this

10    point from mentioning these -- anything said in these

11    conversations until I can rule on whether they're admissible,

12    and I will look at the transcripts, or if you want me to

13    listen to the recordings, whatever you want to do, as long as

14    I can access it, I will do that tonight and give you a ruling

15    on that first thing in the morning, but I need to hear what it

16    is, what they say before I can really judge that.

17        MR. LYNCH:  And you want the ATF undercover vehicle

18    transcript and recording from June 5th?

19        THE COURT:  I want any recordings that you are saying

20    you wish to introduce in your case-in-chief as opposed to the

21    ones that the Government wants to introduce.  I don't need the

22    clips that you're asking the Government to do in context for

23    things the Government's already introducing because they're

24    agreeing to do that.

25        MR. LYNCH:  Can I ask the Court another question?

3/3/2014 Pretrial Conference

64

1   With respect solely to the ATF undercover vehicle

2   conversation, I don't think that the Defendant has to

3   introduce that in his case-in-chief.  I think the Defendant

4   can introduce that --

5           THE COURT:  As cross-examination.

6           MR. LYNCH:  -- as cross-examination because, as the

7   Government already stated, Mr. Washington --

8           THE COURT:  Yeah.

9           MR. LYNCH:  -- made statements that the guns are his.

10          THE COURT:  Yeah, so I -- so I do want to see that

11  one, too, even though it may be on your cross-examination, and

12  I am assuming that we're going to pick the jury, do opening

13  statements, and start on this ATF witness, and so my

14  anticipation is you will not be cross-examining him until

15  tomorrow, so that's -- you know, I mean I hope we can get some

16  evidence started this afternoon.  Okay.

17          MR. LYNCH:  Yes, ma'am.

18          MR. STEVENS:  Judge, I would point out our first

19  witness, the undercover, didn't do any of these postarrest

20  interviews or anything like that, so I don't think it will

21  even come up then.

22          THE COURT:  Yeah.

23          MR. STEVENS:  He was not the agent who did it.

24  Frankly, Judge, I don't intend to put in any of the postarrest

25  statements at all.

1          THE COURT:  Right.

2          MR. STEVENS:  So I'm kind of at a loss for how

3    Mr. Lynch would seek to do that.

4          THE COURT:  Well, Mr. Lynch, provide me with and

5    provide it to the other side, too, a copy of what you're

6    providing me, so that they'll know exactly what you provided

7    me, and I will review those transcripts and give you a ruling

8    on that tomorrow morning.

9          MR. LYNCH:  Yes, ma'am.

10          THE COURT:  Okay.  What else do we need to discuss

11   before we begin picking the jury this afternoon?  I'll do the

12   standard -- I'll do the voir dire the standard way I usually

13   do, and then I'll give you all an opportunity to ask

14   questions.  I will apply my 20-minute presumption to all

15   things, and I will apply it to voir dire.  We're not going to

16   have -- I will be watching the clock.  The clerk is not going

17   to do you to the second the way we do on closing arguments,

18   but I will do that here.  I believe on opening statements also

19   you shouldn't need more than 20 minutes.  Again, that will be

20   a less -- you know, it's a less precise clock.

21          MR. LYNCH:  That's a gift.  I think Mr. Stevens and I

22   got seven minutes the last time we had a trial.

23          MR. STEVENS:  I think you're correct.

24          THE COURT:  Yeah, I don't think you need 20 minutes,

25   but I don't want you to take more than that, and I don't want

1   you to take more than 20 minutes each on voir dire, and I hope

2   you won't need that, and I'll go in order of everything we do

3   will be Mr. Lynch first and then Mr. Jimerson because that's

4   the way the Defendants are listed on the indictment.

5           MR. STEVENS:  And you'll do the standard voir dire

6   before, Judge?

7           THE COURT:  I will and I'll do the standard don't

8   check -- you know, don't do any Internet searches, and I'll

9   give the standard introductory instructions that we usually

10  do, setting out -- you know.

11          MR. STEVENS:  And how about strikes?  How do you want

12  to work strikes with multiple Defendants?

13          THE COURT:  Oh, man.  When in doubt, look at the

14  rule.

15          MS. BEHRENS:  Judge, if you need to go, we can look

16  that up later.

17          THE COURT:  Yeah, I'll tell you how we'll do it, but

18  you might as well know now.  I don't have it in my note how

19  I -- I'm going to decide how many strikes we'll allow once I

20  see how many jurors we have left after the challenges for

21  cause, et cetera.  Even though we had some -- some areas have

22  had weather issues, but not -- most of the people in our --

23  you know, where we get our jurors from didn't have serious

24  weather issues.  In fact, our Cape Girardeau courthouse is

25  closed today because they had serious weather issues, but we

67

1   dodged the bullet, so we will -- I need to see how many people

2   we have left, and I'll decide how to divvy up or whether I'm

3   going to give extra peremptory challenges to the Defendants

4   because they're multiple Defendants because under the rule I

5   may but I do not have to.

6          Okay.  And so do provide to the clerk the -- those

7   transcripts and then talk to each other about anything else

8   you need to talk about, and I will see you all at 1:00 p.m.

9          MR. JIMERSON:  Yes, ma'am.

10         MR. LYNCH:  Yes, Your Honor.

11         MR. STEVENS:  Thank you, Judge.

12      (Court recessed from 10:04 a.m. until 1:03 p.m.)

13         THE COURT:  All right.  Before we bring up the jury,

14  I will tell you a couple things.  First of all, I did receive

15  the -- the transcripts of these conversations, and I looked at

16  the couple of cases that you cited, but I thought one of you

17  told me there were some cases about when a defendant is

18  offering this kind of testimony, the jail phone conversations,

19  when a defendant's offering it in a joint trial, and the cases

20  that you cited, it's both -- were both the government offering

21  them, and I wonder if you all have any cases where the

22  defendant did.

23         MR. LYNCH:  Your Honor, does that include that Fourth

24  Circuit case?

25         THE COURT:  Yeah, the Fourth Circuit case is the

1  one -- the -- okay.  The cases you cited me were the *Mahasin*

2  case in the Eighth Circuit.  That was the Judge Jackson case.

3  And then the Fourth Circuit case was *Jones*, and in that one,

4  it was the government who -- that was offering the -- they

5  talk about context, but it was the government that offered

6  the -- the statements or the recordings, and I didn't know of

7  any -- you know, I'm still working through this in my head,

8  but I don't see how Mr. Warren can object on confrontation

9  grounds to his own statement because it's -- that's -- he's --

10 it's not another witness, you know.  So you have the right to

11 confront the witnesses against you, but he's the witness, so I

12 don't see how he can object on that basis, but I also -- I

13 also need to still look at it some more, and I'm just

14 wondering if you all have any -- any cases where it was not

15 the government that was offering this kind of phone call that

16 was contested.

17         MR. STEVENS:  Judge, I have *United States versus*

18 *Berry*.  It's an unpublished case, Eleventh Circuit case from

19 November 13 of 2012.  Its Westlaw citation is 2012 Westlaw

20 5476922, the Eleventh Circuit, and in that case, one of the

21 defendants sought to introduce the postarrest statement of

22 another defendant and argued, as here, that it was admissible

23 under 804(b)(3) as a statement against interest, and

24 because -- largely because the statement was contrary to other

25 evidence and, therefore, unreliable, they didn't allow it in,

1  which I would argue here as well.  As I indicated, the

2  postarrest statements of these Defendants, Mr. Washington

3  claimed that he possessed one of the guns, Mr. Warren claimed

4  that the other two Defendants possessed the guns, and then in

5  the calls that Mr. Lynch wants to play, Mr. Warren is saying

6  that he had at least one of the guns, which, again, doesn't

7  account for the other gun.  The other issue with it, as I said

8  before, is that it's not even a statement against interest.

9  When you put it in the context of his entire statement, he's

10 saying, "I'm good only for the felon in possession of a

11 firearm, not the other stuff," so it's not even a statement

12 against penal interest.  He's claiming that he's not good for

13 all the other counts but he is for the felon in possession

14 count, so -- but anyway, I think you'll find that *Berry* is on

15 point on that issue.

16         THE COURT:  Okay.  And then, Mr. Jimerson, Mr. Lynch,

17 do you all have anything to add on that issue?  And like I

18 say, I'm not going to decide it until I can have time to look

19 at it all tonight.

20         MR. LYNCH:  Your Honor, I don't have anything to add

21 other than what I've already submitted to the Court.

22         THE COURT:  Okay.

23         MR. JIMERSON:  Nothing further, Your Honor.

24         THE COURT:  Okay.  I will look at this and let you

25 all know.

70

1          The two motions that I withheld ruling on with regard

2    to Mr. Washington -- first of all, on the -- and, actually,

3    one of them is Mr. Warren's motion to preclude the Government

4    from eliciting testimony regarding the efficacy of prior sting

5    operations, and -- and the Government says, well, it's not

6    going to do that, but it is going to have this witness testify

7    about "Here's the way we normally conduct this kind of

8    operation, and here's what we usually do, and this is what we

9    usually do and why," and I think that -- I'm not going to

10   allow it.  I'm going to grant the motion to that extent

11   because I really do think that the Government should not be

12   allowed to have a witness come up here and say, "This is how

13   we always do it; we've been doing it this way for 20 years;

14   this is -- this is what it is."  It's possible that the

15   Defendants' cross-examination might allow them to do that, and

16   so if -- if they -- if there's something the Defendants do in

17   cross-examination that causes the Government to think that on

18   redirect it should be able to go into, you know, this wasn't

19   an unusual thing, then -- then they -- I'm -- I'll be inclined

20   to let them do that or I'll hear about it; I'll have you all

21   talk about it.  I don't want the Government to do this,

22   though, without approaching the bench and telling me you

23   believe that the door has somehow been opened, but I think on

24   just the basics of what the Government does in its

25   case-in-chief, setting aside what the Defendants might do on

1    cross-examination, that what is relevant here and probative is

2    what happened in this case, and -- and he can say, you know,

3    why they did things, just like we -- you know, people can say,

4    you know, "I didn't" -- you know, police officers testify

5    every day, "I didn't get fingerprints.  I didn't try to test

6    the gun for fingerprints because he had it in his hand when I

7    arrested him, so I knew he had it.  I didn't need to find

8    out."  They testify as to why things like that.  Something

9    analogous to that, he can say what he was doing and why but

10   not "This is how we always do it.  We've been doing this for

11   20 years.  I'm very experienced.  I know how to do this."  He

12   can testify when he talks about his background that he's been

13   involved in undercover operations, but there's no reason to

14   talk about "Here's how we usually do it."  What is relevant in

15   this case is "Here's what we did in this case.  This is what

16   happened in this case," and so that's my ruling, and it is --

17   it is my ruling unless the Government can convince me after

18   cross-examination that I should change it, okay?

19          MR. STEVENS:  Yes.

20          THE COURT:  And then with regard to the domestic

21   assault on 609 grounds, you know, I looked at some 609 law

22   rules again, and -- and like I said, this is a -- I think it

23   is a close call, but -- let me get the rule in front of me.

24   I'm going to grant the motion to exclude that domestic assault

25   conviction and here's why.  I do not believe, having heard all

1  the arguments, that a conviction for domestic assault has very

2  much probative value with regard to the Defendant's

3  truthfulness.  I understand the argument that every criminal

4  conviction in every case shows that a defendant, at least at

5  some point in his life, has disregarded the law enough to

6  commit a crime and that, therefore, he may disregard his oath

7  or fears of the penalty in perjury.  That's true in every

8  single case that exists, and I understand that argument, but I

9  think when you look at what 609(a)(1)(B) tells me, it says it

10 must be admitted in a criminal case in which the witness is a

11 defendant if the probative value of the evidence outweighs its

12 prejudicial effect to that defendant, and I simply do not

13 believe that the probative value of this evidence outweighs

14 its prejudicial effect.  In fact, you know, if you flipped it

15 around the other way, I would say the prejudicial effect

16 outweighs the probative value.  I guess it's saying the same

17 thing, but the -- this isn't a typical, you know, 404(b) case

18 where there's other reasons to admit this evidence.  Domestic

19 assault does carry with it a great deal of stigma, as it

20 should, and I know that there -- and I think this is what

21 Mr. Lynch has pointed out in his motion -- that there may be

22 people on the jury panel who, once they hear that the

23 Defendant, you know, beat up his girlfriend or committed a

24 domestic -- has a conviction for domestic assault, because

25 that's all they would hear, that would be enough for them to

73

1   say he's somebody who has convictions for domestic assault;

2   therefore, he's a bad person; therefore, he's probably guilty

3   of this crime, and I think that the likelihood of their doing

4   that is substantial because it's just a hot-button issue for

5   some people, and that issue is totally unrelated to anything

6   else in this case, and it would not be inappropriate if we

7   were going to introduce that, for example, you know, for the

8   Defendant to feel like he needed to voir dire the jury on

9   domestic assault.  That's taking us way far afield from

10  anything that's relevant to this case, so I'm sustaining that

11  and agreeing that the domestic assault convictions may not be

12  used to impeach Mr. Washington if he should choose to testify.

13          MR. STEVENS:  Judge, if I could, may I --

14          THE COURT:  Yeah, go ahead.

15          MR. STEVENS:  -- just object to the Court's ruling on

16  the basis that the -- I understand the Court's ruling, but I

17  would argue, as I did, that the probative value outweighs the

18  prejudice in this case given that this Defendant's credibility

19  would certainly be squarely at issue.  I would also argue

20  that -- as I mentioned -- that I'm not aware of any cases in

21  which that's -- and I understand the way that appeals work in

22  these cases; they may not simply have been appealed, but I'm

23  just -- I'm objecting to the Court's ruling for the purpose of

24  preserving it.

25          THE COURT:  Yeah, I understand that, and the ruling

1   will remain as it is.

2           MR. STEVENS:  Thank you.

3           THE COURT:  Okay.  What else do we need to discuss

4   before we -- oh, do you all know about my "no recross" rule?

5           MR. LYNCH:  I do.

6           THE COURT:  Yeah, you've been in trial before.  So

7   here's what it means, Mr. Jimerson.  I do not allow recross as

8   a matter of right.  We have direct, cross, redirect.  If the

9   proponent of the evidence brings up something new in redirect

10  that wasn't, you know, brought about because of the cross,

11  then you can approach the bench and tell me what you intend

12  to -- what you want to ask and just ask permission to recross,

13  and I -- I will usually ask you what is it exactly you want to

14  ask, and we'll do that at sidebar.  Now, there are some times

15  when it's so obvious that I might just say, "Yeah, go ahead,"

16  and I won't require you to do that.  Unfortunately, sometimes,

17  when I do that, I find out that the questions that are being

18  asked are not the ones I thought were so obviously new things

19  that were going to be brought up, so that's the "no recross"

20  rule.

21          Okay.  Now, what else?

22          MR. STEVENS:  Can Mr. Lynch and I approach, Judge?

23          THE COURT:  Yeah.

24          MR. JIMERSON:  Am I included in this?

25          MR. STEVENS:  You can come if you want.

1          MR. JIMERSON:  I do want to hear.

2       (A bench conference was held on the record as follows:)

3          THE COURT:  Okay.  So we're at sidebar with all three

4   lawyers.

5          MR. STEVENS:  Yes.  Mr. Lynch and I have -- and I

6   know it's awful late, but Mr. Lynch and I have recently, just

7   in the last few minutes, had a discussion about a potential

8   resolution of this case.  I think he, obviously, needs some

9   time to talk to his client about it.  It's something we really

10  hadn't broached before, and I wonder if we might have 10

11  minutes for him to discuss that with his client.

12         THE COURT:  Yeah.  I'm trying to think if there was

13  another way to do it, and there's not because once we start

14  picking the jury we've started picking the jury, so, yeah,

15  okay.  We'll be in recess for -- I'll give you 15 minutes, but

16  let's try to --

17         MR. LYNCH:  Yes.  Is there a room in the hallway

18  where they can put him and I can go in?

19          THE COURT:  There -- there -- oh, where?

20         MR. LYNCH:  For him.

21          THE COURT:  You'll have to ask the Marshals.

22         MR. LYNCH:  He's kind of loud, so . . .

23          THE COURT:  Yeah, you'll have to ask the Marshals.

24  If you stay in the courtroom, all we can do is keep the --

25          MR. LYNCH:  White noise on?

1          THE COURT:  -- the white noise on, but you could

2     also -- if you want to go back downstairs, I know that would

3     take a little more time.

4          MR. LYNCH:  All right.

5          THE COURT:  Or if you wanted to, I could tell

6     everybody else to leave the courtroom.

7          MR. LYNCH:  Whatever is easiest.

8          MR. STEVENS:  We could step out.

9          THE COURT:  Why don't you talk to the Marshals.

10         MR. JIMERSON:  If I might add, Your Honor, if they

11    resolve their case, I think there's a chance my client may

12    reconsider his going to trial on what's remaining, so I

13    just -- I know --

14         THE COURT:  Why don't you all --

15         MR. JIMERSON:  I can't say anything yet.

16         THE COURT:  No, of course not.  Why don't you all

17    talk to your clients, and if you need to go down --

18         MR. LYNCH:  I'm just going to take mine down.  It

19    will save time.

20         THE COURT:  Take them down to the Marshals Service?

21         MR. LYNCH:  Yes.

22         THE COURT:  Okay.  I'll do that.  Okay.  Sorry.  So

23    we're going to be in recess for 30 minutes, and that will give

24    both attorneys time to go downstairs and discuss things with

25    their clients privately.

1          MR. LYNCH:  Yes, ma'am.

2          THE COURT:  All right.  Okay.  All right.  So that's

3     what we'll do.

4          MR. STEVENS:  Thank you, Judge.

5          MR. LYNCH:  Thank you.

6       (The following proceedings were held in open court.)

7          THE COURT:  Okay.  We're going to be in recess for 30

8     minutes, and I would ask that each Defendant, each defense

9     counsel needs to be able to have a private discussion with his

10    lawyer, so 30 minutes will give you time to get them

11    downstairs and back up.  All right.  Court's in recess for 30

12    minutes until 1:45.

13       (Court recessed from 1:16 p.m. until 1:50 p.m.)

14       (A bench conference was held on the record as follows:)

15         MR. LYNCH:  I know you're not going to allow us to

16    have all day to negotiate.  We've been negotiating for a

17    while, but I believe the Government has made a substantial

18    offer to the client, and we've had a couple of changes in what

19    that offer's been, and we're very close to maybe having a

20    resolution, so I'm going to need a few more minutes, if you

21    would indulge me.  I think it may be worth it because the

22    offer is substantial so -- in my mind.

23         THE COURT:  Okay.  Well --

24         MR. LYNCH:  And I don't want to keep doing this.

25    He's going to know it's my last shot, and then we'll just go.

1   We're all ready, so --

2          THE COURT:  Okay.  So we'll do that, and just let the

3   clerk know when you're ready.  You're going to stay in here, I

4   assume?

5          MR. LYNCH:  I would like to go back down.

6          THE COURT:  How are you doing, Mr. Jimerson?

7          MR. JIMERSON:  Well, Your Honor, I'm -- in light of

8   that, I actually tried to talk to my client.  I also talked to

9   Mr. Stevens.  I tried to talk -- he gave me some -- some

10  additional offers as well.  Okay.  It wasn't much, but it was

11  what he could do, and I presented that to my client in light

12  of he may be the only person at trial in this situation, which

13  I don't like him being that only person at trial in this

14  situation, if you will; however, I don't think he's going to

15  change his mind.

16         THE COURT:  Right.  Okay.  That's fine.

17         MR. JIMERSON:  But if that is the case where

18  Mr. Washington decides to plead guilty, Judge, I think

19  Mr. Stevens and I also talked about maybe we can start

20  tomorrow in terms of picking the jurors because I think

21  Mr. Stevens may have to redo his evidence and all of that, you

22  know, so I think we may have a logistic problem in terms of

23  everything.

24         THE COURT:  Okay.  Well, I'm not going to do anything

25  yet.  I'll just give you some extra time, and --

79

1          MR. JIMERSON:  Yes, ma'am.

2          THE COURT:  -- I don't know.  Can -- can you --

3          MR. LYNCH:  Do you want a time frame?

4          THE COURT:  Yeah.

5          MR. LYNCH:  Can I have another half hour, and then

6  I'm done.

7          THE COURT:  Yeah.

8          MR. LYNCH:  I'll tell him that's it.  I'm ready to

9  go.

10          MR. STEVENS:  Judge, we've -- we've -- Mr. Lynch came

11  up after talking to his client.  We talked more.  We're at a

12  bottom line, and either it's going to happen or not.

13          THE COURT:  Yeah, so 30 more minutes?

14          MR. LYNCH:  Yeah.

15          THE COURT:  Okay.  And then it looks like we'll

16  probably go to trial on Mr. -- and I'll make a record once

17  we're done with that.

18          MR. JIMERSON:  Well, Mr. Stevens, give me another

19  bottom line, and I can --

20          THE COURT:  I think it sounds like he's already given

21  you his bottom line.

22          MR. STEVENS:  Yeah.

23          MR. LYNCH:  Thanks, Judge.

24          MR. JIMERSON:  All right.  Thanks.

25          (The following proceedings were held in open court.)

80

1       THE COURT:  All right.  We will be in recess another

2  30 minutes and -- or until -- actually, until 2:30.  At 2:30,

3  we'll move forward one way or another.

4       (Court recessed from 1:53 p.m. until 2:40 p.m.)

5       THE COURT:  All right.  Mr. Lynch, how are we going

6  to proceed?

7       MR. LYNCH:  Judge, it is my understanding that

8  Mr. Washington is prepared to enter a plea.

9       THE COURT:  Okay.  And are you all prepared to do

10  that right now?

11       MR. STEVENS:  Judge, we would need to adjust the Plea

12  Agreement.  I would need some time to do that.  It shouldn't

13  take long.

14       THE COURT:  Is somebody doing that right now?

15       MR. STEVENS:  I would have to go up and do that.

16       THE COURT:  You couldn't have spent the last half

17  hour being prepared in case this happened?  Okay.  So -- and

18  what is Mr. Warren's intention?

19       MR. JIMERSON:  His intention is to proceed to trial,

20  Your Honor.

21       THE COURT:  All right.  And were there any additional

22  concessions or agreements offered by the Government during

23  this break that we need to make a record of?

24       MR. JIMERSON:  We do, Your Honor.  There were some.

25  Mr. Lynch and I -- not Lynch -- Cris and I talked, Mr. Stevens

1    and I talked a couple times.  The first concession -- I think

2    the ultimate one -- is basically with the 15 years with a

3    level two, so, basically, not -- he's -- my client, if found

4    guilty, can be found up to level four, even more in terms of

5    his criminal background, but keeping it at a level two keeps

6    it pretty close to 15 years.

7              MR. STEVENS:  What we were -- what we were

8    discussing --

9              THE COURT:  Yeah, Mr. Stevens, why don't you state --

10             MR. JIMERSON:  Yeah.

11             MR. STEVENS:  Yes.

12             THE COURT:  Because I'm missing something here, so --

13             MR. STEVENS:  Sure.  Judge, we had discussed

14   previously, as I indicated before, potentially, a 15-year

15   sentence.  Mr. Jimerson and I talked today.  He asked also

16   if -- if I was willing to offer anything.  I told him that I

17   would certainly agree to the two levels off for acceptance of

18   responsibility, which I normally would not do on the day of

19   trial, but that that was the extent at this point of what I

20   was willing to offer Mr. Warren.

21             THE COURT:  Well, if -- but -- am I understanding

22   that the Guidelines were going to be higher than 15 years

23   anyway?

24             MR. STEVENS:  Yes.

25             THE COURT:  And would the two levels off have reduced

82

1    the sentence that -- I mean if you are agreeing to 15 years --

2           MR. STEVENS:  Previously.  That was an offer

3    previously that I withdrew.

4           THE COURT:  Right.

5           MR. STEVENS:  And I would not be willing to do that

6    at this point.

7           THE COURT:  Okay.  So the 15 years is off the table

8    because it was withdrawn?

9           MR. STEVENS:  Yes.

10          THE COURT:  But you were willing to, if he did plead

11   guilty, take whatever the Presentence Report shows up for the

12   amount of drugs and whatever else --

13          MR. STEVENS:  Yes.

14          THE COURT:  -- and then -- but you would agree to the

15   concession of two levels off for acceptance of responsibility?

16          MR. STEVENS:  Right.  That's about the extent of what

17   I would agree to at this point.

18          THE COURT:  Okay.  And so, Mr. Jimerson, you then

19   discussed this with your client?

20          MR. JIMERSON:  I did discuss it, Your Honor.

21          THE COURT:  And he chooses to go to trial?

22          MR. JIMERSON:  That's correct, Your Honor.

23          THE COURT:  Mr. Warren, did your client -- did your

24   lawyer discuss this issue with you?

25          DEFENDANT WARREN:  Yes, ma'am.

83

1    THE COURT:  And is it your decision after hearing

2 these, what the Government's offer was, that you wish to go to

3 trial instead of pleading guilty?

4    DEFENDANT WARREN:  Yes, ma'am.

5    THE COURT:  Okay.  Here's what we'll do.  We'll take

6 a short break while the Government goes and gets its paperwork

7 together, and we will not release the jury, of course, and we

8 will probably start picking the jury in the morning, but I

9 can't tell them to go home yet until I -- I mean, we could

10 conceivably keep -- well, we'll just take another recess while

11 the Government goes and does the paperwork.  Let me know when

12 you're ready.

13    (Court recessed from 2:43 p.m. until 3:18 p.m.)

14    THE COURT:  All right.  What I'm doing since Mr. --

15 and I'll note for the record the Defendants are not present,

16 nor is Mr. Lynch nor Mr. Stevens, but Ms. Behrens is here as

17 is -- well, here's Mr. -- Ms. -- is it Aldaddah?

18    MS. ALDADDAH:  Yes.

19    THE COURT:  Okay.  Ms. Aldaddah and Mr. Jimerson.  I

20 have just asked the jury clerks to send the citizens who have

21 been waiting downstairs for two and a half hours for you all

22 to get your act together -- to send them home and tell them to

23 be back tomorrow morning at 9:00 a.m.  Whatever happens this

24 afternoon, we'll start picking the jury in Mr. Warren's case

25 at 9:00 a.m.  If Mr. Washington changes his mind again, we'll,

84

1    obviously, you know, start picking his -- you know, we'll have

2    him come tomorrow morning, too, but I did not want to make

3    these people sit there anymore waiting because you all

4    couldn't have done this sooner, and I don't know why drafting,

5    making changes to a plea agreement couldn't have been done all

6    this time.  When you knew what the offer was, you could have

7    been ready and made minor changes, but in any event,

8    nevertheless, everybody waited until the last minute.  So

9    that's what we're going to do.  I'm also going to notify the

10   Marshals Service that they can return Mr. Warren to his place

11   of incarceration, and so, Mr. Jimerson, you no longer have to

12   remain.  I'll stay -- you know, we'll stay here -- today.

13   Just be back at 9:00 a.m.  You're free to stay if you want to.

14           MR. JIMERSON:  I appreciate that, Your Honor.  I will

15   stay.

16           THE COURT:  Okay.  But I'm going to tell the Marshals

17   they can go ahead and take your client home, okay?

18           MR. JIMERSON:  Yes, ma'am.

19           THE COURT:  Or wherever home is.

20           MR. JIMERSON:  I've got you.

21           THE COURT:  Okay.  Court's in recess.

22       (Proceedings concluded at 3:19 p.m.)

23

24

25

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 84 inclusive.

Dated at St. Louis, Missouri, this 5th day of August, 2014.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter