UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
                  Plaintiff,       )
                                   )
       v.                          )  No. 4:13-CR-221-CDP
                                   )
DARYL WARREN,                      )
                                   )
                  Defendant.       )


JURY TRIAL

VOLUME 1


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


MARCH 4, 2014



**APPEARANCES:**
For Plaintiff:      Cristian M. Stevens, AUSA
                    Allison H. Behrens, AUSA
                    **OFFICE OF U.S. ATTORNEY**
                    111 South Tenth Street, 20th Floor
                    St. Louis, MO  63102

For Defendant:      Herman L. Jimerson, Esq.
                    **JIMERSON LAW FIRM**
                    225 S. Meramec, Suite 508
                    Clayton, MO  63105


*REPORTED BY:        Gayle D. Madden, CSR, RDR, CRR
                    Official Court Reporter
                    United States District Court
                    111 South Tenth Street, Third Floor
                    St. Louis, MO  63102
                    (314) 244-7987*

# INDEX

Voir Dire
    Examination by the Court . . . . . . . . . . . . . Page   6
    Examination by Mr. Stevens . . . . . . . . . . . Page 106
    Examination by the Court . . . . . . . . . . . . . Page 108
    Examination by Mr. Stevens . . . . . . . . . . . Page 110
    Examination by Mr. Jimerson  . . . . . . . . . . Page 118
    *Batson* challenge . . . . . . . . . . . . . . . . Page 137
Jury Instructions . . . . . . . . . . . . . . . . . . Page 144
Plaintiff's Opening Statement (excerpted)
Defendant's Opening Statement (excerpted)


*Witnesses:*

**RICHARD ZAYAS**
    Direct Examination by Mr. Stevens  . . . . . . . . Page 155
    Cross-examination by Mr. Jimerson  . . . . . . . . Page 228
        (continued to 3/5/2014)

3

```
 1          (Proceedings began at 8:47 a.m.)

 2          (The following proceedings were held in open court and

 3     with the Defendant present.)

 4          (The following proceedings were held outside the hearing

 5     and presence of the jury panel.)

 6               THE COURT:  All right.  We're here in the case of

 7     United States of America versus Daryl Warren, Case No.

 8     4:13-CR-221, and Mr. Warren is here with his attorney,

 9     Mr. Jimerson, and the United States is here through

10     Mr. Stevens and Ms. Behrens, and, you know, we were here all

11     day yesterday doing, I guess, extended pretrial things, and so

12     we're ready to begin selecting the jury this morning.  What,

13     if anything, do we need to discuss before we begin?  And

14     before I say that, I did notice the Government filed a witness

15     list and exhibit list.  I printed them out and then forgot to

16     bring them in, but --

17               MR. STEVENS:  I have copies.  Do you want a copy?

18               THE COURT:  Okay.  Yeah.  If you'll provide the clerk

19     with copies, that'd be good.

20               MR. STEVENS:  Sure.

21               THE COURT:  Mr. Jimerson.

22               MR. JIMERSON:  Nothing, nothing, Your Honor.  I think

23     we're ready.

24               THE COURT:  You think we're ready?

25               MR. JIMERSON:  Yes, Your Honor.
```

1          THE COURT:  Okay.  We didn't -- I don't know if we

2     discussed the rule excluding witnesses, but I assume we want

3     that invoked?

4          MR. JIMERSON:  Yes, ma'am.

5          THE COURT:  Okay.  And you all need to pay attention

6     because I don't know who your witnesses are, and so if they

7     walk in the back of the courtroom -- and especially from the

8     Government's side, you've got lots of people here looking --

9     if you see someone who's a witness.

10         Now, you've got two people sitting at counsel table.

11    Who are these two people?

12         MR. STEVENS:  They're both agents with ATF, Judge.

13    Agent Hoffman has been the local case agent on this case, and

14    Agent Johnson is out of Mississippi.  He was here last summer

15    and was the case agent at the time.

16         THE COURT:  Which one is going to be your

17    representative to sit through trial?

18         MR. STEVENS:  It would be Agent Johnson if we had to

19    choose one of the two, Judge.  Would you mind?

20         THE COURT:  Well, are you asking to have two?

21         MR. STEVENS:  Yes.

22         THE COURT:  Yeah.  No.  I mind.  You can only have

23    one.

24         MR. STEVENS:  Okay.  All right.

25         THE COURT:  So you need to pick one.  That's the

1    rule.

2          MR. STEVENS:  Okay.  All right.  Thank you, Judge.

3          THE COURT:  Now, what else?  Anything else we need to

4    discuss?  Did you do any changes?  You mentioned changes to

5    jury instructions.

6          MR. STEVENS:  We haven't done the jury instructions

7    yet, Judge.  What it was is changing up our video.

8    Obviously --

9          THE COURT:  Oh, okay.

10          MR. STEVENS:  -- we aren't going to be playing, you

11    know, all the Robert Washington video.

12          THE COURT:  Okay.  Right.

13          MR. STEVENS:  Yeah, yeah.  And we also got

14    Mr. Jimerson the clip that he had requested yesterday, so he's

15    ready there.  Our person will be prepared to play it for him.

16          MR. JIMERSON:  Yes, ma'am.

17          THE COURT:  Okay.  All right.  That sounds fine.

18    Well, then we'll begin as soon as the jury is available.

19          (Court recessed from 8:49 a.m. until 9:12 a.m.)

20          (The following proceedings were held outside the hearing

21    and presence of the jury panel.)

22          THE COURT:  All right.  You may bring in the jurors.

23          (The following proceedings were held within the hearing

24    and presence of the jury panel.)

25          THE COURT:  All right.  Good morning, ladies and

1   gentlemen, and the first order of business is for me to

2   apologize for making you all come and wait yesterday when you

3   weren't used, and I really appreciate your being back here

4   today to start this jury selection.  We had some unavoidable

5   delays.  Judge Sippel told me to -- well, he chastised me

6   because he said he promised you that you wouldn't come and sit

7   and wait when you weren't needed and then I did that to you

8   yesterday, so I apologize.  It was unavoidable.  I would not

9   have done it otherwise, but now we are ready to begin, and I

10  appreciate you all being back here today.

11          We are going to begin the jury selection in this

12  case.  It is a criminal case, and I will tell you more about

13  it as we go along; however, the first thing we will do is we

14  will administer an oath to you as members of the jury panel,

15  and in this oath, you are promising that you will tell the

16  truth in answering our questions.  As with all oaths in our

17  court, if for some religious or personal reasons you do not

18  believe in taking an oath, which is where you say, "So help me

19  God," you may simply say, "I affirm," and that is affirming

20  under penalty of perjury that your answers are true.  It's

21  exactly the same thing as taking an oath, but some people do

22  not wish to take oaths, and so that's why we have this penalty

23  of perjury.  It means exactly the same thing legally.  So at

24  this time I would ask you to stand and to be administered the

25  oath.

1          (Jury panel sworn.)

2          THE COURT:  All right.  Now, just so you know, we

3   have a list and the lawyers have it, too, and that's why you

4   have these numbers.  Every word we say is taken down by the

5   court reporter here, and the list gives us the following

6   information.  It tells us your name, your city and county of

7   residence, and how long you've lived there and whether you

8   rent or own, or sometimes it says, "Live with homeowners."  It

9   tells us your highest level of education.  It might say

10  twelfth grade, college grad, some college, something like

11  that.  It tells us your occupation and your employer and prior

12  employer and your spouse's employer or prior employer, and it

13  tells us the number of children you have.  It doesn't tell us

14  anything else about them.  This is what -- the information we

15  have, and so we won't be asking you this same information, but

16  that's part of why we have this musical chairs business of

17  trying to make sure you're all seated in the right order, so

18  we can keep track of you as we're asking you these questions.

19  I'll ask you the first group of questions, and then the

20  lawyers will have an opportunity to also ask you questions.

21          The first thing I -- well, the first thing I want to

22  do is tell you what this case is.  This is a criminal case

23  brought by the United States against the Defendant, Daryl

24  Warren, and there are three counts charged against him, and

25  you will hear more about those as the time goes on.

1       I will start, though, by asking the United States

2  Attorneys to introduce themselves and their case agent.

3       MR. STEVENS:  Thank you, Judge.  Good morning.  My

4  name is Cristian Stevens.  I'm an Assistant U.S. Attorney here

5  in St. Louis.  I'm here with my colleague, Allison Behrens,

6  also an Assistant U.S. Attorney, and we're here with Special

7  Agent Rusty Johnson of the Bureau of Alcohol, Tobacco,

8  Firearms and Explosives or ATF.

9       THE COURT:  Thank you.  Does anyone know Mr. Stevens

10  or Ms. Behrens of the U.S. Attorney's Office?

11       Does anyone know Mr. Johnson, the ATF agent?

12       All right.  And then, Mr. Jimerson, I'll ask you to

13  introduce yourself and your client.

14       MR. JIMERSON:  Thank you, Your Honor.  My name is

15  Herman Jimerson.  I'm an attorney in St. Louis.  My client is

16  Mr. Daryl Warren.  Mr. Warren is a citizen of south St. Louis

17  city.

18       THE COURT:  All right.  Thank you.  Does anyone know

19  Mr. Jimerson, the defense attorney, or Mr. Warren, the

20  Defendant in the case?

21       All right.  I will tell you more about the case as we

22  go along, but I'm going to start with the very beginning of

23  our criminal justice system.  This is in our Constitution, and

24  it's the essence of our -- the rule of law in this country,

25  and that is that any person charged with a crime in this

1   country is presumed innocent unless and until they might be

2   proven guilty by the Government beyond a reasonable doubt.   In

3   other words, the Government can't take anybody and, you know,

4   charge -- convict them of a crime without proof beyond a

5   reasonable doubt, and that presumption of innocence was

6   written into our Constitution by the fathers who wrote it

7   because -- our forefathers, I guess we call them -- because

8   they considered it so very important, and so what that means

9   is if I were -- so does everybody understand generally the

10  presumption of innocence?  And what it means is if I were

11  to -- you know, assuming you knew what he was charged with and

12  a little more stuff about the case, but if I were to ask you

13  right now, is Mr. Warren guilty or not guilty, there's only

14  one way you could vote, and that would be not guilty because

15  there's been no evidence presented against him.  He has had no

16  evidence whatsoever presented against him, and unless the

17  Government can overcome that, that presumption of innocence,

18  you must find him not guilty even after you've heard all the

19  evidence unless you -- you know, unless the Government's

20  overcome that.  Does everyone understand that?  All right.

21  Thank you.

22          Now I want to start with reading you an instruction

23  that I have to read you because in today's world we are all so

24  connected that there have been many incidents involving jurors

25  and social media or somehow talking about the case on the

```
 1    Internet or otherwise, that we now are required to tell you

 2    not to do that, and I'm going to tell you in some detail, and

 3    so, first, I will say this.  If you have a cell phone of any

 4    sort or any other wireless communication device with you,

 5    including an iPad or anything, anything else, please take them

 6    out now and turn them off.  Don't just turn them to vibration

 7    or silence.  Please power them completely down, and whenever

 8    you're in the courtroom, these devices must remain turned off,

 9    although it is fun listening to all the different ringtones

10    that people have sometimes on their phone, but we need them

11    off in the courtroom.  This rule is as important -- even

12    though this sounds kind of silly, sometimes the cell phones,

13    even when they're -- sometimes even when they're turned off,

14    interfere with our electronic system, but it's also just

15    because we need to be sure that there is no interruption in

16    court and that nothing is being recorded or photographed, of

17    course.

18            In this court, we do allow you to keep your cell

19    phones with you, and I allow you to have them even when you're

20    deliberating, although you're not supposed to be talking to

21    people outside the jury room, and I -- you know, but we don't

22    tell you you can't bring them in the courtroom.  We like you

23    to keep them, but you can use them at breaks and things, and

24    we do know that many of you do use these tools of technology,

25    including your cell phones, throughout the day.
```

1              What is important is that you not discuss this case

2    at all, either by talking to someone about it or by texting or

3    calling or putting any postings online, anything at all about

4    the case.  I do understand you may want to tell your family

5    and friends or other people about your participation in the

6    trial, so you can explain why you're not at work and when

7    you're required to be here in court, and so what you can tell

8    people is that you are on a -- if you are selected to be on

9    this jury, you can tell people that you are on the jury and

10   that you cannot discuss it at all but you can talk to them

11   about it at the end of the week when it's all over but that

12   you do have to be here.

13              So it is essential that you not discuss the case with

14   anyone even during this jury selection process, and once the

15   jury is selected, I'll give you more instructions, but in the

16   meantime, if your family or friends should ask you, you should

17   warn them not to ask you about the case or tell you anything

18   they know or think they might know about the case or to

19   discuss the case in your presence.  You must not post any

20   information on any social network or communicate with anyone

21   about the parties, witnesses, participants, claims, evidence,

22   or anything else related to the case or tell anyone anything

23   about the jury's deliberations in the case until after I have

24   accepted your verdict.  If you were to discuss the case with

25   someone else, you could be influenced in your verdict by their

1    opinions or even by their questions, and that would not be

2    fair to the parties, and it would result in a verdict that is

3    not based on the evidence and the law.

4          While you are in the courthouse and until you are

5    discharged in the case, do not provide any information to

6    anyone by any means about the case.  For example, do not talk

7    face-to-face or use any electronic device or media such as a

8    telephone, smartphone, cell phone, camera, recording device,

9    any Internet or Internet service or instant messaging service

10   or Twitter, Facebook, YouTube, any other way, until I have

11   accepted your verdict and you've been excused as a juror.

12         Additionally, you may not do any research while the

13   case is going on, and we used to just have to tell people you

14   can't look at the newspapers and you can't look things up in

15   dictionaries because that's a very important part of the law.

16   I will tell you what the law is in the case, and you're not

17   allowed to do further research, but now we also have to tell

18   you not to do any research on the Internet or in libraries, in

19   newspapers or any other way, and you may not make any

20   investigation about the case on your own.

21         Do not view or visit any place that may be discussed

22   in the case, and don't use any Internet programs or other

23   devices to search for or view any place that's discussed in

24   the testimony.  I assure you that if it's important for you to

25   see, you know, views of things that that will be provided to

1   you in the evidence.  Also, don't research any of the -- any

2   information in the case about the law or the people involved,

3   including the parties, the witnesses, the lawyers, or even me

4   until you've been excused as jurors, and the parties have a

5   right to have the case decided only on the evidence that they

6   know about and that has been presented here in court and they

7   have the opportunity to cross-examine or challenge.  If you do

8   some research or investigation or experiment we don't know

9   about, then your verdict may be influenced by inaccurate,

10  incomplete, or misleading information that has not been tested

11  by the trial process, including the oath to tell the truth and

12  by cross-examination.  Each of the parties is entitled to a

13  fair trial rendered by an impartial jury, and you must conduct

14  yourself so as to maintain the integrity of the trial process.

15  If you decide a case based on information that was not

16  presented in court, you will have denied the parties a fair

17  trial in accordance with the rules of this country and you

18  will have done an injustice.  It is very important that you

19  abide by these rules.  Failure to follow these instructions

20  could result in the case having to be retried.

21        So that's the instruction I'm required to give you

22  that is extremely important in today's world, and I -- you

23  know, you all -- most people probably don't follow this.

24  Judges follow it intently.  We are increasingly reading of

25  cases where there has been a mistrial declared or a result in

1    a case set aside and the trial have to be redone because

2    jurors communicated in some way, even doing things like

3    sending out an email or a Twitter or a Facebook post that

4    says, "We're going to reach a verdict tomorrow; you should be

5    paying attention" or something like that.  That's improper,

6    and if you did anything like that, it would be -- it would be

7    grounds for all sorts of things, including, you know, I guess

8    I could hold you in contempt of court, but I've never done

9    that, but there are real repercussions to the system of

10   justice, so please don't do that.

11          Now, I've discussed this issue with my own children

12   who are young adults, and what they tell me when I talk to

13   them about these rules is that they would have a really hard

14   time abiding by it.  They don't understand why we do it.  They

15   don't understand why we have the Rules of Evidence.  The Rules

16   of Evidence have been developed over hundreds of years, and

17   they've been tested and approved by various courts over time,

18   and they're what we have to ensure fairness in our court.

19          So I guess what I want to know from you all -- is

20   there anybody here who, like my children, is so addicted to

21   the Internet that they could not follow this instruction if I

22   tell them not to do it?  Anybody who couldn't do it?

23          All right.  Thank you.  I do appreciate your agreeing

24   to do that.

25          Now, what's this case about?  Mr. Warren is charged

1    in an indictment, and he's charged with three counts, and one

2    is a conspiracy to possess with intent to distribute cocaine,

3    one is possessing a firearm in furtherance of a drug

4    trafficking crime, and one is having been a previously

5    convicted felon in possession of a firearm.  Knowing that,

6    only that, is there anyone here who thinks they know anything

7    about this case?  And I will tell you that these events are

8    alleged to have occurred in and around May and June of last

9    year, 2013, in the city of St. Louis.  Anybody here who thinks

10   they know anything about the case?

11            All right.  Thank you.

12            Now I want to start just by asking about jury

13   service, and I'm going to just -- all the questions I ask you

14   today, we're going to answer by rows, so I can keep track of

15   who is saying what.  So we'll start with the first row back

16   here, which is numbers 1 through 6, but I'll go through and

17   ask you all these questions.

18            The first question I want to know is whether at any

19   time in your life you have ever actually been selected to

20   serve on a jury in any court.  Numbers 1 through 6, anyone

21   who's actually been selected to serve on a jury?

22            All right.  #3, can you tell me -- Ms. French, can

23   you tell me about when you were selected to serve on a jury?

24   How long ago and what court?

25            JUROR #3:  It was probably about 30 years ago, 35

1    years ago.

2              THE COURT:  Okay.  And where was it?

3              JUROR #3:  I had lived in the city.  It's one of

4    these court buildings.

5              THE COURT:  Right.

6              JUROR #3:  It was the one with big brown doors.

7              THE COURT:  Yeah.  Actually, that's -- it was

8    probably the state court.  Does that make sense?  I mean

9    there -- we've only been in this building since 2001, and we

10   were sort of -- let's see -- across the street.  I get my

11   directions screwed up, but that way, I guess, and there's

12   several courthouses right there, but -- so you were in one of

13   those courthouses?

14             JUROR #3:  (Nods head up and down.)

15             THE COURT:  Do you remember if it was a civil or a

16   criminal case?

17             JUROR #3:  It was about theft.

18             THE COURT:  About theft.  Okay.  And do you

19   remember -- and I don't want to know the results of any

20   decisions, but do you remember if the jury actually reached a

21   verdict in the case?

22             JUROR #3:  Uh-huh, yes.

23             THE COURT:  Were you the foreperson?

24             JUROR #3:  No, no, ma'am.

25             THE COURT:  Okay.  Thank you.

1          Anyone else on that row who's been on a jury?

2          All right.  And then the next row, anyone here who's

3    been actually selected to serve on a jury?

4          I see a few of you.  Yes.  So, #8, Ms. -- is it

5    Rothery?

6          JUROR #8:  Yes.

7          THE COURT:  Tell me when and where your prior jury

8    service was.

9          JUROR #8:  Probably in the eighties.  I've been on

10   three juries -- one criminal, two civil, and I was the

11   foreperson for one of them.

12         THE COURT:  Did they all result in decisions by the

13   jury?

14         JUROR #8:  One was settled prior to, and the other

15   two did come to a jury decision.

16         THE COURT:  Okay.  Thank you.  And then #9,

17   Ms. Roberts, tell me about your prior jury service.

18         JUROR #9:  It was probably about five years ago,

19   state court, and it was involving an accident.

20         THE COURT:  Okay.  And was that in the St. Louis

21   County?

22         JUROR #9:  Yes.

23         THE COURT:  Okay.  So it was like a car wreck?

24         JUROR #9:  Correct.

25         THE COURT:  Okay.  So that would have been a civil

1    case, I take it?

2             JUROR #9:  Yes.

3             THE COURT:  Yeah.  Okay.  And did the jury actually

4    decide the case?

5             JUROR #9:  Yes.

6             THE COURT:  Were you the foreperson?

7             JUROR #9:  No.

8             THE COURT:  All right.  Thank you.

9             And let's see.  Ms. Schneider, did you have your hand

10   up?

11            JUROR #10:  Yes.

12            THE COURT:  All right.  Could you tell me when and

13   where your prior jury service was?

14            JUROR #10:  It was like a year ago in the St. Charles

15   County.

16            THE COURT:  And was it civil or criminal, if you

17   remember?

18            JUROR #10:  Well, I guess it was -- I don't remember.

19            THE COURT:  What was the case about?

20            JUROR #10:  Drugs.

21            THE COURT:  Drugs.  Okay.  And so that would normally

22   be a criminal case --

23            JUROR #10:  Criminal.

24            THE COURT:  -- most likely.  Did the jury actually

25   decide the case?

1               JUROR #10:  Yes.

2               THE COURT:  Okay.  Were you the foreperson?

3               JUROR #10:  No.

4               THE COURT:  All right.  Thank you.

5               JUROR #10:  Do you need to go back further because I

6       was on another one?

7               THE COURT:  Yeah, yeah, I'd like to know about the

8       others, too.

9               JUROR #10:  Okay.  Well, it was probably about 30

10      years ago.

11              THE COURT:  Thirty -- I'm sorry.

12              JUROR #10:  About 30, somewhere in there.

13              THE COURT:  Okay.

14              JUROR #10:  And that was down here, too, in the city.

15              THE COURT:  Okay.

16              JUROR #10:  And we did reach a verdict and --

17              THE COURT:  Do you remember if it was criminal or

18      civil?

19              JUROR #10:  It was a rape.

20              THE COURT:  That would be -- that would normally be a

21      criminal case, although it could also be civil, but that's

22      probably right.  Okay.  And so the jury did reach a verdict?

23              JUROR #10:  Yes.

24              THE COURT:  And you were not the foreperson that

25      time?

```
 1              JUROR #10:  Well, you know, I don't remember.  I'm

 2    sure I wasn't.

 3              THE COURT:  But you don't remember really?

 4              JUROR #10:  No.

 5              THE COURT:  Okay.  That's fine.

 6         Then people on the front row, any of you all ever

 7    actually been selected to serve on a jury?

 8         Yes, #14, Ms. Dooley.  Oh, yeah, I have another

 9    question for you, Ms. Dooley, because I think you know

10    somebody in the courtroom or not in the courtroom anymore.

11    You know the court clerk who was -- who led you all up here,

12    right?

13              JUROR #14:  Yes.

14              THE COURT:  Okay.  But tell me about your jury

15    service.

16              JUROR #14:  It was in Clayton.  I think it was around

17    2006, a criminal case.  We did reach a decision, and I was not

18    the foreperson.

19              THE COURT:  Okay.  So let me -- since I'm talking to

20    you now and because Carol did tell me that she knew you, as I

21    understand it, your -- your sister is one of her close

22    friends, is that right?

23              JUROR #14:  Yes.

24              THE COURT:  And so as she's -- throughout this trial,

25    there will be various people who will be -- and I'll tell this
```

1    to all of you.  There will be various people working for the

2    court who will sort of be helping you out or in charge of you

3    or doing what they need to do, and this is Brittany Porter,

4    who will be mostly handling the trial, but there are two other

5    people who also work in -- with me in the courtroom, and

6    they're Carol Long and Melanie Berg.  Aside from Ms. Dooley

7    knowing Carol Long, does anyone here know any of those other

8    people?

9              All right.  Let me just ask you this, Ms. Dooley.

10   Would that affect your decision in any way in -- the fact that

11   you are acquainted with her?

12             JUROR #14:  I don't think so, no.

13             THE COURT:  You don't think it would make you favor

14   one side or the other in the case?

15             JUROR #14:  No.

16             THE COURT:  All right.  Thank you.

17             And so let's see.  Anybody else there who was on a

18   jury in this group?

19             Yes, #26.  I think that's about knowing someone,

20   right?

21             JUROR #26:  Yes.

22             THE COURT:  Tell me who you know.

23             JUROR #26:  Deneen.  She's down --

24             THE COURT:  You know Deneen, the jury clerk?

25             JUROR #26:  Yes, that's who it is.

1          THE COURT:  Okay.  That's interesting because

2     that's -- you know, you've certainly dealt with her, I know,

3     and how do you know Deneen?

4          JUROR #26:  She grew up just right up the street from

5     me.

6          THE COURT:  Do you all see -- have you all seen each

7     other much as adults?

8          JUROR #26:  I haven't seen her in 20 years.

9          THE COURT:  Well, would your knowing her have any

10    effect on your ability to decide this case fairly?

11         JUROR #26:  No, Your Honor.

12         THE COURT:  All right.  Thank you.

13         And you know when I ask you that question about would

14    it affect your ability to decide this case, what we're really

15    asking of jurors is that you come into court with an open

16    mind, that you listen to the evidence, and that you decide the

17    case based on the evidence and the law that I'll give you and

18    not on anything else, and we're asking for you to start with a

19    level playing field.  In other words, give the Government and

20    the Defendant the same opportunity for a fair trial, listen to

21    the evidence, and decide it fairly without favoring one side

22    or the other.  In other words, if I'm going to -- everybody

23    makes fun of my sports analogies because I get them screwed up

24    sometimes, but, you know, if it's a level playing field,

25    there's no home team here, right?  You -- your -- you don't

1   have -- it's like watching a game you don't care who wins.

2   You need to base it on what you believe is right in the case

3   and what you hear from the evidence and the law.  Everybody

4   understand that?  Anybody who has problems with that?  All

5   right.  And that's what I mean when I say can you be fair.

6           Okay.  Let me go back to jury selection.  Yes, ma'am.

7           JUROR #10:  When I was picked, I was an alternate.  I

8   don't know if that matters.

9           THE COURT:  Okay.  Did you actually end up sitting on

10  the case?

11          JUROR #10:  Yes.

12          THE COURT:  Yeah.  So you were an alternate

13  initially, but then you were seated?

14          JUROR #10:  Right.  Somebody ended up the next day

15  got excused for whatever reason, and I was the first

16  alternate.

17          THE COURT:  And that's something I would want to talk

18  about.  We will probably pick -- well, we will have 12 jurors

19  on the case and probably one or maybe two alternates in the

20  case.  Alternate jurors are very important because you -- it's

21  not unusual that something happens and they end up sitting, so

22  once -- if you're picked as an alternate, you just, you know,

23  assume you're a juror until you're told otherwise because it

24  may happen.

25          The -- but we do have 12-person juries in felony

 1    cases such as this, and for a decision to be reached in the

 2    case, whether it's guilty or not guilty, the decision must be

 3    unanimous.  Some people disagree with that rule of law.  They

 4    think it should be majority rules, but it's not.  It's got to

 5    be unanimous in the case.  Is there anybody here who disagrees

 6    with that rule of law?

 7              All right.  Thank you.

 8              Now I'll go back to jury service and ask the people,

 9    numbers 17 through 20, have any of you all previously been

10    selected to serve on a jury?  #18, Mr. Camenzind?

11              JUROR #18:  Perfect.

12              THE COURT:  Okay.  So tell me when and where your

13    prior jury service was.

14              JUROR #18:  It was in 1994.  It was in St. Louis, and

15    it was a criminal trial.

16              THE COURT:  And did the jury actually reach a

17    decision?

18              JUROR #18:  We did.

19              THE COURT:  Were you the foreperson?

20              JUROR #18:  I was.

21              THE COURT:  Can you tell me what type of case it was?

22              JUROR #18:  It was a rape case.

23              THE COURT:  Okay.  Thank you.

24              All right.  Then the next group over here, numbers 21

25    through 27, any of you all ever actually been selected to

1    serve on a jury?

2            THE CLERK:  There's another one.

3            THE COURT:  Oh, sorry.  I'll come back to you then.

4            Let me make a note here, #20.  Let me come to you,

5    Ms. Burns.  Tell me about yours.

6            JUROR #20:  It was about 15, 18 years ago, in

7    Hillsboro, and it was a civil case, I believe, and we didn't

8    reach a verdict because we were about halfway into the trial

9    and something happened or was said and the judge dismissed us.

10           THE COURT:  Okay.  So it ended before the jury got

11   the case to decide?

12           JUROR #20:  Right.

13           THE COURT:  All right.  Thank you.

14           Now I'll go over here.  #27, Mr. Orban?

15           JUROR #27:  Yes, ma'am.

16           THE COURT:  Tell me when and where your prior jury

17   service was.

18           JUROR #27:  November 2012, right across the hallway.

19           THE COURT:  Here on the 14th floor?

20           JUROR #27:  Yep.

21           THE COURT:  In Judge Jackson's court?

22           JUROR #27:  Yeah.

23           THE COURT:  Okay.  So what was the -- was it civil or

24   criminal?

25           JUROR #27:  It was a civil case.  The jury did reach

1   a verdict, and I was not the foreperson.

2            THE COURT:  Okay.  Thank you.

3            All right.  Now let me go to the next group, which is

4   numbers 28 through 31 over here.  Yes, #28.  And if you don't

5   mind, Mr. Gray, I'm going to ask you to stand up because it's

6   hard for the court reporter to see you.

7            JUROR #28:  No problem.

8            THE COURT:  So tell me when and where your prior jury

9   service was.

10           JUROR #28:  It was about five years ago, city of

11  St. Louis, employee theft.  It was criminal.  We did reach a

12  verdict, and I was the foreman.

13           THE COURT:  You were the foreperson.  Thank you.

14  Thanks.  You may be seated.

15           Anyone else on that row?

16           All right.  And the last row here in the middle,

17  numbers 32 through 36, anyone there actually selected?  Oh, we

18  got a home run almost.  So -- see, I'm doing it again.  That

19  doesn't work, does it?

20           Mr. Streicher, would you tell me when and where your

21  jury service was?  Oh, wrong one.  You're the one person who

22  didn't hold up his hand.

23           Mr. Pulley, would you tell me when and when your jury

24  service was?

25           JUROR #32:  Jefferson County, about 17 years ago, a

 1   personal injury lawsuit.  I was not the foreman.

 2          THE COURT:  And the jury did decide the case?

 3          JUROR #32:  Yes.

 4          THE COURT:  All right.  Thank you.

 5          Now, Mr. Baybo, did you have your hand up?

 6          JUROR #34:  Yes, ma'am.

 7          THE COURT:  Would you tell me when and where your

 8   jury service was?

 9          JUROR #34:  Approximately eight years ago in Clayton.

10   It was a criminal case.  I was the foreman, and we did not

11   reach a verdict.

12          THE COURT:  Was it a hung jury?

13          JUROR #34:  Yes.

14          THE COURT:  All right.  Thank you.  And then let's

15   see.  Ms. Masterson, did you have your hand up?

16          JUROR #35:  Yes, I did.

17          THE COURT:  And tell me when and where your jury

18   service --

19          JUROR #35:  A little over a year ago, in the city of

20   St. Louis.  It was a criminal case.  We did reach a verdict,

21   and I was not the foreperson.

22          THE COURT:  All right.  And then, actually,

23   Ms. Hayden, I said there was only one person who didn't, but I

24   think you didn't have your hand up either, did you?

25          JUROR #36:  No, no.

1          THE COURT:  All right.  Thank you.

2          Okay.  All right.  Now, for the -- yeah.

3          THE CLERK:  #8.

4          THE COURT:  Oh, I'm sorry.

5          JUROR #8:  I wanted to clarify.  The criminal case we

6   had, there were several charges, and we did hang on the one

7   charge, but we did come to a verdict on the other.

8          THE COURT:  Okay.  So -- and that can happen, so a

9   jury can reach a decision on some charges but not all the

10  charges, and that's what happened in your case?

11         JUROR #8:  Correct.

12         THE COURT:  Okay.  Thank you.

13         Now, is there anybody here who has previously served

14  on a jury where there's something about that prior jury

15  service that you think would make it difficult for you to

16  decide this case fairly?

17         All right.  Thank you.

18         Now, there will be witnesses.  There's a witness

19  list, but I'm going to let the lawyers read that to you to see

20  if you know any of the people involved in the case.

21         I now want to ask you about your involvement with --

22  I guess I'll start with substance abuse or -- well, let me

23  start with the criminal justice system, and I'm going to ask

24  these questions.  Here's what I'm going to ask.  I'm going to

25  ask you about your friends and family members who have --

1   have -- or yourselves -- who have been involved with the

2   criminal justice system as defendants.  I'm going to ask you

3   about your relationships with police officers and law

4   enforcement, whether you grew up in a law enforcement family

5   and things like that.  I'm also going to ask -- because this

6   case does involve controlled substances, I'm going to ask you

7   about friends and family members or yourselves involved with

8   substance abuse, and I will also ask you some questions about

9   firearms because it's a firearms case, and so I want you to

10  know we ask these questions in all cases, and when I start

11  with the people in your family who are involved in criminal --

12  in criminal cases as defendants, you know, I guess I like to

13  preface this by saying that it's -- it's -- there are a huge

14  percentage of American families who have someone who has been

15  involved in the criminal justice system, and so I please hope

16  you won't be embarrassed or feel like I'm picking on you by

17  asking you these questions, and this is the time when I

18  usually start telling people about my cousin who's been in and

19  out of jail most of his life, but we don't have to give you

20  all those stories and -- but if there is anything I should ask

21  here that, for some reason, you do not feel comfortable

22  answering in open court, you may approach sidebar and answer

23  it here at sidebar.  The lawyers will come up, and we'll hear

24  what you say, and it will be on the record so that we will

25  have a full record, but if there's anything like that -- and

1   because of the nature of this case, I don't think that will

2   happen, but if there is, let me know.

3        But the very first question I want to ask is if

4   there's any one of you on the panel who have yourselves ever

5   been convicted of a felony crime, and a felony crime is one

6   where you -- where the punishment could be more than a year in

7   jail.  Anyone here who has actually been convicted of a

8   felony?

9        All right.  Thank you.

10        Now I'm going to ask about your friends and family

11  members, and I really want this to be fairly broad and ask if

12  you have friends and family members who have been involved in

13  the criminal justice system as a defendant, whether they're

14  currently facing charges, they were in jail in the past, they

15  served time, they were charged with something but didn't

16  actually go to jail.  Anyone who -- and when I say friends and

17  family, I would include people that you believe you're close

18  to, so close friends, close relatives.

19        So anyone in the back row, have you had friends and

20  family members involved in the criminal justice system as a

21  defendant?  Anyone there?

22        All right.  In the next row, #7, close friends or

23  family members involved?  Yes, #8.

24        JUROR #8:  A brother-in-law.

25        THE COURT:  Your brother-in-law?

1          JUROR #8:  Uh-huh.

2          THE COURT:  And what was his -- what was he charged

3    with?

4          JUROR #8:  I guess a DUI.

5          THE COURT:  DUI?

6          JUROR #8:  Recreational vehicle.  And because it had

7    been in a certain interval, he ended up having to go to jail

8    for --

9          THE COURT:  Okay.  He had more than one in a certain

10   period of time?

11         JUROR #8:  Right.

12         THE COURT:  Okay.  Do you have an opinion about how

13   he was treated by the criminal justice system -- fairly,

14   unfairly, neutral, whatever?

15         JUROR #8:  He did it.

16         THE COURT:  Yeah.  Okay.  So you don't have any

17   strong feelings one way or another?

18         JUROR #8:  No.  I mean he -- you know.

19         THE COURT:  He was guilty of what happened?

20         JUROR #8:  Yeah.

21         THE COURT:  Yeah.  Okay.

22         JUROR #8:  I mean they followed all the rules and did

23   everything they should.

24         THE COURT:  Okay.  And there was someone else on that

25   row?  Ms. Roberts?  Yes.

1          JUROR #9:  A cousin.

2          THE COURT:  And can you tell me what your cousin was

3    charged with?

4          JUROR #9:  Assaulting a police officer.

5          THE COURT:  And was he convicted of that?

6          JUROR #9:  Yes.

7          THE COURT:  Did he do time?

8          JUROR #9:  Yeah, he's currently serving time now.

9          THE COURT:  He's currently in.  Can you tell me where

10   he's in jail?

11         JUROR #9:  I don't know exactly.

12         THE COURT:  Okay.  Is it in Missouri?

13         JUROR #9:  Yes, ma'am.

14         THE COURT:  And how long ago did the incident happen?

15   Do you know?

16         JUROR #9:  He was convicted last year.

17         THE COURT:  Okay.  Do you -- do you have an opinion

18   about how he was treated by the criminal justice system?

19         JUROR #9:  No, I don't.

20         THE COURT:  Have you been to visit him in jail?

21         JUROR #9:  No.

22         THE COURT:  Okay.  Thank you.

23         Someone else on that row had their hand up?

24         All right.  Then the front row, numbers 12 through

25   16, friends and family members involved in the criminal

1   justice system?

2          Yes, ma'am, Ms. Prince.

3          JUROR #12:  My best friend's husband was charged with

4   child pornography.

5          THE COURT:  And was that charge here in federal

6   court?

7          JUROR #12:  Well, he -- nothing's happened in court.

8   I mean he was just charged with it, and it's still ongoing.

9          THE COURT:  So let me see if I can sort of surmise

10  what might have -- did they -- did somebody come to his house

11  and actually arrest him?

12         JUROR #12:  Yes.

13         THE COURT:  Okay.  And then he's still waiting to

14  find out what would happen?

15         JUROR #12:  Yeah.  I mean he went to jail for a

16  couple of weeks, and she got him out, and he's doing like the

17  therapy and stuff, and I don't think he's been back to court

18  yet for anything.

19         THE COURT:  Okay.  And do you know where he's

20  charged, which court that is?

21         JUROR #12:  St. Charles County.

22         THE COURT:  St. Charles County.  Okay.  Thank you.

23  Do you have any opinion about how he's being treated by the

24  criminal justice system?

25         JUROR #12:  As far as I know, fine.  She doesn't -- I

1    mean I don't pry too much, but --

2          THE COURT:  Yeah.  So you don't have much of an

3    opinion one way or another?

4          JUROR #12:  No.

5          THE COURT:  All right.  Thank you.

6          And someone else on that row had their hands up?

7    Yes, #15, Mr. Hochecker?

8          JUROR #15:  Hochecker.

9          THE COURT:  Hochecker.  Okay.

10         JUROR #15:  My nephew, possession charge.

11         THE COURT:  Of drugs?

12         JUROR #15:  Yes.

13         THE COURT:  And do you know what -- what drug it was?

14         JUROR #15:  Marijuana.

15         THE COURT:  And how long ago did that happen?

16         JUROR #15:  Been a year ago.

17         THE COURT:  Did -- do you know what happened to him

18    or where --

19         JUROR #15:  He's on parole.  That's all I know.

20         THE COURT:  Yeah.  Did he actually serve any time in

21    jail?

22         JUROR #15:  A week or so, I think.

23         THE COURT:  Okay.  And how do you think he was

24    treated by the criminal justice system?

25         JUROR #15:  I really don't have an opinion.

1          THE COURT:  Okay.

2          JUROR #15:  I didn't -- I wasn't there through it.

3          THE COURT:  All right.  Thank you.  Did that happen

4   here in town or here in St. Louis area or elsewhere?

5          JUROR #15:  It was in the St. Louis area.

6          THE COURT:  Okay.  Anybody else that I missed on this

7   group?

8          All right.  The next group of people, numbers 17

9   through 20, anyone there with close friends or family involved

10  in the system in this way?

11         Yes.  Let me start with Mr. Camenzind.

12         JUROR #18:  A cousin.

13         THE COURT:  And tell me what -- what he was charged

14  with.

15         JUROR #18:  He was charged with multiple DWIs.

16         THE COURT:  Did he ultimately do time on that?

17         JUROR #18:  He did.  He received a 10-year sentence

18  and served two, I believe, two or three.

19         THE COURT:  All right.  Do you have an opinion about

20  how he was treated by the criminal justice system?

21         JUROR #18:  I do.  I think they were a bit lenient.

22         THE COURT:  Okay.  Does he have a serious alcohol

23  problem in your opinion?

24         JUROR #18:  He does.

25         THE COURT:  Has he gotten treatment for it since he's

1    been out?

2            JUROR #18:  I believe he received treatment for it --

3    and you can tell me if I'm wrong -- while he was in.

4            THE COURT:  Yeah, I mean that usually does happen in

5    prison.

6            JUROR #18:  Yeah, and --

7            THE COURT:  Do you know at the current time whether

8    he's sober or still having problems?

9            JUROR #18:  I do not believe he's sober.

10           THE COURT:  Okay.  Do you think there's anything

11   about that situation that would affect your ability to serve

12   fairly in this case?

13           JUROR #18:  I don't think so.

14           THE COURT:  Okay.  And then somebody else there had

15   their hand up.  Okay.  Mr. Calkins?

16           JUROR #19:  Yes.  My father.  Probably 25 years ago.

17   It was -- I wouldn't have an opinion about the court then.

18           THE COURT:  Do you know what he was charged with?

19           JUROR #19:  Some kind of a possession.

20           THE COURT:  Some kind of a drug case?

21           JUROR #19:  Yeah.

22           THE COURT:  And do you know what the drug was?

23           JUROR #19:  No, I don't.

24           THE COURT:  Okay.  And did -- did he go to jail?

25           JUROR #19:  Yes.

```
 1          THE COURT:  How long was he in jail?

 2          JUROR #19:  Eight to 10 years.

 3          THE COURT:  Did you go visit him when he was in jail?

 4          JUROR #19:  Yes.

 5          THE COURT:  And how long has he been out then?  Like

 6   15 years or --

 7          JUROR #19:  Umm, probably 10 to 12 years, 10 to 12 to

 8   15 years.

 9          THE COURT:  Okay.  And you said -- well, let me ask

10   you this.  Do you know where he was prosecuted?  Was it

11   federal court, state court?

12          JUROR #19:  I believe it was federal.

13          THE COURT:  And was it here in the St. Louis area?

14          JUROR #19:  No, ma'am.

15          THE COURT:  Okay.  It was in another state?

16          JUROR #19:  Yes, ma'am.

17          THE COURT:  Okay.  Is there anything about that

18   situation -- it sounds fairly serious.  I mean that's a long

19   sentence, and it's your father; it's a very close relative.

20   Do you think that would affect your ability to decide this

21   case fairly, which does involve an allegation of, you know, a

22   drug conspiracy?

23          JUROR #19:  No.

24          THE COURT:  Okay.  You think you can be fair?

25          JUROR #19:  Yes.
```

1          THE COURT:  All right.  Thank you.

2          And, Ms. Burns, you had your hand up?  Yes.

3          JUROR #20:  Yes.  My husband was charged probably 15

4   or 20 years ago with a DUI and a concealed weapon, and he just

5   received probation.

6          THE COURT:  Okay.  And so that was, you said, 15 or

7   20 years ago?

8          JUROR #20:  Yeah.

9          THE COURT:  And has he had any trouble since?

10         JUROR #20:  No.

11         THE COURT:  Do you have any opinion about how he was

12  treated by the criminal justice system?

13         JUROR #20:  No.  He was fairly treated.

14         THE COURT:  Okay.  All right.  Thank you.

15         Now I want to take the people on this row here.

16  Anyone there who has close friends or family involved in the

17  criminal justice system?

18         All right.  Let me see if I get this.  Ms. -- is that

19  Rice Hill?

20         JUROR #23:  Uh-huh.

21         THE COURT:  All right.  Can you tell me who in your

22  friends or family?

23         JUROR #23:  Someone I'm not close to anymore but was

24  about five years ago, a little over five years ago.

25         THE COURT:  A friend?

```
 1              JUROR #23:  A boyfriend.

 2              THE COURT:  Okay.

 3              JUROR #23:  Multiple DUIs.  Probation violation.

 4   Went to prison.

 5              THE COURT:  Did you ever visit him in prison?

 6              JUROR #23:  No.

 7              THE COURT:  And I understand he's no longer your

 8   boyfriend?

 9              JUROR #23:  Correct.

10              THE COURT:  And do you -- do you have an opinion

11   about how he was treated by the criminal justice system?

12              JUROR #23:  Very fairly.

13              THE COURT:  All right.  Thank you.

14              And Ms. Mitchell?

15              JUROR #24:  I have a nephew-in-law that was in

16   jail -- a gun charge, but I don't ever see him.  I'm not close

17   to him.  I don't even know the true facts about it.

18              THE COURT:  Right.

19              JUROR #24:  I just know he was in jail.

20              THE COURT:  And how long ago did that happen?

21              JUROR #24:  Seven or eight years.

22              THE COURT:  Did -- did -- do you know if he

23   actually -- how much time he actually served?  Was he -- if he

24   was just arrested and spent a little time in jail or was

25   sentenced to a longer time?
```

1             JUROR #24:  I was told four years, but I cannot say

2      that's a fact.  I don't even think we're supposed to know.

3             THE COURT:  Yeah.  In some families, I understand

4      that's -- that people don't go around talking about it at

5      Christmas dinner.

6             JUROR #24:  And I don't ever see him, so . . .

7             THE COURT:  Yeah.  Is -- is there -- do you have any

8      opinion about how he was treated by the system?

9             JUROR #24:  No.  I wasn't even around at that time

10     where he was.

11            THE COURT:  Thank you.

12            And then Ms. -- is it Schieffer?

13            JUROR #25:  Schieffer.

14            THE COURT:  Can you tell me who in your family or

15     friends you're talking about?

16            JUROR #25:  I have a brother-in-law that had a DWI,

17     several DWIs.

18            THE COURT:  And do you have an opinion about how he

19     was treated?

20            JUROR #25:  Very fairly.

21            THE COURT:  Did he actually do time in jail?

22            JUROR #25:  He was on probation for several years

23     after that.  It's been two to three years ago, and then he did

24     do DWI court in Warren County.

25            THE COURT:  Okay.  All right.  Anyone else in that

1    row?

2           All right.  Then the people on the back row over

3    here, numbers 28 through 31, anyone there have friends or

4    family involved in the criminal justice system?

5           Let's see.  Yes, ma'am, Ms. -- is it Wesley Toney or

6    Toney?

7           JUROR #31:  Toney.

8           THE COURT:  I'm sorry?

9           JUROR #31:  Toney.

10          THE COURT:  Toney.  Okay.  Ms. Toney, can you tell me

11   who in your family or friends were involved in the criminal

12   justice system?

13          JUROR #31:  I have an uncle and a cousin.

14          THE COURT:  And do you know what their crimes -- what

15   charges they had?

16          JUROR #31:  I believe my uncle's is for molestation

17   of a minor.  He's doing time for that in prison.  I think he

18   will serve up to 10 years.

19          THE COURT:  Okay.

20          JUROR #31:  And then I have a cousin, which was his

21   son, who just got out about a year ago, and he did time for

22   five years in prison.

23          THE COURT:  And do you know what that charge was?

24          JUROR #31:  Armed robbery and a bunch of other

25   things.

1           THE COURT:  Do these -- do these relatives live in

2     this area?

3           JUROR #31:  No.  Missouri, though, but no.

4           THE COURT:  But not here?  Okay.  So not in the

5     St. Louis metro area?

6           JUROR #31:  No.

7           THE COURT:  Okay.  Did you ever visit either one of

8     them in jail?

9           JUROR #31:  Huh-uh.

10          THE COURT:  And that's a no?  I have to hear it; the

11    court reporter --

12          JUROR #31:  No.  I'm sorry.

13          THE COURT:  That's okay.  We have to take it down.

14          JUROR #31:  No.

15          THE COURT:  Okay.  And then do you have an opinion

16    about how he was treated by the criminal justice system?

17          JUROR #31:  No, I don't have an opinion.

18          THE COURT:  All right.  All right.  And then the next

19    row of people, the last row, any of you all with friends or

20    family involved in the criminal justice system?

21          All right.  And let me just start with you,

22    Mr. Pulley.

23          JUROR #32:  This was my sister-in-law's sister.  She

24    was charged with murder.  She was just sentenced to eight

25    years.

1           THE COURT:  Where did that happen?

2           JUROR #32:  Kansas City area.

3           THE COURT:  That's a fairly serious crime.  And she

4    was just recently sentenced?

5           JUROR #32:  Yeah.  It was a plea bargain.  I think

6    she was sentenced for manslaughter.

7           THE COURT:  Do you know any of the circumstances

8    surrounding that crime?

9           JUROR #32:  Just that I think her and her boyfriend

10   were out partying and when they got home he got shoved down a

11   staircase.

12          THE COURT:  Okay.  It didn't involve a firearm to

13   your knowledge?

14          JUROR #32:  No.

15          THE COURT:  All right.  Do you have an opinion about

16   how she was treated by the criminal justice system?

17          JUROR #32:  Other than that they didn't get her off

18   the street fast enough, no.

19          THE COURT:  Is this somebody you didn't have the

20   greatest relationship with even before this?

21          JUROR #32:  My sister-in-law never had a great

22   relationship with her.

23          THE COURT:  Okay.  Yeah.  That's -- that's where --

24   yeah, where it goes.  Okay.  All right.  And did you have

25   someone else to talk about?

1          JUROR #32:  No.

2          THE COURT:  Okay.  Do you think that would affect

3    your ability to serve fairly on this jury?

4          JUROR #32:  No.

5          THE COURT:  All right.  Thank you.

6          And then Mr. Streicher?

7          JUROR #33:  Streicher.

8          THE COURT:  Streicher.  Okay.

9          JUROR #33:  German.

10         THE COURT:  Got to remember that.  And so tell me who

11   in your friends and family.

12         JUROR #33:  Daughter.  DWI.

13         THE COURT:  Your daughter?

14         JUROR #33:  Yes.

15         THE COURT:  And how long ago was that?

16         JUROR #33:  Probably two, three years ago.

17         THE COURT:  Did she actually serve time?

18         JUROR #33:  No.

19         THE COURT:  And is she doing okay now?

20         JUROR #33:  Yep.

21         THE COURT:  What's your opinion about how she was

22   treated by the criminal --

23         JUROR #33:  It was fair.

24         THE COURT:  Okay.  All right.  And then, Mr. Baybo,

25   did you have your hand up?

```
 1                JUROR #34:  Yes, ma'am.

 2                THE COURT:  And tell me who in your family.

 3                JUROR #34:  Friend and neighbor.

 4                THE COURT:  And what was that person charged with?

 5                JUROR #34:  A DWI.

 6                THE COURT:  And how long ago was that?

 7                JUROR #34:  I think maybe two years ago.

 8                THE COURT:  Did that person do time in jail or

 9      prison?

10                JUROR #34:  She did a shock therapy, like three days.

11                THE COURT:  Yeah.  And do you have an opinion about

12      how -- how she was treated by the criminal justice system?

13                JUROR #34:  No, ma'am.

14                THE COURT:  Okay.  And then anyone else on that row?

15                Yes, #26, did you have an answer?

16                JUROR #26:  Yeah, I did want to interject.  I did

17      have a neighbor that was convicted of robbery, of bank

18      robbery.

19                THE COURT:  A bank robber?

20                JUROR #26:  Yeah.

21                THE COURT:  How long ago was his conviction?

22                JUROR #26:  About ten years ago.  I think he was

23      sentenced to four years in Fulton.

24                THE COURT:  And did you know him at that time?

25                JUROR #26:  At that time, I did not.  I had moved
```

1    away.

2            THE COURT:  But you know him now?

3            JUROR #26:  No, I don't.  I haven't seen him since,

4    but I mean we lived across the street from each other

5    literally for 12 years.

6            THE COURT:  And then after you moved away, you heard

7    that this had happened?

8            JUROR #26:  Yes, yes.

9            THE COURT:  Okay.  Do you have an opinion about how

10   he was treated?

11           JUROR #26:  I think he was treated fairly.

12           THE COURT:  Yeah.

13           Is there anyone I missed?  Yes, ma'am, #14.

14           JUROR #14:  I know this sounds crazy, but I forgot my

15   husband had a DUI.

16           THE COURT:  Okay.

17           MR. JIMERSON:  I'm sorry.  I didn't hear that.

18           THE COURT:  She said her husband had a DUI.

19           MR. JIMERSON:  Okay.

20           THE COURT:  And how long ago was that?

21           JUROR #14:  Sixteen years.

22           THE COURT:  And did he -- what happened?  What was

23   the result of that?  Was it --

24           JUROR #14:  His license was suspended and --

25           THE COURT:  That was it?

```
 1              JUROR #14:  That was it.

 2              THE COURT:  And do you have an opinion about how he

 3    was treated?

 4              JUROR #14:  It was fair.

 5              THE COURT:  Okay.  And then there was someone else.

 6    Yes, #1, Ms. Reinhardt.

 7              JUROR #1:  Yeah.  My brother-in-law, I think, has two

 8    DUIs.  I don't really know much about it.  My uncle's a ward

 9    of the state.  I guess he has been in and out of jail, but I

10    don't really know him very well.  And then my uncle-in-law I

11    never knew, I guess, was gunned down on Christmas, and he was

12    selling cocaine.

13              THE COURT:  And that was this recent Christmas?

14              JUROR #1:  No.  I'd never actually met him.

15              THE COURT:  Oh, okay.

16              JUROR #1:  It was a really long time ago.

17              THE COURT:  A long time ago, so it was something your

18    husband told you about in his family?

19              JUROR #1:  Yeah.

20              THE COURT:  Yeah.  When you said your uncle was a

21    ward of the state, is it -- is he -- does he have some

22    disability or --

23              JUROR #1:  Yeah.  I guess he just has a lot of mental

24    issues.  Bipolar.  He was released and was able to, you know,

25    obtain his own apartment for a while, and then I guess that
```

1    didn't go very well, and so he was, you know, taken back.  He

2    can't really take care of himself.

3              THE COURT:  Right.  And so he's got -- he's been

4    through the criminal justice system as well?

5              JUROR #1:  Yeah.  I know in California and currently

6    in Missouri.

7              THE COURT:  All right.  Thank you.  Now, is there

8    anything about those situations that would affect your ability

9    to be fair?

10             JUROR #1:  No.

11             THE COURT:  And those of you -- I didn't ask

12   everybody that question, and I meant to, so if I didn't ask

13   you, is there anybody here who thinks their relative or

14   friend's situation with the criminal justice system would make

15   it hard for them to judge this case fairly?

16             Now, I just want to make sure because I'm not sure of

17   how I asked it.  Did -- is there anybody here who has close

18   friends or relatives, if you haven't already told me about it,

19   who are currently facing any charges?

20             All right.  Thank you.

21             Now I want to ask about friends and family members

22   who are in law enforcement, and in particular, I want to know,

23   again, if you have close family, close friends, in particular,

24   you know, if you grew up around a law enforcement family or

25   have a lot of friends who are law enforcement officers, but

1    I'd also like to know generally just do you know people or

2    consider people close friends or family who are involved in

3    law enforcement, and I'm describing law enforcement very

4    broadly, and that would include, obviously, you know, city and

5    county and state police.  It would also include anybody who

6    works for a prison or works for a police department even if

7    they're, like, a dispatcher or something.  It would include

8    anybody who was a prosecuting attorney.  It would also include

9    anybody who works for any of the federal law enforcement

10   agencies.  Now, you've heard reference to the Bureau of

11   Alcohol, Tobacco and Firearms.  They're involved in this case,

12   but there are several other federal law enforcement

13   agencies -- the Drug Enforcement Administration, the Secret

14   Service, the FBI, the Postal Inspectors.  There's a lot of

15   different law enforcement people in various areas, and so if

16   you know anybody who's involved in law enforcement as I've

17   defined it very broadly and if they're somebody -- not just

18   somebody you vaguely know but somebody you see or you know

19   well or you're related to, I'd like to know about that.

20          So, again, the back row, friends and family members

21   in law enforcement?

22          All right.  And let me start with #1, Ms. Reinhardt.

23          JUROR #1:  My uncle is a retired police officer.  I

24   believe he -- of Shrewsbury.

25          THE COURT:  Okay.

1          JUROR #1:  Or maybe it was Crestwood.

2          THE COURT:  Okay.  Thank you.

3          And #2, Ms. Blust, or is it Blust or Blust?

4          JUROR #2:  Either way.  It doesn't matter to me.

5          THE COURT:  Okay.

6          JUROR #2:  My cousin's an attorney.  Her dad was in

7    the AFOSI.  I also have a cousin in the INS or Homeland

8    Security.  I think that's it.

9          THE COURT:  AFOSI -- is that --

10          JUROR #2:  Air Force Office of Special

11   Investigations.

12          THE COURT:  So he was an Air Force policeman?

13          JUROR #2:  He's in Air Force Special Investigations.

14          THE COURT:  Okay.  Yeah.  All right.  And your cousin

15   who's the attorney is -- what kind of practice does that

16   person have?

17          JUROR #2:  She mainly handles disability cases in

18   Poplar Bluff.

19          THE COURT:  Okay.  All right.  And then let's see.

20   Who else had their hands up there?  #4, Ms. Clayton.

21          JUROR #4:  My boyfriend was a police officer in

22   Byrnes Mill up to about three years ago.

23          THE COURT:  I'm sorry.  I can't hear you.

24          JUROR #4:  My boyfriend was a police officer in

25   Byrnes Mill up to about three years ago.

1          THE COURT:  What does he do now?

2          JUROR #4:  He works for a security company, but for

3    the last four years, he was working in Michigan, so he was

4    part-time.

5          THE COURT:  Okay.  And so he's worked in law

6    enforcement off and on?

7          JUROR #4:  Yes.

8          THE COURT:  Okay.  And -- all right.  And then

9    someone else on that row had their hand up?  Yes, Ms. Boyer.

10          JUROR #6:  I have a good friend that's a state

11    patrolman, Troop C, and I have a nephew that works in the

12    prison system.

13          THE COURT:  Okay.  Where does your nephew work?

14          JUROR #6:  Bonne Terre.

15          THE COURT:  All right.  Now let me ask the next row

16    of people, numbers 7 through 11.  Yes, sir, Mr. Payne.

17          JUROR #7:  I have a sister that's a deputy sheriff in

18    St. Francois County, and I have an uncle and a cousin that's

19    lawyers.  One's in Madison County.  One's here in St. Louis.

20          THE COURT:  Do you know if either of the lawyers are

21    involved in -- do criminal work, or do they do civil work?

22          JUROR #7:  No.  Just civil work.

23          THE COURT:  Okay.  All right.  Thank you.

24          And others on that row?  Yes, ma'am, Ms. Schneider.

25          JUROR #10:  My niece -- her husband is a sergeant on

1    the SWAT team.  I'm pretty sure it's South County.

2            THE COURT:  All right.  Thank you.

3            Others?

4            The front row then, numbers 12 through 16.

5            Number -- let's see; I'm sorry -- 13, Ms. -- is it

6    Deichmann?

7            JUROR #13:  Very good.

8            THE COURT:  Okay.

9            JUROR #13:  My nephew's fiancée is a Webster Groves

10   police officer.

11           THE COURT:  All right.  Thank you.

12           And someone else had their hand up on that row.

13           Yes, ma'am, Ms. Dooley.

14           JUROR #14:  My uncle is a retired St. Louis County

15   police officer, and my college roommate married a St. Louis

16   County police officer, but I haven't seen them in like 20

17   years.  We were close at the time.

18           THE COURT:  You were close when she married him?

19           JUROR #14:  Right.

20           THE COURT:  Yeah.  All right.  Others on that row?

21           Yes, sir, #15, Mr. Hochecker.

22           JUROR #15:  A friend of mine, officer of Manchester.

23   He's a police detective.

24           THE COURT:  He's a detective?

25           JUROR #15:  Yeah.

1          THE COURT:  All right.  And Mr. Councilor?

2          JUROR #16:  Yeah.  I don't know if this is a close

3   enough relative, but my dad's cousin married someone who

4   retired from the ATF recently, and going back to what you were

5   asking about earlier, my college roommate had multiple DWIs,

6   and I was close to him at that time, and, you know, not

7   somebody I'm in regular contact with now.

8          THE COURT:  Yeah.  So the college roommate, you're

9   not in contact again?

10          JUROR #16:  Right.

11          THE COURT:  Okay.  And the -- the person -- your

12   dad's cousin married someone who was -- did that -- I'm trying

13   to decide if what you were telling me was the retirement

14   recently happened or the marriage recently happened or both.

15          JUROR #16:  They've been married for 40 years.

16          THE COURT:  Okay.

17          JUROR #16:  Just recently retired.

18          THE COURT:  But she just recently retired or he just

19   recently retired?

20          JUROR #16:  He just recently retired.

21          THE COURT:  Okay.  I'm having trouble here with

22   pronouns.  So -- and do you know what he did?

23          JUROR #16:  He was pretty high up out in Washington,

24   DC, towards the end.  That's about all I know.

25          THE COURT:  Can you tell me his name?

```
 1              JUROR #16:  Wally Nelson.

 2              THE COURT:  Wally Nelson?

 3              JUROR #16:  Yeah.

 4              THE COURT:  All right.  The lawyers can figure out if

 5    this is someone that anybody knows or is involved with.

 6    Assuming that person is not involved at all in this case, do

 7    you think that relationship or knowing that person -- it

 8    sounds a little bit attenuated -- would affect your ability to

 9    be fair in this case?

10              JUROR #16:  No.

11              THE COURT:  You could still give both the Defendant

12    and the Government the same fair trial?

13              JUROR #16:  Yes.

14              THE COURT:  All right.  Thank you.

15              All right.  Then the next group of people over here,

16    friends and family members with law enforcement family or

17    friends?

18              Yes, #18.

19              JUROR #18:  A friend.  She's a prosecutor in

20    St. Louis County.

21              THE COURT:  And what is her name?

22              JUROR #18:  Lorena von Kaenel.

23              THE COURT:  All right.  Thank you.

24              And the -- let's see.  #19, let me take Mr. Calkins.

25              JUROR #19:  I have a friend that's a St. Charles
```

1    County cop, I guess.  Two other friends, they're both

2    dispatch.  I think one's O'Fallon and one's St. Charles

3    County, and we have a friend who's a lawyer.

4            THE COURT:  And does the lawyer -- what kind of law

5    does the lawyer practice?

6            JUROR #19:  I think it's mostly civil, traffic and

7    stuff, DUIs.

8            THE COURT:  And Ms. Burns?

9            JUROR #20:  I have an -- I guess he's more of an

10   acquaintance than a close friend.  He's a police officer in

11   Jefferson County, I believe.  I think he does undercover work

12   of some type.

13           THE COURT:  All right.  Thank you.  And then on the

14   front row here, numbers 21 through 27, anyone there with

15   friends and family members in law enforcement?

16           Yes, Mr. Orban, #27.

17           JUROR #27:  Yeah.  We have a friend of the family

18   that's a retired highway patrolman.

19           THE COURT:  All right.  And then the four people over

20   or the numbers -- I can't find your numbers -- 28 through 31.

21           Yes, ma'am.  That's Ms. Hayes?

22           JUROR #29:  Yes.  My dad was a police officer in

23   Sedalia and Jeff City, Missouri.

24           THE COURT:  Okay.  Your dad was a police officer in

25   Sedalia and Jeff City?

1          JUROR #29:  Yes.

2          THE COURT:  And is he retired now?

3          JUROR #29:  Yes.

4          THE COURT:  And let's see.  Mr. Walterman, did you

5   have your hand up?

6          JUROR #30:  No, ma'am.

7          THE COURT:  Okay.  Then somebody else?  Ms. Toney,

8   did you have your hand up?

9          JUROR #31:  (Shakes head from side to side.)

10          THE COURT:  Okay.  All right.  Then the last group of

11   people, numbers 32 through 36.  All right.  So, Mr. Pulley,

12   can you tell me who in your friends and family are involved in

13   law enforcement or have been?

14          JUROR #32:  Growing up, I had neighbors that were a

15   county sheriff and a highway patrolman.  They were good -- my

16   family knew them well -- good friends with my parents.  And

17   then I know somebody that works -- a man who works in the

18   forensics lab in St. Charles County.

19          THE COURT:  All right.  And then Mr. Streicher.

20          JUROR #33:  Cousin, retired detective in Florissant.

21          THE COURT:  All right.  And then, Mr. Baybo, did you

22   have your hand up?

23          JUROR #34:  (Shakes head from side to side.)

24          THE COURT:  All right.  Anyone else there?

25          All right.  Thank you.  Ms. Masterson?

1          JUROR #35:  Yes.  We have quite a few friends who are

2     St. Louis City police officers.  Most of them retired.  Most

3     of them are homicide.  One is now a federal investigator for

4     the State of Illinois.  One's a sheriff's deputy for the City.

5          THE COURT:  All right.  So you know a number of

6     people?

7          JUROR #35:  Yes.

8          THE COURT:  All right.  And I'm not sure if I asked

9     you all this, but -- well, I know I didn't ask it in this way.

10    The United States -- the lawyers here are Assistant United

11    States Attorneys.  The actual United States Attorney for the

12    Eastern District of Missouri, this district, is a man named

13    Richard Callahan.  Does anyone know Mr. Callahan?

14          Does anyone know anybody who works for the U.S.

15    Attorney's Office?

16          JUROR #14:  (Raises hand.)

17          THE COURT:  And you've told me who you know?

18          JUROR #14:  Yes, Carol.

19          THE COURT:  Carol.  Well, she works for the court,

20    not for the U.S. Attorney's Office, but that -- they are

21    different.  That's the -- does anybody else know anyone who

22    works for this federal court in any capacity?

23          Do any of you all know each other?  Sometimes people

24    get to jury duty and they see somebody they haven't seen since

25    high school, like you saw somebody working in the court you

```
 1   hadn't seen.  Yes, #28.  I'm sorry.  35.

 2          JUROR #35:  35.  I don't know if you mean this

 3   particular federal court or in this building.

 4          THE COURT:  In the building.

 5          JUROR #35:  I'm acquainted with Judge Sherri Sullivan

 6   and Tom Mummert.

 7          THE COURT:  Oh, okay.  And so, actually -- yeah, so

 8   Judge Mummert works here.  He's out of town this week, I could

 9   tell you.  Judge Sullivan works actually in the Missouri Court

10   of Appeals.

11          JUROR #35:  Okay.

12          THE COURT:  But so you do -- you are acquainted with

13   both of them?

14          JUROR #35:  Acquainted, yes.

15          THE COURT:  Anybody else know any other judges that

16   you haven't already told us about?  #1.

17          JUROR #1:  Judge Ohmer.

18          THE COURT:  Yeah, Judge Ohmer in St. Louis County.

19          JUROR #1:  Uh-huh.

20          THE COURT:  Okay.  Anybody else know any other

21   judges?

22          All right.  So of all these relationships you've told

23   me about, both with law enforcement officers, people in

24   various aspects of the -- of the legal system where you know

25   those people, is there anything about any of your
```

1    relationships that might make it difficult for you to judge

2    this case fairly?

3           And a couple of you -- I guess, Ms. Masterson, maybe

4    I'll pick on you since you have a lot of friends who are

5    police officers and know some judges.  When I -- part of what

6    I'm trying to ask is, if you were to listen to the evidence in

7    the case and based on the evidence and the law decide that

8    this Defendant was not guilty and return that verdict and the

9    other -- you know, that was the verdict in the case, when you

10   next saw your friends who are all retired law enforcement

11   officers and you tell them you were on jury duty and they ask

12   you what happened, would you be embarrassed to tell them that

13   you found someone not guilty?

14          JUROR #35:  Not at all.

15          THE COURT:  Would that make you hesitate in any way

16   to act?

17          JUROR #35:  No.

18          THE COURT:  Thank you.  So that's really what I'm

19   asking all the rest of you more or less.  I mean, is there any

20   reason that those relationships would make it hard?

21          Okay.  Thank you.

22          Your job in this case will be to determine what --

23   well, here's how we say it, and Judge Sippel may have said

24   something like this to you yesterday.  There are two parts of

25   a case.  There's the facts and the law, and I'm the judge of

1   the law, and the jury is the judge of the facts.  If you are

2   selected to serve on the jury, it will be your job to listen

3   to the evidence and then to decide what you believe happened

4   in the case, and then I will give you instructions about the

5   law.  The ones you get at the end of the case will be in

6   writing, and you'll take them with you to the jury room, and

7   then it will be your job to decide whether -- based on the law

8   that I give you and the evidence that you determined was --

9   was what you believed happened in the case -- whether the

10  Government has met its burden of proving the Defendant guilty

11  beyond a reasonable doubt.  Is there anybody who thinks that,

12  "Well, I'm not sure" -- you know, well, let me back up.  If

13  you're the judge -- I'm the judge of the law, and you have to

14  follow the law that I give you in my instructions.  I will

15  tell you what the law is.  I assure you I don't make it up.  I

16  get it from the Congress of the United States and the Supreme

17  Court of the United States, and -- but I will tell you what

18  the law is, and then it will be your job to follow that.  You

19  know, you decide the facts, I decide the law, and so is there

20  anybody who thinks that they could not follow my instructions

21  on the law even if they disagreed with them?  It's not usual

22  for someone to disagree with the law, but sometimes you do,

23  but your job as a juror is to follow the law even if you don't

24  think it's right.  Is there anybody who has any problem with

25  that?  And I have to tell you that's the same oath I take.  I

1    take an oath to follow the law whether it would be a law I

2    personally agreed with or not, and I have to do that, and

3    that's what we're asking you of you as well.  Anybody who has

4    a problem with that?  And there are some very legitimate

5    disputes over it, and people do dispute them from time to

6    time.

7              Now I want to ask you about -- because this case does

8    involve allegations of a conspiracy to possess drugs -- and in

9    particular, it's an allegation of conspiracy to possess

10   cocaine -- I need to know about whether you all have any

11   friends or relatives who have had serious problems with

12   substance abuse and whether that would include cocaine or any

13   other illegal substance or if it would include even alcohol

14   because substance abuse is substance abuse, as we all now

15   know.  Anyone who has close friends or family who has had

16   serious problems with substance abuse at the current time or

17   in the past?

18             So let me take the first row, back row of people.

19   Yes, #4.

20             JUROR #4:  My ex-husband.

21             THE COURT:  Your ex-husband.  And what was his

22   substance problem?

23             JUROR #4:  Marijuana and alcohol that I know of.

24             THE COURT:  And how long have you all been divorced?

25             JUROR #4:  Let's see here.  Ten years.

1          THE COURT:  Ten years.  Do you know how he's doing

2   now?

3          JUROR #4:  As far as I know, he doesn't use either

4   one now.

5          THE COURT:  You think he's clean and sober now?

6          JUROR #4:  (Nods head up and down.)

7          THE COURT:  Okay.  Anyone else in that row?

8          The next row of people, numbers 7 through 11.  Anyone

9   there?  All right.  #8?

10          JUROR #8:  I have a -- well, an ex-boyfriend who used

11   marijuana and alcohol.

12          THE COURT:  And do you know how he's doing now?

13          JUROR #8:  No.

14          THE COURT:  You don't know one way or another?

15          JUROR #8:  No.

16          THE COURT:  Okay.  And --

17          JUROR #8:  And another good friend who had alcohol.

18          THE COURT:  And you said "had"; does that mean that

19   person's sober?

20          JUROR #8:  He's doing very well.

21          THE COURT:  He's doing well and sober now?

22          JUROR #8:  (Nods head up and down.)

23          THE COURT:  All right.  And, Ms. Roberts, did you

24   have your hand up?

25          JUROR #9:  Yeah.  I have an aunt.  Crack cocaine.

1    She's now 10 years sober.

2         THE COURT:  That's great.

3         JUROR #9:  And an uncle that OD'd on heroin.

4         THE COURT:  How long ago did he OD on heroin?

5         JUROR #9:  About three years.

6         THE COURT:  That's, obviously, a really serious issue

7    to have someone die from using drugs.  Do you think that would

8    make it hard for you to decide this case fairly?

9         JUROR #9:  No.

10        THE COURT:  All right.  Thank you.  And Ms. -- let's

11   see.  Yeah, Ms. Dohack?

12        JUROR #11:  Yes.  My brother, about eight years ago,

13   was addicted to pain pills and marijuana, but he's clean now.

14        THE COURT:  He's clean now?

15        JUROR #11:  (Nods head up and down.)

16        THE COURT:  Okay.  All right.  The next group of

17   people, numbers -- I'm sorry -- 12 through 16.

18        Yes, Ms. Prince.

19        JUROR #12:  I have alcoholism in my family.

20        THE COURT:  Your -- yeah, I mean, and that's true;

21   often it is in the whole families.

22        JUROR #12:  Yeah.  My dad.

23        THE COURT:  Are the people in your family who have

24   struggled with this doing okay now or still struggling?

25        JUROR #12:  My dad passed away six years ago from it.

1          THE COURT:  Okay.  And alcohol was a factor?

2          JUROR #12:  I mean it led up to it.  He had cirrhosis

3     and stuff, so it contributed to it.

4          THE COURT:  Well, I can sympathize with that.  My own

5     father had that as well, and that's -- he -- he actually

6     didn't die of cirrhosis.  He got clean 10 years before he died

7     and died of something else, so that was nice he had 10 years,

8     but I do understand it.  And so other people have struggled as

9     well?

10         JUROR #12:  Uh-huh.

11         THE COURT:  All right.  Thank you.

12         THE COURT:  Others in that row?  Yes, #14.

13         JUROR #14:  Also a lot of alcoholism in the family.

14    Large Irish family.

15         THE COURT:  You know, I was going to make that

16    stereotypical remark and thought better of it, but since you

17    did, that's -- you know, it's a stereotype, but it doesn't

18    mean it's always true.

19         JUROR #14:  But it's true.

20         THE COURT:  So are people in your -- do you still

21    have people in your family who are still struggling actively

22    or still drinking too much actively?

23         JUROR #14:  Oh, yeah.

24         THE COURT:  Okay.  Is there anything --

25         JUROR #14:  I'm not real close with them, but I -- I

 1  mean it's a huge family.

 2          THE COURT:  Right.

 3          JUROR #14:  So, yeah.

 4          THE COURT:  Okay.  Thank you.

 5          Others on that row had their hand up.

 6          Yes, Mr. Councilor.

 7          JUROR #16:  My grandfather, apparently, was an

 8  alcoholic.  We didn't have much contact with him, though,

 9  so --

10          THE COURT:  You haven't had -- you never had contact

11  with him?

12          JUROR #16:  Only a few times when he was alive.

13          THE COURT:  Okay.  Thank you.

14          And numbers 17 through 20?   #18, Mr. Camenzind.

15          JUROR #18:  A brother -- cocaine and meth.

16          THE COURT:  Cocaine and meth?

17          JUROR #18:  Yes.

18          THE COURT:  And how's he doing now?

19          JUROR #18:  Not well.

20          THE COURT:  Has he gotten any treatment?

21          JUROR #18:  He's been through treatment many times.

22          THE COURT:  Thank you.

23          JUROR #18:  You're welcome.

24          THE COURT:  And I think -- Mr. Calkins, did you have

25  your hand up?

1        JUROR #19:  I did not, but my brother-in-law did at

2   one point have some issues with -- I think it was some form of

3   cocaine, and he's good now.

4        THE COURT:  He's doing okay now?

5        JUROR #19:  (Nods head up and down.)

6        THE COURT:  Thank you.

7        And, Ms. Burns, did you have your hand up?

8        JUROR #20:  Yes.  Well, my husband, he's clean now.

9   He hasn't had anything to drink in probably 15 years.  I had

10  two brothers that struggled with alcohol.  My oldest brother

11  is deceased now.  My other brother is much better.  And I have

12  a nephew, my brother's son, who struggles with alcohol and

13  drugs, and I really don't know.  He's kind of back and forth.

14  I don't know how he's doing right now.

15        THE COURT:  Do you know what drugs he uses besides

16  alcohol?

17        JUROR #20:  I really don't.

18        THE COURT:  Okay.  Thank you.

19        All right.  Now, the next group of people, numbers 21

20  through 27.  Let's see.  Yes, Ms. Rice Hill.  No.  Yeah,

21  Ms. Rice Hill.

22        JUROR #23:  Uh-huh.  The person I spoke of earlier

23  with the DUI charges is an alcoholic.

24        THE COURT:  Right.  And I think you said -- well, do

25  you still -- do you know how he's doing now?

1          JUROR #23:  No idea.

2          THE COURT:  Okay.  And let's see.  Others had their

3    hands up there.  Yes, Ms. Schieffer -- Schieffer.  I said it

4    right the first time, wrong the second time.

5          JUROR #25:  My brother-in-law with a DWI charge.  And

6    then I have a biological grandfather I never met that died

7    from alcoholism.

8          THE COURT:  All right.  Others in that row?

9          Yes, Mr. Orban.

10          JUROR #27:  Yeah.  My great grandfather was an

11    alcoholic.  Also, my grandmother's boyfriend is an alcoholic.

12          THE COURT:  Currently?

13          JUROR #27:  Yes.

14          THE COURT:  All right.  Then the next row of people,

15    numbers 28 through 31.

16          JUROR #28:  My mother is an alcoholic, has been for

17    years.

18          THE COURT:  And has she gotten treatment?

19          JUROR #28:  No.  Resists all treatment.

20          THE COURT:  Resists treatment, yeah.  Well, you have

21    my sympathy also.

22          All right.  And, Ms. Hayes, did you have your hand

23    up?

24          JUROR #29:  Yes.  My husband's cousin has been on and

25    off meth for the past 10 years.

 1              THE COURT:  All right.  Thank you.

 2              And others in that row?

 3              And then the last row of people, friends and family

 4    members with substance abuse problems?

 5              All right.  So Mr. Pulley?

 6              JUROR #32:  My cousin and my father-in-law.  Both

 7    alcoholics.  Both contributed to their deaths.

 8              THE COURT:  Okay.

 9              JUROR #32:  And my wife's from a large Irish family

10    also, so --

11              THE COURT:  Yeah, so other people who have issues.

12              Mr. Streicher?

13              JUROR #33:  My youngest son had a bout with cocaine.

14              THE COURT:  And how long ago was that?

15              JUROR #33:  It's been probably around six or eight

16    years ago.

17              THE COURT:  And is he doing okay now?

18              JUROR #33:  Yes, he's doing great.  I will tell you I

19    have a major issue with drug use.

20              THE COURT:  Yeah.  And tell me about that.

21              JUROR #33:  I just -- you know, you've got three

22    kids, and you try to raise them right, and he got mixed up

23    with a girlfriend who brought it into his life, and I have a

24    major -- I have a major issue with it.

25              THE COURT:  Okay.  I'm going to ask you some more

1    questions about that in a minute.

2          And others on that row who had their hand up?

3          Mr. Baybo?

4          JUROR #34:  Grandfather and mother.

5          THE COURT:  And was that alcohol?

6          JUROR #34:  Yes, ma'am.

7          THE COURT:  And have -- if they're still living, have

8    they gotten treatment or are they doing okay now?

9          JUROR #34:  Grandfather has since passed of cancer,

10   and Mom has not decided she needs any help.

11         THE COURT:  Okay.  Well, good luck.

12         And was there someone else there?  Yes, Ms. Hayden.

13         JUROR #36:  My grandfather was an alcoholic.

14         THE COURT:  You know, when I was growing up, I used

15   to think it was a generation-skipping disease because if you

16   grew up with it, then the next -- you know, but it just runs

17   in families, I know for sure.

18         So let me ask all of you, and I just want to -- and

19   setting aside Mr. Streicher, who I'm going to call up here to

20   talk about, this case does involve a conspiracy to possess

21   cocaine, and you'll hear more about it later.  Is there anyone

22   who because of their family member's substance issues thinks

23   that it would be very difficult for them to judge this case

24   fairly?  Sometimes people do have reactions that because

25   they've had family problems or issues they have a -- find it a

1    very hard time listening to anything about drugs or dealing

2    with a case like this.  Anybody who thinks they would?

3            Mr. Streicher, I'll ask you to come up to sidebar,

4    please.

5        (A bench conference with Juror #33 was held on the record

6    and outside of the hearing of the jury panel as follows:)

7            THE COURT:  This is the microphone, which is why I'm

8    holding it here --

9            JUROR #33:  Okay.

10           THE COURT:  -- so the court reporter can hear you.

11   So tell me -- I mean you sounded like -- you said you had very

12   strong feelings about drugs.

13           JUROR #33:  I have never myself messed with drugs.  I

14   have three kids.  You try to teach them the right thing.  She

15   came into his life, almost killed him, and I have a very

16   strong passion against drugs right now.

17           THE COURT:  And so how did he get cleaned up?

18           JUROR #33:  The last time he went to the hospital

19   when we were there.  She took him because he about died in his

20   bedroom downstairs.  So we didn't even know what was going on.

21   We had an idea.  His mother didn't want to listen to it, but I

22   had an idea, and after the last time -- she took him like

23   three times.  We only knew about the last time, and that was

24   when he woke up because I intervened.

25           THE COURT:  Right.  And was this -- did you say this

1    was cocaine?

2              JUROR #33:  Yes.

3              THE COURT:  It was cocaine?

4              JUROR #33:  Uh-huh.

5              THE COURT:  And this case does involve cocaine, and I

6    guess what I'm asking you is -- you sound pretty emotional

7    about it.  Are you telling us that you don't believe you could

8    fairly give the Defendant the presumption of innocence?

9              JUROR #33:  I'm shaking.

10             THE COURT:  You are shaking, yeah.

11             JUROR #33:  I just -- it's --

12             THE COURT:  I mean this is --

13             JUROR #33:  It was a very bad time.

14             THE COURT:  Yeah.

15             JUROR #33:  And I'm upset.

16             THE COURT:  Look, it's completely legitimate, and

17   there are -- does anybody have any objections if I --

18             MR. JIMERSON:  No, Your Honor.

19             THE COURT:  -- this juror?  Okay.  You're not going

20   to have to serve on this case.  I have had other people tell

21   me similar stories, and it's very understandable.  However,

22   what I would like you to do is sit through the rest of the

23   voir dire.  You don't need to answer any more questions.

24             JUROR #33:  Not a problem.

25             THE COURT:  But I don't want you to tell everybody

1  you're off the jury --

2          JUROR #33:  No.  That's fine.

3          THE COURT:  -- so I don't want -- you know, because I

4  don't want to have a flock of people coming up with problems.

5  Yours is obviously very genuine, and I'm sympathetic, and I'm

6  glad your son is doing well.

7          JUROR #33:  Yeah, he's doing great.

8          THE COURT:  But you will not be required to serve.

9          JUROR #33:  Thank you.

10          THE COURT:  Okay.  Thank you.

11          MR. JIMERSON:  Thank you, sir.

12          JUROR #33:  Thank you.

13     (The following proceedings were held within the hearing

14  of the jury panel.)

15          THE COURT:  Oh, I knew there -- I'm sitting here

16  trying to remember what next I'm supposed to ask you about.

17  Guns.  This -- oh, yes, ma'am.

18          JUROR #2:  I forgot.  My uncle has a felony charge.

19          THE COURT:  Has a felony charge?

20          JUROR #2:  He was an alcoholic.

21          THE COURT:  And what was his charge?  Was it felony

22  DWI?

23          JUROR #2:  It was something to do with a firearm and

24  a house burning down.

25          THE COURT:  And do you know what happened as a result

1     of that?

2              JUROR #2:  No.  I know he lost his teaching license

3     over it.

4              THE COURT:  Do you know if he went to jail?

5              JUROR #2:  No, I don't know.

6              THE COURT:  Okay.  Thank you.

7              All right.  I want to -- this case does -- there are

8     two firearms charges in this case.  One of them is the -- a

9     charge alleging that the Defendant was a felon, a previously

10    convicted felon, in possession of a firearm, which is a

11    federal crime, and the other one alleging that the Defendant

12    possessed a firearm in connection with a drug trafficking

13    offense, and it's -- the drug trafficking offense is the

14    cocaine conspiracy that he's charged with.  So they're all

15    related.  You know, it's one set of incidents, but there are

16    two gun charges.

17             There are many people, including right now,

18    apparently, some people in the Missouri legislature, who do

19    not believe that these gun laws should be enforced by the

20    federal government, and they think that it's just a wrong law,

21    and that's a perfectly legitimate political belief, but if

22    someone feels that way, we need to know about it because that

23    might affect whether you could serve on this jury and do

24    the -- you know, follow the law.  So let me just ask; is there

25    anyone here who feels that the federal gun laws that will be

1    involved in this case should not be enforced in the state of

2    Missouri?

3                All right.  I see no hands.

4                Is there anyone who believes that there should --

5    well, you've sort of answered it because this is a more

6    general question, but some people do think there shouldn't be

7    any regulations whatsoever on who can possess or use a

8    firearm.  Is there anyone who believes that?

9                All right.  And then people always ask me to ask you

10   this question, so I'm going to.  How many of you all are

11   members of the NRA?

12               JUROR #7:  (Raises hand.)

13               THE COURT:  You know, if I ask this question when I'm

14   sitting in Cape Girardeau, it's half the jury, and so how

15   long -- so, Mr. Payne -- so I really do think it has something

16   to do with where you live often, but, Mr. Payne, how long have

17   you been a member of the NRA?

18               JUROR #7:  Five years.

19               THE COURT:  Okay.  Even though you're a member of the

20   NRA, do you have any problem with these federal laws that I've

21   just discussed, the two involved in this case?

22               JUROR #7:  No.

23               THE COURT:  Okay.  I think that's -- I think that's

24   probably all I need.  I guess I'll ask this question as well.

25   How many people on the jury have guns in their -- firearms in

1   their homes?

2        (Show of hands.)

3        THE COURT:  Okay.  Quite a few.  Let me -- let me go

4   ahead and keep track, and I just want to -- let's see.  And,

5   Mr. Payne, I think you had your hand up, and others here in

6   the box with their hands up, numbers 15 and 16.  Thank you.

7   And then over on this side, numbers 19 and 20.  And then on

8   this side, numbers 24, 26, 27.  And the back row, 34, 35, and

9   36.  All right.  Thank you.

10        Yeah, yeah, hold on a second.  Yeah.  So on the

11   front, in this group, I believe -- and just tell me if I'm

12   wrong and listen to this and if I missed you, please let me

13   know.  The people in this group that I had were numbers 2, 4,

14   6, 7, 15, and 16.  Anybody else in this group that has

15   firearms in their homes?

16        Okay.  Let me ask, start with you, Ms. Blust, and

17   just ask, do you have your firearms for protection or for

18   sport or for hunting or for some other reason?

19        JUROR #2:  Hunting.

20        THE COURT:  Hunting.  Okay.  And, Ms. Clayton, what's

21   your reasons?

22        JUROR #4:  They're not mine.  They're my boyfriend's,

23   so it's both or all three.

24        THE COURT:  All three?

25        JUROR #4:  (Nods head up and down.)

1            THE COURT:  Okay.  And Ms. Boyer?

2            JUROR #6:  Hunting and for protection.

3            THE COURT:  All right.  And then Mr. Payne?

4            JUROR #7:  The same.

5            THE COURT:  The same?  And sporting, hunting?  I'm

6    sorry?

7            JUROR #7:  Sporting, hunting, protection, all of

8    them.

9            THE COURT:  I guess sporting and hunting are the same

10   thing, aren't they?

11           JUROR #7:  Yes.

12           THE COURT:  But, yeah.  Okay.  Thank you.  Well,

13   actually, I know some people who target shoot that don't

14   actually hunt animals, so that's -- yeah.

15           JUROR #7:  Yeah.

16           THE COURT:  And, yes, #11, Ms. Dohack?

17           JUROR #11:  Yes.  We also -- I live with my dad, and

18   he has a gun for hunting.

19           THE COURT:  Yeah.  Thank you.  And the front row

20   then, #15.

21           JUROR #15:  My father-in-law had me hold it for him

22   and he passed away.

23           THE COURT:  Yeah.  So you're keeping his gun?

24           JUROR #15:  (Nods head up and down.)

25           THE COURT:  Yeah.  And Mr. Councilor?

1          JUROR #16:  Primarily hunting and sport shooting.

2          THE COURT:  Yeah.  You know, Mr. Hochecker, you're --

3    there are -- I know -- I know other people who have heirloom

4    guns or guns that were in the family, whether they're ancient

5    or not.  It's -- yeah, so, Mr. Calkins, why do you have

6    firearms?

7          JUROR #19:  Protection.

8          THE COURT:  Okay.  And Ms. Burns?

9          JUROR #20:  Hunting and protection, and they're

10   actually my husband's guns, and he's also a member of the NRA.

11   I'm not.

12         THE COURT:  Okay.  All right.  Thank you.  And then

13   Ms. Mitchell?

14         JUROR #24:  Hunting and protection, but I don't know

15   how to use it, so it's not going to protect me.

16         THE COURT:  Somebody in your home.  I mean it's

17   really why does someone in your home have them because I

18   realize it might not be you personally.  And Mr. Beavers?

19         JUROR #26:  Yeah, hunting and protection.

20         THE COURT:  Yeah.  And Mr. Orban?

21         JUROR #27:  My mother has a pistol used for

22   protection and just like target shooting, and we also have

23   rifles that were my great grandfather's that are just pretty

24   much decoration that he used for hunting.

25         THE COURT:  All right.  Thank you.

1          And then let's see.  Mr. Baybo?

2          JUROR #34:  Protection.

3          THE COURT:  And Ms. Masterson?

4          JUROR #35:  Ours are more the heirloom, old hunting

5     guns.  No one hunts anymore, but we still have my

6     father-in-law's guns.

7          THE COURT:  And Ms. Hayden?

8          JUROR #36:  Hunting.

9          THE COURT:  Okay.  Thank you.

10          #39.  Oh, yeah, I missed -- I missed two of you,

11     didn't I?  I apologize.  Hold on a second.  It's not 39.

12     It's -- let's see -- #29.  Thank you.  And that's -- let me

13     just find you on the list.  That's Ms. Hayes.  Yes, ma'am.

14          JUROR #29:  Hunting.

15          THE COURT:  Okay.  So you all have a firearm for

16     hunting?

17          JUROR #29:  Yes, ma'am.

18          THE COURT:  Okay.  Anyone else that I haven't asked?

19          All right.  Thank you.

20          Yes, #32.

21          JUROR #32:  I'm not sure this is relevant.  My

22     parents owned a store, and we sold rifles, shotguns,

23     ammunition.

24          THE COURT:  Did you work there in the past?

25          JUROR #32:  Yes, as a teenager.

1            THE COURT:  And your parents don't own the store

2  anymore?

3            JUROR #32:  No.  They're retired.

4            THE COURT:  Okay.  Where was the firearms store?

5            JUROR #32:  King City, Missouri.  That's up by

6  St. Joseph.

7            THE COURT:  Okay.  Thank you.  And so is there -- I

8  asked that question because often the lawyers ask me to ask

9  it, although they didn't in particular in this case, but is

10  there anybody who for any reason, because you own firearms or

11  have them in your home, think that would make it hard to

12  decide this case?

13            All right.  Thank you.

14            #27 -- I'm sorry -- you had something to add.

15            JUROR #27:  Yeah.  I wasn't quite sure if this was

16  relevant, but occasionally, I stay over at my girlfriend's

17  house.  Her family has firearms used for sporting and

18  protection.

19            THE COURT:  All right.  Thank you.

20            Yes, #30.  Thank you.

21            JUROR #30:  Yes.  Your Honor, I'm not sure of the

22  relevance of this, but I work in an emergency department, and

23  I take care of patients who are shot every day.

24            THE COURT:  Right.  And tell me what you do in the

25  emergency -- so you're at Barnes, which is --

 1          JUROR #30:  Yes.

 2          THE COURT:  -- is where a lot of people with gunshots

 3  go, I think.

 4          JUROR #30:  Uh-huh.  I'm a technician in the ED

 5  there.

 6          THE COURT:  What does a technician do?

 7          JUROR #30:  All the dirty work.

 8          THE COURT:  Yeah.  Whatever they tell you to do,

 9  right, or all the things, and what shift do you work?

10          JUROR #30:  I work nights.

11          THE COURT:  And so you've had a lot of experience

12  dealing with gunshots?

13          JUROR #30:  Yes.

14          THE COURT:  Yeah.  There's not -- this case, as far

15  as I know, does not involve any actual firing of firearms, I

16  don't believe, but do you believe that your work with victims

17  of gun violence would make it difficult for you to decide this

18  case fairly?

19          JUROR #30:  Honestly, I don't know.

20          THE COURT:  Okay.  Why don't you come up to the

21  bench, and we'll ask you some more questions about that.

22      (A bench conference with Juror #30 was held on the record

23  and outside of the hearing of the jury panel as follows:)

24          THE COURT:  I haven't asked them about being a victim

25  of a crime, have I?

1          MR. STEVENS:  No.  I was going to ask you to do that,

2    Judge.

3          THE COURT:  Yeah.  No.  I don't know what I'm

4    thinking.  That one usually takes a long time.  Sorry about

5    that.

6          MR. STEVENS:  No.  That's okay.

7          THE COURT:  So -- so how long have you been in this

8    line of work?

9          JUROR #30:  About seven years.

10         THE COURT:  And where did you work before, before

11   Barnes?

12         JUROR #30:  I worked at St. Mary's ED.

13         THE COURT:  And so tell me what you feel about this.

14   How does -- you deal with people who have been shot?

15         JUROR #30:  Yeah.  I mean I take care of patients all

16   the time who are brought in who are overdosed.  I mean just

17   the other day I had somebody who was brought in and he had

18   literally thrown out on the floor because he had OD'd on

19   drugs, so I mean I guess I could have a biased opinion.

20         THE COURT:  Hold on.  She's having trouble.  This is

21   the microphone.

22         JUROR #30:  Oh, okay.  I guess I could have a biased

23   opinion on it because, like I said, I see it literally every

24   day.

25         THE COURT:  Okay.  Do you all wish to ask him

1    questions?

2            MR. STEVENS:  Yeah, if I could.  Now, you understand,

3    obviously, there are drug and firearms charges in this case,

4    as the Judge has explained, but there's no reason to think,

5    obviously, this Defendant has anything to do with any patient

6    you've seen.

7            JUROR #30:  Sure.

8            MR. STEVENS:  Do you understand that?

9            JUROR #30:  Yes.

10           MR. STEVENS:  Do you think you could set it aside and

11   be fair to this Defendant in this case --

12           JUROR #30:  I could, yeah.

13           MR. STEVENS:  -- given the charges?

14           JUROR #30:  Yes.

15           MR. STEVENS:  If the Judge instructs you, can you

16   follow the Judge's instructions in this case?

17           JUROR #30:  Yes.

18           MR. STEVENS:  Okay.  You're sure about that?

19           JUROR #30:  Yes.

20           MR. STEVENS:  All right.

21           MR. JIMERSON:  If I may?  Sir, you might hear some

22   evidence regarding cocaine, okay, and would that subject you

23   to start thinking about your patients and the things -- and

24   the things that they're going through?

25           JUROR #30:  I mean I would associate it with my

1    patients, but I don't -- I think I could separate it from

2    that.

3            MR. JIMERSON:  What I'm trying to get at is that, you

4    know, we don't ask you to set aside all your feelings because

5    you can't do that as a human being, okay, but the question is

6    whether or not that -- you know, we don't want you bringing in

7    things outside the court that's just going to really persuade

8    you one way or another other than what the Judge tells you,

9    and, you know, so my question to you is, thinking about it,

10   can you do that?

11           JUROR #30:  I can sure try.  I mean like I literally

12   see it every day, and I've done it for years.  So I mean, you

13   know, you go to work, you work 12 hours a night, and you take

14   care of people all the time, so it's -- I have dreams of

15   people.  It's weird, so I mean --

16           THE COURT:  Yeah, well, and the real issue is whether

17   that would affect your -- I mean that's who you are.

18           JUROR #30:  I mean I don't know.  I mean this is what

19   I've done for years, so I guess I wouldn't know until I had

20   the evidence and knew what was going on, if it would affect me

21   at all.

22           MR. STEVENS:  So as you stand here now, you can't be

23   sure whether you can be fair to the Defendant -- is that what

24   you're saying -- or whether you could follow the Judge's

25   instructions?

1          JUROR #30:  I mean if the Judge told me to do

2     something, I would do it, yes, but I mean I still have my

3     opinion.

4          MR. STEVENS:  All right.  Okay.  Thank you.

5          THE COURT:  All right.  Thank you very much.

6          JUROR #30:  You're welcome.

7       (Juror #30 leaves bench conference.)

8          MR. JIMERSON:  Your Honor, how do you want to handle

9     strikes if this would be one that --

10          THE COURT:  Oh, yeah, we do them all at the end.

11          MR. JIMERSON:  Okay.

12          THE COURT:  And so what -- don't make any strikes or

13     say anything about, you know, whether you like them or don't

14     in front of the jury.

15          MR. JIMERSON:  Okay.

16          THE COURT:  What we do is we ask all the questions,

17     and then we send them out, and then I ask initially for -- you

18     know, immediately, I'll ask you, both sides, for any

19     challenges for cause.

20          MR. JIMERSON:  Okay.

21          THE COURT:  And then we'll rule on those, and then

22     we'll discuss any hardship and I'll deal with those.

23          MR. JIMERSON:  Yes, ma'am.

24          THE COURT:  And then you'll know who your pool is

25     left and that's who you'll have to select.

1          MR. JIMERSON:  I guess I was asking about this

2     gentleman here; do you want me --

3          THE COURT:  Yeah.

4          MR. JIMERSON:  When you call them up --

5          THE COURT:  Why don't you wait --

6          MR. JIMERSON:  We'll wait.

7          THE COURT:  -- and let's -- let's see where we are.

8          MR. JIMERSON:  Yes, ma'am.

9          THE COURT:  Okay.

10          MR. JIMERSON:  Yes, ma'am.

11          MS. BEHRENS:  Judge, I'm sorry.  You mentioned, I

12     think, to Cris about the victim.

13          THE COURT:  Yeah.

14          MS. BEHRENS:  But were you also going to ask just the

15     general follow-up of any prejudices or anything that we

16     haven't already talked about?  Sometimes --

17          THE COURT:  Oh, yeah.

18          MS. BEHRENS:  Do you want to do that?

19          THE COURT:  Yeah.

20          MS. BEHRENS:  Because the last one you said, "I think

21     this is my last question," so I just wanted to --

22          THE COURT:  I said it was my last area, and it

23     wasn't, yeah, and so yeah.

24          MR. STEVENS:  Will you ask for hardships also, Judge?

25          THE COURT:  I'll do that.

1          MR. STEVENS:  Okay.  Thank you.

2          THE COURT:  I try to do that at the very end.

3          MR. STEVENS:  All right.  Thank you.

4       (The following proceedings were held within the hearing

5    of the jury panel.)

6          THE COURT:  So the lawyers have reminded me that if a

7    lawyer or a judge ever says, "This is my last question," don't

8    believe it, and so here's -- I do have a couple of other areas

9    that I had forgotten about that I need to go over with you,

10   and then the lawyers will ask some questions, so I'm going

11   to -- we're going to take a short recess at this time, and

12   what I would like is for you all to reassemble in the hallway

13   in 15 minutes.  If you want to go back downstairs, that's

14   fine.  There are restrooms on the hall here.  Just be back up

15   here at 11:00, and then we'll -- we'll proceed, and like I

16   say, wait in the hallway.  You will be sitting in the same

17   chairs, so if you want to leave your coats and things, that's

18   fine.  I'd take your purses, but, you know, your -- feel --

19   you can leave other things here if you want to.  So at this

20   time -- and please don't come back in the courtroom at all

21   until we call for you out in the hallway.  So the jury is

22   excused for 15 minutes.  Oh, and please remember what I said

23   before.  Don't talk about this case or this process at all.

24      (The following proceedings were held outside the hearing

25   and presence of the jury panel.)

1          THE COURT:  All right.  Counsel, I just wanted to

2    mention something to you about the jury list because sometimes

3    it is a little hard to interpret.  When you look at that

4    column that says "Employer/Prior Employer/Spouse Employer",

5    the first two lines apply to the juror, and that would be --

6    the first line would be their current employment, and the next

7    line, if there is one there, their spouse's employment -- I

8    mean their prior employment.  The third and fourth lines if

9    they're listed or the third line is the spouse's employment.

10   So like if you look at number -- I'll just take one that's got

11   three.  I don't think anybody's got four.  Look at #7.  His

12   first two -- on #7, it shows Beco Concrete Production.  That

13   would be where he works now and how long.  Pepsi America is

14   where he worked previously for five years.  And then the next

15   line, that Parkland Health Center, that's his wife or his

16   spouse.  That's usually what it means, anyway.  So I just

17   wanted to let you know, and I do see there are some people who

18   don't have any employment listed, and so I may ask them about

19   that.  If I don't, certainly, you're free to do that, and I'll

20   try to remember.

21          So when they come back, I will ask them about being a

22   victim of a crime, I'll talk about hardship, and I'll ask

23   the -- I'll ask the catchall question as well as the question

24   about whether they have a religious or moral difficulty

25   sitting in judgment that would interfere with their ability to

1    be a juror.  Okay?

2         MR. JIMERSON:  Can we adjust that question, Your

3    Honor?

4         THE COURT:  Yeah.

5         MR. JIMERSON:  Particularly -- I don't know; Cris

6    want to hear this?

7         THE COURT:  Yeah, go ahead.  He's here.  He can

8    listen if he wants.

9         MR. JIMERSON:  The issue about sitting in judgment,

10   Judge, Your Honor, I -- I -- I believe that it probably states

11   a jury's function, and I think the problem --

12        THE COURT:  Here's the way I ask the question, and

13   then you tell me if you have any objection.  I always use too

14   many words, but I say to the jurors there are many people who

15   have deeply held religious or moral views that they should not

16   sit in judgment of another human being.  Some people who have

17   that view believe that means they can't be a juror.  Other

18   people who have that view think that doesn't interfere with

19   their role as a juror because all you're doing as a juror is

20   deciding whether the Government has proved its case beyond a

21   reasonable doubt.  So if you're in the category where you have

22   that belief but you don't believe it interferes with your

23   ability to serve as a juror, that's fine.  If you're in the

24   group that -- and I don't usually say it exactly this way, but

25   I do that preface, okay, and then I say if you're somebody who

1   has that belief and believes it would keep you from serving as

2   a juror, please let me know.

3          MR. JIMERSON:  Yes, ma'am.

4          THE COURT:  So is that okay?

5          MR. JIMERSON:  That's fine.

6          THE COURT:  Yeah, because I agree because there are

7   people -- if you start asking them -- you know, if you try to

8   get everybody to agree that they shouldn't sit in judgment on

9   another human being, you know, a whole bunch of people will

10  agree to that, but they don't necessarily mean that they

11  couldn't be a juror.  They're -- you know, they're not --

12         MR. JIMERSON:  Yes, ma'am.

13         THE COURT:  You know, they're deciding whether the

14  Government's met its burden of proof.  Okay.  That's what

15  we'll do.

16         MR. JIMERSON:  Thank you, Your Honor.

17         THE COURT:  Yep.  Thanks.  Fifteen minutes or -- 15

18  minutes from now.  It will take them that long.  You know, it

19  won't really be exactly when the jury comes back.

20      (Court recessed from 10:48 a.m. until 11:07 a.m.)

21      (The following proceedings were held within the hearing

22  and presence of the jury panel.)

23         THE COURT:  All right.  Thank you, all.  And there

24  are some areas I had neglected to ask you about earlier.  The

25  first thing I want to ask you about is whether you or any

1    close friends or close family members have been victims of gun

2    violence.  Anybody who's been shot, had their friends shot, or

3    otherwise been what you would consider a victim of gun

4    violence or had, you know, close family members who have?

5    Anyone in this section of the jury?

6            Anyone in this section of the courtroom?

7            Anyone in this section?  Yes, ma'am, Ms. Burns.  I'm

8    sorry.  No.  I've got the wrong page.  Ms. Hayden.

9            JUROR #36:  My husband --

10           THE COURT:  Can you stand up?  I can't hear you.  I'm

11   sorry.

12           JUROR #36:  My ex-husband is a teacher, and his class

13   was held hostage by a student with a gun.

14           THE COURT:  How long ago did that happen?

15           JUROR #36:  It was in 1994 or '95.

16           THE COURT:  And did everyone get out okay?

17           JUROR #36:  Yes.  They had to call the SWAT team, but

18   they were fine.

19           THE COURT:  Were you married to him at the time?

20           JUROR #36:  Yes.

21           THE COURT:  That must have been terrifying for you.

22           JUROR #36:  I didn't know it was going on.

23           THE COURT:  Until afterward?

24           JUROR #36:  I heard it on KMOX, yeah.

25           THE COURT:  So do you have -- do you believe that

1    would affect your ability to serve fairly in this case?  This

2    case does involve firearms.  That's why I'm asking.

3              JUROR #36:  No.

4              THE COURT:  All right.  Thank you.

5              So now I want to ask a little more generally about

6    being a victim of any other serious crime, and I would include

7    anything, obviously, that would be -- include violence or

8    anything you believe is -- you felt was a serious crime if you

9    or close family members or close friends have been victims of

10   crime of any type.

11             So let me start with numbers 1 through 6.  Anyone

12   there who has been a victim of a crime or had close friends or

13   family members who have been?

14             Yes, ma'am, #3, Ms. French.

15             JUROR #3:  I had my wallet stolen out of my purse,

16   and they used my charge card and debit card.

17             THE COURT:  They used your -- yeah, so -- and how

18   long ago did that happen?

19             JUROR #3:  About four years ago.

20             THE COURT:  All right.  Thank you.

21             Others on that row?  Yes, #1.

22             JUROR #1:  We've had our car stolen twice from the

23   front of our house, our moped stolen from our backyard, and

24   our lawn mower stolen.

25             THE COURT:  Okay.  And I should have asked this

1    question earlier of the other person.  Do you have any -- how

2    do you feel that law enforcement handled -- I assume you

3    reported those thefts to the police?

4           JUROR #1:  Uh-huh.

5           THE COURT:  How do you feel about how law enforcement

6    handled your reports?

7           JUROR #1:  Some of them, very well.  Some of them,

8    not so well.

9           THE COURT:  In the "not so well" cases, what was

10   wrong?

11          JUROR #1:  Well, when they found our van in

12   Florissant, you know, they fingerprinted the inside and

13   everything like that, very little details, and then in

14   St. Louis city, they didn't even bother searching the inside

15   of the van or doing any sort of extra, you know, investigation

16   on it.

17          THE COURT:  Did -- were any of the perpetrators

18   caught in any of these circumstances?

19          JUROR #1:  No.

20          THE COURT:  Okay.  Do you believe that your feelings

21   about the way that that was investigated would have any effect

22   on your ability to serve in this case?

23          JUROR #1:  No.

24          THE COURT:  All right.  And, Ms. French, I should

25   have asked you the same question.  I assume you reported your

1   wallet being stolen and your cards being used?

2          JUROR #3:  Correct.

3          THE COURT:  How do you feel?  What's your opinion of

4   how law enforcement handled that report or the -- any

5   investigation?

6          JUROR #3:  The place that I was at was one county,

7   and where it was used was another, and so I had to communicate

8   with the second county, and, you know, I would call.  It was

9   very hard.  They wanted me to go in person up there, and I

10  never did follow through on that.

11         THE COURT:  Did -- and so no one was ever --

12         JUROR #3:  I -- they credited my account, you know,

13  credit card.

14         THE COURT:  Right, but nobody was ever apprehended

15  for that crime?

16         JUROR #3:  No.

17         THE COURT:  All right.  Anyone else on that row?

18  Yes, ma'am, #6.

19         JUROR #6:  I had my identity stolen.

20         THE COURT:  Your identity?

21         JUROR #6:  Yes.

22         THE COURT:  And how did that happen?

23         JUROR #6:  Someone had gotten my Social Security

24  number and used it to get a phone bill -- to get a phone.

25         THE COURT:  To get a phone.  And did -- what was the

1    upshot of that?  What happened as a result of that?

2         JUROR #6:  The investigator that was taking care of

3    it got it all straightened out.

4         THE COURT:  Okay.

5         JUROR #6:  And everything was taken off of my report.

6         THE COURT:  Was that on your credit report?

7         JUROR #6:  Yes.

8         THE COURT:  All right.  People on the second row,

9    anyone there who's been a victim of crime?

10        #11, Ms. Dohack.

11        JUROR #11:  Yes.  I had cash stolen out of my wallet

12   from a coworker during work.

13        THE COURT:  But you knew who did it or you found out?

14        JUROR #11:  Yes.

15        THE COURT:  And did anything happen to that person?

16        JUROR #11:  Yes.  They were arrested.

17        THE COURT:  They were arrested.  How do you feel that

18   it was handled by law enforcement generally?

19        JUROR #11:  It was very effective.

20        THE COURT:  Okay.  And then, yes, #8, Ms. Rothery.

21        JUROR #8:  So when I was young, I was approached by a

22   pedophile, and he attempted a lewd act.

23        THE COURT:  And was he apprehended?

24        JUROR #8:  I don't know.  I know we were brought

25   down, you know, to line-ups to try to identify him.

1          THE COURT:  And were you able to identify one, or do

2   you remember?

3          JUROR #8:  I did not.

4          THE COURT:  Yeah.  And that sounds like it was awhile

5   back, but do you have any feelings about how it was handled by

6   law enforcement at that time?

7          JUROR #8:  Well, they were pretty mad at us kids

8   because we couldn't identify this person in the lineup

9   because, apparently, he was going around the area to several

10  other young girls.

11         THE COURT:  And so there were a number of victims?

12         JUROR #8:  Correct.

13         THE COURT:  And nobody could identify him?

14         JUROR #8:  Right.

15         THE COURT:  And the police sort of were like --

16         JUROR #8:  Well, it was frustrating, I'm sure, yeah.

17         THE COURT:  Yeah, but so they expressed some kind of

18  dissatisfaction that you couldn't --

19         JUROR #8:  Yeah.

20         THE COURT:  -- pick somebody out?  Okay.  Thank you.

21  Others on the --

22         JUROR #8:  I also had --

23         THE COURT:  Oh, yeah.

24         JUROR #8:  My credit card was stolen -- the number,

25  just the number.  It wasn't really the physical card, and it

1    was used in Canada.

2           THE COURT:  And I assume that one was -- did you

3    just -- did you report that to the police, or did you just

4    report it to the credit card company?

5           JUROR #8:  The credit card company reported it to me.

6    I did attempt to report it to the police, but there wasn't

7    much they could do.

8           THE COURT:  Do you have any opinion about how that

9    was handled?

10          JUROR #8:  Yes.

11          THE COURT:  All right.  Anyone else on that row?

12          And then the front row of people, anyone there who's

13   been a victim or had close friends or family?

14          Yes, ma'am, Ms. Dooley.

15          JUROR #14:  My car was broken into in Forest Park.

16          THE COURT:  And do you have -- was anyone ever

17   apprehended for that?

18          JUROR #14:  No.

19          THE COURT:  Did you report it to the police?

20          JUROR #14:  Yes.

21          THE COURT:  Do you have any opinion about how they

22   handled the investigation or that report?

23          JUROR #14:  No.  They were fine.

24          THE COURT:  It was okay?

25          JUROR #14:  Yeah.

1          THE COURT:  All right.  Anyone else there?

2          Yes, Mr. Councilor.

3          JUROR #16:  Fifteen years ago or so, my cousin got

4    mugged.

5          THE COURT:  And did they -- did anyone check the --

6    or find out who did that?

7          JUROR #16:  I don't even know if he went to the

8    police or anything.  I just heard that, you know, he had been

9    mugged, I think, and the guy was armed, so . . .

10         THE COURT:  Okay.  And then the next group of people,

11   numbers 17 through 20?

12         Yes, #17, Ms. Williams.

13         JUROR #17:  My house was broken into when I lived in

14   Phoenix, Arizona, back in 2005.

15         THE COURT:  And was anyone ever apprehended for that?

16         JUROR #17:  No.

17         THE COURT:  Did you report it to the police?

18         JUROR #17:  I did.

19         THE COURT:  And did you -- what -- do you have any

20   opinion about how they handled the investigation?

21         JUROR #17:  Well, I mean it was my fault because I

22   did not have lighting or anything like that.  I think it was

23   somebody that I knew but was never able to --

24         THE COURT:  Never able to prove it?

25         JUROR #17:  Knew who it was.

1      THE COURT:  But you don't hold anything against --

2      JUROR #17:  No.

3      THE COURT:  -- the police for that?

4      JUROR #17:  No, because --

5      THE COURT:  All right.  Anyone else on that row?

6      The next row of people?

7      Yes, let's see.  Hold on.  I've got my numbers messed

8   up.  Mr. -- is it Calotes?

9      JUROR #22:  Yes.

10      THE COURT:  Tell me who in your --

11      JUROR #22:  It was identity thief about 2002.  I got

12   a phone bill under my name.  I used to live in an apartment

13   building, so I think he must have gotten my number through,

14   you know, mails under my name.

15      THE COURT:  Right.  And did -- did they ever find out

16   who did that?

17      JUROR #22:  The City of Maryland -- I reported it to

18   the City of Maryland Heights, so it was handled very well by

19   the police.  It was some young teenagers.

20      THE COURT:  Yeah.  And did you have -- were you --

21   did you have any repercussions, I guess, to your own credit or

22   anything like that?

23      JUROR #22:  I was advised by the City of Maryland

24   Heights to report it to, you know, the credit reporting agency

25   like Experian and all that stuff.

1          THE COURT:  And you did that?

2          JUROR #22:  And I did that.

3          THE COURT:  Okay.  Thank you.

4          All right.  Others on that wall row?

5          Yes, Ms. Mitchell.

6          JUROR #24:  My mom was the victim of rape, and my

7    son's girlfriend was raped down at Mizzou.

8          THE COURT:  How long ago did those things happen?

9          JUROR #24:  It's his ex-girlfriend now, but it was

10   probably 2004ish, something like that, 2003.

11         THE COURT:  And what about your mom?

12         JUROR #24:  You know, when this came -- this happened

13   to my son's girlfriend was when my mom told all of us, and so

14   it was -- my mom is 78.  I don't even know.  Maybe 25, 30 when

15   it happened.

16         THE COURT:  Right, so a long time ago?

17         JUROR #24:  Yeah.

18         THE COURT:  With regard to the more current incident

19   that happened in Columbia, is -- do you have any opinion about

20   how that was handled by law enforcement?

21         JUROR #24:  I think it was handled really well, but

22   she had some law enforcement in her family at that time.

23         THE COURT:  Okay.  All right.  Thank you.

24         Others in that row?

25         Number 27, Mr. Orban.

1          JUROR #27:  Yeah.  My mom had the radio stolen out of

2    her car out of our driveway before, and I, myself, have been a

3    victim of online credit card fraud.

4          THE COURT:  And when you were the victim of online

5    credit card fraud, did you report that to the police?

6          JUROR #27:  I did not.  I just reported it to the

7    bank, and the bank took care of it.

8          THE COURT:  Okay.  And so the bank then handled it?

9          JUROR #27:  Yeah.

10          THE COURT:  Yeah.  All right.  And then the next

11    group of people over here, numbers 28 through 31, anyone

12    there?

13          Yes, Ms. Hayes.

14          JUROR #29:  I had my car broken into at my workplace

15    about 10 years ago.

16          THE COURT:  And did you report that to the police?

17          JUROR #29:  Yes.

18          THE COURT:  And were they able to apprehend -- find

19    out who did it?

20          JUROR #29:  No.

21          THE COURT:  Do you have any opinion about how the

22    police handled it?

23          JUROR #29:  It was fine.

24          THE COURT:  Okay.  And then the last row of people,

25    anyone a victim of a crime?

1          Yes, Mr. Pulley.

2          JUROR #32:  We've had our credit card information

3   stoled about three times, and then my daughter had a date rape

4   case about four years ago.

5          THE COURT:  On the credit cards, did you report that

6   to the police or just to the credit card company?

7          JUROR #32:  Just the credit card.

8          THE COURT:  And with your daughter's situation, did

9   she report that to the authorities?

10         JUROR #32:  Yes.

11         THE COURT:  And was the person -- was there -- what

12  happened as a result?

13         JUROR #32:  Basically nothing.

14         THE COURT:  How do you feel about how law enforcement

15  handled that?

16         JUROR #32:  Really not very well.  I thought they

17  should have been able to handle somebody who had a pattern of

18  being accused.

19         THE COURT:  And what jurisdiction was that in?

20         JUROR #32:  She was at Cape Girardeau.

21         THE COURT:  Okay.

22         JUROR #32:  The Southeast Missouri State college.

23         THE COURT:  All right.  Thank you.

24         Others on that row?

25         All right.  For any of you all who have answered

1    these questions, is there anything about the fact that you

2    were -- you or your family members were victims of crimes or

3    about the way that these things were handled by law

4    enforcement or the justice system that you think would affect

5    your ability to be fair in this case?

6         And I guess, Mr. Pulley, most recently, let me ask

7    you about your case.  Do you think that would affect your

8    ability to be fair -- your daughter's situation?

9         JUROR #32:  Not really.

10        THE COURT:  Okay.  And then, yes, #24.

11        JUROR #24:  In the case of my son's girlfriend, it

12   just -- I don't know if it's important.  It turned out to be a

13   family friend.  Something was slipped in her drink, so they

14   knew who did it.

15        THE COURT:  Yeah, so they were able to find out who

16   the person was?

17        JUROR #24:  Yeah, they knew.

18        THE COURT:  And then you did think it was handled

19   well by police?

20        JUROR #24:  (Nods head up and down.)

21        THE COURT:  All right.  Anybody who thinks this might

22   affect their ability -- these things might?

23        Is there anybody here who has had a particular bad

24   incident or experience with law enforcement in any way, maybe

25   arrested for something you didn't do or hassled by police for

1    no reason?  Anybody who has something like that that has

2    stayed with them?

3              All right.  Thank you.

4              Oh, yes, sir, Mr. Pulley.

5              JUROR #32:  I'm not sure this counts, but a coworker

6    of mine is a sister of a man who was one of those

7    well-publicized cases where DNA cleared him of murder.

8              THE COURT:  And so her -- so her brother was --

9    was -- was he convicted of murder?

10             JUROR #32:  Yeah.  He was in prison, and then DNA

11   cleared him.

12             THE COURT:  And then DNA later cleared him?

13             JUROR #32:  Yeah.

14             THE COURT:  Do you think that -- how did that make

15   you feel about law enforcement?

16             JUROR #32:  I just -- you know.

17             THE COURT:  Those cases do happen, and they have been

18   in the news, I know.

19             JUROR #32:  Right.

20             THE COURT:  Because DNA -- unfortunately, DNA doesn't

21   solve every crime, of course, but is there anything about that

22   that you think would affect your ability to serve in this

23   case?

24             JUROR #32:  I think it was mostly a case where

25   circumstances made him the most likely person but it turned

1   out it was actually someone else.

2          THE COURT:  Okay.  All right.  Thank you.

3          All right.  Now I want to tell you a little bit about

4   this case.  I do -- in terms of the length of the case, I do

5   think this case will last through Thursday for sure, probably

6   into Friday, and here's how we do our normal trial day.  We

7   usually start at 9:00.  We stop at 5:00.  We take an hour for

8   lunch.  It's usually 12:30 to 1:30, but that can vary, and we

9   take two recesses, one in the morning and one in the

10  afternoon, usually 15 minutes.  So that's the schedule we

11  would normally have if you are selected to serve on this jury.

12  If you have any physical issues or hearing issues, we can move

13  you around the jury box or we can take more frequent breaks if

14  necessary, but that is the schedule.  What I need to know is

15  if there's anyone on this panel for whom serving -- and this

16  is relatively short by federal trial standards, but is there

17  anyone who serving the rest of this week would cause a

18  particular hardship or you have some physical reason you do

19  not believe you could follow that schedule?

20         All right.  Thank you.

21         And another question I wanted to ask you has to do

22  with the -- well, hold on a second.  I need to look at

23  something else before I ask you that.

24         Yeah.  All right.  So some people have deeply held

25  religious or moral views that they should not sit in judgment

1   of another human being, and there are many people who have

2   that religious belief that one person shouldn't sit in

3   judgment on another person who do not believe that interferes

4   at all with their ability to serve as a juror because when

5   you're on jury duty, your job is to decide whether the

6   Government has met its burden of proving the Defendant guilty

7   beyond a reasonable doubt; however, some people who have that

8   view think it does interfere with their ability to serve as a

9   juror because they think that that would be sitting in

10  judgment on another human being.  Is there anybody here who

11  thinks that because of such a deeply held personal or

12  religious view they would not be able to serve as a juror on

13  this case?

14          All right.  Thank you.

15          My brain is not working here today, and I apologize.

16  One question I do have -- oh, I know.  Here it is on my notes.

17  Does everyone here understand that the only questions that the

18  jury will be asked -- there are three charges in this case,

19  and the only thing the jury will be asked will be to determine

20  whether the Government has proved each of those charges beyond

21  a reasonable doubt.  If -- if the Defendant is convicted of

22  one or more charges, the jury has no role in sentencing.  Do

23  you all understand that?

24          All right.  And you are not to consider sentencing at

25  all in reaching your decision because it's not -- you know,

1    it's not an issue of whether -- your decision is going to be

2    whether the Government met its burden of proof.

3           And I believe that's all I have, although the lawyers

4    will have a chance to ask some and I will probably remember

5    some other things I've forgotten since I've forgotten so many

6    already today, but I do want to ask you this.  I've been

7    asking you all these questions and asking you can you be fair

8    and is there anything that would affect your decision.  I may

9    have forgotten to ask you something that you've been sitting

10   here wondering why I haven't asked it the whole time.  Is

11   there anything else about yourselves or about this case in

12   particular that makes you believe there's something we should

13   know about you when we go through the jury selection process

14   or a feeling you have that it might be hard for you to serve

15   on this case for some reason I haven't asked?

16          All right.  Thank you.

17          The lawyers will now inquire.  Mr. Stevens, you may

18   proceed.

19          MR. STEVENS:  Thank you, Judge.

20          Good morning again.  It is still morning.  Thank you

21   all for being here, particularly considering the weather.

22   Obviously, this is a pretty hearty group considering how cold

23   it is outside, so thank you all for being here.  I'll get

24   right into it.  As the Judge mentioned, I wanted to ask just

25   about potential witnesses in this case and whether anyone knew

1    those people.

2         Special Agent Richard Zayas with ATF -- does anyone

3    know him?  Is anyone familiar with him?

4         Or Special Agent Jason Townsend with ATF -- does that

5    name ring a bell?

6         Special Agent Jeff Eleveld with ATF?

7         Detective Edward Clay with the St. Louis Metropolitan

8    Police Department -- does anyone know him?

9         Okay.  I see no hands.

10        Also, I want to mention that during the course of

11   this case you're going to hear names of individuals by the

12   name of Robert Washington and Michael Twitty.  Do those names

13   ring a bell at all?  Does anyone know Robert Washington or

14   Michael Twitty?

15        All right.  And I want to make clear, obviously, in

16   this case, we have a single Defendant, Daryl Warren here.  The

17   jury in this case, once it's picked, will decide the case just

18   regarding Mr. Warren, all right, and I expect, like I say,

19   you'll hear the names Robert Washington and Michael Twitty.

20   Neither Mr. Jimerson or I can indicate to you anything that

21   might have happened with those two individuals in connection

22   with this case.  Is there anyone that would have a problem

23   deciding this case only regarding Mr. Warren and not knowing

24   anything about those other individuals?  Anyone at all?

25        Okay.  I see no hands.

1     THE COURT:  Can I interrupt you?  There were a couple

2  of questions I forgot that I just remembered.

3     MR. STEVENS:  Sure, certainly, Judge.

4     THE COURT:  There were a couple of you I wanted to

5  ask something else to.  Ms. Toney -- let's see -- #31, there

6  you are; what do you do at St. Luke's?

7     JUROR #31:  Patient care tech.

8     THE COURT:  Okay.  And, Mr. Baybo, what is -- can you

9  tell me what your employer -- it says you're building support.

10  Can you tell me what you do?

11     JUROR #34:  Pretty much a lot.  I help at a charter

12  school, doing attendance, running reports for administration,

13  making phone calls to parents, substitute teaching,

14  intervention work, things like that.

15     THE COURT:  So a whole variety of things.  Okay.

16  Thank you.  And it is a charter school that you're at?

17     JUROR #34:  Yes, ma'am.

18     THE COURT:  Okay.  And, Ms. McMorris, are you

19  currently employed?

20     JUROR #21:  No, no, ma'am.  No, sir -- ma'am.

21     THE COURT:  Have you worked in the past?

22     JUROR #21:  Yes.

23     THE COURT:  Tell me what jobs you've had in the past.

24     JUROR #21:  I was a dishwasher.

25     THE COURT:  Okay.  And for a restaurant?

1          JUROR #21:  A hotel.

2          THE COURT:  For a hotel.  Okay.  Okay.  Thank you.

3          And, Mr. Hochecker, what is -- what is your -- what's

4  your employer?

5          JUROR #15:  Roto-Die.  It's a tool and die company.

6          THE COURT:  A tool and die?

7          JUROR #15:  Yeah.

8          THE COURT:  Okay.  And it's RotoMetrics?

9          JUROR #15:  Yeah.

10         THE COURT:  I should have figured that out from the

11  name, but I couldn't, so that's what I wondered.  Thank you.

12         Okay.  A couple of others.  Ms. Dohack, what do you

13  teach?

14         JUROR #11:  I'm a fifth grade special education aide,

15  so we teach all the subjects.

16         THE COURT:  Yeah.  Thank you.

17         And I had a couple of others I didn't know.  Let's

18  see.  Mr. Seviere, if I'm pronouncing that right, are you

19  currently employed?

20         JUROR #5:  No, ma'am.

21         THE COURT:  Have you worked in the past?

22         JUROR #5:  Yes.

23         THE COURT:  Tell me what jobs you've had in the past.

24         JUROR #5:  Master Logos Print Company.

25         THE COURT:  All right.  Thank you.  I apologize,

1  Mr. Stevens.  I told you I was going to ask that before, and

2  then I forgot.

3        MR. STEVENS:  Oh, thank you, Judge.

4        All right.  For those of you who -- many of you,

5  unfortunately, had friends and family who have had some

6  criminal history, have had some brushes with law enforcement,

7  and I just wanted to discuss that with a few of you.  #9,

8  Ms. Roberts, you had indicated that you have a cousin who's

9  currently serving time, is that right?

10        JUROR #9:  Yes.

11        THE COURT:  Okay.  Do you have any concern at all

12  that if you're on the jury in this case that you might be

13  considering that cousin when you're considering this case,

14  given that he's currently incarcerated?

15        JUROR #9:  No.

16        THE COURT:  That won't be a problem for you?

17        JUROR #9:  No.

18        THE COURT:  All right.  You mentioned it was an

19  assault on a police officer.  Do you know where that occurred,

20  which department that police officer was with?

21        JUROR #9:  St. Louis City.

22        MR. STEVENS:  All right.  And when did that occur?

23        JUROR #9:  He was convicted last year.  Thanksgiving

24  2010.

25        MR. STEVENS:  Okay.  Thank you.

1          And, #19, is that Mr. Calkins?

2          JUROR #19:  (Nods head up and down.)

3          MR. STEVENS:  You also indicated that your father

4    went to prison for about eight to 10 years, is that right, on

5    a drug possession charge?

6          JUROR #19:  Yes, yes.

7          MR. STEVENS:  And you thought that that was a federal

8    case --

9          JUROR #19:  Yes.

10          MR. STEVENS:  -- is that right?  Anything about that

11    case that you would hold against the Government here in this

12    case?  Will you be considering that at all when you consider

13    this case?

14          JUROR #19:  No.

15          MR. STEVENS:  All right.  That won't be a problem for

16    you?

17          JUROR #19:  No.

18          MR. STEVENS:  All right.  Thank you, sir.

19          That brings me to #31, Ms. Toney.

20          THE COURT:  Can you use the mike, Mr. Stevens?  I'm

21    having difficulty hearing you, so --

22          MR. STEVENS:  Yes, Judge.

23          You had an uncle who's currently serving 10 years, is

24    that right?

25          JUROR #31:  Uh-huh.

1          MR. STEVENS:  Same question to you.  Given that he's

2     currently imprisoned, will that be a concern for you in this

3     case when you're considering this case?

4          JUROR #31:  No.

5          MR. STEVENS:  All right.  You're confident that you

6     can set that aside?

7          JUROR #31:  Uh-huh.

8          MR. STEVENS:  All right.  Thank you.

9          #32, Mr. Pulley, your sister-in-law's sister was --

10         THE COURT:  Mr. Stevens, would you please use the

11    mike?

12         MR. STEVENS:  Yes.  Was convicted of murder?

13         JUROR #33:  Excuse me?

14         MR. STEVENS:  Or manslaughter, is that right?

15         JUROR #33:  I believe it was manslaughter, sir.

16         MR. STEVENS:  Okay.  And is currently serving an

17    eight-year term.  Will that be a problem for you in this case?

18         JUROR #33:  No.

19         MR. STEVENS:  Okay.  I think you had indicated that

20    they didn't get her off the street fast enough.  That doesn't

21    sound like that would be a problem for you, is that fair?

22         JUROR #33:  Uh-huh.

23         MR. STEVENS:  Okay.  You have to say yes or no, sir,

24    so the court reporter can take it down.

25         JUROR #33:  Yes.

1          MR. STEVENS:  Okay.  Thank you.

2          And that brings me back to #1, Ms. Reinhardt.  You

3  had indicated that your brother-in-law was currently -- I'm

4  sorry -- your uncle is a ward of the state and is currently

5  locked up; is that going to be a problem for you in this case

6  at all?

7          JUROR #1:  No.

8          MR. STEVENS:  All right.  Thank you.  You'd also

9  mentioned your -- was it your uncle-in-law that was gunned

10  down in connection with cocaine?

11          JUROR #1:  Uh-huh, yes.

12          MR. STEVENS:  Okay.  Will that be a problem for you

13  in this case?  There's a cocaine conspiracy count in this

14  particular case.  Will you be able to set that aside and just

15  consider the facts in this case?

16          JUROR #1:  Yes.

17          MR. STEVENS:  Will that be a problem for you at all?

18          JUROR #1:  No.

19          MR. STEVENS:  Okay.  And as I understand, you didn't

20  know him, is that right?

21          JUROR #1:  Correct.

22          MR. STEVENS:  Okay.  Thank you.

23          As the Judge indicated, in Count III of this case,

24  this Defendant is charged with conspiracy to possess with

25  intent to distribute cocaine, and he is not charged with

1   actually possessing the cocaine.  He's charged in a conspiracy

2   to possess with intent to distribute cocaine.  In order to

3   prove this Defendant guilty beyond a reasonable doubt on that

4   conspiracy, does everyone understand that the Government won't

5   be required to prove that he actually possessed the cocaine?

6   Does everyone understand that, that in a conspiracy we don't

7   have to prove that he actually possessed the cocaine, simply

8   that he conspired to --

9          MR. JIMERSON:  Let me object, Your Honor.  He's

10  improperly instructing this jury.

11         THE COURT:  Yeah.  I'll instruct you on the law.

12  What he's saying isn't wrong, but I also -- it's not -- it's

13  not the time for instructions on the law.  I will tell you

14  what the law is on a conspiracy.

15         MR. STEVENS:  Thank you, Judge.

16         THE COURT:  Sustained.

17         MR. STEVENS:  Is there anyone who would require the

18  Government to prove that this Defendant actually possessed

19  cocaine in this case?

20         THE COURT:  Let me ask you this.  Is there anyone who

21  would ask -- who would require the Government to prove

22  something that's not in the jury instructions?  So you're

23  basically asking can they follow the law as I give it to them?

24         MR. STEVENS:  Exactly, Judge.

25         THE COURT:  That's really all you're asking, so why

1   don't you ask a question that's not trying to tell them what

2   the law is because that's my job.

3          MR. STEVENS:  I understand.

4          There were many of you on the panel who also had

5   friends and family in law enforcement, and the Judge followed

6   up on that and asked you about whether you could all be fair.

7   You all indicated that you could be fair, but I want to ask a

8   similar question, and that is, has anyone -- any of those

9   people who had friends or family in law enforcement or even

10  anyone else on the jury panel -- is anyone going to

11  automatically believe a law enforcement witness over anyone

12  else simply because they are a law enforcement witness,

13  whether they're ATF or police, based on your relationship with

14  your friend or family or on anything else?  Is there anyone

15  who would do that?

16         All right.  I see no hands.

17         And, again, the Judge will instruct you on how to

18  determine the credibility of witnesses and what factors you

19  can consider.  Can everyone apply those instructions across

20  the board to all witnesses in this case fairly?

21         All right.  Is there anyone who couldn't do that?

22         I see no hands.

23         #7, Mr. Payne, the Judge asked you some specific

24  questions.  You had indicated you're a member of the NRA.  The

25  two gun counts in this case, as the Judge indicated, are

1   possessing a firearm or firearms in furtherance of a drug

2   trafficking crime and being a felon in possession of a

3   firearm.  Do you have any problem with the federal law that

4   prohibits people from possessing firearms in furtherance of a

5   drug trafficking crime?

6          JUROR #7:  No.

7          THE COURT:  Or do you think that felons should be

8   allowed to possess firearms?

9          JUROR #7:  No.

10          MR. STEVENS:  All right.  Thank you, sir.

11          Unfortunately also, a lot of us have been victims of

12   crime, and the Judge asked you about that.  Specifically, #11,

13   Ms. Dohack, you had indicated that your -- was it your wallet

14   was stolen by a coworker at work?

15          JUROR #11:  The contents of it, the cash out of the

16   wallet.

17          MR. STEVENS:  The cash out of the wallet.  Was that

18   captured on videotape at work there?

19          JUROR #11:  It was not.

20          MR. STEVENS:  Okay.  Was there -- I assume there

21   wasn't a police officer there who witnessed that or anything

22   like that?

23          JUROR #11:  A police officer, no.

24          MR. STEVENS:  Right.  Okay.  For anyone on the jury

25   panel that indicated they were a victim of a crime, did anyone

1    have the benefit of having a police officer there to witness

2    it or have it captured on videotape?

3         Okay.  I see no hands.

4         May I have just a moment, Judge?

5         Does anyone on the jury panel have any friends or

6    relatives who do criminal defense work in any capacity?  I

7    know a few of you, in response to the law enforcement

8    question, indicated that you know lawyers of one sort or

9    another.  Is there anyone who is a close friend or a family

10   member of someone who does criminal defense work?

11        Yes, ma'am, #35.

12        JUROR #35:  I have a friend who's a criminal defense

13   attorney.

14        MR. STEVENS:  I'm sorry?

15        JUROR #35:  I have a friend who's a defense attorney.

16        MR. STEVENS:  All right.  And is that here in the

17   city of St. Louis?

18        JUROR #35:  Yes, it is.

19        MR. STEVENS:  Who is that if you don't mind my

20   asking?

21        JUROR #35:  Joe Neill.

22        MR. STEVENS:  Joe Neill?

23        JUROR #35:  Yes.

24        MR. STEVENS:  Okay.  Do you discuss his cases with

25   him much?

1          JUROR #35:  No.

2          MR. STEVENS:  All right.  Do you know anything about

3     any of the cases that he does?

4          JUROR #35:  Just one that was in the news in the last

5     year or two, but that would be it.  Because it was in the

6     news, that's the only reason.

7          MR. STEVENS:  And would your relationship with

8     Mr. Neill -- would that affect your ability to be fair and

9     impartial here at all?

10          JUROR #35:  Not at all, no.

11          MR. STEVENS:  All right.  Thank you.

12          Anyone else on the panel?

13          Just a moment, Judge.

14          Thank you, all, for your time.  Thank you.

15          THE COURT:  Mr. Jimerson, you may inquire.

16          MR. JIMERSON:  Thank you, Your Honor.  May it please

17     the Court?

18          THE COURT:  Yes.

19          MR. JIMERSON:  Mr. Stevens.  Good afternoon, pretty

20     close to afternoon, ladies and gentlemen of the Jury.  Again,

21     I'm Herman Jimerson.  Most of you said -- well, all of you

22     said you didn't know me, so I'll give you another chance and

23     stand in front of you.  Have you ever seen me before, or do

24     you have -- do you know me?  It's one of the hardest questions

25     I ask because I always get people saying they don't know me,

1    and I feel bad, but that's okay because I mean it's important

2    just to -- this process -- and Her Honor has gone through it

3    all, so there's a reason when we get up we don't have a lot to

4    say, okay.

5              THE COURT:  Can you pull the mike around, so it's

6    like pointing toward you, and it will help me a little.

7              MR. JIMERSON:  I'm so sorry, Your Honor.

8              THE COURT:  There.  Thank you.

9              MR. JIMERSON:  You told Mr. Stevens that, and I

10   didn't follow.  I'm sorry.

11             When we get up and we -- there's not a lot to say

12   because Her Honor has said a lot of it in terms of the

13   questioning process.  We're just trying to determine -- mostly

14   to determine how you feel about certain things.  There's no

15   right or wrong answers in this process.  Okay.  Some things

16   might be hard to answer.  Some things might be easier to

17   answer, but all things are right because it involves you.

18   Okay.

19             So with that in mind, one thing -- one thing that Her

20   Honor asked but I'm going to ask it further because I think it

21   goes to your ability to sit here as well -- is there anybody

22   here that maybe is taking medication that, perhaps, makes you

23   drowsy or to have certain needs, and the reason I'm asking

24   that is because, if so, we need to let the Court know so we

25   can make accommodations for you.  Is there anybody here that

1    has any special needs regarding medication?  Okay.  Those

2    things are, you know, pills, insulin, those kind of things

3    like that.  Okay.  All right.

4            Now, one of the -- you've heard my client,

5    Mr. Warren, and I ask Mr. Warren to stand up again.  Can you

6    please stand up for them?  Likewise, earlier, we stood up, and

7    Mr. Warren lives in St. Louis city, in the south side.  Does

8    anybody here know Mr. Warren?

9            Okay.  Thank you, Mr. Warren.  Thank you.

10           We've heard a ton of charges here.  We heard a felon

11   in possession of a weapon.  We heard conspiracy to commit

12   cocaine.  We heard -- and there's other charges there.  My

13   question to you -- now that you've heard that my client has a

14   conviction regarding -- a conviction and that's why we have a

15   charge of felon in possession of a weapon, does anyone here

16   think automatically because he has that conviction that he's

17   guilty of any other charge?  Does anybody here believe that?

18           So even though you heard -- and I'm taking the ones

19   saying no.  So even though you heard, ladies and gentlemen of

20   the jury, that -- that he may have a conviction, you won't

21   necessarily hold that against him because he has a conviction,

22   is that accurate?

23           Okay.  And I know and everybody is nodding their

24   head.  I just want to get some people on record.  Okay.  And

25   I'll start again.  Like everyone else, Ms. Reinhardt, do you

1    believe that?

2            JUROR #1:  Yes.

3            MR. JIMERSON:  Okay.  Even though he has a conviction

4    doesn't necessarily mean that he's guilty of the charges we

5    have here today --

6            JUROR #1:  Correct.

7            MR. JIMERSON:  -- is that correct?  Again, we go back

8    to what Her Honor said earlier, the presumption of innocence,

9    okay, and even though someone has a prior situation, that

10   presumption still applies; would you agree, Ms. Reinhardt?

11           JUROR #1:  Yes, I agree.

12           MR. JIMERSON:  Okay.  And I'm asking you guys

13   generally, and I saw head nods.  Does everybody agree with

14   that proposition Ms. Reinhardt has said and agree with me?

15           JURORS IN UNISON:  Yes.

16           MR. JIMERSON:  Okay.  So we're good on that.  All

17   right.

18           Now, another area of law that we want to hear, that

19   you're going to hear about is -- and I assume the Judge is

20   going to issue instructions, and if Her Honor does issue this

21   instruction, then basically we're going to -- we're going to

22   ask that you follow it, and that instruction is called

23   entrapment.  Okay.  Now --

24           THE COURT:  Now, you objected to him instructing on

25   the law, and so I think that this is the same thing.  I mean

1    the general presumption of innocence, burden of proof, those

2    things, you can inquire into, but beyond that, I'll be

3    instructing on the law.

4         MR. JIMERSON:  Okay.  Your Honor, I wasn't going to

5    go further other than just a general, but I'll stay away from

6    it now.

7         THE COURT:  Okay.  Well --

8         MR. JIMERSON:  I appreciate it.

9         THE COURT:  I don't know.  If you have a general

10   question, maybe you can do it.

11        MR. JIMERSON:  Yeah.  The general question is -- is

12   that I talked about entrapment.  Again, I'm not permitted to

13   tell you what it is, and I'm not going to do that.  Okay.  My

14   question just generally is, if you receive instruction of

15   entrapment, you will listen to that, you will try to follow it

16   and consider that instruction, is that correct?

17        JURORS IN UNISON:  (Nodding.)

18        MR. JIMERSON:  Same head nods, right?  Okay.  All

19   right.  So, in other words, whatever the instructions the

20   Judge gives you, those instructions, you're going to pay

21   attention to and not necessarily try to bring in your outside

22   influence or whatnot, is that correct?

23        JURORS IN UNISON:  Yes.

24        MR. JIMERSON:  Head nods again, everybody?  Okay.

25   Does anybody disagree with that at all?

1           JURORS IN UNISON:  No.

2           MR. JIMERSON:  Okay.  All right.  Okay.  We're

3   moving.  Likewise, there will be another -- instructions, the

4   same thing.  You know, that's a withdrawal instruction.  It's

5   called withdrawal.  In other words, the Judge will tell you

6   what that is.

7           MR. STEVENS:  Judge, can we approach here, please?

8           THE COURT:  You may.

9           MR. STEVENS:  Thank you.

10   (A bench conference was held on the record and outside of

11   the hearing of the jury panel as follows:)

12           MR. STEVENS:  Judge, I'm going to object on the basis

13   of him getting into the instructions but further that this is

14   an 846 conspiracy.  There can't be a withdrawal under the

15   instructions.  There's no overt act required, and the

16   instructions explicitly say that you can't have a withdrawal

17   defense in a conspiracy that doesn't require an overt act, so

18   there won't be a withdrawal instruction in this case.

19           THE COURT:  And in any event, whether there is or

20   not, we'll decide at a later time if you ask for one, but you

21   can't talk to the jury about it.

22           MR. JIMERSON:  Yes, ma'am.

23           MR. STEVENS:  Thank you, Judge.

24           THE COURT:  So --

25           MR. JIMERSON:  Yes, ma'am.

1          THE COURT:  Yeah.

2          MR. JIMERSON:  Okay.  All right.

3     (The following proceedings were held within the hearing

4  of the jury panel.)

5          MR. JIMERSON:  Okay.  Moving right along, does

6  everyone here understand that we're asking that you make an

7  individual decision in this case if you can, okay?  Do you

8  understand what I mean by that, individual decision?  You'll

9  be sitting with other jurors here, and Her Honor instructed

10  you that a unanimous decision is required.  That simply means

11  that -- tell me if anyone disagrees.  That simply means that

12  you're sure you could have a unanimous decision, all being the

13  same, but that decision will be your individual decision; do

14  we agree with that?

15          JURORS IN UNISON:  Yes.

16          MR. JIMERSON:  In other words, you as an individual

17  has the right to make up his or her own mind regarding it, and

18  you can't be forced into it another way; do you understand

19  that?

20          JURORS IN UNISON:  Yes.

21          MR. JIMERSON:  Okay.  You have your right to your

22  determination, and that's your -- that's your decision; we all

23  agree?

24          JURORS IN UNISON:  Yes.

25          MR. JIMERSON:  All right.  Thank you, Your Honor.

1            THE COURT:  All right.  Thank you.  Now, members of

2    the jury, what we're going to do now is go through the jury

3    selection process, and this will take us a little while, and

4    so you're going to go to lunch, and we're going to keep

5    working, and I want to tell you what I told you before.

6    During this time when you'll be in recess, in your lunch

7    recess, please don't discuss this case at all among yourselves

8    or with anyone else and please keep an open mind until you do,

9    you know, you do get on the jury and you hear what's going on.

10   So please don't talk about this case.  You can talk about the

11   weather.  You can talk about spring training.  You can talk

12   about anything you want, but don't talk about this case during

13   this recess, and so I'm going to ask you to come back at 1:15.

14   That's an hour and a half for you all, and that'll give us

15   time to do our work and also eat some food, too.  So you will

16   have -- yes, ma'am.

17            JUROR #14:  I know you asked earlier, and we didn't

18   realize it, but Juror 10 and I used to work together.

19            THE COURT:  Okay.  Where did you work?

20            JUROR #14:  TWA.

21            THE COURT:  Okay.  And so you realize now you did

22   work together?

23            JUROR #14:  Yes.

24            THE COURT:  Well, here's the question I ask when that

25   happens.  If you all were both selected on the jury, could you

1    each exercise your own independent judgment and not just vote

2    one way because the other person told you to?

3              JUROR #14:  Yes.

4              JUROR #10:  Yes.

5              THE COURT:  You're both saying yes.  Okay.  And I'll

6    tell you; one time I had a high school principal on the jury,

7    and one of his former students was also on the panel, and I

8    asked him this question, and the principal said, "He never did

9    anything I told him to do when he was in high school; I don't

10   see why he would now."  But we do want to make sure that we

11   have 12 jurors who will each individually do what is right and

12   not just rely on someone else, so do you understand that?

13             JUROR #14:  Yes.

14             THE COURT:  Yes, sir.

15             JUROR #28:  Could I approach?

16             THE COURT:  You may.

17        And I'll tell you what; if you don't mind, I'm going

18   to send the other jurors out while you do that, so if you'll

19   just wait here.

20        Anybody else have anything else they think we need to

21   know?

22        All right.  The jury panel is excused.  This time,

23   you should take your coats and everything else because you

24   will not necessarily be sitting in the same seats when you

25   come back.

1          (A bench conference with Juror #28 was held on the record

2     and outside of the hearing and presence of the jury panel as

3     follows:)

4          THE COURT:  Okay.  All right.  Here, this is our

5     microphone.  Yes, sir.

6          JUROR #28:  Oh, that's fine.  I owned a real estate

7     company, Second Empire Realty, during the real estate boon,

8     covered all of south city.  I know it very well, all through

9     Carondelet.  I sold the old City Hospital, Benton Park, all

10    the state streets, and a lot of my clients were the victim of

11    violent crime, almost always by African-American males, and

12    that could influence me.  You know, your client is an

13    African-American.  It might unduly influence me, and I thought

14    it was worth mentioning.  Rapes and shootings and all sorts of

15    things, so --

16         MR. STEVENS:  Do you feel that you can set that aside

17    and follow the Court's instructions in this case?

18         JUROR #28:  It was a number of different incidences

19    over a long period of time.  That's why.  I wouldn't have

20    brought it up if I thought I could get past that.

21         MR. STEVENS:  Okay.  So you have concern about

22    whether you can get past it?

23         JUROR #28:  I think I do, yeah.  I'm sorry.

24         MR. JIMERSON:  Well, don't be sorry for your

25    feelings.  Okay.  As I said earlier, you know, that's who we

1   are, that's what you feel.

2           JUROR #28:  Right.

3           MR. JIMERSON:  And I appreciate you coming up, sir.

4   For the record, what's your name, sir?

5           JUROR #28:  Steve Gray.

6           MR. JIMERSON:  Mr. Gray, you're Juror #28?

7           JUROR #28:  Correct.

8           MR. JIMERSON:  You're saying that based on your prior

9   experience in south St. Louis and based on the prior crimes

10  committed on customers or people, friends that you knew by

11  African-American males, you think that would be a difficult

12  thing for you to set aside?

13          JUROR #28:  Yes, I think so.

14          MR. JIMERSON:  Okay.  All right.

15          JUROR #28:  I have a number of friends that live down

16  there, and they're all -- they've all got stories.

17          MR. JIMERSON:  Oh, okay.  And for the record, my

18  client, as you mentioned, is -- you perceive him to be an

19  African-American male, is that correct?

20          JUROR #28:  Yes.

21          MR. JIMERSON:  Okay.

22          THE COURT:  Okay.  Would you just step over; just

23  step over there for a second, and let me --

24      (Juror #28 left the bench conference.)

25          THE COURT:  I assume there's no objection to my

1    excusing him for cause?  Can I -- is it okay with you all if I

2    tell him he can just go ahead and leave?

3              MR. STEVENS:  Yes.

4              MR. JIMERSON:  Yes, ma'am.

5              THE COURT:  Okay.  Would you come back, sir?

6         (Juror #28 returned to the bench conference.)

7              JUROR #28:  Yes, Your Honor.

8              THE COURT:  All right.  I am going to excuse you from

9    service in this case.

10             JUROR #28:  Okay.

11             THE COURT:  And so you're discharged at this time.  I

12   would appreciate your not talking to anyone else about it or

13   even telling the other jurors that you have been discharged,

14   okay?

15             JUROR #28:  Okay.

16             THE COURT:  And if you'll give me your number, I can

17   give it back to the people who -- oh, you need to -- no.  Take

18   it downstairs to the Clerk's Office -- to the Jury

19   Commissioner's Office, the clerks on the first floor --

20             JUROR #28:  Okay.

21             THE COURT:  -- where you give them your number there

22   and tell them that I have discharged you, and if there's

23   anything they need to give you or tell you, they can give it.

24             JUROR #28:  I'm sorry I couldn't be more help.

25             THE COURT:  Okay.  Thank you.

1          JUROR #28:  Thank you.

2          MR. JIMERSON:  Thank you.

3      (Juror #28 left the bench conference.)

4      (Juror #24 joined the bench conference.)

5          THE COURT:  Yes, ma'am, #24.

6          JUROR #24:  You know, there was an incident with my

7   uncle about a year and a half ago.  Somebody robbed him and

8   almost beat him to death with a pole, and he -- they were

9   actually in his house.  He lives in southern Cape Girardeau

10  area, and they knew he had guns, and he had been robbed once,

11  and they came back to rob him again, and they were beating him

12  with a pole, and he actually got to his guns and shot them and

13  saved his life, and they had to air flight him to St. Louis

14  and everything, so . . .

15         THE COURT:  Do you think that would affect your

16  decision in this case?

17         JUROR #24:  Not at all.

18         THE COURT:  Okay.

19         JUROR #24:  Not at all.

20         THE COURT:  Does either counsel have any questions

21  you'd like to ask?

22         MR. STEVENS:  No.

23         MR. JIMERSON:  No, Judge.

24         THE COURT:  All right.  Thank you very much for

25  telling us that.

1          JUROR #24:  All right.

2       (Juror #28 left the bench conference.)

3       (The following proceedings were held outside the hearing

4    and presence of the jury panel.)

5          THE COURT:  All right.  So I have released for

6    cause -- the fellow who was just here was #28, and I -- yeah,

7    that was #28, and so I have released for cause #28 and then

8    also Mr. -- that was Mr. Gray that we just discussed, and then

9    Mr. Streicher, who we discussed earlier.  Those two have been

10   dismissed and are not on the panel.  So then what I need to

11   know is if either side has any other challenges for cause, and

12   I'll ask Mr. Stevens first.

13          MR. STEVENS:  None from the Government, Your Honor.

14          THE COURT:  And Mr. Jimerson?

15          MR. JIMERSON:  Yes, Your Honor.  Thank you.  We move

16   for cause -- strike for cause Juror #30, Mr. Cole J.

17   Walterman.  As the Court recalls the conversation with the --

18          THE COURT:  Hold on a second.  Are there any others

19   besides Mr. Cole?

20          MR. JIMERSON:  Juror #7.

21          THE COURT:  Okay.  And why don't you step up to the

22   lectern, both of you, and we'll discuss both of them.

23          MR. JIMERSON:  Yes, Judge.

24          THE COURT:  All right.  So Mr. Cole -- Cole

25   Walterman, Mr. Walterman, #30, is the person who said he

1   worked in the emergency room.

2          MR. JIMERSON:  Yes, ma'am.

3          THE COURT:  And does the Government object to this

4   strike for cause?

5          MR. STEVENS:  I would, Judge.  I asked him twice

6   whether he could follow the Court's instructions, and he said

7   that he would follow the Court's instructions.

8          THE COURT:  Mr. Jimerson, your response.

9          MR. JIMERSON:  Yes, Judge, but he -- that question

10  was in fact asked, but then he also demonstrated an

11  ambivalence about it, "Well, maybe.  I don't know, you know."

12  So to me, the certainty of being a juror is knowing what

13  you're going to do and not necessarily what you might do, and

14  I believe that's the question here.  He admitted that, you

15  know, he may keep thinking about his patients, and that's an

16  honorable thing, but he's here with a certain function.  If he

17  can't commit solely to saying, "I will not do this," then I

18  believe that's a disadvantage toward my client, and I believe

19  he should be removed for cause.

20         THE COURT:  Yeah, I think what he said was enough

21  that he should be removed for cause.  He -- he said -- he said

22  it two different ways.  When Mr. Stevens said, "Will you

23  follow the Judge's instructions," he said, "Yes."  When we

24  said, "Are you able to -- do you think you can be fair given

25  your history with all these victims of gun violence," he said,

1    "I'll do my best.  I'll try.  I don't -- it will be in my

2    mind.  I will be thinking about it."  So I think it was enough

3    that it showed a -- that he should be stricken for cause, so

4    I'm going to grant the challenge for cause by the Defendant on

5    #30, Mr. Walterman.

6            Now, what's your reason on #7, Mr. Jimerson?

7            MR. JIMERSON:  Thank you, Your Honor.  It's really

8    the question posed by Mr. Stevens to Juror #7, Mr. Russell

9    Payne, and that was "Your opinion regarding felons, should

10   they possess guns," and particularly, he's already -- he's

11   given a conclusion already, you know, in terms of how he feels

12   about it, and that, to me, leans him toward convicting him.

13   Even prior to even hearing anything, he's already formed his

14   opinion, and I believe -- well, I think I've said it.

15   Basically, you know, he's already stated what his opinion is

16   and what he's going to do.

17           THE COURT:  Mr. Stevens, your response.

18           MR. STEVENS:  No, Judge.  I -- what I asked him

19   was -- I asked him about the law and the charges and whether

20   he basically was in agreement with what the law is, and he

21   expressed that he was.  I don't see that as a reason for a

22   cause strike.

23           THE COURT:  Yeah, I think it's an appropriate

24   question in a -- in a gun case, and really, I think the

25   Government wants to know if he's somebody who believes that

1    there shouldn't be any restrictions on people owning firearms

2    because he did indicate that he was -- you know, had guns and

3    was a member of the NRA.  I don't believe that in any way he

4    was saying he had prejudged the case.  He was simply saying he

5    was not going to disagree with the law.  So I will overrule

6    that challenge for cause.

7            So we need to pick a jury, and we have -- the jury

8    panel -- hold on a second.  Okay.  Just running through it,

9    the ones who have been removed for cause are numbers 28, 30,

10   and 33.  For the jury itself, you should exercise your strikes

11   on numbers 1 through 29, excluding 28, of course, because that

12   person's gone, and then for the alternates, the alternate pool

13   is -- well, it would be -- do you all think there's any reason

14   I should seat more than one alternate?

15           MR. STEVENS:  The case is short, Judge.  I think

16   we're fine.

17           THE COURT:  I think it's a short case and that should

18   be fine, so the alternate pool is numbers 31, 32, and 34.  So

19   each side -- and numbers 30 -- I'll tell you what; I'm going

20   to seat two alternates and use all of these jurors, so there

21   will be -- each of you -- let's see.  One, two, three.  No, I

22   can't do that.  Let's see.  That causes too much confusion.

23   Never mind.  We're going to seat one alternate, and so the

24   alternate pool will be numbers -- did I say that right -- 31,

25   32, and 34, and then numbers 35 and 36 are excess.  Okay.  And

1  then the Defendant has 10 strikes, and the Government has six.

2  The Government needs to do its six first and then provide

3  those strikes to Mr. Jimerson, and then, Mr. Jimerson, you can

4  do your 10.

5          MR. JIMERSON:  Yes, ma'am.

6          THE COURT:  And I would appreciate your doing this

7  expeditiously.  I want to be able to -- you know, I don't

8  know -- get -- we need to know when you're ready.  So I have

9  some people coming in here at 12:30.  It's not a formal court

10  proceeding.  I'm just swearing in some officers.  So I'll

11  check on your status at 12:30, and if you haven't finished it

12  by then, we'll send you to lunch, and then you can come back

13  at 1:00 or whatever.  Okay?

14          MR. JIMERSON:  Yes, ma'am.

15          THE COURT:  All right.  So I'll be in recess while

16  you do this.

17      (Court recessed from 11:58 a.m. until 12:32 p.m.)

18      (The following proceedings were held outside the hearing

19  and presence of the jury panel.)

20          THE COURT:  Mr. Stevens, do you have the list?  Can

21  you read to me what you've --

22          MR. STEVENS:  Oh, I'm sorry, Your Honor.

23          THE COURT:  -- the Government's strikes are?

24          MR. STEVENS:  Yes.

25          THE COURT:  Numbers?

1          MR. STEVENS:  The Government strikes are 5, 11, 19,

2     21, 23, 27.

3          THE COURT:  And the Defendant's strikes?

4          MR. JIMERSON:  I'm still writing the list, Your

5     Honor, but I'll give them to you.

6          THE COURT:  Okay.

7          MR. JIMERSON:  #1, 3, 4, 6, 14, 18, 20, 26, 29, and

8     the alternate strike it #32.

9          THE COURT:  And -- and --

10         MR. STEVENS:  #7.

11         MR. JIMERSON:  #7.  I'm sorry, Your Honor.  #7.

12         THE COURT:  Right.  And the Government's alternate

13    strike?

14         MR. STEVENS:  #34, Judge.

15         THE COURT:  Okay.  So I show -- I'm going to read

16    these into the record, and you all can tell me if I've got

17    this right.

18         Juror #1 will be Lynne Blust.  #2 will be Geralyn

19    Rothery.  #3 would be Tera Roberts.  #4 would be Denise

20    Schneider.  #5 would be Stacie Prince.  #6 would be Beth

21    Deichmann.  #7 would be Richard Hochecker.  #8 would be Philip

22    Councilor.  #9 would be Lori Williams.  #10 would be Paul

23    Calotes.  #11 would be Melinda Mitchell, and #12 would be

24    Melissa Schieffer, and the alternate would be Ronicia Wesley

25    Toney.  Is that correct?

137

1           MR. STEVENS:  Yes, Judge.

2           MR. JIMERSON:  Did you miss #7?  I didn't hear #7.

3           THE COURT:  #7 is gone.  Well, I was reading the ones

4    that remain.

5           MR. JIMERSON:  Okay.  I got you.

6           THE COURT:  So the ones that remain are the ones I

7    just read.

8           MR. JIMERSON:  I got you.  I got you.

9           THE COURT:  So, yeah, so were there -- are there any

10   challenges to the Jury then as it will be empaneled?

11          MR. JIMERSON:  Yes, ma'am, I have to.

12          THE COURT:  Okay.  Go ahead.

13          MR. JIMERSON:  Your Honor, Defendant moves regarding

14   challenges to the Jury based on United States versus -- *Batson*

15   *versus Kentucky*.  Particularly, there were -- as I looked over

16   the jury venire, apparently, there was four African-Americans

17   that were seated in the venire panel.  The Government has

18   exercised its strikes against two of those.  Let me state

19   this.  Three were possibly able to be seated in the area -- in

20   the panel.  One was the alternate, and she was not in the

21   position to be seated based on this.  Out of the three, two of

22   the strikes were used by the Government to flag

23   African-American potential jury members, particularly, Mrs. --

24   Juror #5, Antonio Seviere, and Juror #21, Lynnette McMorris.

25   Your Honor, we believe that -- that the effect of striking

1   those jurors has a racial effect, discriminatory effect,

2   particularly in respect to my client's rights, Mr. Daryl

3   Warren.  The -- I heard nothing from the Government regarding

4   anything that would necessarily disqualify them or -- in fact,

5   the Court even asked questions regarding -- where there was

6   lack of information regarding them, and they answered all very

7   positive or similarly situated to other jurors sitting in this

8   venire panel, and as a result, Judge, I believe that the only

9   effect that it could have is one of discrimination against

10  Mr. -- Mr. Stevens -- I mean Mr. Warren, my client.

11          THE COURT:  All right.  Well, let me just state first

12  for the record, based on my own observations, it appears to me

13  that the following panel members were African-American.  This

14  is what I believed was correct.  #5, Mr. Seviere.  #9 -- these

15  are the panel numbers -- Tera Roberts.  #21, Lynnette

16  McMorris.  And #31, Ronicia Wesley Toney, and she is going to

17  be the alternate.  So of the -- the three, you are challenging

18  the Government strikes on #5, which was Mr. Seviere, and # --

19  what was the panel number -- 21, Ms. McMorris.

20          MR. JIMERSON:  Yes.

21          THE COURT:  So, Mr. Stevens, will you respond to the

22  Defendant's motion?

23          MR. STEVENS:  Certainly, Judge.  Our reason for

24  striking those two jurors is pretty simple.  They were the

25  only two jurors on the entire panel that did not answer any of

1    the general questions.  All I know about them is what's on the

2    questionnaire.  I will point out the Court, when it came back

3    to ask about employment, did direct direct questions to them;

4    however, that's simply information that should have been on

5    the questionnaire to begin with, but they did not answer --

6    they were the only two panel members who did not answer a

7    single general question of any kind.  This is a relatively

8    talkative panel, but they -- they didn't answer one question.

9    All I know about them is basically what is on the -- on the

10   questionnaire.

11       THE COURT:  Any -- any response, Mr. Jimerson?

12       MR. JIMERSON:  Your Honor, I believe the nature of a

13   lot of people's responses was pretty limited, particularly, if

14   you look at Mrs. Beth -- Juror #13, Beth A. Deichmann or

15   Deichmann.  Basically, she only answered one thing, and I

16   believe it was that her nephew -- Webster Groves -- maybe a

17   police officer.  There were other people who just answered

18   maybe just one question, one question at all.  So it appears

19   that -- you know, that the question -- I mean the answers

20   provided by the Government are just in fact pretextual for the

21   basis of striking those jurors as I mentioned earlier.

22       THE COURT:  All right.  Well, I don't find that

23   there's been any pretext or any discrimination here.  The

24   Government is correct that these were the only two jurors who

25   did not answer any questions.  They're also the only two that

1   didn't fill out any employment information on the form.  Now,

2   they both said they're not currently employed, but -- so

3   they -- but they didn't list a prior employer either, although

4   when I asked them, of course, they did, and that's not

5   saying -- the fact they didn't fill it out is not here nor

6   there, but there was no information about them, and that by

7   itself is sufficient nonracial reason, nondiscriminatory

8   reason for the strike, and you did point out #13,

9   Ms. Deichmann.  In fact, I think you are correct that she only

10   answered the one question, but she did answer that question.

11   She also provided information about, you know, her -- her jobs

12   and everything that was already on the form, so I don't think

13   there's been any discrimination shown, and I'll overrule the

14   *Batson* challenge, and the Jury will be seated as I just

15   stated.

16           MR. JIMERSON:  Yes, Your Honor.  Thank you, Your

17   Honor.

18           THE COURT:  All right.  And so the case is in recess

19   until 1:15.

20           MR. STEVENS:  Thank you, Judge.

21           MS. BEHRENS:  Thank you, Judge.

22       (Court recessed from 12:40 p.m. until 1:21 p.m.)

23       (The following proceedings were held outside the hearing

24   and presence of the jury panel.)

25           MR. STEVENS:  Judge, I anticipate with the first

1   witness, at some point, I'll want to use the paper on the

2   easel.  We're going to have quite a bit of video going on the

3   screens and things.  I'm going to show him some phone records

4   where we'll establish several phone numbers that I'd like to

5   just write up there for future reference.  Do you mind if I

6   pull that over to use that?

7           THE COURT:  No.  Just make sure you don't block the

8   jurors' view of anything, and that's fine, and I want to

9   remind you, too, to stand at the lectern and use the -- use

10  the microphone, and if you all want to use this one to address

11  the Jury during your opening statements, you can do that.

12  That's why it's there, but what you have to do is pick the

13  mike up and move it over so that -- you know, so that it's --

14  because that mike that's on it is not live.

15          MR. JIMERSON:  Yes, ma'am.  I'll be using this one,

16  Your Honor.

17          THE COURT:  Okay.  All right.  You may bring in the

18  jury.

19     (The following proceedings were held within the hearing

20  and presence of the jury panel.)

21          THE COURT:  All right.  Good afternoon.  Thanks for

22  being back here, and we are now ready to seat the persons who

23  have been selected as jurors, and so as your name is called,

24  would you please step forward and be seated where indicated by

25  the clerk?

1        (Jury seated.)

2            THE COURT:  All right.  The next step is that the

3    persons who have been selected to serve on the Jury will now

4    be administered another oath for faithful performance of your

5    duties as jurors.  So would you all please stand and raise

6    your right hands?

7        (Jury sworn.)

8            THE COURT:  You may be seated.

9            Now, to those of you who were not selected to serve

10   on this Jury, I want to thank you for your service in this

11   case.  It's essential that we have a large pool of qualified

12   individuals such as yourselves from whom to pick a jury in

13   every case, and we do really appreciate your being here and

14   appreciate, like I said, your being here yesterday as well.

15   So you are discharged in this case at this time.

16           Do they need to go --

17           THE CLERK:  They're finished.

18           THE COURT:  Okay.  And so you do not need to report

19   back downstairs.  If you'll give your numbers to the clerk at

20   the back of the courtroom, she'll get those down to the jury

21   clerks.  If you are needed again for jury service, you will be

22   notified by the jury clerks, and I don't know if you will or

23   not, but you could be called again, and -- but I do want to

24   thank you very much for your service.  I hope you all

25   understand that, you know, our system of justice could not

1  function if it weren't for citizens such as you willing to

2  serve, so I appreciate your being here and going through this

3  process.  Yes, sir.

4        JUROR:  How will we know if we're picked as an

5  alternate?

6        THE COURT:  Well, you're not picked at all.  You

7  would be up here if you were.  There is an alternate here.

8  It's actually the one we called 13, but she's really -- we

9  tell her to forget about that.  So you're not -- you're

10  completely discharged in this case, so you are done.

11        Okay.  Yes, ma'am.

12        JUROR:  So we don't need to log online and see if we

13  have to serve out the rest of our like -- is it two weeks?

14        THE COURT:  No, you don't.

15        JUROR:  Okay.

16        THE COURT:  But you'll be contacted however you were

17  contacted to come in this time.  I can't remember how they --

18  how did you know to --

19        JUROR:  Online.

20        THE COURT:  How are they called in the first place?

21  Aren't they mailed?

22        JUROR:  You get a letter the first time.

23        THE COURT:  You get a summons, right, and that

24  summons then tells you to log in, so I think you'd be -- you

25  don't have to keep logging in.  Someone will contact you is

1    the main thing.  You don't have to keep checking every day

2    because this week there's no more need for you, so you don't

3    have to keep checking every day, but they'll contact you one

4    way or another.  Okay.  Thank you, all.

5        (Remaining jury panel left the courtroom.)

6        THE COURT:  All right.  Members of the Jury, I'm

7    going to take a few moments now to give you some initial

8    instructions about this case and about your duties as jurors.

9    At the end of the trial, I will give you further instructions,

10   and I may also give you instructions during the trial.  Unless

11   I specifically tell you otherwise, all of the instructions,

12   both those I give you now and those I give you later, are

13   equally binding on you and must be followed.

14        This is a criminal case brought by the Defendant

15   against the United States Government.  The Defendant is

16   charged with conspiracy to distribute cocaine, possessing a

17   firearm in furtherance of a drug trafficking crime, and being

18   a felon in possession of a firearm.  Those three charges are

19   set forth in what is called an indictment, which reads as

20   follows:

21        The first charge is, beginning at a time unknown to

22   the Grand Jury but up to and including June 5th, 2013, in the

23   city of St. Louis, within the Eastern District of Missouri,

24   Daryl Warren and others, acting together and with others known

25   and unknown to the Grand Jury, did knowingly and willfully

1    conspire, combine, confederate, and agree to commit an offense

2    against the United States, to wit, to distribute and possess

3    with intent to distribute in excess of five kilograms of a

4    mixture or substance containing a detectable amount of

5    cocaine, a Schedule II narcotic controlled substance drug, in

6    violation of Title 21 United States Code § 841(a)(1) and 846

7    and punishable under Title 21 United States Code §

8    841(b)(1)(a)(ii).

9            The second charge is that on or about June the 5th of

10   2013, in the city of St. Louis, within the Eastern District of

11   Missouri, Daryl Warren, acting with others known and unknown

12   to the Grand Jury, did knowingly possess a firearm in

13   furtherance of a drug trafficking crime, which may be

14   prosecuted in a court of the United States, specifically,

15   conspiracy to distribute in excess of five kilograms of

16   cocaine as charged in the previous charge, in violation of

17   Title 18 United States Code § 924(c)(1)(2).

18           And the third charge is that on or about June 5th,

19   2013, in the city of St. Louis, within the Eastern District of

20   Missouri, Daryl Warren, the Defendant herein, had been

21   previously convicted of a felony crime punishable by a term of

22   imprisonment exceeding one year, did knowingly possess a

23   firearm, which traveled in interstate or foreign commerce

24   during or prior to being in the Defendant's possession, in

25   violation of Title 18 United States Code § 922(g)(1).

1          You should understand that an indictment is simply an

2     accusation; it is not evidence of anything.  The Defendant has

3     pleaded not guilty and is presumed to be innocent unless and

4     until proved guilty beyond a reasonable doubt.  It will be

5     your duty to decide from the evidence whether the Defendant is

6     guilty or not guilty of the crime charged.  From the evidence,

7     you will decide what the facts are.  You are entitled to

8     consider that evidence in the light of your own observations

9     and experiences in the affairs of life.  You may use reason

10    and common sense to draw deductions or conclusions from facts

11    which have been established by the evidence.  You will then

12    apply those facts to the law which I give you in these and my

13    other instructions, and in that way, you will reach your

14    verdict.  You are the sole judges of the facts, but you must

15    follow my instructions whether you agree with them or not.

16    You have taken an oath to do so.

17          Do not allow sympathy or prejudice to influence you.

18    The law demands of you a just verdict, unaffected by anything

19    except the evidence, your common sense, and the law as I give

20    it to you.  You should not take anything I may say or do

21    during the trial as indicating what I think of the evidence or

22    what I think your verdict should be.

23          Finally, please remember that only this Defendant,

24    not anyone else, is on trial here and that this Defendant is

25    on trial only for the crime charged, not for anything else.

1          I have mentioned the word "evidence".  Evidence

2    includes the testimony of witnesses, documents and other

3    things received as exhibits, and any facts that have been

4    stipulated, that is, formally agreed to by the parties, and

5    any facts that have been judicially noticed, that is, facts

6    that I tell you you may but are not required to accept as true

7    even without evidence.

8          Certain things are not evidence, and I will list

9    those things for you now.

10          One, statements, arguments, questions, and comments

11   by the lawyers representing the parties in this case are not

12   evidence.

13          Two, objections are not evidence.  Lawyers have a

14   right to object when they believe something is improper.  You

15   should not be influenced by the objection.  If I sustain an

16   objection to a question, you must ignore the question and must

17   not try to guess what the answer might have been.

18          Three, testimony that I strike from the record or

19   tell you to disregard is not evidence and must not be

20   considered.

21          Four, anything you see or hear about this case

22   outside the courtroom is not evidence unless I specifically

23   tell you otherwise during the trial.

24          Furthermore, a particular item of evidence is

25   sometimes received for a limited purpose only.  That is it can

1    be used by you only for one particular purpose and not for any

2    other purpose.  I will tell you if that occurs and instruct

3    you on the purposes for which the item can and cannot be used.

4          Now, some of you may have heard the terms "direct

5    evidence" and "circumstantial evidence".  You're instructed

6    that you should not be concerned with those terms.  The law

7    makes no distinction between direct and circumstantial

8    evidence.  You should give all evidence the weight and value

9    you believe it is entitled to receive.

10         In deciding what the facts are, you may have to

11   decide what testimony you believe and what testimony you do

12   not believe.  You may believe all of what a witness said or

13   only part of it or none of it.  In deciding what testimony to

14   believe, you may consider the witness' intelligence, the

15   opportunity the witness had to have seen or heard the things

16   testified about, the witness' memory, any motives that witness

17   may have for testifying a certain way, the manner of the

18   witness while testifying, whether that witness said something

19   different at an earlier time, the general reasonableness of

20   the testimony, and the extent to which the testimony is

21   consistent with any evidence that you believe.

22         During the trial, I'm sure it will be necessary for

23   me to talk with the lawyers outside the hearing of the Jury,

24   and we do that either by having a bench conference over here

25   while you are present in the courtroom or by calling a recess.

1  Please understand that while you are waiting we are working.

2  The purpose of these conferences is to decide how certain

3  evidence is to be teated under the Rules of Evidence and to

4  avoid confusion and error.  We will, of course, do what we can

5  to keep the number and length of these conferences to a

6  minimum.

7          Now, to ensure fairness, you as jurors must obey the

8  following rules.

9          First, do not talk among yourselves about this case

10  or about anyone involved with it until the end of the case

11  when you go to the jury room to decide on your verdict.

12          Second, do not talk with anyone else about this case

13  or about anyone involved with it until the trial has ended and

14  you have been discharged as jurors.

15          Third, when you are outside the courtroom, do not let

16  anyone tell you anything about the case or about anyone

17  involved with it until the trial has ended and your verdict

18  has been accepted by me.  If someone should try to talk to you

19  about the case during the trial, please report it to me.

20          Fourth, during the trial, you should not talk with or

21  speak to any of the parties, lawyers, or witnesses involved in

22  the case.  You should not even pass the time of day with any

23  of them.  It is important not only that you do justice in this

24  case but that you also give the appearance of doing justice.

25  If a person from one side of the lawsuit should see you

1    talking to a person from the other side, even if it were

2    simply to pass the time of day, an unwarranted and unnecessary

3    suspicion about your fairness might be aroused.  If any

4    lawyer, party, or witness does not speak to you when you pass

5    in the hall or ride in the elevator or the like, please

6    understand they are not being rude; it is because they are not

7    supposed to talk to or visit with you either.

8              Fifth, it may be necessary for you to tell your

9    family, friends, coworkers, or employer about your

10   participation in the trial.  You can explain to them when you

11   are required to be in court and can warn them not to ask you

12   about this case or tell you anything they know or think they

13   know about the case or discuss it in your presence.  You must

14   not communicate with anyone or post information about the

15   parties, witnesses, participants, charges, evidence, or

16   anything else related to this case.  You must not tell anyone

17   anything about the Jury's deliberations in the case until I

18   have accepted your verdict or until I give you specific

19   permission to do so.  If you discuss the case with someone

20   other than the jurors, other jurors during deliberations, it

21   could create the perception that you have already decided the

22   case or that you may be influenced in your verdict by their

23   opinions.  That would not be fair to the parties, and it may

24   result in the verdict being thrown out and the case having to

25   be retried.  During the trial, while you are in the courthouse

1   and after you leave for the day, do not provide any

2   information to anyone by any means about this case.  Thus, for

3   example, do not talk face-to-face or use any electronic device

4   or media, such as the telephone, a cell or smartphone,

5   BlackBerry, PDA, computer, the Internet, any Internet service,

6   any text or instant messaging service or any Internet

7   chatroom, blog, or website such as Facebook, YouTube, Twitter,

8   or any other way to communicate with anyone any information

9   about this case until I accept your verdict.

10          Sixth, do not do any research on the Internet, in

11   libraries, in the newspapers, or in any other way or make any

12   investigation about this case on your own.  Do not visit or

13   view any place discussed in the case, and do not use Internet

14   programs or other devices to search for or to view any place

15   discussed in the testimony.  Also, do not do research of any

16   information about the case, the law, or the people involved,

17   including the parties, the witnesses, the lawyers, or the

18   judge.

19          Seventh, do not read any news stories or articles in

20   print or on the Internet or in any blog about the case or

21   about anyone involved with it or listen to any radio or

22   television reports about the case or about anyone involved

23   with it.  In fact, until -- let's see.  I do not know whether

24   there might be any newspaper reports of this case or other

25   news reports, but if there are, please do not listen, read any

1   newspapers, or listen to any news reports about this case.  I

2   can assure you that by the time you have heard the evidence in

3   this case you will know what you need to know to return a just

4   verdict.  The parties have a right to have the case decided

5   only on evidence they know about and that has been introduced

6   here in court.  If you do some research or investigation or

7   experiment that we don't know about, then your verdict may be

8   influenced by inaccurate, incomplete, or misleading

9   information that has not been tested by the trial process,

10  including the oath to tell the truth and by cross-examination.

11  All of the parties are entitled to a fair trial rendered by an

12  impartial jury, and you must conduct yourselves so as to

13  maintain the integrity of the trial process.  If you decide a

14  case based on information not presented in court, you will

15  have denied the parties a fair trial in accordance with the

16  rules of this country and you will have done an injustice.  It

17  is very important that you abide by these rules.  Remember,

18  you have taken an oath to abide by these rules, and you must

19  do so.  Failure to follow these instructions may result in the

20  case having to be retried and could result in your being held

21  in contempt.

22          Now, the trial will proceed in the following manner.

23  First, the Government attorney will make an opening statement.

24  Next, the Defendant's attorney may but does not have to make

25  an opening statement.  An opening statement is not evidence

1   but is simply a summary of what the attorney expects the

2   evidence to be.  The Government will then present its

3   evidence, and counsel for the Defendant may cross-examine.

4   Following the Government's case, the Defendant may but does

5   not have to present evidence, testify, or call other

6   witnesses.  If the Defendant calls witnesses, the Government

7   counsel may cross-examine them.  After presentation of the

8   evidence is completed, the attorneys will make their closing

9   arguments to summarize and interpret the evidence for you.  As

10  with opening statements, closing arguments are not evidence.

11  I will then further instruct you on the law, and after that,

12  you will retire to deliberate on your verdict.

13          So at this time, we are ready for the opening

14  statements of the attorneys.  Mr. Stevens, you may proceed.

15          MR. STEVENS:  Thank you, Your Honor.

16      (Opening statements excerpted.)

17          THE COURT:  Mr. Stevens, you may proceed.

18          MR. STEVENS:  Thank you, Judge.  The Government calls

19  Agent Richie Zayas to the stand.

20          THE COURT:  And any other witnesses in the courtroom

21  need to be excused at this time if there are any.

22          MR. STEVENS:  Judge, may I approach briefly here?

23          THE COURT:  Yeah.

24      (A bench conference was held on the record and outside of

25  the hearing of the Jury as follows:)

1          MR. STEVENS:  I expect to play transcripts with the

2     video, and I just wanted to --

3          THE COURT:  Say it again.  She couldn't hear you.

4          MR. STEVENS:  I'm sorry.  I expect to play

5     transcripts with the video, so I'm just handing you the

6     standard instruction.

7          THE COURT:  Oh, okay.  And you want me to give this

8     when he gets ready?

9          MR. STEVENS:  Yes.

10         THE COURT:  Tell me when you're ready.

11         MR. STEVENS:  Yes, I will.

12         THE COURT:  Okay.

13         MR. JIMERSON:  No objection to it, and --

14         THE COURT:  Okay.  And so none of these people are

15    witnesses who are in the courtroom?

16         MR. STEVENS:  That's correct.

17         MR. JIMERSON:  Not for us.

18         THE COURT:  Okay.  All right.

19         MR. STEVENS:  Thank you, Judge.

20      (The following proceedings were held within the hearing

21    of the Jury.)

22         MR. STEVENS:  May I proceed, Your Honor?

23         THE COURT:  You may.

24         MR. STEVENS:  Thank you.

25

1    **RICHARD ZAYAS**,

2    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

3    FOLLOWS:

4                        DIRECT EXAMINATION

5    BY MR. STEVENS:

6    Q     Will you state your name again for the Jury, please?

7    A     Richard Zayas.

8    Q     And what is your occupation, sir?

9    A     Special Agent with the Department of Justice, Bureau of

10   Alcohol, Tobacco, Firearms and Explosives.

11   Q     How long have you been with ATF?

12   A     Over 25 years.

13   Q     And let's talk a little bit about your background and

14   experience.  Where did you start your career as an ATF agent?

15   A     In 1989, in Miami, Florida.

16   Q     And where did you receive your initial training to become

17   an ATF agent?

18   A     In Brunswick, Georgia.

19   Q     All right.  And what sort of training did you undergo

20   there?

21   A     There's an initial basic school, which is nine weeks,

22   which teaches you basic law enforcement, and then there's a

23   subsequent nine weeks, which you get into specific ATF laws

24   and how we do the job.

25   Q     Did you later receive -- receive specialized training as

1    an ATF agent?

2    A    Yes, sir.

3    Q    And, specifically, were you a member of a Special

4    Response Team?

5    A    Yes, sir.

6    Q    And what is a Special Response Team?

7    A    A Special Response Team is a group of agents they bring

8    together, basically, a SWAT team, which we're involved in

9    high-risk arrest warrants and search warrants.

10   Q    All right.  And how long did you do that?

11   A    Five and a half years.

12   Q    Did you receive training in undercover operations?

13   A    Yes, sir, I did.

14   Q    And what is your current assignment?

15   A    I'm currently assigned to the Special Operations Division

16   in Washington, DC, and I'm involved in undercover operations

17   throughout the United States and its properties.

18   Q    How long have you worked as an undercover agent?

19          MR. JIMERSON:  Objection, Your Honor.  May we

20   approach?

21          THE COURT:  You may.

22    (A bench conference was held on the record and outside of

23   the hearing of the Jury as follows:)

24          MR. JIMERSON:  Your Honor, I believe this is getting

25   dangerously close, if not already, to the -- to the ruling

1    that you made regarding his qualifications.  This man is not

2    being used as an expert, yet we're getting so much into his

3    qualifications, his years of experience and those things,

4    particularly, his working 20 plus years and those things.  I'm

5    afraid that basically what he's done is establish this

6    witness' reliability based on something that we had talked

7    about earlier.

8             THE COURT:  Okay.  Well, I don't think he's done that

9    at all.  This is what I said he could do, the basic normal

10   stuff, so overruled.

11            MR. STEVENS:  Judge, if I could, while I'm here,

12   after I go through his experience, I intend to ask him what

13   the primary focus of his undercover work is now, and that

14   would be home invasion robbery investigations.  Do you have a

15   problem with that?

16            THE COURT:  Yeah.

17            MR. STEVENS:  You do?  Okay.

18            THE COURT:  I think that's covered by my --

19            MR. STEVENS:  Okay.  That's all I wanted to ask.

20            THE COURT:  -- by what I told you.  Okay.

21            MR. STEVENS:  All right.

22      (The following proceedings were held within the hearing

23   of the Jury.)

24   Q   (By Mr. Stevens) I think I'd asked you how long you'd

25   been a undercover agent with ATF.

1    A    Yes, sir.

2    Q    And how long have you been?

3    A    Twenty-four of the 25 years.

4    Q    As part of your experience as an undercover agent, have

5    you had an occasion to infiltrate criminal organizations?

6    A    Yes, sir, I have.

7    Q    What sort of organizations?

8    A    I worked a year and a half undercover in the Washington,

9    DC, area on a gang by the name of MS13, and then I worked

10   three years undercover in northern California on a prison

11   street gang known as the Nortenos.

12   Q    And those are just a few examples?

13   A    Yes, sir.

14   Q    Have you been involved in the undercover purchase of

15   illegal drugs over the course of your career as an undercover

16   agent?

17   A    Yes, sir, I have.

18   Q    Have you trained other agents to make those kinds of

19   purchases?

20   A    Yes, sir, I have.

21   Q    Do your undercover operations sometimes include what are

22   called confidential informants?

23   A    Yes, sir.

24   Q    And those are commonly referred to as CIs?

25   A    Yes, sir.

1  Q    All right.  Those are individuals who are not agents but

2  who are working with you in these operations at times?

3  A    That's correct.

4  Q    Now, you were in St. Louis last summer as part of an

5  operation here, is that right?

6  A    Yes, sir, from April to June.

7  Q    All right.  And did that involve home invasion robbery

8  investigations?

9  A    Yes, sir.

10 Q    Can you explain to the Jury what we mean by a home

11 invasion robbery?

12 A    Home invasion is where an individual or group of

13 individuals come together by means of force to enter either a

14 permanent structure or nonpermanent structure to steal some

15 property.

16 Q    All right.  And what -- what sort of operation was this

17 you were involved in last summer?

18 A    It was known as Operation Gideon, and our purpose was to

19 combat violent crime here in the St. Louis area.

20 Q    How long did that operation go on?

21 A    From April to June of 2013.

22 Q    So about four months?

23 A    Yes, sir.

24 Q    All right.  And as part of that operation, you were doing

25 home invasion robbery investigations?

1    A    Yes, sir.

2    Q    All right.  Now, as part of a home invasion robbery

3    investigation, did you meet the Defendant Daryl Warren?

4    A    Yes, sir, I did.

5             MR. STEVENS:  Let me show you, if I could, Agent

6    Zayas, what I will mark as Government's Exhibit 1.

7             May I approach, Judge?

8             THE COURT:  You may.  Is there any objection to this

9    exhibit?

10            MR. JIMERSON:  No, Your Honor.

11            THE COURT:  All right.

12            MR. STEVENS:  And for the record, Judge, I have

13   previously disclosed it to defense counsel.

14            THE COURT:  Right.  Okay.  So Exhibit 1 is received

15   into evidence.

16            MR. STEVENS:  Thank you, Judge.

17   Q    (By Mr. Stevens) In that case, I'll stand here, Agent

18   Zayas.  You indicated you met Daryl Warren?

19   A    Yes, sir.

20   Q    Do you see him here on Government's Exhibit 1?

21   A    Yes, sir.

22   Q    And where is he?

23   A    He's to the left of the board, wearing the white T-shirt.

24   Q    All right.  Did you have occasion during this

25   investigation to meet the other two individuals here?

```
 1   A     Yes, sir, I did.

 2   Q     And who are they?

 3   A     Robert Washington in the middle and Michael Twitty on the

 4   right.

 5   Q     All right.  Thank you, sir.  So you indicated you met

 6   Daryl Warren in the course of this home invasion robbery

 7   investigation?

 8   A     Yes, sir.

 9   Q     How did you meet Mr. Warren?

10   A     Through Washington.

11   Q     All right.  And that would be Robert Washington pictured

12   in Exhibit 1?

13   A     Yes, sir, in the middle.

14   Q     Did he introduce you to Mr. Warren?

15   A     Yes, sir, he did.

16   Q     All right.  Did you go out looking for Mr. Warren, or did

17   Mr. Washington bring him to you?

18   A     I was introduced to the Defendant Warren through

19   Washington.

20   Q     All right.  Now, how did you come -- how did you meet

21   Robert Washington?

22   A     Through two confidential informants.

23   Q     All right.  And did you conduct a undercover cocaine

24   investigation regarding Mr. Washington?

25   A     That is correct.
```

1   Q    Regarding that cocaine investigation, did you meet with

2   Mr. Washington on several occasions?

3   A    Yes, sir.

4   Q    And when was that?

5   A    That was on May the 21st, May the 23rd, and May the 29th,

6   2013.

7   Q    At that May 29th meeting with Robert Washington, did your

8   investigation change at that point?

9   A    I wouldn't say necessarily changed, but its focus -- one

10  of the focuses was on home invasion investigations.

11  Q    All right.  And at that point did the investigation then

12  expand to this home invasion investigation?

13  A    Yes, sir, that's correct.

14  Q    Up until that time, it was an undercover cocaine

15  investigation?

16  A    Yes, sir.

17  Q    All right.  And you say that Robert Washington introduced

18  Daryl Warren to you?

19  A    That is correct.

20  Q    When was that?

21  A    That was on June the 3rd, year 2013, in St. Louis.

22  Q    All right.  And was Mr. Warren introduced to you as

23  someone who could do one of these home invasion robberies?

24  A    Yes, sir.

25  Q    That June 3rd meeting in which you met Daryl Warren, in

1   which Robert Washington introduced you to Daryl Warren -- was

2   that audio and video recorded?

3   A    Yes, sir.

4   Q    And was that meeting not only recorded but later meetings

5   with Daryl Warren?

6   A    Yes, sir.

7   Q    All right.  And I'd like to ask you, Agent Zayas, were

8   you familiar with the recording equipment that was used in

9   connection with this investigation?

10  A    Yes, sir.

11  Q    Was that in normal operating condition at the time you

12  used it?

13  A    Yes, it was.

14  Q    And did it accurately record sounds and images?

15  A    Yes, it did.

16  Q    Were you experienced and qualified to use that recording

17  equipment?

18  A    Yes, I am.

19  Q    And were you actually present personally at each of these

20  meetings?

21  A    Yes, sir.

22  Q    You personally met with Daryl Warren on each of these

23  dates?

24  A    Yes, I did.

25  Q    After the video -- each video was recorded, did you

1    review each of those videos?

2    A    Yes, sir, I did.

3    Q    And were they accurate recordings of the meetings that

4    you attended?

5    A    Yes, sir.

6    Q    Now, you're aware that portions of those videos have been

7    downloaded to compact disc for purposes of trial here?

8    A    Yes, I have.

9    Q    All right.  Agent Zayas, I'll show you what have been

10   marked as Government's Exhibits 5, 6, and 7, previously

11   disclosed to defense counsel.  Do you recognize 5, 6, and 7?

12   A    Yes, I do.

13   Q    And what are they?

14   A    They're the -- they're the videos and the audios of those

15   individual meetings.  Also, they're snippets of those

16   meetings.

17   Q    All right.  And so these are excerpts or portions of

18   those meetings, is that right?

19   A    That's correct.

20   Q    All right.  Is it your understanding that there are

21   several hours of video in this case?

22   A    Yes, sir.

23   Q    You understand we're not planning to play all of that?

24   A    Yes, sir.

25   Q    All right.  Can you give context to these videos

1    nonetheless?

2    A     Yes, I can.

3    Q     All right.  And so you recognize these as excerpts of

4    videos from June 3rd, 4th, and 5th?

5    A     That's correct.

6          MR. STEVENS:  I would offer Government's Exhibits 5,

7    6, and 7 at this time, Your Honor.

8          THE COURT:  5, 6, and 7 are received into evidence,

9    and, you know, I -- I -- I don't know what's wrong with me

10   today.  I made another mistake.  When I was instructing the

11   Jury, I omitted one of the instructions I usually give you,

12   and I'm going to do it now because I looked over and noticed

13   your notebooks there, and you are -- at the end of the trial,

14   you'll be required to make your decision based on what you

15   recall of the evidence, and you won't have a written

16   transcript to consult, and it's not practical for the court

17   reporter to read back testimony, so you must pay close

18   attention to the testimony as it is given.  If you wish,

19   however, you may take notes to help you remember what the

20   witnesses said, and if you do take notes, please keep them to

21   yourself until you and your fellow jurors go to the jury room

22   to decide the case.  Please make sure that you don't let note

23   taking distract you, so that you're not listening to other

24   answers by the witnesses.  When you leave at night, your notes

25   will be secured and will not be read by anyone, and I usually

1    tell you this, and I forgot, but that's why you've got those

2    notebooks there.  You shouldn't feel like you have to take

3    notes, but if you want to, you may do so.

4              All right.  Sorry to interrupt.  Go ahead.

5              MR. STEVENS:  Thank you, Judge.

6    Q    (By Mr. Stevens) All right.  Agent Zayas, so you

7    recognize 5, 6, and 7; you've recently watched these?

8    A    Yes, sir.

9    Q    And they're accurate depictions of the meetings that you

10   engaged in on those dates, June 3rd, 4th, and 5th?

11   A    Yes.

12   Q    Are you aware that this same video has been downloaded to

13   a laptop to be played here for courtroom presentation?

14   A    Yes, sir.

15   Q    You've reviewed that as well?

16   A    Yes, sir.

17   Q    And is that an accurate copy of the videos regarding your

18   meetings?

19   A    Yes, sir.

20   Q    All right.  Now, you also assisted in preparing

21   transcripts of those, the conversations on those videos, is

22   that right?

23   A    That's correct.

24   Q    And those were also placed on the laptop for courtroom

25   presentation?

1   A    Yes, sir.

2   Q    Are those transcripts accurate?

3   A    Yes, sir.

4   Q    In addition to providing some context to these videos,

5   can you also identify the individuals that appear on the

6   videos at the meetings you attended?

7   A    Yes, sir.

8   Q    All right.  Now I want to direct your attention -- you'd

9   mentioned that you met Daryl Warren on June 3rd of 2013.  I'd

10  like to direct your attention to that date if I might.  Who

11  else attended that meeting?

12  A    It was -- well, initially, it was myself, another ATF

13  Special Agent Lisa Jordan, J-O-R-D-A-N, the two confidential

14  informants, and Robert Washington initially.

15  Q    All right.  So, initially, you met with Robert Washington

16  there?

17  A    That is correct.

18  Q    And where did you meet?

19  A    We went in the parking lot at 3400 block of South

20  Jefferson.

21  Q    All right.  At this time, Agent Zayas, I'd like to show

22  you what I've marked as Government's Exhibit 8.  Do you

23  recognize Government's 8?

24  A    Yes, sir, I do.

25  Q    Do you see the location there where you met with Robert

1    Washington on June 3rd of 2013?

2    A    Yes, sir.

3    Q    All right.  And is that indicated by 3451 South

4    Jefferson?

5    A    That is correct.

6    Q    All right.  And this also shows dates of other meetings

7    as well, is that right?

8    A    That is correct.

9    Q    Is this map an accurate depiction of south St. Louis city

10   and the locations in which you met in the course of this case?

11   A    Yes, sir.

12          MR. STEVENS:  I would offer Government's Exhibit 8 at

13   this time, Your Honor.

14          MR. JIMERSON:  No objection.

15          THE COURT:  All right.  Government's Exhibit 8 is

16   received into evidence, and you can show it to the Jury.

17          MR. STEVENS:  Thank you, Judge.

18   Q    (By Mr. Stevens) All right.  Now, Agent Zayas, you

19   identified the 3400 block of South Jefferson as where you met

20   on June 3rd, 2013?

21   A    Yes, sir.

22   Q    All right.  Now, you've mentioned already that you also

23   had several meetings with Robert Washington prior to this.

24   Where did those occur?

25   A    They occurred at the 2800 block of Ohio twice --

1    actually, no -- once and also down at -- at the 4100 block of

2    Gravois.

3    Q    That was on May 29th?

4    A    Yes, sir, that's correct.

5    Q    The occasion in which the investigation expanded to home

6    invasion robberies?

7    A    That is correct.

8    Q    And you mentioned regarding the 2800 block of Ohio.  You

9    personally met with Robert Washington there one time, is that

10   right?

11   A    That is correct.

12   Q    Previous to that, did someone else meet with him there?

13   A    Yes, sir.

14   Q    And who was that?

15   A    The two confidential informants.

16   Q    All right.  This was in the course of your cocaine

17   investigation?

18   A    That is correct.

19   Q    All right.  Thank you.  When you initially met with

20   Robert Washington there, what was the purpose of meeting with

21   him?

22   A    The purpose was to determine whether or not Washington

23   was involved -- or excuse me.  Can you repeat the question?

24   Q    Yes.  With meeting with Robert Washington there on

25   June 3rd of 2013, what was the purposes of meeting with him

1    there?

2    A    The purpose was for Washington to introduce me to the

3    individuals that were going to be involved in the home

4    invasion robbery.

5    Q    All right.  And so you expected other individuals to

6    arrive?

7    A    That is correct.

8    Q    Before that time, did you have any idea who that would

9    be?

10   A    No, sir.

11   Q    Again, you didn't go seek out Daryl Warren, is that

12   right?

13   A    That is correct.

14   Q    All right.  And did Mr. Washington, as you determined, in

15   fact arrange for two other individuals to meet you there?

16   A    Yes, sir.

17   Q    And who were they?

18   A    That was the Defendant Warren and an individual by the

19   last name of Twitty.

20   Q    All right.  And those are the individuals here on

21   Government's Exhibit 1?

22   A    That is correct.

23   Q    And so on June 3rd of 2013 we have all three of these

24   individuals meeting with you at 3451 South Jefferson?

25   A    That is correct.

1   Q    What kind of a lot is that?  What is that there?

2   A    It's a business parking lot.  I believe there is a

3   grocery store there, and it's a parking lot for the grocery

4   store.

5   Q    All right.  And so you're expecting other individuals to

6   arrive?

7   A    That is correct.

8   Q    Did they?

9   A    Yes, sir, they did.

10  Q    Who arrived there?

11  A    The Defendant Warren and Twitty.  Warren was driving a

12  blue-colored Cadillac, and Twitty was in the front passenger's

13  seat.

14  Q    Agent Zayas, I'll briefly show you what I've marked as

15  Government's Exhibit 11.  Do you recognize this photograph?

16  A    Yes, sir.

17  Q    And what is that?

18  A    That's the blue Cadillac that they arrived in on June the

19  3rd, 2013.

20  Q    Who was driving that car on that date?

21  A    The Defendant Warren.

22  Q    Daryl Warren?

23  A    Yes, sir.

24  Q    And is this a fair and accurate depiction of the way the

25  car looked at that time?

1    A    Yes, sir.

2         MR. STEVENS:  Judge, I'd offer Government's Exhibit

3    11.

4         MR. JIMERSON:  No objection.

5         THE COURT:  Exhibit 11 is received into evidence.

6         MR. STEVENS:  Thank you.  May I publish, Judge?

7         THE COURT:  You may.  And I mean we just turned it

8    on.  It's not turned on normally, so you should use this for

9    identifying your exhibits as well.  We'll just turn it on and

10   off.

11        MR. STEVENS:  Okay.  Thank you, Judge.  And I expect

12   to have very few actual physical exhibits like this.  Most of

13   what we do will be video.

14        THE COURT:  Okay.

15   Q    (By Mr. Stevens) All right.  Agent Zayas, that's the

16   Cadillac you identified in Government's Exhibit 11?

17   A    Yes, sir.

18   Q    And that's the car that Daryl Warren drove onto the lot

19   on June 3rd of 2013?

20   A    That's correct.

21   Q    Can you make out the license number there?

22   A    Yes, sir.

23   Q    And what is it?

24   A    That's D as in Delta, H as in Hotel, 7, F as in Foxtrot,

25   2, Z as in Zulu.

1  Q    After that car pulled onto the lot, did you find yourself

2  shortly thereafter in the passenger's seat?

3  A    Yes, sir.

4  Q    And how was that?

5  A    Initially, when they arrived, they exited their vehicle

6  and approached the vehicle in which Washington was seated.  I

7  was standing outside that vehicle.  Washington exited, walked

8  over, greeted Warren and Twitty, and then they walked over to

9  my direction, they walked over to where I was standing, and we

10  all greeted each other.  After the initial greeting, they

11  asked me if the confidential informants were involved, and I

12  said they weren't.  So then all four of us walked over to the

13  Cadillac and entered the Cadillac.

14  Q    And the four of you would be whom?

15  A    It would be myself, Washington, Twitty, and Warren.

16  Q    Where did Mr. Warren sit in the Cadillac?

17  A    When we entered the Cadillac, Warren sat in the front,

18  the driver's seat.

19  Q    And you were in the front passenger's seat?

20  A    That is correct.

21  Q    I would assume then Mr. Washington and Mr. Twitty are in

22  the back seat?

23  A    Yes, sir.  Washington was seated behind Warren, and

24  Twitty was seated behind me.

25  Q    So at this time you've been introduced then to the

1    Defendant Daryl Warren?

2    A    Yes, sir, that's correct.

3    Q    And, again, what was the purpose of meeting with

4    Mr. Washington and Mr. Warren that day?

5    A    Washington told me that I was going to meet the

6    individuals that were going to be involved in the home

7    invasion robbery.

8    Q    All right.  Did you then, in the Cadillac, explain the

9    facts surrounding this, this home invasion robbery?

10   A    That is correct.

11   Q    Will you tell the jurors, please, what you talked about

12   on that date?

13   A    What I explained was that I was a disgruntled courier of

14   five to six kilograms of cocaine for a Mexican organization

15   and that I was upset because I was only getting paid $1,000 a

16   kilo to move those drugs to another location and I didn't feel

17   like I was being compensated correctly, so I was seeking

18   individuals which could rob this cocaine.  I explained that on

19   the day of the collection I'm provided the location of the

20   house.  I don't know where the house is prior to that date.

21   I'm provided a specific amount of time in which to arrive to

22   the house.  Upon arriving to the house, I observe two

23   individuals, one of which has a gun in their pants.  That

24   individual stays with me.  The second individual goes to a

25   back room in the house, comes back, hands me my five or six

1  kilograms of cocaine, and tells me where to take it; however,

2  while I'm standing there waiting, I observe an additional 20

3  to 22 kilograms of cocaine that have stamps on them in the

4  residence, but they never take my cocaine from that.  They

5  take it out the back room.  I'm provided the cocaine, told

6  where to go, and I depart.

7  Q    Are there purposes for each of those statements that you

8  made to Mr. Warren and the other coconspirators at that time?

9  A    Yes, sir.

10  Q    Let's talk specifically about your reference to being a

11  courier for a drug cartel.  What's the purpose of introducing

12  that element?

13  A    What we're trying to do during the course of this thing

14  is to elevate the level of unknown and to elevate the level of

15  violence in order to do away with individuals that are simply

16  down on their hard luck and to get to the point where we're

17  targeting individuals that are truly involved in this type of

18  crime.  So what we do is we create hurdles and raise the level

19  of violence.  So in that particular instance, we're letting

20  them know that this is cartel-level narcotics.  He's dealing

21  with a major drug trafficking organization.

22  Q    All right.  You referred also to two guards in the house,

23  one with a gun in his pants.  Is that for the same reason?

24  A    Yes, sir.  We want to elevate the level of violence.  So

25  in order to be able to steal this cocaine, they know that

1  they're going to at least encounter one individual that has a

2  gun that's there to protect the drugs.

3  Q    You talked about, I believe, a back room in the house, in

4  the stash house?

5  A    Yes, sir.

6  Q    Why introduce this back room?  Why refer to that?

7  A    What the back room does -- it creates an unknown, so they

8  don't know if there's an individual back there with a gun, if

9  there's more drugs or what's involved in the back room.  So,

10  again, raising the level of violence, raising another hurdle

11  that has to be overcome in order to steal this cocaine.

12  Q    Again, this is in order to weed out individuals who

13  wouldn't otherwise be interested in this?

14  A    That's correct.

15  Q    Again, you referred to another 20 to 22 kilograms of

16  cocaine in the house.  Was there a purpose for -- for

17  referring to that?

18  A    Yes.  What that shows is that there is multiple --

19          MR. JIMERSON:  Let me object, Your Honor.  First of

20  all, it calls for a narrative.  Two, it's also speculation as

21  to what other people will do.

22          THE COURT:  Well, this is why he told these -- why he

23  gave this story as his explanation for why he was giving this

24  story, so I'm overruling it.

25  Q    (By Mr. Stevens) You can proceed.

1  A    So saying that there's 20-22 kilograms of cocaine,

2  meaning that I'm there to collect cocaine, there's individuals

3  coming behind me, so more individuals will be coming to that

4  house to collect the cocaine, so another hurdle to overcome.

5  More individuals may be in the house or may be involved in

6  that location when this robbery is attempted.

7  Q    Along similar lines, do you indicate -- did you indicate

8  that day that these kilograms of cocaine in the stash house

9  would be marked or stamped?

10 A    That is correct.

11 Q    Why did you do that?

12 A    Because individuals that are involved in the drug

13 business understand the way that cartels operate.

14         MR. JIMERSON:  Objection, Your Honor.  Speculation.

15         THE COURT:  Overruled.

16 Q    (By Mr. Stevens) You can proceed.

17 A    They understand that cartels operate, they put stamps on

18 their cocaine, and what that signifies is that as the cocaine

19 is being produced and packaged for distribution, stamps are

20 placed on the kilograms, and those stamps mean that they're

21 going to go to a specific individual in whatever country

22 they're being taken into, so by there being stamps on those

23 kilograms, they understand that it's cartel.

24         THE COURT:  Excuse me.  You don't know what's

25 actually in these Defendants' minds, these people you're

 1   talking to, right?

 2           THE WITNESS:  No.  This is why I'm stating it, ma'am.

 3           THE COURT:  Right, because you're hoping that's what

 4   they think, right?

 5           THE WITNESS:  That they understand that, yes, ma'am.

 6           THE COURT:  Well, you keep telling the Jury that they

 7   understand that, but you have no knowledge of what was in

 8   Mr. Warren, Washington, and Twitty's minds that day?

 9           THE WITNESS:  That is correct.

10           THE COURT:  Okay.  So make that clear when you answer

11   these questions, please.

12           THE WITNESS:  Yes, ma'am.

13   Q    (By Mr. Stevens) All right.  Agent Zayas, let's talk

14   about -- you referred before to the back room being an

15   unknown.  Did you introduce other unknowns that day?

16   A    Yes, sir.

17   Q    And, for example, the location of the stash house?

18   A    Yes, sir.

19   Q    What did you tell these individuals about that?

20   A    I told these individuals that on the day of the

21   collection I'm told the general area to wait and then I

22   receive a phone call and then I'm given a specified period of

23   time in which to arrive at the house, so I don't know the

24   location of the house until the day that I'm to collect the

25   cocaine.

1    Q    And why does that matter?

2    A    For a couple of reasons.  One, that they -- those

3    individuals, if they decide to go rob the house, can't get to

4    the house before me, so to protect the public I'm not giving

5    them the location, and then, secondly, it is once they know

6    the location of the house, there's no longer a need for me.

7    So, in other words, I can't be tortured or I can't -- nothing

8    can happen to me in order to divulge that location of the

9    house because I simply just don't know the location.

10   Q    Did you, during the course of this and subsequent

11   meetings, offer opportunities to not be involved in this?

12   A    Yes, sir, continuously.

13   Q    How did you go about doing that?

14   A    I'll make statements like, "Are we straight?  Are we

15   cool?  Do you feel me?"  I'll constantly say that while

16   discuss -- in discussions about this robbery in order for them

17   to provide -- for them -- to allow them a point at which they

18   could say, "Listen, it's not cool; I don't want to do it.  No,

19   it's not straight" or "No, I don't feel you.  I don't feel

20   this.  I don't want to do it."

21   Q    What was the overall purpose of this conversation after

22   Robert Washington had introduced you to Daryl Warren?

23   A    It was to ensure that they heard the parameters

24   surrounding this robbery from my mouth, that there was no

25   misunderstanding of what the hurdles were, what the level of

1    violence it was going to take to commit this robbery, and then

2    to question them and to identify whether or not they wanted to

3    do it.

4         MR. STEVENS:  All right.  Your Honor, at this time,

5    we intend to play the first video clip.

6         THE COURT:  And do I understand that the -- the

7    transcript is on the screen?

8         MR. STEVENS:  Correct.

9         THE COURT:  All right.  So, members of the Jury, as

10   you've just heard, there's a transcript of the recording

11   you're about to hear, and it's actually going to roll on the

12   screen with the video, and it also undertakes to identify the

13   speakers engaged in the conversation.  The transcript, the

14   written words, are for the limited purpose of helping you

15   follow the conversation as you listen to the recording and

16   also to help you keep track of the speakers.  Differences in

17   meaning between what you hear in the recording and what you

18   read in the transcript could be caused by things such as the

19   inflection in the speaker's voice.  It is what you hear and

20   see on the video, however, that's the evidence, not the

21   transcript.  The transcript is just an aid to help you

22   understand the evidence.

23        You may play -- which one is this?

24        MR. STEVENS:  This is June 3rd, Clip 2, Judge.  This

25   is from Government's Exhibit 5.

 1           THE COURT:  All right.

 2           (Video played.)

 3   Q    (By Mr. Stevens) All right.  Agent Zayas, at the

 4   beginning of that particular video and throughout the course

 5   of it, you say things like, "Esto es lo cosa, this is the

 6   thing," and other similar Spanish phrases.  Why do you do

 7   that?

 8   A    Because I'm Hispanic and it would make sense that since

 9   I'm Hispanic and I'm dealing with other Hispanic individuals

10   and that's the reason that I'm moving that amount of cocaine

11   for these -- for this organization.

12   Q    All right.  When you do that, do you frequently repeat it

13   in English?

14   A    That's correct.

15   Q    All right.  The camera we saw there -- the camera view

16   was moving around quite a bit.  Why was that?

17   A    Because that piece of equipment is affixed to my body, so

18   as I move, the camera moves.

19   Q    And who was the individual that was primarily visible

20   there in the camera?

21   A    The Defendant Warren.

22   Q    He was sitting in the driver's seat?

23   A    That's correct.

24   Q    Early on in that particular call, you say to Mr. Warren

25   that "On Wednesday, they will call me."  What are you

1    referring to there?

2    A    That's the day in which the collection is to occur.

3    Q    That would have been June 5th of 2013?

4    A    That's correct.

5    Q    All right.  And, again, we're meeting on June 3rd of 2013

6    at this time, is that right?

7    A    That is correct.

8    Q    Okay.  And who was it that was going to be calling you?

9    A    Allegedly, the individuals with the information as to

10   where the stash house was.

11   Q    And, again, so you're indicating that you don't know the

12   location of the stash house?

13   A    That's correct.

14   Q    You refer to the two guys in the house, one with a gun in

15   his pants, is that right?

16   A    Yes, sir.

17   Q    And why is that?

18   A    Again, raising the level of violence that it's going to

19   take in order to accomplish this theft of the cocaine.

20   Q    You refer in your conversation with Mr. Warren there to

21   the individual in the house hands you five to six kilograms of

22   cocaine, is that right?

23   A    Yes, sir.

24   Q    That would be what you're supposed to transport, correct?

25   A    Correct.

1   Q    And then you see an additional 20 to 22 kilograms of

2   cocaine?

3   A    Yes, sir, in the living room section of the house.

4   Q    So we're talking about a total of 25 to 28 kilos, is that

5   right?

6   A    Yes, sir.

7   Q    Mr. Warren, at one point, asked you, "Where's the area

8   at?"  Do you recall that?

9   A    Yes, sir.

10  Q    And what was your response to that?

11  A    That it could either be where we were located, which was

12  the southern part of the city, or it could be in the northern

13  part of the city, but it would be contained within the city of

14  St. Louis.

15  Q    But he's attempting to determine from you where this

16  stash house is, is that right?

17  A    That is correct.

18  Q    You tell him, quote, unquote, "These guys ain't just

19  going to hand you this shit."  Why do you refer to that?  Why

20  do you tell Mr. Warren that?

21  A    Because I want him to understand that it's going to take

22  a certain level of violence in order to take this cocaine,

23  that those individuals are there for the purpose of protecting

24  that cocaine, and that in order to go there and steal that

25  cocaine, these individuals are not simply going to hand him

1    the cocaine; it's going to take a level of violence to steal

2    that cocaine.

3    Q    Now, you were sitting across from Daryl Warren at the

4    time of those particular statements, is that right?

5    A    That is correct.

6    Q    And we saw it there on the video?

7    A    Yes, sir.

8    Q    Do you recall Mr. Warren's demeanor when you told him,

9    "These guys ain't just going to hand you the shit"?

10   A    He was smiling.

11   Q    You repeatedly asked Mr. Warren during this part of the

12   conversation, "You feel me?"  Is that right?

13   A    Yes, sir.

14   Q    Why do you ask him that?

15   A    Because, again, that's an opportunity for him to tell me,

16   "No, I don't feel you.  I'm not a part of this.  I don't do

17   this, and I'm out."

18   Q    Did he do that at any time in this conversation?

19   A    No, sir.

20   Q    Instead, he asked you a little later, "How many -- so how

21   many dudes is in the house?"  Is that right?

22   A    Yes, sir.

23   Q    At the end of the clip, Mr. Warren indicates, "This is

24   the real deal, man."  Did you hear that?

25   A    Yes, sir.

1   Q    All right.  Did you give Mr. Warren additional

2   opportunities to not be involved in this?

3   A    Yes, sir.

4         MR. STEVENS:  J3-3, please.  This is also from

5   Government's Exhibit 5, Your Honor, June 3rd.

6        (Video played.)

7   Q    (By Mr. Stevens) Agent Zayas, we talked about

8   opportunities for Mr. Warren to back out.  At the beginning of

9   this, you said, "You feel me?  Is that something you guys can

10  handle?"  Is that right?

11  A    Yes, sir.

12  Q    Do you recall his response?

13  A    He responded they could handle the robbery.

14  Q    And he was continuing to smile at that time?

15  A    Yes, sir.

16  Q    If Mr. Warren at that point had said that he was not able

17  to handle it, where would this investigation have gone?

18  A    This portion of the investigation would have stopped.

19  Q    Mr. Warren told you, "I got one more guy.  He ain't here

20  right now."  Do you recall that?

21  A    Yes, sir.

22  Q    Were you and ATF ever able to confirm whether there was

23  another individual other than the three in the Cadillac that

24  was involved in this conspiracy?

25  A    No, sir, we were unable to.

1    Q    All right.  And we'll talk about that a little bit more

2    later.  Mr. Twitty, from the back seat, indicates, "When you

3    get that phone call, you got to at least call us right then

4    and there," is that right?

5    A    Yes, sir.

6    Q    And do you recall what your response was about how you

7    would handle that?

8    A    I said that what we could do is we could all be together,

9    so once I obtained that location to the stash house, which

10   meant that I had a specified period of time in which to arrive

11   and the fact that they knew my starting point, that I could

12   provide them -- they could be next to me, I could give them

13   the address, and if they wanted to get ahead of me, they could

14   get ahead of me before I entered that house.

15   Q    And why did you indicate that, that you could all be

16   together when you get the phone call?

17   A    Because what that does is on -- on the final day, the day

18   of the robbery, any additional individuals which may be

19   arriving to be part of this crew, it gives me an opportunity

20   to talk to those individuals and to be able to go through what

21   I just went through before, explain exactly the parameters,

22   explain all the dangers involved, explain all the hurdles,

23   explain the level of violence, and decide whether or not that

24   individual also wishes to participate in this robbery.

25   Q    All right.  Does it give these individuals as well an

1    opportunity not to show?

2    A     Yes, absolutely, yes, sir.

3    Q     You introduced the idea of a trap car, is that right?

4    A     Yes, sir.

5    Q     Was there anything else in the entire course of this

6    investigation that you offered these individuals as far as

7    tools they could use?

8    A     No, sir.  Just the trap car.

9    Q     Did you ever offer them firearms?

10   A     No, sir.

11   Q     Did you ever ask them to bring firearms?

12   A     No, sir.

13   Q     All right.  But you introduced this, this trap car, and

14   Mr. Twitty's response, you recall, was, "We have a car"?

15   A     That is correct.

16   Q     All right.  But then they showed interest in the trap

17   car, is that right?

18   A     They asked me questions about it, yes, sir.

19   Q     Okay.  And, again, at this particular point in the video,

20   Mr. Warren smiles again, is that right?

21   A     Yes, sir.

22   Q     When we're talking about a trap car, what are you

23   referring to?  Can you explain that to a jury -- for the Jury?

24   A     A trap car is a vehicle, which someone gets that vehicle

25   and then creates a space in it where you can conceal something

1   into that space so that if someone were to look for it they

2   couldn't find it.  So it takes a series of buttons in order to

3   open that space up, commonly, used to hide drugs from law

4   enforcement.

5   Q    All right.  Did you have to explain that concept to

6   Mr. Warren, Mr. Twitty, or Mr. Washington?

7             MR. JIMERSON:  Objection.  Relevance, Your Honor.

8             THE COURT:  Yeah, sustained.  Can you all approach

9   the bench?

10             MR. STEVENS:  Yes.

11   (A bench conference was held on the record and outside of

12   the hearing of the Jury as follows:)

13             THE COURT:  The Jury's looking at the videotape, and

14   I don't -- I mean you're asking him to go over every single

15   line in the videotape, repeat it, so the Jury -- you want to

16   emphasize this evidence, have them hear it twice, three times,

17   but you can't ask him to comment on the evidence.  If you ask

18   him again if somebody's smiling, I'll tell you not to from the

19   bench because that's -- they can -- the Jury can see that, and

20   they also can hear what the witnesses said to him, so I

21   really -- you're really way over the line, Mr. Stevens, okay?

22             MR. STEVENS:  I'll minimize it, Judge.  I'll ask him

23   just to explain context, that kind of thing.

24             THE COURT:  Okay.  Thank you.

25             MR. STEVENS:  All right.  Thank you.

1          (The following proceedings were held within the hearing

2    of the Jury.)

3    Q    (By Mr. Stevens) All right.  Agent Zayas, what's the

4    purpose of introducing the trap car?

5    A    What the trap car does for us is on the final day, if

6    they decide to go ahead with the robbery, it gives me an

7    excuse to take the individuals that are going to be involved

8    in that robbery to a location where it's safe for us, safe for

9    the public, and safe for them to conduct the arrest.

10   Q    At the end of the video, you refer to "Give my half to

11   them."  What does -- what does that -- who are you referring

12   to and half of what?

13   A    Where we were sitting in the Cadillac, the vehicle -- I

14   don't know if you can see it on the video; there's a vehicle

15   next to it.  Inside that vehicle, the two confidential

16   informants were sitting in it, so when I made that statement,

17   I looked at Washington and I said once the robbery happens,

18   depending upon what happens to me in the house, give my

19   portion of the drugs to the confidential informants, and then

20   I would retrieve those narcotics at a later time.

21   Q    As this conversation went on, did you -- did you talk to

22   Mr. Warren about the distribution of the cocaine further?

23   A    Yes, sir.

24          MR. STEVENS:  J3-4, please.

25          THE COURT:  All right.  This is also still part of

1    the same exhibit?

2           MR. STEVENS:  Yes, Judge.  It's Exhibit 5, June 3rd,

3    2013.

4           THE COURT:  Hold on a second.  That's okay.  Go

5    ahead.

6        (Video played.)

7    Q    (By Mr. Stevens) Asking Mr. Warren, "You aren't going to

8    have any problem unloading that shit" is what you referred to.

9    What are you referring to there?

10   A    His ability to sell the kilograms of cocaine after the

11   robbery.

12   Q    At the end of that video, you ask, "Are we square?" and

13   "Are we good?"  What were the purposes of asking that

14   question?

15   A    To ensure after Warren heard everything that I'd said

16   that he still wants to be involved and commit the armed

17   robbery, the robbery.

18   Q    Whose hands did you shake there at the end of that video?

19   A    I shook the Defendant Warren and Washington that was

20   sitting in the back seat.

21   Q    Now, on the video, you referred to Mr. Warren appearing

22   there in the driver's seat, is that right?

23   A    That's correct.

24   Q    There were the other two individuals in the back seat

25   that really don't appear much on that video, correct?

1   A    Yes, sir.

2   Q    Were there -- for this and other meetings, were there

3   other agents conducting video surveillance of the overall

4   area?

5   A    Yes, sir.

6   Q    And why is that done?

7   A    We do -- prior to any type of investigation like this is

8   we have an operational plan, and within that plan, it

9   describes specific duties to anybody that's involved in that

10  operation.  For instance, we would have a number of

11  individuals watching myself, other individuals watching the

12  confidential informant, other individuals --

13          THE COURT:  Actually, his question was why, why you

14  do that.  You're telling him what you do.  He asked why you do

15  it.

16          THE WITNESS:  Oh, I'm sorry.  I misunderstood the

17  question.

18          THE COURT:  So he said why do you have all that

19  surveillance.

20  A    In order for individuals to have different duties.  So a

21  number of agents would have different duties throughout the

22  course of that undercover operation.

23  Q    (By Mr. Stevens) All right.  And one of those duties is

24  agents who conduct the surveillance video, is that right?

25  A    That's correct.

1    Q    Okay.  In this case, does that video show you meeting

2    with these individuals on June 3rd?

3    A    Yes, it does.

4    Q    And that video would show you meeting with whom on the

5    lot?

6    A    It would show me meeting with Washington, Twitty, and the

7    Defendant Warren.

8              MR. STEVENS:  J3-5, please, from Government's Exhibit

9    5.

10             THE COURT:  Okay.  And here's what we're going to do.

11   We can just leave that turned on, but if you switch exhibits

12   and when you're done with this Exhibit 5, let me know.

13             MR. STEVENS:  Okay.  Thank you, Judge.

14        (Video played.)

15   Q    (By Mr. Stevens) All right.  Agent Zayas, was the

16   Defendant Daryl Warren depicted there meeting with you on

17   June 3rd?

18   A    Yes, sir.

19             MR. STEVENS:  And we are finished with -- yeah,

20   Judge, can we -- I think that just played a short.  It should

21   have been a little bit longer.  Can we play it again?

22             THE COURT:  Okay.  Yeah, you can.

23             MR. STEVENS:  All right.

24        (Video played.)

25   Q    (By Mr. Stevens) Are Daryl Warren, Michael Twitty, and

1    Robert Washington depicted there with you?

2    A    Yes, sir.

3    Q    What -- what is that in the foreground?  What vehicle is

4    that in the foreground?

5    A    That's the blue Cadillac.

6              MR. STEVENS:  All right.  Thank you.

7              THE COURT:  Now you can turn it off, Brittany.

8    Q    (By Mr. Stevens) Did you all plan to meet again the next

9    day?

10   A    Yes, sir.

11   Q    That would have been June 4 of 2013?

12   A    Yes, sir.

13   Q    All right.  Before we get to that, are you aware that

14   during the course of this investigation phone records were

15   obtained from Sprint regarding Robert Washington and Daryl

16   Warren?

17   A    Yes, sir.

18             MR. STEVENS:  Your Honor, at this time, I would offer

19   Government's Exhibits 12 and 13, phone records from Sprint

20   with business records certification establishing that these

21   are records of that organization and that they are records of

22   Robert Washington and Daryl Warren.

23             THE COURT:  Any objection?

24             MR. JIMERSON:  No, ma'am.

25             THE COURT:  All right.  Exhibits 12 and 13 are

1    received into evidence.

2              MR. STEVENS:  Thank you, Judge.

3              Could we switch to the --

4              THE COURT:  Yeah.

5              MR. STEVENS:  Thank you.

6    Q    (By Mr. Stevens) All right.  Agent Zayas, I'm going to

7    show you what's marked as Government's Exhibit 12 admitted

8    into evidence.  It's a Sprint certification of business

9    records, and on the next page, does that indicate here at the

10   top the subject number, the subject phone number?

11   A    Yes, sir.

12   Q    And what is that?

13   A    It's 314-564-2492.

14   Q    All right.  And on that record, does it also indicate the

15   person to whom that phone is billed?

16   A    Yes, sir.

17   Q    And who is that?

18   A    Robert Washington.

19   Q    Does it also indicate the date on which the account was

20   established in Mr. Robert Washington's name?

21   A    Yes, sir.  It states that the account was established

22   5-23 of 2011.

23   Q    All right.  And, again, here at the bottom, it refers to

24   a personal telephone number or PTN.  Do you see that?

25   A    Yes, sir.

1   Q     And, again, what is the number?

2   A     314-564-2492.

3            MR. STEVENS:  All right.  May I bring this over,

4   Judge?

5            THE COURT:  You may.

6            MR. STEVENS:  Thank you.

7            THE COURT:  And, again, Mr. Jimerson, if you need to

8   move over there or wherever --

9            MR. JIMERSON:  Yes, ma'am.

10           THE COURT:  -- go ahead.

11           Well, now, who's going to stand over there?  I didn't

12  realize you were saying you were going to put it all the way

13  over there.

14           MR. STEVENS:  I was just going to --

15           THE COURT:  Who's going to write on it?

16           MR. STEVENS:  Yeah, I was just going to write the

17  number and walk back, Judge.

18           THE COURT:  You're going to write on it?

19           MR. STEVENS:  Yes.

20           THE COURT:  Well, then leave it over here by you.

21           MR. STEVENS:  Okay.

22           THE COURT:  You can put it -- yeah, right -- yeah,

23  thanks.

24           MR. STEVENS:  Okay.  Mr. Jimerson, can you --

25           MR. JIMERSON:  I'll walk around.

1  Q    (By Mr. Stevens)  Okay.  All right.  And so according to

2  Government's Exhibit 12, Agent Zayas, we have Robert

3  Washington at what phone number?

4  A    314-564-2492.

5  Q    All right.  Thank you.  And according to these records,

6  that number was active at the time of these meetings?

7  A    Yes, sir.

8  Q    I'll show you now Government's Exhibit 13, already

9  admitted into evidence, again, a certification of business

10  records from Sprint, and do you see the subject number here

11  and the person billed for that number?

12  A    Yes, sir.

13  Q    And what is the number?

14  A    314-372-6037.

15  Q    6037, is that right?

16  A    Yes, sir.

17  Q    And that's Daryl Warren?

18  A    Yes, sir.

19  Q    All right.  If we go to the bottom here, does it again

20  indicate the same number as the personal telephone number,

21  314-372-6037?

22  A    Yes, sir.

23  Q    Again, according to these records, that number was active

24  at the time of these meetings?

25  A    Yes, sir.

1   Q    You're aware that the actual call records that go along

2   with Government's Exhibit 13, Daryl Warren's phone records,

3   were produced in electronic format?

4   A    Yes, sir.

5   Q    And I'll show you --

6        MR. JIMERSON:  Before you go there, may we approach

7   the bench on a matter, Your Honor?

8        THE COURT:  Yeah, you may.

9   (A bench conference was held on the record and outside of

10  the hearing of the Jury as follows:)

11       MR. JIMERSON:  Your Honor, I just noticed when I was

12  sitting there that, actually, Mr. Stevens has Government's

13  Exhibit #1 facing the Jury, which it appears to be the arrest,

14  arrest photos at the time.  They're all kind of standing

15  there.  I would ask that, you know, until this is given to

16  them that those -- that that not be shown to where they can

17  look right at it.

18       THE COURT:  Well, it's been -- it's already been

19  introduced, and they've already seen it, but I think you can

20  turn it around after you're finished with it and do the same

21  with any other exhibits, okay?

22       MR. JIMERSON:  Okay.  Thank you.

23  (The following proceedings were held within the hearing

24  of the Jury.)

25  Q    (By Mr. Stevens) Government's Exhibit 14.  Agent Zayas,

1   do you recognize Exhibit 14 as Daryl Warren's Sprint phone

2   records?

3   A    Yes, sir.

4   Q    And how do you recognize it?

5   A    My initials are affixed to the DVD or CD.

6   Q    You've reviewed those previously?

7   A    Yes, sir.

8        MR. STEVENS:  All right.  Your Honor, I would offer

9   Government's Exhibit 14 pursuant to the business records

10  affidavit.

11       THE COURT:  Any objection?

12       MR. JIMERSON:  No, ma'am.

13       THE COURT:  All right.  Exhibit 14 is received into

14  evidence.

15       MR. STEVENS:  Thank you, Judge.

16  Q    (By Mr. Stevens) Government's Exhibit 14, Agent Zayas,

17  that contains Daryl Warren's phone records, phone calls for

18  June 3rd, 4th, and 5th of 2013?

19  A    Yes, sir.

20  Q    And did you meet with Daryl Warren on each of those

21  dates?

22  A    Yes, sir.

23  Q    And did Robert Washington meet with Daryl Warren on each

24  of those dates?

25  A    Yes, sir.

1        MR. STEVENS:  Judge, if I could, I'd like to show the

2  phone records from those dates from Government's Exhibit 14 to

3  the Jury.

4        THE COURT:  Okay.  You may do so, and I guess that's

5  on the computer?

6        MR. STEVENS:  Yes.

7        THE COURT:  Okay.  You need to switch it.  That's

8  okay.

9  Q    (By Mr. Stevens) All right.  Agent Zayas, if we refer to

10  the top here, these are call records for personal telephone

11  number 314-372-6037, is that right?

12  A    Yes, sir.

13  Q    As the records identify Daryl Warren's phone number?

14  A    That is correct.

15  Q    All right.  And if we could page down, please, does this

16  shown phone calls to and from another number that are

17  highlighted here?

18  A    Yes, sir.

19  Q    And what number -- what phone number is that that's

20  highlighted?

21  A    Robert Washington.

22  Q    564-2492?

23  A    Yes, sir.

24  Q    So this shows various calls on June 3rd of 2013 between

25  Robert Washington and Daryl Warren?

1   A    Yes, sir.

2   Q    The same date on which you met with both of those

3   individuals?

4   A    That's correct.

5   Q    Can we page down?  If you could, could you just count up

6   the number of calls we have there?

7   A    There's 10 on that sheet.

8   Q    All right.  Could you page down, please?  All right.

9   Going to the next page, there's another call there between

10  Daryl Warren and Robert Washington?

11  A    That is correct.

12  Q    For a total of 11 on June 3rd of 2013, is that right?

13  A    That's correct.

14  Q    Again, the date is still June 3rd there?

15  A    Yes, sir.

16       MR. JIMERSON:  Let me object to the relevance of this

17  line of questioning.  So what?

18       THE COURT:  Overruled.

19       MR. STEVENS:  Thank you, Judge.

20  Q    (By Mr. Stevens) All right.  You mentioned, at the end of

21  the June 3rd, 2013 meeting, that you and Robert Washington and

22  Daryl Warren agreed to meet again?

23  A    Yes, sir.

24  Q    And when did you meet again?

25  A    The following day, on June the 4th, year 2013.

1  Q    And did you meet with both Mr. Washington and Mr. Warren

2  on that date?

3  A    That's correct.

4  Q    And, Agent Zayas, we talked about the meetings that

5  occurred previous to that.  Could you point out for the Jury

6  on Government's Exhibit 8, already admitted into evidence,

7  where it was that you met on June 4 of 2013?

8  A    It's going to be in the top right-hand corner at the 2800

9  block of Iowa.

10  Q    That was on June 4?

11  A    Yes, sir.

12  Q    All right.  Thank you.  This is all south St. Louis city,

13  is that right?

14  A    That's correct.

15  Q    And, Agent Zayas, I'd refer you to Government's

16  Exhibit 6, which you've already identified as video clips from

17  that June 4, 2013 meeting.

18  A    Yes, sir.

19  Q    And the location where you met on June 4th, what was that

20  location?

21  A    It's -- it was the -- it was an open lot behind the

22  residence of Washington.  Washington lived on the next street

23  over.

24  Q    All right.  And so you were at an open vacant lot there?

25  A    It was an open vacant lot with a number of individuals

1    standing around in the lot.

2    Q    When you initially met with Mr. Warren and

3    Mr. Washington, did Mr. Warren have specific questions for

4    you?

5    A    Yes, he did.

6    Q    Regarding what?

7    A    Regarding the robbery.

8    Q    All right.  And, specifically, was he asking you about

9    the stash house and the number of people in it?

10   A    That's correct.

11        MR. STEVENS:  J4-1, please.  Judge, this is a clip

12   from Government's Exhibit 6.

13        THE COURT:  All right.  You may play it.

14        MR. STEVENS:  Thank you.

15   (Video played.)

16   Q    (By Mr. Stevens) All right.  Agent Zayas, who was that in

17   the white T-shirt that you were talking to?

18   A    That was the Defendant Warren.

19   Q    And the other individual?

20   A    Robert Washington.

21   Q    Mr. -- we started out by asking about Mr. Warren asking

22   about the number of people in the house.  He also wanted other

23   information about the house, is that right?

24   A    Yes, sir.

25   Q    And what was that?

1   A    He was questioning me about the back room.

2   Q    Okay.  And that's one of the unknowns that you've

3   introduced here?

4   A    Yes, sir.

5   Q    At the end of that, you refer to "Tomorrow morning, I've

6   got to get my girl straight."  Why -- why the reference to the

7   girl, and who are you referring to?

8   A    I'm referring to the agent that I brought with me the day

9   before, Agent Jordan.

10  Q    A female agent posing as your girlfriend?

11  A    Yes, sir.

12  Q    All right.  And what was the purpose of referring to her?

13  A    The purpose of referring to her, it would give me an

14  excuse the following day not to be initially present when they

15  all met, so that I could pick the meeting location on that

16  particular day.

17  Q    And the next day we're talking about is June 5th of 2013,

18  is that right?

19  A    Correct.  That's the day of the robbery.

20  Q    All right.  As this next clip begins, do you continue to

21  talk about your girlfriend for that reason?

22  A    Correct.

23       MR. STEVENS:  J4-2, please, also from Government's

24  Exhibit 6, Your Honor.

25       (Video played.)

1    Q    (By Mr. Stevens) Again, Mr. Warren is asking specific

2    questions about the number of people in the house?

3    A    Correct.

4    Q    And right there at the end, you ask him, "What do you

5    think?"  And his response, "It's going to be a little

6    shootout, though, probably," is that right?

7    A    Yes, sir.

8    Q    What was your purpose for asking him, "What do you

9    think?"

10   A    Because I wanted to allow him an opportunity to say,

11   after he had heard it for the second time, "No, I don't want

12   to do this."

13   Q    Instead his response is, "I think it's pretty good"?

14        MR. JIMERSON:  Objection.  Asked and answered.

15        THE COURT:  Sustained.

16        MR. STEVENS:  All right.  I'll move on, Judge.

17   Q    (By Mr. Stevens) As you stand there with Mr. Warren, does

18   the discussion about the armed home invasion robbery continue?

19   A    Yes, sir.

20        MR. STEVENS:  J4-3, please, also from Government's

21   Exhibit 6.

22        (Video played.)

23   Q    (By Mr. Stevens) At the beginning of that tape, there's a

24   reference to "We'll hook up around 11:00 then."  Who was it

25   that said that?

1  A    That was Warren.

2  Q    He's suggesting a time that you should meet?

3  A    That is correct.

4  Q    At one point, you look around and Mr. Washington says,

5  "You good."  What was going on there on this lot when you

6  looked around and Mr. Washington indicated, "You're good"?

7  A    There was a number of individuals on the lot, and there

8  were individuals walking around us.  So at one point, one of

9  those individuals walked close to us, so I stopped the

10 conversation based upon what our conversation was about, and

11 at that point, Washington was -- was looking around,

12 conducting surveillance, making sure nobody could overhear us

13 and told me, "It's okay.  You can continue to talk."

14 Q    At one point, Mr. Warren indicates that they might need

15 that car, the trap car, is that right?

16 A    Yes, sir.

17 Q    Did you ultimately end up showing him that trap car?

18 A    Yes, I did.

19        THE COURT:  Counsel, we're going to take a recess

20 now, so I'm going to interrupt you.

21        Members of the Jury, we're going to take our

22 afternoon recess, and I want to remind you of the instructions

23 I've given you earlier about not discussing this case among

24 yourselves or with anyone else and keeping an open mind until

25 you've heard all of the evidence in the case.  In addition to

1    not discussing it with anyone else, don't allow anyone to

2    discuss the case with you or in your hearing, and as I said

3    before, "Do not discuss" also means don't email, send text

4    messages, or engage in any other form of written, oral, or

5    electronic communication and don't do any research or read any

6    newspaper or, you know, accounts or anything like that, do

7    any -- don't do any Internet research.  Please keep an open

8    mind until you've heard all of the evidence, and I will -- I

9    may not repeat these things to you before every recess, but

10   please keep them in mind throughout the trial because this

11   instruction about not discussing the case or doing any

12   research or communicating about it applies throughout the

13   case.  So the Jury is excused.  We'll be in recess for 15

14   minutes, and she'll show you where your jury room is.  This is

15   your first time in there, right?  So leave your notebooks on

16   your chair, and she'll show you where this jury room is, and

17   just so you know, when I tell you to be back here at a certain

18   time, from now on, it means meet in the jury room.  That's

19   your room, and so that's where you'll be, and we'll come and

20   get you from that location from now on.

21       (The following proceedings were held outside the hearing

22   and presence of the Jury.)

23           THE COURT:  All right.  If you'll just be back here

24   in the witness stand in 15 minutes, and, Mr. Stevens, I do

25   want to caution you again that it gets to a point where it

1   becomes unfairly prejudicial when you repeat the evidence and

2   put your arguments on it every time you ask a question and

3   when your witness continues to talk about what's in somebody

4   else's mind that he can't possibly know, and I would just warn

5   you to please follow the Rules of Evidence.

6           MR. STEVENS:  I understand.

7           THE COURT:  Court's in recess.

8       (Court recessed from 2:58 p.m. until 3:20 p.m.)

9       (The following proceedings were held outside the hearing

10  and presence of the Jury.)

11          THE COURT:  All right.  You may bring in the Jury.

12      (The following proceedings were held within the hearing

13  and presence of the Jury.)

14          THE COURT:  All right.  You all may be seated, and

15  you may continue, Mr. Stevens.

16          MR. STEVENS:  Thank you, Your Honor.

17  Q   (By Mr. Stevens) Agent Zayas, we just finished watching

18  some video from June 4 of 2013, and now, at the end of that,

19  did you and Mr. Warren talk about meeting at another time?

20  A   Yes, sir.

21  Q   And what did you set that meeting or when did you set

22  that meeting?

23  A   That would be for the following day, June the 5th, year

24  2013.

25  Q   All right.  Now I want to ask you -- previously, you were

1   talking about, with Mr. Warren, 20 to 22 kilograms of cocaine

2   in the stash house, is that right?

3   A    Yes, sir.

4   Q    And will you tell the Jury how you arrived at that

5   particular number?

6   A    What I did -- prior to conducting this operation, I spoke

7   with law enforcement officials that are familiar with what a

8   typical stash house in --

9        MR. JIMERSON:  Objection, Your Honor.  First of all,

10  it's hearsay.

11       THE COURT:  Yeah, I -- yeah, I -- I need to hear what

12  he's going to say.  Members of the Jury, we're going to have

13  to have you leave again while I resolve this evidence.

14       MR. STEVENS:  Judge, maybe I can just rephrase the

15  question.

16       THE COURT:  Maybe you can.

17       MR. STEVENS:  Okay.  Thank you.

18       THE COURT:  So the objection is sustained.

19       MR. STEVENS:  All right.  Thank you, Judge.

20  Q    (By Mr. Stevens) Agent Zayas, did you deal with local law

21  enforcement in putting this operation together?

22  A    Yes, sir.

23  Q    All right.  And after that, did you come up with the 20

24  to 22 kilos in the stash house?

25  A    Yes, sir.

1   Q     Thank you.  All right.  Now, again, on June 4 of 2013,

2   did you have other agents who were conducting surveillance of

3   your meeting with Mr. Warren and Mr. Washington?

4   A     Yes, sir.

5   Q     And would that surveillance show you meeting with those

6   two individuals on June 4 of 2013?

7   A     Yes, sir.

8         MR. STEVENS:  J4-4, please.  And, Judge, this is the

9   final clip from Government's Exhibit 6.

10        (Video played.)

11  Q     (By Mr. Stevens) All right.  That's the three of you

12  meeting on that vacant lot?

13  A     Yes, sir.

14        MR. STEVENS:  All right.  J4C, please.

15  Q     (By Mr. Stevens) Agent Zayas, at this time, I'd like to

16  return to Daryl Warren's phone records, and on Government's

17  Exhibit 14, does that also reflect calls on June 4 of 2013,

18  the date that you met with Robert Washington and Daryl Warren

19  on that lot?

20  A     Yes, sir.

21  Q     Okay.  Now, at the top again there, do you see personal

22  telephone number 314-372-6037?

23  A     Yes, sir.

24  Q     And according to the records, those would be -- the phone

25  records -- that would be Daryl Warren's phone number?

```
 1   A     That's correct.

 2   Q     All right.  Will you page down, please?  And do you see

 3   various calls to and from 314-564-2492?

 4   A     Yes, sir.

 5   Q     And whose phone number is that?

 6   A     Robert Washington.

 7   Q     All right.  And can you total up the number of calls we

 8   have here on June 4 of 2013?

 9   A     That would be eight phone calls.

10   Q     All right.  Will you page down, please?  Two additional

11   phone calls there?

12   A     Yes, sir.

13   Q     And again.  Again.  All right.  And so we'd have a total

14   of 13 calls between Mr. Washington's phone number and

15   Mr. Warren's phone number on June 4 of 2013?

16   A     That's correct.

17   Q     All right.  Were you personally involved in any of those

18   phone calls?

19   A     No, sir.

20   Q     And if you look here, the last calls on June 4 of 2013

21   are at about what time?

22   A     At 8:24 in the evening.

23   Q     All right.  And the one below that?

24   A     That's at 8:29 in the evening.

25   Q     All right.  That's substantially later than your meeting,
```

1    is that right?

2    A    That's correct.

3    Q    All right.  Thank you.  So you planned to meet on June 5

4    of 2013?

5    A    Yes, sir.

6    Q    For what purpose?

7    A    That was the day of the robbery.

8    Q    All right.  And did you engage -- did you and ATF engage

9    in additional preparation on that day for that meeting?

10   A    Yes, sir.

11   Q    What sort of preparation did you engage in?

12   A    Prior to that date, we had one of our Special Response

13   Team's SWAT teams fly into St. Louis in preparation for the

14   arrests if it was to occur the following day.

15   Q    All right.  And so that SRT team was there for the

16   purposes of arresting these individuals on June 5 of 2013?

17   A    Yes, sir.

18   Q    If they showed?

19   A    That is correct.

20   Q    All right.  And I'd like to refer you again then to phone

21   records from June 5th of 2013 -- J5C, please -- also from

22   Government's Exhibit 14.  Are these again Daryl Warren's phone

23   records and calls to and from Robert Washington?

24   A    That is correct.

25   Q    All right.  It looks like we have six calls on this page.

1    Could you page down, please?  And an additional six calls on

2    the next page, all on June 5th of 2013, is that right?

3    A    Correct.

4    Q    For a total of 12 calls between Mr. Washington and

5    Mr. Warren?

6    A    Correct.

7    Q    And based on the times there, do all of these calls

8    occur, obviously, before the time of the last home invasion

9    robbery meeting?

10   A    Yes, sir.

11   Q    All right.  Thank you.  On June 5 of 2013, who showed up

12   to meet with you?

13   A    Initially, it was the two confidential informants with

14   Washington in one vehicle.  In the blue Cadillac that I

15   observed on the two prior meets, the Defendant Warren and

16   Twitty.

17   Q    All right.  Who was driving the blue Cadillac?

18   A    Warren.

19   Q    And at this June 5th of 2013 meeting, referring to

20   Government's Exhibit 8, where did that occur?

21   A    At Meramec and Gravois.

22   Q    All right.  And that would be the lower left-hand corner

23   of this map?

24   A    Yes, sir, bottom left-hand corner.

25   Q    And that was the first of two meeting locations on that

1   date, is that right?

2   A    That is correct.

3   Q    Okay.  Thank you.  All right.  Referring you to

4   Government's Exhibit 7, Agent Zayas, the video clips from

5   June 5 of 2013, did then the three individuals you

6   anticipated -- Robert Washington, Daryl Warren, and Michael

7   Twitty -- show up and meet you there at the car wash lot?

8   A    Correct.

9        MR. STEVENS:  All right.  And let's go to J5-1,

10  please, from Government's Exhibit 7.

11       THE COURT:  Are you done with the phone numbers?

12       MR. STEVENS:  I am, Judge.

13       THE COURT:  Can you move this so it's not blocking

14  the -- just move it back over there?

15       MR. STEVENS:  Yes.  Thank you.

16       THE COURT:  Thank you.

17       (Video played.)

18  Q    (By Mr. Stevens) Agent Zayas, when that video starts,

19  Mr. Warren indicates that it's not just the three of them,

20  that he has somebody else, is that right?

21  A    That's correct.

22  Q    And you, obviously, indicate that that's a concern to

23  you?

24  A    That is correct.

25  Q    Why is that?

1  A    Because I want to be able to speak to that individual as

2  I have with Warren and explain to that individual all the

3  parameters surrounding this impending robbery.

4  Q    Is there a benefit also to having all the individuals

5  involved in this in a single location?

6  A    Yeah.  It gives me an opportunity then at that point, if

7  they wish to travel with me to the next location, they can

8  travel to the next location to get the car.

9  Q    All right.  Were you able, again, ever able to confirm

10 the involvement of any other person in this, in this endeavor?

11 A    We were not.

12 Q    You -- in responding to Mr. Warren about this other

13 individual, you talk about wanting to get them right -- "Could

14 they meet us right here, and I want them to see my face."  Why

15 did you say that?

16 A    That's me using an excuse that I was scared that when

17 they entered that house and I could possibly be shot and

18 killed in that house since I knew violence was going to occur

19 since I'd been told the day before there was going to be a

20 shootout.

21       THE COURT:  So that's you trying to get them to

22 believe that?

23       THE WITNESS:  That's my excuse wanting me to be able

24 to have that individual see my face because I understood --

25       THE COURT:  But it's an excuse because it's what --

1    it's just what you're telling them; it's not true?

2          THE WITNESS:  Correct.  It's based upon what he had

3    said as well.

4          THE COURT:  Okay.

5          THE WITNESS:  Yes, ma'am.

6    Q    (By Mr. Stevens) All right.  So your -- your excuse to

7    them for trying to get these other individuals there is you're

8    concerned you could get shot in the face --

9    A    Correct.

10   Q    -- if they don't see you and know you?

11   A    Correct.

12   Q    All right.  You continued then to discuss this home

13   invasion robbery?

14   A    That is correct.

15         MR. STEVENS:  J5-2, please.

16         (Video played.)

17   Q    (By Mr. Stevens) Mr. Warren indicates they got the heat,

18   they got the ammunition.  Heat -- in your experience, would

19   that be a reference to a firearm?

20   A    Yes, sir.

21   Q    And there's a reference to the other guys he's referred

22   to having those, is that right?

23   A    That is correct.

24   Q    Did that turn out to be the case in this particular case?

25   A    I don't know if those individuals had guns.  I know they

1    had guns.

2    Q    All right.  Mr. Warren indicates there, "I'm coming in.

3    I'm going to tell them what to do."  Coming into -- at that

4    point, what are you -- what structure are the two of you

5    talking about?

6    A    We're talking about the robbery.

7    Q    Again, on -- at this location on June 5th, other agents

8    were conducting video surveillance of this meeting?

9    A    That's correct.

10         MR. STEVENS:  J5-3, please.

11         (Video played.)

12   Q    (By Mr. Stevens) This is at the car wash?

13   A    Yes, sir.

14   Q    Who is the individual on the right in the white T-shirt?

15   A    That's the Defendant Warren.

16   Q    After this meeting on the car wash, did you offer to take

17   Mr. Washington and Warren and Twitty to the trap car?

18   A    Yes, I did.

19   Q    All right.  And why did you decide to do that at this

20   time?

21   A    Well, I asked them prior to going to the car wash, "Are

22   you guys ready to go?"  And they told me they were ready to

23   conduct the robbery.  So at that point, I decided to go to the

24   next location in order to take them to the location to conduct

25   the arrest and also in an attempt to identify that fourth

1    individual if I could.

2    Q    All right.  How would you go about doing that by moving

3    to another location?

4    A    The -- we were at -- the first location was a car wash,

5    and the second location I was taking them to was a -- was a

6    business area, which was approximately about a half a mile

7    away, and there was a series of turns that we were going to

8    have to make in order to get to that location.  So it was my

9    hope that the surveillance units would be able to identify --

10   if there was a -- another individual -- would be able to

11   identify that car as we were making those turns following us.

12   Q    Let me show you if I could, Agent Zayas, again,

13   Government's Exhibit 8, the map.  Could you show the Jury

14   briefly, if you would, the route that you took from the car

15   wash at Meramec and Gravois on June 5th to the arrest location

16   on June 5th?

17   A    Yes, sir.  As I came out of the car wash, I made a

18   left-hand turn.  I traveled over some railroad tracks and then

19   came to a stoplight.

20   Q    Let me stop you there.  What vehicle were you in?

21   A    I was driving an undercover vehicle, which was a pickup

22   truck.

23   Q    Who was in the car with you?  Anyone?

24   A    Washington.

25   Q    Robert Washington?

```
 1   A     Yes, sir.

 2   Q     And where were Mr. Warren and Mr. Twitty at that time?

 3   A     They had returned to the blue Cadillac and were following

 4   me in the blue Cadillac.

 5   Q     They were following you?

 6   A     That is correct.

 7   Q     Did they make that turn with you and go over the train

 8   tracks?

 9   A     Yes, they did.

10   Q     All right.  Will you continue, please?

11   A     I then approached a stoplight.  I sat at the stoplight

12   for a period of time and then veered to the right, up in this

13   location.

14   Q     All right.  Did they continue to follow in the blue

15   Cadillac?

16   A     Yes, sir, they did.

17   Q     And then where did you go?

18   A     Upon reaching where the road came perpendicular to this

19   road, I then had to make another right, a slight right, and

20   then an ultimate right-hand turn to come down the road where

21   the business area was located.

22   Q     And that was the arrest location?

23   A     Ultimately, I had to make another right-hand turn, two

24   right-hand turns into the business location.

25   Q     And at each of those turns, did Mr. Warren continue to
```

1    follow in his blue Cadillac?

2    A    Yes, he did.

3    Q    He was driving?

4    A    Yes, he was.

5    Q    He followed you all the way to the arrest location?

6    A    Yes, sir.

7    Q    You mentioned that Mr. Washington was in your vehicle

8    with you, and during the course of this drive from the car

9    wash to the arrest location, did you have a conversation with

10   Mr. Washington?

11   A    Yes, sir, I did.

12          MR. STEVENS:  J5-4, please.  This is from

13   Government's Exhibit 7.

14       (Video played.)

15   Q    (By Mr. Stevens) Is that a reference to the trap car?

16   A    Yes, it is.

17       (Video played.)

18   Q    (By Mr. Stevens) Agent Zayas, Mr. Washington refers to "a

19   lick like this."

20          MR. JIMERSON:  Objection.  May we approach on this,

21   Your Honor?

22          THE COURT:  You may.

23       (A bench conference was held on the record and outside of

24   the hearing of the Jury as follows:)

25          MR. JIMERSON:  Your Honor, I object to any comments

1    about what Mr. Washington made in this statement.  This is all

2    about Mr. Washington's statements, and basically, he's --

3    apparently, he's not here.  I'm going to say it's hearsay at

4    this point, Judge, but more in particular, it has nothing to

5    do with the charge that he's going against my client with, so

6    to have him testify about what Washington said or thought or

7    did is totally irrelevant and prejudicial.

8         MR. STEVENS:  Judge, it's a statement in furtherance

9    of the conspiracy.  Obviously, I think, at this point, we've

10   obviously established a conspiracy involving Mr. Washington

11   and Mr. Warren, and this conversation with Mr. Washington is

12   a -- it's a coconspirator's statement.  All I'm going to ask

13   him is based on his experience what does "a lick" mean in

14   street vernacular.

15        THE COURT:  Yeah, I think that there is evidence from

16   which a conspiracy could be alleged, so I think under *Bell*

17   it's appropriate to do this as -- you know, to allow this in

18   at this point, so --

19        MR. STEVENS:  Thank you, Judge.

20        THE COURT:  -- I will overrule the objection.

21        MR. JIMERSON:  Yes, ma'am.

22        MR. STEVENS:  That's the single question I'm going to

23   ask about this tape, Judge.

24        THE COURT:  Okay.

25        MR. STEVENS:  Thank you.

1          (The following proceedings were held within the hearing

2     of the Jury.)

3     Q    (By Mr. Stevens) Agent Zayas, Robert Washington referred

4     to "a lick like this"; based on your experience, what would

5     that be a reference to?

6     A    "Lick" is street vernacular for robbery.

7     Q    You -- at the end there, you refer to, "It's a

8     landscaping lot.  There's the car."  You were arriving at the

9     landscaping lot at that time?

10    A    Yes, sir.

11    Q    And that's the prearranged arrest location of June 5th of

12    2013?

13    A    Yes, sir.

14    Q    And, again, you and Mr. Washington were in your vehicle?

15    A    That's correct.

16    Q    All right.  And was this location also in the city of

17    St. Louis, within the Eastern District of Missouri?

18    A    Yes, sir.

19    Q    And is that fair for all of the locations we've referred

20    to here today?

21    A    That's correct.

22    Q    All right.  Let me ask you this.  Will you tell the Jury

23    how you decided to -- on this particular arrest location and

24    why to arrest these individuals there?

25    A    Why did we -- we decided to arrest them there because the

1    location has a degree of isolation.  It afforded us an

2    opportunity to be able to secrete our Special Response Team

3    into a location that as we pulled in it wouldn't be visible to

4    anyone, and it also afforded us a location that would be safe

5    for us, for the public as well as the individuals getting

6    arrested.

7    Q    All right.  Now, was there an actual stash house on this

8    lot?

9    A    No, sir.

10   Q    All right.  And was there a particular reason why you

11   wouldn't wait for them to actually enter a stash house or to

12   get on the street close to the stash house to make an arrest

13   at that time?

14          MR. JIMERSON:  Your Honor, I'm going to object at

15   this point.  It points to all speculation as to what he would

16   think.

17          THE COURT:  Overruled.

18   Q    (By Mr. Stevens) You may answer.

19   A    Yes, sir.  Because of the level of violence that it was

20   going to take to commit this robbery, the propensity for me

21   being shot or killed during that attempted robbery or that

22   robbery was too high.

23   Q    If you were to go all the way to a stash house?

24   A    That's correct.

25   Q    And so -- and your purpose is to minimize the danger, is

1    that fair?

2    A    That is correct.

3    Q    All right.  And that's how you picked this particular

4    arrest location?

5    A    Yes, sir.

6    Q    All right.  After arriving on that lot -- you've referred

7    now several times to a trap car -- did you in fact show a trap

8    car to Mr. Warren and the other individuals?

9    A    Yes, sir.

10   Q    And when you pulled onto the lot there, before showing

11   them that car, you're in your pickup truck; you've indicated

12   Mr. Warren is in his blue Cadillac.  Is there a third car that

13   pulls onto the lot there?

14   A    Yes, sir.  That's the vehicle containing the two

15   confidential informants.

16   Q    And that's a small silver car?

17   A    That is correct.

18   Q    And were there surveillance cameras?  In addition to

19   having the Special Response Team and SWAT team at this

20   location, were there surveillance cameras set up around the

21   lot?

22   A    Yes, sir.

23   Q    Where they capture you pulling onto the lot and the other

24   individuals as well?

25   A    That's correct.

1              MR. STEVENS:  J5-5, please.

2              THE COURT:  And which exhibit is this in?

3              MR. STEVENS:  This is still Government's Exhibit 7,

4    Your Honor.

5              THE COURT:  Okay.

6              MR. STEVENS:  June 5, 2013.

7         (Video played.)

8    Q    (By Mr. Stevens) Mr. Warren was in the white T-shirt

9    there?

10   A    Correct, actually, in the driver's side of the blue

11   Cadillac.

12   Q    All right.  And as you were -- you were there with

13   Mr. Warren that day.  As you were showing them the trap car,

14   did they appear to follow what you were showing them?

15   A    Yes, sir.

16   Q    Including Mr. Warren?

17   A    That's correct.

18   Q    All right.  When you offer to Mr. Warren to show him the

19   trap car, he responds, "He is going to be driving."  Do you

20   recall that?

21   A    Yes, sir.

22   Q    Did he motion towards anyone or indicate who he was

23   talking about?

24   A    Indicated toward Washington.

25   Q    All right.  "He is going to be driving," is that right?

1  A    Yes, sir.

2  Q    After you showed them the trap car, you shushed everyone

3  and reached for your pocket.  What were you retrieving there?

4  A    My cellular telephone.

5  Q    Okay.  And why were you doing that?

6  A    What I was doing was I was giving a signal to our Special

7  Response Team to commence with the arrest, so that was my

8  signal that I was prepared for the arrest to commence.

9  Q    And who was that call supposed to be from as far as you

10  were indicating to the other individuals on the lot?

11  A    That call was coming from the stash house, providing me

12  the exact address where we were supposed to go to for the

13  robbery.

14  Q    All right.  But it was actually a signal to the SRT?

15  A    That is correct.

16  Q    All right.  When you take that call, what language do you

17  speak when you answer the phone?

18  A    I speak in Spanish.

19  Q    All right.  And why do you do that?

20  A    In order to add realism to the -- to what we're talking

21  about.

22  Q    As if you're talking to Mexicans at the stash house?

23  A    Yes, sir, correct.

24          MR. STEVENS:  J5-6, please.

25          MR. JIMERSON:  Your Honor, I'm going to object to

1  that and ask that it be stricken from the record in terms of

2  what his realism is and as to talk Spanish from the stash

3  house.  There's been no evidence of that.

4          THE COURT:  Yeah.  Overruled.  I mean I think the

5  Jury understands now that there is no stash house, there is no

6  cocaine, there is no Mexican drug dealer.

7          MR. STEVENS:  There are no Mexicans.

8          THE COURT:  Right.

9          MR. STEVENS:  Yes.

10         THE COURT:  So, okay, go ahead.

11         MR. STEVENS:  Thank you, Judge.  J5-6.

12     (Video played.)

13  Q   (By Mr. Stevens) Agent Zayas, at the beginning of that

14  tape, obviously, you take the phone call you referred to, and

15  then there's a loud bang.  Did you hear that?

16  A    Yes, sir.

17  Q    Can you explain to the Jury what that was?

18  A    That's commonly referred to as a diversionary device, and

19  what it does is it causes a -- when you toss it, it causes a

20  large light and a large sound, so what it does is it causes

21  you to look in that direction and allows our Special Response

22  Team time to come from the other direction, so it causes a

23  diversion to allow them time to get into position to make the

24  arrest.

25  Q    At the end of that video, we see Mr. Warren and

1    Mr. Washington and Mr. Twitty running across the lot there.

2    Were they apprehended on the lot?

3    A    Yes, sir.

4    Q    Did any of them leave the lot in any way?

5    A    No, sir.

6    Q    They were arrested right there?

7    A    That's correct.

8    Q    Were you still wired up at the time of the -- of the

9    arrest?

10   A    Yes, sir.

11   Q    All right.  And would the camera that you had on you at

12   that time show your point of view of this, this portion of the

13   video?

14   A    Yes, sir.

15        MR. STEVENS:  J5-7, please.

16        (Video played.)

17   Q    (By Mr. Stevens) Agent Zayas, do you see the Daryl Warren

18   that you met with on June 3rd, 4th, and 5th in the courtroom

19   here today?

20   A    Yes, sir.

21   Q    Will you identify him by where he's located and what he's

22   wearing?

23   A    Yes, sir.  He's seated at the defense table.  He's

24   wearing a sweater with a collared shirt underneath it, maroon

25   in color sweater.

 1             MR. STEVENS:  Thank you.  Your Honor, may the record

 2   reflect that the witness has identified the Defendant Daryl

 3   Warren?

 4             THE COURT:  The record will so reflect.

 5             MR. STEVENS:  Thank you, Your Honor.  I have no

 6   further questions for this witness.

 7             THE COURT:  You may cross-examine.

 8             MR. JIMERSON:  Thank you, Your Honor.  Thank you.

 9                      CROSS-EXAMINATION

10   BY MR. JIMERSON:

11   Q    Is it Detective or Officer Zayas?

12   A    Special Agent Zayas.

13   Q    Special Agent.  Okay.  Special Agent Zayas, how you doing

14   today, sir?

15   A    Good, sir.  Thank you.

16   Q    All right.  Now, you're a Special Agent, but you're not

17   assigned -- well, you're not from St. Louis, is that correct,

18   sir?

19   A    That's correct, sir.

20   Q    In fact, you testified that you're actually from the DC

21   area?

22   A    I'm assigned to Washington.

23   Q    Okay.  All right.  Now, you also said that you had some

24   confidential informants, is that correct?

25   A    Yes, sir.

1    Q    Were they under you?

2    A    Yes, sir.  I was -- I was directing them in this

3    particular investigation.

4    Q    Okay.  How many under -- what's a confidential informant?

5    A    A confidential informant is an individual that comes

6    forward to law enforcement to provide information either for

7    assistance in a particular case to lower his sentence or for

8    monetary reasons.

9    Q    Okay.  And in this situation, it was for monetary

10   reasons, isn't that correct, sir?

11   A    Yes, sir.

12   Q    In fact, these informants, you've worked with for a bit,

13   is that correct, sir?

14   A    Yes, sir, that would be correct.

15   Q    Okay.  How much money have you paid these confidential

16   informants, sir, to work with you?

17   A    On this particular investigation?

18   Q    Yes, sir.

19   A    I don't recall.  I know that that paperwork -- we have

20   documentation where we pay them, and I believe it was turned

21   over to the defense --

22   Q    Okay.

23   A    -- but I don't know that number specifically.

24   Q    Well, you believe it was turned over to the defense.  I'm

25   asking you what you know.  Do you know how much they were

1    paid?

2    A    I think it might have been 22 or 23 hundred dollars.

3    Q    Okay.  And that was to -- originally, to first find you,

4    I guess, drug dealers in St. Louis, is that correct, sir?

5    A    To identify individuals that are involved in criminal

6    activity in the St. Louis area.

7    Q    Well, let's talk about that because when you first said

8    that, Special Agent Zayas, you said basically you came here

9    because, I guess, a drug task force or something like that?

10    A    No, sir.  Violent crime.

11    Q    Okay.  But you were focusing on drug crimes, is that

12    correct, sir?

13    A    No, sir.  Violent crime.  Violent crime is associated

14    with drug crimes.

15    Q    Okay.  Well, when you first got here, though, you wasn't

16    focused on home invasions, is that correct, sir?

17    A    Pardon?

18    Q    You were not focusing on home invasions?

19    A    No, sir.  We were focusing on the full gamut of violent

20    crime.

21    Q    Well, I mean I'm going to take issue with you on that

22    because you said that at some point, when Mr. Stevens asked

23    you, that your focus changed.  Do you recall that?

24    A    It changed because it started initially as a drug case

25    and then it moved into -- the drug case was still there.  It

1    moved into the home invasion case.

2    Q    Okay.  But let's see straight here.  The drug case never

3    involved Mr. Darren -- Mr. Warren, is that correct, sir?

4    A    You mean where the purchases were made or the --

5    Q    No.  We're talking about, yeah, the first, your initial

6    drug buys, purchases.  Never made with Mr. Warren, is that

7    correct, sir?

8    A    Yes, sir, that's correct.

9    Q    In fact, you never -- nothing was ever sold to him;

10   nothing was ever purchased from him, is that correct, sir?

11   A    That's correct, sir.

12   Q    Okay.  Now, you made your informants, though, or some

13   people might call them snitches -- they were in fact -- you

14   know, they were making purchases from Mr. Robert Washington,

15   is that correct, sir?

16   A    That's correct.

17   Q    Tell the Jury who Robert Washington is, sir.

18   A    Robert Washington is the individual that's in the center

19   of those, those three photographs.

20   Q    Tell me -- tell them what he is to Mr. Warren.  Do you

21   know?

22   A    I believe he's his cousin.

23   Q    His cousin.  Okay.  So -- so you were dealing with him

24   about drug cases and buys and those things, is that correct,

25   sir?

1  A    Drug cases and the home invasion.

2  Q    In fact, you had your snitches in fact buy drugs from

3  Mr. Washington in about 14 -- on two occasions, is that

4  correct, sir?

5  A    No.  Well, they purchased an ounce of cocaine from

6  Washington on May the 21st, 2013, and then I purchased an

7  ounce of cocaine in the presence of the confidential

8  informants from Washington on May the 23rd.

9  Q    So it was two sales?

10 A    Two sales, yes, sir.

11 Q    And each sale cost -- you paid approximately how much

12 for --

13 A    $1,400.

14 Q    For each sale, is that correct?

15 A    That is correct, sir.

16 Q    Okay.  Now, one thing that, you know, you kept mentioning

17 here and I was a little confused about -- when you were

18 talking about, "Are we straight?  Are we straight?" and you

19 were kind of using street language, is that correct?

20 A    Yes, sir.

21 Q    Okay.  Why didn't you just say, for clarity, "You

22 understand what I'm asking you here?"  Why didn't you use that

23 kind of language?

24 A    Because, sir, I'm in their environment.  I'm in an

25 environment of individuals who sell drugs, individuals who are

1    committing robberies, so I'm speaking their language.

2    Q    Are you trying to say that people that you believe --

3    that are -- that are -- that commit violence only talk a

4    certain way?

5    A    No, but we speak in -- we speak in certain slangs.  For

6    instance, if you're in the football community, you're going to

7    speak in football terms.  If you're in a baseball community,

8    you're going to speak in baseball terms.

9    Q    All right.

10   A    If you're in a drug community or robbery community,

11   you're going to speak in those terms.

12   Q    "Are we straight?" -- isn't that meant for people that

13   are in the drug community?  Is that what you're saying?  "Are

14   we straight?" -- that's meant for people on the streets?

15   A    No.  That can also be said in another -- in another

16   area --

17   Q    Okay.

18   A    -- but in particular, that's the kind of language that's

19   spoken in that particular type of activity.

20   Q    Well, what about English?  How about -- do you -- you

21   know, you're a law enforcement officer.  You're trying to get

22   someone to do something, and you're trying to make it clear to

23   the Court or to the justice system that they understood, is

24   that correct?

25   A    Yes, sir.

1   Q    Why didn't you use the word in English, "Are we clear?

2   Do you understand what we're doing here?"

3   A    Because, sir, again, I'm going to speak in their language

4   and I'm going to tell them three times exactly what I'm saying

5   and offer them an opportunity to back out if they so desire.

6   Q    Well, let's speak in our language.  You're really

7   guessing what their language is.  You don't know really

8   whether he understood that or not, do you?

9   A    No, sir.  I know that he understood what I said.

10  Q    All right.  You're guessing, basically, that -- that --

11  are we clear -- that he understood perfectly what you were

12  trying to set him up to do, is that correct?

13  A    That he understood --

14  Q    Yeah.

15  A    -- that he was going to go commit a robbery, I completely

16  stand behind that, yes, sir.  He understood it.

17  Q    Well, let me ask you this.  There was no stash house, is

18  that correct, sir?

19  A    That is correct, sir.

20  Q    There was no -- so -- so when you told him that, that was

21  a lie, is that correct?

22  A    Yes, sir, it was untrue.

23  Q    There was no Mexican cartel, is that correct?

24  A    That is correct.

25  Q    And I respect your Spanish heritage, sir, but when you're

1  using all those words, your Spanish words, for realism,

2  basically, you was using that for realism to pull him into

3  thinking something, is that correct, sir?

4  A    For him to believe what I was telling him, yes, sir.

5  Q    All right.  In addition, in addition to that, there was

6  no drugs ever sold or found in a stash house, is that correct?

7  A    That is correct.

8  Q    Okay.  So all these things that you were leading him up

9  to never in fact ever existed, is that correct?

10  A    That is correct.

11  Q    In fact, I want to show you some clips.  We've looked at

12  a lot of them, okay, but you were all -- and if we have to,

13  we'll go look at them again, but you were in fact -- you were

14  saying that he was agreeing with you and smiling with you, but

15  isn't it true that you were all in his face in his car, making

16  all type of hand gestures in front of him?

17  A    We also were in a vehicle.

18  Q    Okay.

19  A    So unless I was standing outside the car, I would be in

20  pretty close proximity to him.

21  Q    Okay.  But when -- but when you're, "Are we straight,

22  man," using all kind of hand gestures, and, you know, he's

23  kind of leaning back from you, is that correct?

24  A    No, sir.

25  Q    Let's take a look at it again.

1    A    Okay.

2         MR. JIMERSON:  It was -- excuse me.  Mr. Stevens, you

3    may have to help me with this.  It was on the first clip where

4    he first met Mr. -- allegedly met Mr. Warren.

5         MR. STEVENS:  That would be --

6         MR. JIMERSON:  Could you play that?

7         MR. STEVENS:  J3-2.

8         THE COURT:  Oh, we need to change the system over for

9    the computer, I think.  Yeah, you've got it.  There you go.

10        (Video played.)

11        MR. JIMERSON:  Stop it right there.  Can we stop it

12   right there?

13   Q    (By Mr. Jimerson) Was he smiling then, sir?

14   A    Not right there, he's not smiling.

15   Q    Okay.  Let's go.  In fact, you're waving your hands and

16   all those things right off the bat, isn't that correct?

17   A    Well, I mean that's the way I talk, sir.

18   Q    That's the way you talk, but isn't it in a fast manner

19   and making someone move backward at this point?

20   A    Not moving back.  When he entered the car -- if you roll

21   the tape back, when I enter the car, he's in that position.

22        MR. JIMERSON:  I didn't ask you to roll it back.

23   Let's keep going.

24        (Video played.)

25        MR. JIMERSON:  Stop it.

1    Q    (By Mr. Jimerson) All up to this point -- again, I don't

2    want to -- the Jury can look at this, but you're saying he's

3    smiling, but we're halfway through this whole thing here, and

4    there's no smile at this point, isn't that correct?

5    A    Well, he asked -- the Government asked me a specific --

6    Q    If -- if --

7    A    If I may answer the question, sir.

8    Q    No, you answer my question.

9         THE COURT:  Hold on.  Wait a minute.  Yeah, you've

10   made your point.  Ask him a new question.

11        MR. JIMERSON:  Sure.  I'll move on, Judge.

12   Q    (By Mr. Jimerson) Now, you talked about this home focus

13   change.  Who changed that focus?  I mean was there some higher

14   up hierarchy in your -- in your division that changed that

15   home -- that focus?

16   A    No, sir, it didn't change the focus.  It's just the case

17   went into -- the case was still going in that direction of the

18   drugs; it just moved to the home invasion section.

19   Q    Okay.  How long were you in St. Louis before?

20   A    I was in St. Louis the -- we actually started in April,

21   and I was in St. Louis 30 days prior.

22   Q    Okay.  And you focused on these four people, these three

23   people -- Michael Twitty, Robert Washington, and Daryl

24   Warren -- from what point in time?

25   A    When this investigation was initiated, which was May the

1  21st, year 2013.  I met Washington -- actually, the informants

2  met Washington on the 21st.  I met with Washington on the

3  23rd.  On both those occasions, we bought cocaine, and then I

4  met Washington again on May the 29th, which is where we

5  initially discussed the home invasion.  That's when he told me

6  that he had individuals -- actually, he told me that on the

7  23rd and on the 29th, that he had individuals that were

8  involved in this type of activity.

9  Q    Okay.  Special Agent, do you -- you -- you've talked

10 about phone calls and those things.  Do you recall that, when

11 Mr. Stevens asked you that?

12 A    Yes, sir.

13 Q    Isn't it true that Mr. Warren never called you?

14 A    That's correct.

15 Q    Isn't it true you never called Mr. Warren?

16 A    That is correct.

17 Q    In fact, you looked at a lot of phone logs about phone

18 calls, but isn't it true if you go back and look at those

19 phone logs -- and, again, I'm asking you to remember it.  If

20 not, we'll put it up here.  If you go back and look at the

21 phone logs, very few of those phone calls came from Daryl

22 Warren, isn't that correct, sir?

23 A    From Daryl Warren to who?

24 Q    Very few -- well, you're looking at Daryl Warren and

25 Robert Washington.  Very few of those phone calls came from

1  Darren Warren to Robert Washington, is that correct, sir?

2  A    Yes, sir, I believe so.  I believe you're correct.

3  Q    Okay.  So, in fact, you know they're cousins, right?

4  A    Yes, sir, they're cousins.

5  Q    So they made a phone call to each other.  You don't know

6  what they talked about over the telephone, is that correct?

7  A    That is correct.

8  Q    So to sit up here today in front of this Jury and say,

9  well, they talked to each other three or four times in one

10 night, therefore, they must have been talking about drugs,

11 that's a big jump, isn't it, sir?

12 A    Well, I know a couple of those phone calls were about the

13 robbery because I was standing outside the window when Robert

14 Washington was calling Warren, giving him directions to

15 arrive, so we could discuss the robbery.  So I know that those

16 conversations were about the robbery.

17 Q    Did you hear Mr. Warren's voice on the telephone, sir?

18 A    No.  He told me, "I'm calling my cousin," and then he

19 arrived.

20 Q    That's not my question.  My question -- did you hear

21 Mr. Warren's voice on that telephone?

22 A    No, sir, I did not.

23 Q    In fact, you're saying you knew it was him, but

24 basically, you can't pinpoint a time on there that he was

25 calling that you were standing outside that telephone booth or

1    whatever, is that correct?

2    A    I couldn't.

3    Q    Okay.  Now, so, in other words, other than the fact that

4    you thought he may -- Robert Washington may have been talking

5    to Mr. Warren about this drug -- fake stash house, fake cartel

6    that you're talking about, basically, you don't know any of

7    the conversation, do you, is that correct?

8    A    I know the conversation that was had with that phone

9    number when he was standing in front of me.  Now, after that,

10   no, I don't know.

11   Q    Okay.  So -- so if he called -- I'm sorry.  If he called

12   later that night, he could have been talking about, "Let's go

13   get a burrito, or let's go get a hamburger," is that correct?

14   A    I have no idea what they were talking about.

15   Q    Not necessarily, "Let's go rob a fake stash house," is

16   that correct, sir?

17   A    I don't know what they were talking about.

18   Q    Okay.

19        THE COURT:  Mr. Jimerson, you keep moving away from

20   the microphone.

21        MR. JIMERSON:  I'm sorry.

22        THE COURT:  I'd like you to -- you can pull that

23   microphone over there if you want, so it's -- you know, you

24   can move around.

25        MR. JIMERSON:  I have a habit of wandering, Your

1    Honor, and I'm sorry.

2         THE COURT:  Yeah, I know.  So I just -- I need you in

3    the mike.

4         MR. JIMERSON:  I'm sorry.

5    Q    (By Mr. Jimerson) So I think we're clear on the telephone

6    logs that, basically, at least you think that very few calls

7    came from Mr. Warren to Mr. Washington, is that correct?

8    A    Yes, sir.

9    Q    Okay.  All right.  And we're clear on the phone calls; at

10   least with the majority of them, you don't know what the

11   conversation was about, is that correct?

12   A    That's correct.

13   Q    You're testifying that you -- maybe you stood by a phone

14   booth maybe or something and maybe heard Mr. Washington call

15   what you think was Mr. Warren, okay, but you don't know

16   necessarily whether it was him or not on the other end?

17   A    Well, I know he was -- he called that number and he was

18   giving that guy directions to arrive there and shortly

19   thereafter --

20   Q    Well, my question --

21   A    -- Warren arrived.

22   Q    I'm sorry.  My question is simple.  You don't know

23   whether Mr. Warren was on the other end of the phone call, is

24   that correct?

25   A    That's correct.

1   Q    Okay.  Now, Mr. Warren told you -- when you first met

2   him, you were, you know, again, in that -- you say you talk --

3   that's the way you talk, hands fast and those things, and I

4   understand that, you know, but you were saying -- you were

5   saying things to him, "I got a girlfriend," right?  You said

6   that, right?  "I have a woman" or something?

7   A    I don't believe I discussed it on June the 3rd.  I

8   believe that discussion was on June the 4th.

9   Q    Didn't you create a sense of urgency there, you know, in

10  what you had to do?  Didn't you initially tell him, "We've got

11  to do this now.  I've got to get my girlfriend out of here.

12  I've got to -- you know, because I've got to move her and all

13  that"?  Did you not tell him that at first?

14  A    No, sir.  I told him that the next day, on June the 4th,

15  not June the 3rd.

16  Q    Isn't it true, Special Agent, that Daryl Warren -- I mean

17  that Daryl Warren told you he didn't want to participate in

18  this, sir?

19  A    Absolutely not.

20  Q    And it's not true that he said that?

21  A    Absolutely not.

22  Q    Okay.  In fact, on that trap car, he said he wasn't

23  getting inside that trap car, is that correct, sir?

24  A    No, I don't remember him saying that.

25  Q    Did he volunteer to drive it?

243

1    A    No.  Are you talking about getting into it to look when

2    I'm opening the trap, or are you talking about driving it to

3    go commit the robbery?

4    Q    Driving it to commit the robbery.

5    A    No.  He simply said that Washington was going to be the

6    driver.

7    Q    All right.  And he also said, when you guys were at the

8    car wash, right, that he had no tools?  Can you explain that

9    to the Jury since we're talking street language -- he had no

10   tools?

11   A    "Tools" are vernacular, street vernacular, for firearms.

12   Q    In fact, you even asked him what did he mean by that,

13   right?

14   A    Correct.

15   Q    Okay.  So he's telling you he doesn't have any tools.

16   Isn't he saying that "I'm not participating in this.  I don't

17   have any tools"?

18   A    No.  He said that he was going to commit the robbery but

19   that the guns were in a fourth individual's car.

20   Q    Right, they were in somebody else's car, but he don't

21   have them, right?

22   A    He said -- yes, he said they were going to commit the

23   robbery but the guns were in the fourth guy's car, which

24   wasn't true.

25   Q    Now, did you ever see a fourth person's car?

```
 1   A     No.

 2   Q     Okay.  Did you ever inquire about it?

 3   A     Yes, sir.

 4   Q     Okay.  Now, did you know about a fourth person's car?

 5   A     I knew about it when he told me.

 6   Q     So you knew that was a lie, too, right?

 7   A     No, I don't.

 8   Q     All right.  So you basically got one person, you, telling

 9   lies to them, and Mr. Warren is telling you a lie basically

10   based on what he believed you're trying to get him to do,

11   isn't that correct, sir?

12   A     No, sir.

13   Q     You're telling him to go to a fake stash house; you're

14   telling him to go pick up some fake dope; you're telling him

15   about some girlfriend that you've got to move out of the state

16   right away because you're going to rob these Mexican cartel

17   people, and he's telling you a lie, saying, "Okay, I don't

18   have any guns"?

19   A     That's correct.

20   Q     Okay.  Right?  So both people are lying to each other, is

21   that correct?

22   A     About that, yes, sir.

23   Q     Okay.  In fact, Mr. Warren never knew the whereabouts of

24   a stash house; it didn't exist, but you never told him, right?

25   A     Correct.  I was getting the address when the phone call
```

1    happened at the end, when the arrest occurred.

2    Q    You were getting the address?  What do you mean by you

3    were getting the address when something never existed?

4    A    Because in his mind he believed that I was going to be

5    called from the stash house and provided the address, and at

6    that point, I had a very short period of time, which I told

7    him at the car wash, so when I made that -- when I was getting

8    that phone call, he believed that I was at that point getting

9    the address to the stash house.

10   Q    Okay.  Now, isn't it true that Mr. Warren basically went

11   with you on that day because -- do you know Michael Twitty?

12   A    No, sir.  I mean I met him, obviously --

13   Q    Yeah.

14   A    -- but, no, I don't know him personally.

15   Q    That's what I'm getting at.  I'm sorry.  So isn't it true

16   that Mr. Warren was going with him just to make sure that he

17   was okay?

18   A    Absolutely not.

19   Q    Now, who is Michael Twitty by the way?

20   A    I would assume a friend of Warren's.

21   Q    Yeah.  Would you assume he's a good friend of Mr. Warren?

22   A    They were going to do a robbery together, so I would

23   assume they're friends.

24   Q    Now you're taking a joke.  Now you're telling a joke.

25   A    No, sir.  I'm exactly serious.  He -- Warren brought

1   Twitty into the robbery.

2   Q    So you're trying to say -- and I hope with some levity --

3   if they're going to do a robbery together, they've got to be

4   good friends; that's -- that's your belief, sir?

5   A    Well, sir, you're going to go into a house; you're going

6   to kill people in a house; I would imagine you're going to

7   trust the person you're going to go commit the murder with.

8   Q    Okay.  Is that another example or is that a fact?

9   A    Mr. Warren said there's going to be a shootout at the

10  house.

11  Q    Supposedly --

12  A    If I may finish.  If there's going to be a shootout,

13  obviously, the results of that shootout may be death.

14  Q    Let's talk about the facts.  The fact is that there's no

15  shootout.  The fact is there's no house.  The fact is there's

16  no cocaine.  In fact, there was no cartel.  Fact, you were

17  lying to him about this and you induced him to do this; isn't

18  that a fact, sir?

19  A    That is not a fact.

20  Q    Okay.

21  A    He decided to do this.

22  Q    Now, did you ask him on the last day, "Do you want to get

23  out of this, man?"  Did you say anything to him on the last

24  day?

25  A    I said, "Are you guys" -- I said something to the effect,

1    "Are you guys good for this?  Are you guys ready to do this?"

2    Q     So is that street talk again?

3    A     No.  That's asking somebody, "Do you want to do this?"

4    Q     In fact, you had an agenda, isn't that correct, sir?  You

5    flew people in from Washington, DC, in order to ensnare this

6    man into this event, is that correct?

7    A     Absolutely not.

8    Q     They came in from DC, right?  They came in from another

9    part of the country just to do the special tactical thing,

10   right?

11   A     If he decided to do the robbery.

12   Q     Okay.  Okay.  And there again, when they came in, there

13   was nothing there?  There was no -- I mean we've said this 100

14   times already, but there was no drugs, dope, anything, right?

15         MR. STEVENS:  Your Honor, I'm going to object.

16   It's -- it's been asked and answered.

17         THE COURT:  Yeah, it has been asked and answered.

18         MR. JIMERSON:  Yes, ma'am.  Okay.

19   Q     (By Mr. Jimerson) So when your tactical people came in,

20   they found nothing other than some guns that they found in the

21   car that you're saying that Mr. Warren had, is that correct?

22   A     And gloves.

23   Q     Okay.  Okay.  Did you -- did you do anything with those

24   gloves in particular?

25   A     I didn't.  They took them into evidence.

1  Q    Okay.  And so what?  You found gloves in my car.  So

2  what?

3  A    Well, it's -- they're going to go commit a robbery.

4  There's guns with ammunition, and there's gloves and it's

5  June, so I would assume they're going to use them for the

6  robbery.

7  Q    Well, that's your assumption, but he could be digging a

8  ditch, too, right, sir?

9  A    Well, they told me they were going to go do a robbery,

10  so -- and they've got guns and they've got gloves, so . . .

11  Q    And what I'm getting at is that you're making a lot of

12  assumptions here that you want this Jury to believe about

13  things that you find and, therefore, they must do this.

14  You've said that over and over again in terms of how you

15  speculated about what people must be thinking because you want

16  to escalate the level of violence and all that.  I'm asking

17  you this question.  Aren't you making a lot of assumptions

18  when you come to try to get someone to try to -- to try to get

19  someone to go do something, sir?

20  A    Absolutely not, sir.  I'm looking at their actions, I'm

21  looking at their words, and I'm looking at the evidence that's

22  recovered.

23  Q    Now, is it true that Mr. Warren told you he doesn't feel

24  comfortable doing this?

25  A    No, sir.

1   Q     He never said that to you?

2   A     Nope.

3   Q     Okay.  Isn't it true that he said he never wanted to go,

4   he doesn't want to do this?

5   A     Absolutely not.

6   Q     And you told him at that point, "I've got to get my

7   girlfriend out, I need to know."  You put him in a hurry-up

8   mode to do that?

9   A     Absolutely not.  That discussion was done on June 4th.

10  He could have walked away.  The robbery wasn't until the next

11  day.

12  Q     My question is, didn't you put him in a hurry-up mode to

13  do something, sir?

14  A     Absolutely not.

15  Q     Okay.  I asked you about the phone call, so I won't

16  belabor that.  "Lick" was used by Robert Washington?

17  A     Yes, sir.

18  Q     Okay.  You said that's a term used by robbers or

19  something?

20  A     It's -- it's -- "lick" means robbery.

21  Q     All right.  You looked at Robert Washington's record,

22  right?

23  A     No, sir.

24  Q     Okay.  Did you know Robert Washington was a robber, sir?

25  A     I don't recall, sir.  He might be.  I don't know.  I

1    don't recall.

2    Q    So you said, you know, he was using the term "lick", so,

3    therefore, he must have been a robber because he was using

4    that kind of term.  Mr. Stevens asked you that question, but

5    you don't know whether or not in fact that that was used by

6    Mr. Warren, is that correct, that it was meant that way?  I

7    mean Mr. Washington, that he meant it that way.

8    A    I don't follow your question.

9    Q    Sure.  Mr. Washington used the term "lick", and you're

10   saying that in street vernacular that means robbery, right?

11   A    Yes, sir.

12   Q    Okay.  But you don't know in fact that he meant that, is

13   that correct, sir?

14   A    No.  I know he did because we were talking about a

15   robbery.

16   Q    That could have meant a Tootsie Roll pop, right?

17   A    No.  It was a robbery.

18        MR. JIMERSON:  Okay.  May I have a couple of minutes,

19   Your Honor, please?

20        Mr. Stevens, what's the tape with the meeting between

21   Mr. -- Mr. --

22     (Off record discussion between counsel.)

23        THE COURT:  Okay.  None of this is on the record, so

24   you all need to not talk to each other.  You can have side

25   conversations, but just tell me what's going on.

1         MR. STEVENS:  Yeah.  Mr. Warren wanted to play a

2    portion of Government's Exhibit 7, a portion of a clip.  Most

3    of it was not played by the Government.  He asked us to do

4    that.

5         THE COURT:  Okay.  So you're going to play that?

6         MR. JIMERSON:  Yes, ma'am.

7         MR. STEVENS:  It's a portion of Government's

8    Exhibit 7.  I stipulate that that's what it is, and I don't

9    object.

10         THE COURT:  Okay.

11         MR. JIMERSON:  Okay.  Which is the whole complete

12   record.

13         THE COURT:  Okay.  So this is Exhibit 7?

14         MR. STEVENS:  Well, Judge, this is --

15    (Off record discussion between counsel.)

16         MR. STEVENS:  This is actually a three-minute clip,

17   Judge, that we had not played in the portion that we played.

18   Some portions were played and some were not.

19         THE COURT:  Okay.

20         MR. STEVENS:  All right.

21         THE COURT:  You can turn on their -- yeah, I think

22   they're not quite there yet, but that's okay.

23    (Audio only playing.)

24         THE COURT:  Okay.  This isn't what you're trying to

25   play, is it?  Is there a video that's supposed to be with

1    this?

2           TECHNICIAN:  Yes.

3           THE COURT:  Okay.  Members of the Jury, we're going

4    to take like a five-minute recess while they work on this, and

5    so please remember the instructions I gave you earlier.  Don't

6    communicate with anyone at all about this case or among

7    yourselves, and please keep an open mind until you've heard

8    all the evidence.  You can step out for five minutes or so,

9    and we'll call you when we have that ready.

10      (The following proceedings were held outside the hearing

11   and presence of the Jury.)

12          THE WITNESS:  Excuse me, ma'am.  Is it okay if I go

13   to the lavatory?

14          THE COURT:  Yeah.

15          THE WITNESS:  Okay.  Thank you.

16          THE DEFENDANT:  Your Honor --

17          THE COURT:  Yes.

18          THE DEFENDANT:  -- can I say something?

19          THE COURT:  Hold on.  Wait a minute.  No.  The

20   lawyers aren't all here, so I need you to wait, and then you

21   can when Mr. Stevens gets back.

22          Okay.  Mr. Jimerson.

23          MR. JIMERSON:  Your Honor, Mr. Warren wants to speak

24   to the Court about a particular point of evidence, and I --

25   I --

1          THE COURT:  Okay.  The Jury is not in here.

2     Mr. Warren, what is it you wish to say?

3          THE DEFENDANT:  Okay.  There's a part of these tapes

4     that are missing, that's edited.  I asked my lawyer.  He said

5     he had it, but he's not -- when they're playing it, that's not

6     it because there's a part on there that I'm saying I'm not

7     going and I'm saying it multiple times, but that is not on

8     that clip.  Now, I've seen it with my Public Defender.  He

9     came and showed it to me.  Now, Mr. Jimerson came out and

10    showed me audio one time, and the audio he came to show me was

11    last week, and he didn't have it with him.  I asked him did he

12    have it, did he have this, these videos.

13         THE COURT:  And what day is this supposed to have

14    happened?

15         THE DEFENDANT:  What day did you come out there last

16    week?

17         THE COURT:  No.  I mean what day on the tape.

18         MR. JIMERSON:  This is -- this is --

19         THE DEFENDANT:  No.  That was when I had my Public

20    Defender before he was hired.

21         THE COURT:  Yeah.  What -- the video clip you're

22    talking about --

23         THE DEFENDANT:  Up on the third day, on the third

24    day.

25         THE COURT:  The third day, the day you got arrested?

1          THE DEFENDANT:  Yeah, the day we got arrested.

2          THE COURT:  Okay.  Hold on a second.

3          Mr. Stevens, do you have the entire file of whatever

4    was recorded that day?

5          MR. STEVENS:  Yeah, I'm sure I do, Judge.  It's Bates

6    number 110.  It was disclosed eight months ago and has the

7    entirety of that meeting on it.  Mr. Jimerson has it.

8          THE COURT:  How long is it?

9          MR. STEVENS:  Let me see.  I don't recall how long it

10   is from beginning to end, Judge.

11         THE COURT:  Are we talking two hours --

12         MR. STEVENS:  It's -- no.

13         THE COURT:  -- 15 minutes, somewhere in between?

14         MR. STEVENS:  Well, it's -- it's played straight

15   through from Agent Zayas, you know, sitting and waiting to the

16   car wash to the arrest location and everything else, so maybe

17   if he's just talking about the car wash, maybe we can get just

18   to that.

19         MR. JIMERSON:  Yeah, this 110 was re-given to me,

20   Judge, on yesterday, day before yesterday.

21         MR. STEVENS:  Uh-huh.

22         MR. JIMERSON:  Okay.  And I have to find it, but the

23   portion that he's talking about, I don't hear, but --

24         MR. STEVENS:  Well, Mr. Jimerson had suggested that,

25   that his client had told him there was something he didn't

1   have from the car cash, so I gave him 110 again, which I

2   disclosed back in June of last year and --

3            THE COURT:  And you're saying this is the entire

4   thing?

5            MR. STEVENS:  Yes, it's everything and, I mean, you

6   know --

7            THE COURT:  Well, so, Mr. Jimerson, have you gone

8   over the whole thing?

9            MR. JIMERSON:  I've gone over what I see as 110, and

10  I've shared that with my client, but he's saying that there's

11  something missing from that, but I don't know what's missing.

12  You know, I've looked at the whole thing, so --

13           MR. STEVENS:  After we had the discussion in court

14  yesterday about a clip that Mr. Jimerson and Mr. Lynch wanted

15  to play, Judge, they came up to my office and gave me a

16  three-minute clip, and that's exactly what we cut here from

17  110.

18           THE COURT:  Right, but --

19           MR. STEVENS:  They chose what -- what we want -- what

20  they wanted to play here.  As far as any other portion --

21           MR. JIMERSON:  Can we just play this, I mean, and

22  just --

23           THE COURT:  Yes --

24           MR. JIMERSON:  -- if it's there, it's there.

25           THE COURT:  -- all of 110.  Is there any reason not

1   to?

2           MR. JIMERSON:  Yeah, let's just play 110, and then if

3   it's there, it's there, and then we can play it, I can use it.

4           MR. STEVENS:  Well, I mean, does he know whether it's

5   on this clip or not?  Have you showed him this clip?

6           MR. JIMERSON:  He's seen those today.  I've showed

7   him the clip, but I don't see it.

8           THE DEFENDANT:  I've never seen this clip, Your

9   Honor.

10          THE COURT:  Oh.

11          THE DEFENDANT:  I mean I've seen -- I've seen -- I've

12  seen the clip before.  I only seen it the once; that's when my

13  Public Defender showed it to me.  He's never showed it to me.

14          THE COURT:  Well, what about this one he has?  You're

15  saying it's different?

16          THE DEFENDANT:  Some of it's the same, but there's a

17  certain part in there when I'm telling him I'm not going.  He

18  says, "Let's go to the car," and I'm telling him I'm not

19  going, and he says, "Come on, man, we've got to stick

20  together."  I'm like, "Man, I'm not going."  And then he kept

21  on like, "We've got to stick together," and tried to get us to

22  the car.

23          THE COURT:  And you saw this when your Public

24  Defender showed it to you?

25          THE DEFENDANT:  I know I said it, and the Public

1  Defender showed it to me on the first week.  I was locked up

2  for two weeks, and he came up there with it on --

3          THE COURT:  Okay.  Hold on.

4          MR. STEVENS:  Judge, if what he's referring to -- I

5  mean on this clip that they asked us to cut, there is

6  Mr. Warren saying -- talking about staying at the car wash

7  rather than going to the arrest location.  If that's what he's

8  referring to, that is on this clip.

9          MR. JIMERSON:  No, that's --

10         THE COURT:  Play it for me.  How long -- show me this

11 clip that you've got right here.  Let's play it while the Jury

12 is out.

13         MR. STEVENS:  It's three minutes.

14         MR. JIMERSON:  No, that's not the one he's asking.

15 He's saying it happened at the beginning of the tape, and this

16 is at the end of that, so --

17         THE DEFENDANT:  Your Honor, can I speak, please?

18         THE COURT:  Yeah.

19         THE DEFENDANT:  It's on the -- it's at the meeting

20 when we at the car wash --

21         THE COURT:  Okay.

22         THE DEFENDANT:  -- because what happened was -- can I

23 explain to you what happened?  What happened was I told my

24 friend Mike that he was the police.  My friend Mike went and

25 asked him, "Are you a cop?"  I told my friend I'm going to

1    leave.  My friend Mike asked, "Are you a cop?"  The police

2    said, "No, I ain't no cop."  Then my friend Mike asked him,

3    "Then why are you trying to get us to do this?"  And then he

4    would explain why he wanted us to do it.

5               THE COURT:  Okay.  Hold on, hold on, hold on.  All

6    right.  You can step down.  We're going to call the Jury back

7    in, send them home, and then I want you to play the entire

8    thing for me while we're all here in the courtroom, and we can

9    figure out if there's a discovery problem or not.

10              MR. STEVENS:  The entire --

11              MR. JIMERSON:  Yeah, I mean --

12              THE CLERK:  Go get them?

13              THE COURT:  Yeah, if you'll bring the Jury in.

14              MR. JIMERSON:  Your Honor, excuse me, Your Honor.

15              THE COURT:  Yeah.

16              MR. JIMERSON:  Now Mr. Warren is also saying that --

17   and I don't mean to use the word "now".  Mr. Warren is also

18   saying that on the second day on --

19              THE COURT:  Hold on.  Let's bring the Jury in, and

20   we'll send them home, and then we can have this discussion.

21              Go ahead.  You may bring them in.

22             (The following proceedings were held within the hearing

23   and presence of the Jury.)

24              THE COURT:  You all may be seated.  Members of the

25   Jury, we're having some technical and other difficulties

1    trying to figure out if we have exactly the right video that

2    we're trying to show you, and so we're going to need to work

3    on this, and I'm going to let you go home early today, so you

4    don't have to wait around while we're having this discussion.

5    We'll start up at 9:00 a.m. in the morning.  When you get here

6    at 9:00, just go in the jury room.  There's a coffeepot in

7    there.  Whoever gets there first can make coffee if you want

8    it.  There's all the stuff in there.  It will be open fairly

9    early.  And during this recess, remember what I told you

10   before.  You may not communicate with anyone or do any

11   research about the case or, you know, talk at all about the

12   case or about anything connected to it.  I know it's natural

13   when you go home from your first day of actually being in a

14   trial for your family or whoever you go home to to say, "What

15   happened?  Are you on the Jury?  What's going on?"  And I know

16   that partly because my husband's been on jury duty and I asked

17   him those questions and he always says, "The judge told me not

18   to talk about it," and so it's natural for them to do that.

19   So just say to them, "Look, I am on a jury.  It's in

20   Judge Perry's court.  It's a criminal case.  I'll tell you all

21   about it at the end of the week when it's over," and that's

22   really important because it is essential for everyone involved

23   that we have your decision based on the evidence here in court

24   and not anything else.  So you are excused until 9:00 in the

25   morning.  Just leave your notebooks there on your chairs, and

1    we will deal with them, and thank you very much.  I will see

2    you all in the morning.

3         (The following proceedings were held outside the hearing

4    and presence of the Jury.)

5         THE COURT:  All right.  One step at a time.

6    Mr. Jimerson, what are you saying?  You think there's two

7    tapes we need to watch or two clip videos?

8         MR. JIMERSON:  Yes, ma'am.  Mr. Warren is saying that

9    some portion of the conversations that he had on June 4th are

10   also missing from -- from -- from the DVDs provided by the

11   Government, particularly, conversation that he had with

12   Special Agent Zayas about him saying he's not going, this is

13   a -- this is a setup or something of that nature, and he's

14   saying that is not on -- on -- I believe it would be 10 -- the

15   day before would be 109.  Is that -- is that accurate?

16        MR. STEVENS:  Not necessarily because there are

17   multiple recordings of each meeting from different views and

18   everything, but, Judge, I can tell you that the June 4th

19   meeting, it starts with Agent Zayas walking up and meeting

20   with them and then leaving.  I mean it's -- the entire thing

21   is on what we've turned over.

22        THE COURT:  How long is that meeting?

23        MR. STEVENS:  That's relatively short.  I think it's

24   about 10 minutes.

25        THE COURT:  Play me the whole meeting.

 1            MR. STEVENS:  Okay.

 2            THE COURT:  This is exhibit what?  Do you have it

 3    there?  Do you have the whole thing?

 4            MR. STEVENS:  I'll have it in my discovery file,

 5    yeah.

 6            MR. JIMERSON:  Second and third.  Okay.  So those are

 7    the second and third meetings, basically, we're playing, is

 8    that correct?

 9            MR. STEVENS:  You're talking about June 4th and

10    June 5th, right?

11            MR. JIMERSON:  Yes.

12            MR. STEVENS:  Okay.  I think that would be Disc 106,

13    Judge, Bates number 106.  Actually, Judge, I would have a

14    transcript of the entire thing, too, if you'd want that.

15            THE COURT:  Yeah, that would be helpful.

16            MR. STEVENS:  Yeah.

17            THE COURT:  And that's all been -- you know, this has

18    all been turned over, you said, both to Mr. Fehlig and to --

19            MR. STEVENS:  Yes.

20            THE COURT:  -- and to Mr. Jimerson.

21            MR. STEVENS:  That number 106 is the Bates number.

22    It was turned over as Bates number 106.

23            THE COURT:  Actually, I'll just watch the video.  I

24    don't need the transcript.

25            MR. JIMERSON:  Is this June 4th?

1          (Video played.)

2              MR. STEVENS:  Right here is where we started.

3          (Video played.)

4              MR. STEVENS:  Can you stop?

5              MR. JIMERSON:  Your Honor, can we stop it, please?

6              THE COURT:  Yes.

7              MR. JIMERSON:  Mr. Warren said he heard what he

8      thought was missing within this tape, and therefore, it's --

9      go ahead.

10             THE DEFENDANT:  That's the part I wanted you to argue

11     about because you said because I told you, and I said --

12             THE COURT:  Hold on a minute.  You don't want to have

13     these conversations with us here.  You have an attorney/client

14     privilege.  You should not talk to your lawyer with all of us

15     listening in and on the record, so, Mr. Jimerson, go talk to

16     Mr. Warren.  I mean, Mr. Warren, I've let you address me, and

17     I would, but, obviously, you shouldn't do that in front of a

18     jury, and really, you should speak to me through your lawyer

19     at this -- at this point in the proceedings, and so,

20     Mr. Jimerson, you all consult, and then you come back and talk

21     to me.

22             MR. STEVENS:  Judge, if -- if I could, and I know

23     we're not on -- are we on the record?

24             THE COURT:  Yeah, we are on the record.

25             MR. STEVENS:  The portion that Mr. --

```
1            THE COURT:  Well, hold on a second.

2            MR. STEVENS:  Okay.  The portion that Mr. Warren

3    just --

4            THE COURT:  Hold.

5            MR. STEVENS:  I'm sorry.

6            THE COURT:  Okay.  Go ahead, Mr. Stevens.

7            MR. STEVENS:  The portion that Mr. Warren just

8    identified as the portion he thought was missing from that

9    video is one of the clips we actually played in trial.

10           THE COURT:  Right, the Jury's already seen that.

11           MR. STEVENS:  They have exactly.  Not only is it

12   there, we've played it.

13           THE COURT:  Okay.

14           MR. JIMERSON:  Okay.  Now --

15           THE COURT:  Mr. Jimerson.

16           MR. JIMERSON:  Thank you, Your Honor.  That -- for

17   that video, we're okay.  Okay.  Now he wants to play the

18   June 5th one.

19           THE COURT:  The June 5th one.  Okay.  Can you play

20   the June 5th one?

21           MR. STEVENS:  That's -- for the record, Judge, that's

22   Bates number 110.

23           MR. JIMERSON:  Is that 110 you're playing?

24           MR. STEVENS:  Yes.

25           MR. JIMERSON:  Okay.
```

 1          (Video played.)

 2          MR. JIMERSON:  Any way to fast-forward to the meeting

 3     where they were having the conversation?

 4          MR. STEVENS:  Is that okay with you, Judge?

 5          THE COURT:  Yeah.

 6          (Video played.)

 7          THE COURT:  What happened there?

 8          MR. STEVENS:  That's -- it's broken into two

 9     sessions, Judge.  It's when the memory runs out on one and

10     picks up on another one.

11          THE COURT:  Okay.

12          (Video played.)

13          THE COURT:  Okay.  Can we stop it there?  Are we

14     correct that -- I mean now we're going to have the part in the

15     car that we've already seen, and we're not worried about that

16     part, right?

17          THE DEFENDANT:  Your Honor, I've seen another CD

18     already, but what I'm saying -- I'm not going.  I don't know

19     what happened to this CD, but it's not in there.

20          THE COURT:  So you're claiming there's some other CD

21     somewhere?

22          THE DEFENDANT:  It's the same meeting.

23          THE COURT:  From the car wash?

24          THE DEFENDANT:  The same meeting, yes.

25          THE COURT:  Okay.  Well, you know what?  You have a

1   right to testify in this trial if you wish to testify, and you

2   can talk to your lawyer about that.

3          Mr. Stevens, I mean, before I foreclose it, are you

4   telling me this is the only part that exists?

5          MR. STEVENS:  Yes, Judge.  Everything on this,

6   everything -- this is from Agent Zayas' point of view -- this

7   camera.  Everything that was recorded by that is on this disc.

8          THE COURT:  And have I seen everything that happened

9   at the car wash that has been recorded?

10         MR. STEVENS:  Well, there are other camera views.

11   There's the long-distance surveillance.

12         THE COURT:  Right, but --

13         MR. STEVENS:  But yes, yeah.

14         THE COURT:  -- where you can hear people talking --

15         MR. STEVENS:  Yes, right.

16         THE COURT:  -- this is -- I've now seen everything?

17         MR. STEVENS:  This is the extent of it, yes.

18         THE COURT:  And you're telling me there is nothing

19   more?

20         MR. STEVENS:  That's correct.

21         THE COURT:  And you've verified with your agents and

22   everybody else this is all there is.

23         MR. STEVENS:  Yes.  Right.

24         THE COURT:  Okay.  Well, then I'm satisfied.  The

25   Government's evidence can proceed, and I will -- we'll proceed

1    tomorrow, and you can proceed however you wish, Mr. Jimerson.

2    Okay?

3             MR. JIMERSON:  Thank you, Your Honor.

4             THE COURT:  So court's in recess until 9:00 a.m.

5             THE DEFENDANT:  Your Honor --

6             THE COURT:  Yes, Mr. Warren.  Here, come up to the

7    lectern and speak if you wish to speak.

8             THE DEFENDANT:  So there's no other way I can prove

9    that we can get them to see if this video has been edited, has

10   been altered in some type of way.

11            THE COURT:  Well, I don't -- I don't -- what is it

12   you're saying?

13            THE DEFENDANT:  I'm saying because there's a certain

14   part of the video that's missing when he asks them, "Let's go

15   to the trap car," and I tell him I'm not going.

16            THE COURT:  You know, how are you going to -- what

17   evidence do you have or what are you telling -- why do you

18   believe that's true?

19            THE DEFENDANT:  I mean because I know where a CD of

20   it is at.

21            THE COURT:  You do know where a CD of it is at?

22            THE DEFENDANT:  Yes.  It's my -- my -- my --

23            WOMAN IN GALLERY:  Public Defender.

24            THE DEFENDANT:  My Public Defender gave my brother my

25   discovery to find me a lawyer, and it's in that CD, and I can

1  have him hand it to Mr. Jimerson today.

2          THE COURT:  Your brother has it?

3          THE DEFENDANT:  Yes.

4          MR. JIMERSON:  May I speak?

5          THE COURT:  Yeah.

6          MR. JIMERSON:  Okay.  I called -- you know, if my

7  client believes something is missing, I'm not here to

8  challenge that, but I've talked to Mr. Warren, his brother

9  Everett, who gave me the numbers -- apparently his --

10 Mr. Warren's Public Defender prior to that had gone out to

11 visit him and also gave the tapes to Mr. Warren's brother.

12         THE COURT:  Right.  And this was Mr. Fehlig who was a

13 Court-appointed attorney?

14         MR. JIMERSON:  Yes, ma'am.  And Mr. Fehlig -- I'm

15 sorry.  Mr. Fehlig, well, left some discs with Mr. Warren's

16 brother, and Mr. Warren told me they were disc number 110,

17 117, and those things.  I looked at those tapes.  I've shared

18 those tapes with -- at least the ones that he told me from

19 what I received from Mr. Fehlig.

20         THE COURT:  Okay.

21         MR. JIMERSON:  Okay.  I've shared those discs with

22 Mr. Warren, Mr. Daryl Warren, and this is all I know.  Now

23 he's saying that something else exists.

24         THE COURT:  Well, here's what I -- here's what I

25 suggest.  If your client believes that his brother has some

```
 1    disks that we haven't seen in this courtroom, he needs to

 2    bring them to you, and you need to look at them and see what

 3    you need to do, and what we'll do is we'll move forward

 4    tomorrow, and then if you have these, he needs -- if he's got

 5    family members, they need to have them here for you, you know,

 6    tonight or in the morning, and then if we need to, we'll take

 7    some time while you look at them, but we are moving forward

 8    with this, and if there is -- you know, at this point, I have

 9    no reason to believe that the evidence has been tampered with,

10    but if Mr. Warren believes his brother has some DVDs, then,

11    you know, you'll need to get those and see what's what.

12              MR. STEVENS:  Could I just add something for the

13    record, Judge?

14              THE COURT:  You may.

15              MR. STEVENS:  It sounded to me -- excuse me; I'm

16    sorry -- from what Mr. Warren said that he's claiming that

17    what he has seen before that is not on this tape was something

18    that was disclosed in discovery, so it would have come from

19    me, obviously.  So I just want to make that clear for the

20    record.  I think what he said was what he's claiming is not on

21    this, on this disc, is something he saw in discovery that was

22    produced by us.

23              THE COURT:  Right.  And what you're saying is what

24    you just showed me is everything you've ever had --

25              MR. STEVENS:  Exactly.
```

269

1           THE COURT:  -- and ever produced in discovery, and I

2   understand that's what you're saying, and I understand what

3   Mr. Warren is saying, and if Mr. Warren's relatives have

4   something that Mr. Warren thinks will help him out, they

5   better get it to Mr. Jimerson ASAP.  Okay?

6           THE DEFENDANT:  Yes, ma'am.

7           THE COURT:  All right.  I'll see you all at 9:00 in

8   the morning.

9           MR. STEVENS:  Thank you, Judge.

10      (Court adjourned at 4:57 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 269 inclusive.

Dated at St. Louis, Missouri, this 26th day of July, 2014.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter