UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
                  Plaintiff,     )
                                 )
      v.                         )  No. 4:13-CR-221-CDP
                                 )
DARYL WARREN,                    )
                                 )
                  Defendant.     )


JURY TRIAL

VOLUME 2


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


MARCH 5, 2014


APPEARANCES:

For Plaintiff:        Cristian M. Stevens, AUSA
                      Allison H. Behrens, AUSA
                      **OFFICE OF U.S. ATTORNEY**
                      111 South Tenth Street, 20th Floor
                      St. Louis, MO  63102

For Defendant:        Herman L. Jimerson, Esq.
                      **JIMERSON LAW FIRM**
                      225 S. Meramec, Suite 508
                      Clayton, MO  63105


*REPORTED BY:          Gayle D. Madden, CSR, RDR, CRR*
                      *Official Court Reporter*
                      *United States District Court*
                      *111 South Tenth Street, Third Floor*
                      *St. Louis, MO  63102*
                      *(314) 244-7987*

## INDEX

*Witnesses:*

**RICHARD ZAYAS**
   Cross-examination by Mr. Jimerson  . . . . . . . . Page    8
      (cont'd from 3/4/2014)
   Redirect Examination by Mr. Stevens  . . . . . . . Page   20

**JASON TOWNSEND**
   Direct Examination by Mr. Stevens  . . . . . . . . Page   32
   Cross-examination by Mr. Jimerson  . . . . . . . . Page   49
   Redirect Examination by Mr. Stevens  . . . . . . . Page   54

**JEFF ELEVELD**
   Direct Examination by Ms. Behrens  . . . . . . . . Page   55

Motions . . . . . . . . . . . . . . . . . . . . . . Page   76
Jury Instruction Conference . . . . . . . . . . . . Page   78
Jury Instructions . . . . . . . . . . . . . . . . . Page  126
Plaintiff's Closing Argument  . . . . . . . . . . . Page  141
Defendant's Closing Argument  . . . . . . . . . . . Page  157
Plaintiff's Rebuttal Closing Argument . . . . . . . Page  174
Jury Instructions . . . . . . . . . . . . . . . . . Page  179
Jury Notes  . . . . . . . . . . . . . . . . . . . . Page  184
Verdict . . . . . . . . . . . . . . . . . . . . . . Page  189

1        (Proceedings began at 9:06 a.m.)

2        (The following proceedings were held in open court and

3    with the Defendant present.)

4        (The following proceedings were held outside the hearing

5    and presence of the Jury.)

6            THE COURT:  Anything we need to discuss before we

7    begin with the Jury?

8            MR. JIMERSON:  Yes, ma'am.

9            THE COURT:  Okay.  Why don't you stand at the --

10   please stand at the microphone.

11           MR. JIMERSON:  Sure.  Thank you, Your Honor.  Your

12   Honor, Mr. Warren's brother, through his mother, delivered a

13   tape to me this morning.

14           THE COURT:  A CD, yeah.

15           MR. JIMERSON:  Yes, ma'am, a CD.  It was listed as

16   Bates 117, and this is the tape that, according to Mr. Warren,

17   that contains information that -- that I didn't have on my --

18   on my 117s and the prior tapes, so I don't know.  I have not

19   looked at it.  I'm asking to play it before the Jury comes

20   out, of course, to play it in front of the Court to see if it

21   contains the information that Mr. Warren is asking.

22           THE COURT:  Okay.  Mr. Stevens, how long is this one?

23           MR. STEVENS:  Judge, I have no idea.  This wasn't one

24   we played, and I haven't looked at it in weeks.  What this

25   is --

4

1          THE COURT:  Okay.  Is it five hours?  Is it half an

2    hour?  Can you give me an estimate?

3          MR. STEVENS:  I think it will be the same length as

4    110, which we watched yesterday, the second one that we

5    watched yesterday.

6          THE COURT:  Okay.  So you do have an idea?

7          MR. STEVENS:  Well, I haven't seen it in a long time,

8    Judge.

9          THE COURT:  I understand.  I just -- I need some help

10   here, okay?

11         MR. STEVENS:  I understand.  I understand, but what I

12   want to explain is 117 is the same material that we saw in

13   110, just from a different camera view.  It's the same audio

14   that Agent Zayas had on, which we heard in 110.

15         THE COURT:  Okay.  Well, I need to see what's correct

16   since the Defendant thinks this is it, so would you please go

17   tell the Jury that it will be about a half an hour before we

18   start?

19         All right.  Would you please play it for me?

20         You can step down, sir, until the time comes.

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Tell them in come back in 30 minutes.

23         THE CLERK:  Okay.

24         MR. STEVENS:  Do you want to fast-forward to the

25   actual meeting, Judge?

```
 1            THE COURT:  Yeah, when the Defendants get there or

 2   the Defendant.

 3        (Video played.)

 4            MR. JIMERSON:  Your Honor -- stop it.

 5            THE COURT:  Well, why don't you keep playing it?

 6            MR. JIMERSON:  Okay.  Go ahead.

 7            MR. STEVENS:  What you'll be hearing, Judge, is the

 8   audio from Agent Zayas and Robert Washington together in the

 9   truck again.

10            THE COURT:  Yeah, I understand that.  I just -- I

11   want to see.

12        (Video played.)

13            THE COURT:  Okay.  Thank you.

14        All right.  Mr. Jimerson, anything we need to

15   discuss?

16            MR. JIMERSON:  No, ma'am.

17            THE COURT:  Okay.  What else do we need to talk

18   about?  We've got -- I told the Jury 30 minutes.  I should

19   have told them 10, so anything else we need to discuss before

20   we get going?  Okay.  All right.  So we'll -- just stay close.

21   I'll have the clerk check.  Maybe the jurors will be back

22   sooner, and we'll start whenever they come back.

23            MR. JIMERSON:  Yes, ma'am.

24            THE COURT:  Okay.

25            MR. JIMERSON:  Thank you.
```

 1          (Court recessed from 9:19 a.m. until 9:36 a.m.)

 2          (The following proceedings were held outside the hearing

 3     and presence of the Jury.)

 4              THE COURT:  All right.  Mr. Stevens.

 5              MR. STEVENS:  Thank you, Judge.  If I could, I wanted

 6     to just finish the record regarding the tape we watched this

 7     morning, and, Mr. Jimerson, if I say anything incorrect, you

 8     can correct me, but my understanding is that the Defendant's

 9     brother arrived with a CD this morning, Bates #117, which

10     would have been disclosed by the Government, I believe, last

11     June, and that it was the Defendant's position that that was

12     the CD that would contain some -- quote, unquote -- missing

13     video that was not on the Bates #110 or in the Government's

14     exhibits that were played at trial and that we in court here,

15     outside of the hearing of the Jury, watched Bates #117 and

16     that there was no -- quote, unquote -- missing video and that

17     it essentially was the same as 110 but for the fact that it

18     was from a different camera angle.

19              THE COURT:  Well, you know, I'll agree that it was --

20     it looked essentially the same to me as 110 and was from a

21     different camera angle, but I'm not making any findings about

22     what's missing or what's not missing.  You'd have to go

23     frame-by-frame, and I don't think that's necessary.  I am

24     curious why Mr. Jimerson didn't have it.  You produced it to

25     the other defense lawyer?

1          MR. STEVENS:  Well, yeah, I produced it months ago,

2   Judge, and I don't know if --

3          THE COURT:  Do you know why you didn't have it,

4   Mr. Jimerson?

5          MR. JIMERSON:  No, no, Your Honor.  In fact, let me

6   state this.  I think I had 117.  Now, the missing portion that

7   Mr. Warren was speaking about, I didn't have it, so I had 117,

8   but that's not what I think Mr. Warren was speaking of, so --

9          THE COURT:  Okay.  Okay.  All right.  That's fine,

10  and I -- yeah, it was -- I believe it looked like the same to

11  me from another camera angle, and obviously, the video was

12  different, but they were saying -- I mean the audio was

13  different, but they were saying the same things.  It was

14  staticky and from a --

15         MR. STEVENS:  Different quality, yes.

16         THE COURT:  Different quality, yeah.  Okay.

17         MR. STEVENS:  On another note, Judge, we just wanted

18  to make sure that you got the amended jury instructions.

19         THE COURT:  Yeah.  I haven't had time to look at

20  them, but I did see they came in.  Okay.  We'll bring in the

21  Jury, and you can continue the cross-examination.

22         MR. JIMERSON:  Thank you, Your Honor.

23     (The following proceedings were held within the hearing

24  and presence of the Jury.)

25         THE COURT:  Members of the Jury, I apologize for the

1  delay.  There was an evidentiary issue we had to resolve.  So

2  we are ready to continue with the cross-examination, and you

3  may proceed.

4         MR. JIMERSON:  Thank you, Your Honor.

5                        **RICHARD ZAYAS**,

6  HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND TESTIFIED

7  AS FOLLOWS:

8                      CROSS-EXAMINATION

9                  (continued from 3/4/2014)

10  BY MR. JIMERSON:

11  Q    Good morning, again, Special Agent Zayas.

12  A    Good morning, sir.

13  Q    Good morning.  Sir, we were last talking about, I guess,

14  your conversations with Mr. Warren and whether he told you he

15  didn't want to participate.  Do you recall the last meeting?

16  We were talking about that.

17  A    Yes, sir.

18  Q    Okay.  All right.  Let me go back a little bit now.  You

19  also had a conversation with Daryl -- I mean Michael Twitty

20  and Roberto -- Robert Washington, is that correct, sir?

21  A    Yes, sir.

22  Q    Okay.  Now, isn't it true that you were asked by -- by

23  one of those people, particularly, Twitty or Washington,

24  that --

25         MR. STEVENS:  Judge, I'm sorry.  If I could, I would

1   object.  I think this is hearsay.

2         THE COURT:  Overruled.

3   Q   (By Mr. Jimerson) You were asked by those two people or

4   one of those persons that -- that -- whether you were a police

5   officer, isn't that correct?

6   A   Yes, sir, by Twitty.

7   Q   Okay.  And -- and you told him, if I can quote this, you

8   said, "Fuck, no, bro.  We'll do -- we'll do what you want to

9   pick up that car while we're waiting.  I can show you how to

10  work the trap and all that shit."  That's what you said, is

11  that correct?

12  A   Yes, sir, with a pause.  I think there's a pause in

13  there.

14  Q   Okay.  I -- okay, but, basically, you were asked that,

15  and you lied to them about whether or not you were in fact a

16  police officer, is that correct, sir?

17  A   That is correct.

18  Q   And isn't that essential when someone wants to withdraw,

19  they're asking you whether you're a police officer, and you

20  lied to them?

21  A   No.  That's when they don't want to get caught.

22  Q   That's your belief, is that correct?

23  A   No, sir, that's a fact.  They don't want to get caught.

24  Q   If you had told this man that you were a police officer

25  when he's asking about that, then, basically, you know, he

1   wouldn't participate, is that correct?

2   A    Precisely.  He doesn't want to get caught.

3   Q    All right.  But that's precisely you're trying to entrap

4   him, is that correct, sir, by telling him you're not a police

5   officer?

6   A    No, sir.  I'm trying to continue the case while assuming

7   my identity.

8   Q    Well, you're saying one thing, he doesn't want to get

9   caught, but I'm just asking you, just the opposite, logically,

10  you know, if -- if -- if -- whether he's -- it's entrapping

11  him by saying he's not a police officer when he asked you?

12  A    Absolutely not.  It's his free will to do whatever he's

13  doing.

14  Q    Okay.  Just like, in fact, when he told you -- he,

15  Mr. Warren, saying he's feeling bad vibes about this; do you

16  recall that, sir?

17  A    I recall him saying that.  I don't remember what context

18  he said that.

19  Q    Okay.  Okay.  Well, I'll read you again.  You were

20  talking about -- and this is from the transcript on the 5th, I

21  believe.  It said, "What's his vibe?  He's going to come or

22  no?  It's just not a good vibe, man, I mean," and basically,

23  he said that, Mr. Warren, is that correct?

24  A    Again, I don't understand the context.  I'd have to read

25  what's before it and after it in order to understand what the

1   context is.

2   Q    Let me read to you what I believe you said after that.

3   You said, "You don't think he's going to come over here?"

4   A    Again, I would need to read the transcript, several

5   pages, several questions above it and several questions below

6   it, so I could understand the context.

7   Q    Yeah, but, Special Agent, this is your case.  This is

8   what you put together.  You're telling me now that basically

9   I'm reading you a conversation that you had and you don't

10  understand the context of what I'm reading to you?

11  A    I'd have to look at the transcript.  If I could see the

12  transcript, I could tell you the context of what was said.

13            MR. JIMERSON:  Okay.  Your Honor, may I approach the

14  witness and provide his transcript to him?

15            THE COURT:  You may.

16            MR. JIMERSON:  Thank you.

17            THE WITNESS:  Thank you.

18            MR. JIMERSON:  Read it and I'll take it back.

19            THE WITNESS:  Okay.

20            MR. JIMERSON:  Hold that page for me, though.

21            THE WITNESS:  You got it.

22            MR. STEVENS:  Can you tell me the page?

23            MR. JIMERSON:  I don't know it.  Actually, Special

24  Agent, what page are you looking at -- the one I had kind of

25  marked for you?

1               THE WITNESS:  Page 5.

2               MR. JIMERSON:  Thank you.

3               THE WITNESS:  Okay.  I understand the context.

4               MR. JIMERSON:  Okay.  All right.  May I approach

5   again, Your Honor, to retrieve it?

6               THE COURT:  You may.

7               THE WITNESS:  Here you go, sir.

8               MR. JIMERSON:  Thank you.

9               THE WITNESS:  Yes, sir.

10  Q    (By Mr. Jimerson) So isn't it true -- my question was,

11  isn't it true that Mr. Warren said he -- that he's not --

12  there's -- "It's just not a good vibe, man"; isn't it true he

13  said that?

14  A    Right.  He's talking about the unknown person, the

15  unknown person's vibe, not his vibe, the unknown person's

16  vibe.

17  Q    That's your belief, right?

18  A    No.  That's what it says in the transcript.

19  Q    In fact, isn't it true, sir, that, basically, he's saying

20  there's not a good feeling about what's going on here, sir?

21  A    No.  He's talking about the fourth person.  If you read

22  before it and you read the context in which it's said, he's

23  speaking about the other individual, the unknown.

24  Q    Okay.  Now, in fact, Mr. Warren, even later on in that

25  conversation, you know, said he wasn't -- he wasn't going,

1    isn't that correct, sir?

2    A    He wasn't going to get the car?

3    Q    Yes.

4    A    At a point, he wanted to stay there and not go get the

5    car.

6    Q    Now, staying there is not following you, is that correct?

7    A    Correct.

8    Q    Okay.  Staying there is simply -- now, in your job as

9    a -- as to entrap these -- well, your job is to get these

10   people to come follow you because you want to do what, sir?

11   A    No.

12        MR. STEVENS:  I'm going to -- yeah, I'm going to

13   object to the premise of the question.  It's argumentative.

14   He's asking --

15        THE COURT:  Yeah, sustained.  Rephrase your question.

16        MR. JIMERSON:  Thank you, Your Honor.

17   Q    (By Mr. Jimerson) You wanted to keep everybody with you,

18   is that correct, sir?

19   A    Yes, sir.

20   Q    That's the basis of your getting them to commit this

21   crime, as you speak, is by keeping people together?

22   A    No, sir.  Just it gives me an opportunity to be able to

23   speak to other unknowns if they haven't been there yet.  He

24   had already heard this twice before.

25   Q    Well, well, but that still doesn't mean he complied with

1    you, he was complicit with you in doing what you was doing,

2    but my question to you -- I'm sorry.  My question to you,

3    sir -- he has stated he wanted to stay and not go with you,

4    isn't that correct?

5    A    He wanted -- initially, he wanted to stay at the car

6    wash, yes, sir.

7    Q    And not go with you?

8    A    Not go with me to retrieve the car.  He was going to send

9    Washington to retrieve the car, and then we were going to come

10   back.

11   Q    All right.  I'm trying to ask you a direct question, and

12   basically, he said he didn't want to go with you, is that

13   correct?

14   A    Yes, sir.

15        MR. JIMERSON:  All right.  If you can play -- is it

16   6-4?

17        MR. STEVENS:  J4-2?

18        MR. JIMERSON:  J4-2, please.

19   (Video played.)

20   Q    (By Mr. Jimerson) Now, there was some hesitation in

21   Mr. Warren speaking to you about that, is that correct, sir?

22   A    About his associates, not about him.

23   Q    Okay.  That's your belief, is that correct?

24   A    No.  That's what he said.

25   Q    That's your belief?

1   A    No.  That's what he said.

2   Q    Okay.  You don't think that, basically, Mr. Warren is

3   telling you about -- you knew at this time Mr. Warren didn't

4   have any associates, is that correct, sir?

5   A    He did have an associate.  He had Washington and Twitty.

6   Q    This other car, this other car that was supposedly going

7   to follow him or something, you knew that was not correct?

8   A    No.  This is June the 4th.

9   Q    Okay.

10  A    The issue about the other car is June the 5th.

11  Q    Okay.  But you knew -- well, let's go to June 5th.  You

12  knew that -- basically, that -- that there was no other car,

13  isn't that correct?

14  A    No.

15  Q    Sir, you are a trained Special Agent; you have a number

16  of years of experience, is that correct, sir?

17  A    Yes, sir.

18  Q    And are you saying that, basically, you don't investigate

19  the background information to see whether that's true or not

20  for safety reasons?

21  A    It's -- again, it's his free will to bring whomever he

22  pleases, so he could have brought Washington and Twitty.  He

23  could have brought five other individuals.  That's not my

24  choice.  That's his choice.

25          MR. JIMERSON:  Okay.  And, Mr. Stevens, could you

1   play the remaining one, the -- I think the three-minute clip,

2   please?

3            MR. STEVENS:  The disc you wanted?

4            MR. JIMERSON:  Yes, sir, that three-minute clip.  I

5   don't know what -- what exhibit is it for the Court?

6            MR. STEVENS:  That's from Government's Exhibit 7.

7            MR. JIMERSON:  Exhibit 7.  It's the three-minute

8   missing exhibit.

9            THE COURT:  Government's Exhibit 7.  Okay.

10           MR. STEVENS:  Judge, I'm going to object.  He

11   referred to it as missing.

12           THE COURT:  Yeah, I don't know that anything's

13   missing, but, yeah, let's go ahead and play Government's

14   Exhibit 7.  It's been received into evidence and, I think, was

15   played yesterday, correct?

16           MR. JIMERSON:  No, ma'am, not that portion of it.

17           THE COURT:  Not that portion of it.  Okay.  That's

18   fine.

19       (Video played.)

20           MR. JIMERSON:  Let's stop it right there, please.

21           THE COURT:  Can you stop it?

22           MR. JIMERSON:  Stop it right there.

23   Q    (By Mr. Jimerson) You heard the statement, "My people

24   have tools.  They've got to come."  Did you hear that, sir?

25   A    Yes, sir.

1   Q    Okay.  And that's referring to guns, is that correct,

2   sir?

3   A    Yes, sir.

4   Q    Okay.  So, at this point, Mr. Warren is telling you he

5   doesn't have any guns, is that correct, sir?

6   A    That's correct.

7   Q    Okay.  All right.  And you're expecting there to be guns

8   in order to go do this, is that correct, sir?  Let me rephrase

9   that.  Why would Mr. Washington be telling you he doesn't have

10  guns to go do the crime that you're talking about, sir?

11  A    You'd have to ask him.

12  Q    Well, I'm asking you.  Why -- you know --

13  A    I don't know.  You'd have to ask him.  He's the one

14  that's going to commit the robbery, not me.

15  Q    Isn't that -- well, you're there saying you're a Mexican

16  cartel participant.  Now, my question -- so as a liar you

17  would know --

18            MR. STEVENS:  Your Honor, I'm going to object.

19            MR. JIMERSON:  I'll rephrase it.

20            THE COURT:  Okay.  Please, please rephrase the

21  question.

22  Q    (By Mr. Jimerson) And I'm sorry.  That was improper.  As

23  a person and as you're making this story up and telling -- you

24  know, you're saying I've got to ask him.  Isn't -- wouldn't

25  you know, Special Agent Zayas, that, basically, that someone

1    that's going to commit a crime like that would have to have

2    some guns ready to go or committed to go?

3    A    Again, it's his decision.  If he wants to go in there

4    with a knife or if he wants to go in there with a saw, that's

5    his decision as to how he's going to commit the robbery.  I'm

6    not telling him how to do it, what to bring, or who to bring.

7    Q    But isn't that an indication that he's withdrawing from

8    doing this, sir?

9    A    Absolutely not.  I asked him --

10    Q    If --

11    A    If I may finish, sir.

12    Q    All right.

13    A    If I may finish.

14         THE COURT:  Wait.  One question at a time.  You asked

15    him a question.  It was a question.  Let him answer it.

16    A    I asked him, "Are you guys ready to go from here?"  And

17    they said, "Yes."  Both he and Twitty answered, "Yes," so they

18    were ready to commit the robbery from that location.

19    Q    (By Mr. Jimerson) But they told you they didn't have any

20    weapons, is that correct?

21    A    No.  They said the individual was close by who would be

22    meeting them to go do the robbery is what they said.

23    Q    Well, I'm asking you.  They said they didn't have any

24    weapons, isn't that correct, sir?

25    A    Yes, sir.

1    Q    Okay.  And -- and that is an indication that they're

2    withdrawing, isn't that correct, sir?

3    A    No, absolutely not.  I asked them, "Are you guys ready to

4    go from here?"  And they said, "Yes," so they were prepared to

5    commit the robbery.

6              MR. JIMERSON:  Okay.  We can continue, please, the

7    tape.

8         (Video played.)

9              MR. JIMERSON:  Okay.  Thank you.

10   Q    (By Mr. Jimerson) Now, at the end of that conversation,

11   is that the one where you're going to the trap car?

12   A    Yes, sir.  What we do is we depart from that location,

13   the car wash, over to the arrest location.

14   Q    Okay.  And Mr. Washington told you he wasn't going to go,

15   is that correct, sir?  I'm sorry.

16   A    No.

17   Q    That was the day before he said he wasn't going to go, is

18   that correct?

19   A    No, sir.

20   Q    Some day he said he wasn't going to go to the car, is

21   that correct, sir?

22   A    No.  Washington?

23   Q    No, no.  Warren.  I'm sorry.

24   A    No.  On the 5th there, I told them, I said, "If you guys

25   want to stay here, you can stay here, and I'll go get the

1    car," and that's when I asked them, "Are you ready to go?"

2    And they said, "Yes."

3    Q    Okay.  Mr. Warren told you one of those days that he

4    wasn't going, he was going to stay there, is that correct?

5    A    They had -- that was on the 5th they were thinking about

6    staying there, correct.

7    Q    That's what I'm asking you.

8    A    Well, you're confusing me because you're not saying the

9    days.

10   Q    And I'm not trying to.  I'm just trying to get out the

11   fact that you understood that one of those days, the 5th, he

12   said he wasn't going, is that correct?

13   A    They were contemplating staying there, yes, sir.

14         MR. JIMERSON:  Okay.  All right.  May I have one

15   minute, Your Honor?

16         THE COURT:  You may.

17         MR. JIMERSON:  Thank you, Your Honor.  I have no

18   further questions.

19         THE COURT:  Any redirect?

20         MR. STEVENS:  Thank you, Judge.  Leave that

21   transcript there, Mr. Jimerson.

22         MR. JIMERSON:  Sure.

23                    REDIRECT EXAMINATION

24   BY MR. STEVENS:

25   Q    Agent Zayas, let me hand you back that transcript that

1    Mr. Jimerson showed you, and I want to talk a little bit more

2    about that.  That's page 5 of the transcript of June 5th of

3    2013.

4    A    Yes, sir.

5    Q    All right.  And starting at the top there, you asked

6    Mr. Warren, "Hey, what's his vibe," is that right?

7    A    I can't -- I don't recall if it was Warren I was speaking

8    to or Twitty, but they were both standing next to each other.

9    Q    Okay.  And they were both there?

10   A    Correct.

11   Q    And when you say, "Hey, what's his vibe," what were you

12   referring to in the context of the conversation?  Who were you

13   referring to?

14   A    I'm talking to that unknown individual as to what's his

15   vibe about coming to meet with me.

16   Q    Okay.  And you asked, "What's his vibe?  Is he going to

17   come or no?"  And Mr. Warren says, "It's just not a good

18   vibe," and you ask, "You don't think he's going to come over

19   here?"  And he says, "I doubt it, dog.  He ain't going to

20   come," right?

21   A    Correct.

22   Q    Okay.  Now, shortly after this, you had the conversation

23   in which Mr. Warren says that if they're going to -- if

24   something happens and they're going to take a fall, then he

25   doesn't want his people there for it.  Do you recall that

1    conversation?

2    A     Yes, sir.

3    Q     We played that yesterday?

4    A     Yes, sir.

5    Q     And Mr. Twitty says, "Yes, it will be just -- it's just

6    us."  Do you recall that?

7    A     That's correct.

8    Q     And, basically, referring to if -- if they're going to

9    take a fall, it's just going to be them, not whoever else

10   might be out there?

11   A     That's correct.

12   Q     All right.  And, again, this is the same day, June 5th,

13   you referred to.  You asked Mr. Warren and Mr. Twitty if

14   they're ready to go?

15   A     That is correct.

16   Q     Right here and right now?

17   A     Correct.

18   Q     And what was their response?

19   A     That they were prepared to go commit the robbery.

20   Q     All right.  Going back to the first clip Mr. Jimerson --

21   well, before I get to that, let's finish with this.  On

22   that -- also on June 5th, the clip that was just played,

23   Mr. Warren refers to the tools, the ammunition, and the heat

24   being in another vehicle, is that right?

25   A     Yes, sir.

1   Q    And would you say it's fair that that indicates he's

2   aware that there are guns involved in this conspiracy?

3             MR. JIMERSON:  I would object to the conclusion, Your

4   Honor.

5             THE COURT:  Yeah.  Sustained.

6             MR. STEVENS:  All right.  But he indicates --

7             THE COURT:  It's argument and you don't need to make

8   it from the jury or the witness stand.

9             MR. STEVENS:  I understand, Judge.

10  Q    (By Mr. Stevens) He indicates to you that there's heat,

11  tools, and ammunition, is that right?

12  A    That's correct.

13  Q    He indicates that it's in a different car, correct?

14  A    Yes, sir.

15  Q    All right.  He never told you, "I don't have heat or

16  ammunition or tools," did he?

17  A    No, he did not.

18  Q    But he said that they were in another car?

19  A    That is correct.

20  Q    All right.  And, in fact -- and, of course, this is on

21  the same day he's arrested, correct?

22  A    Correct.

23  Q    And his car searched?

24  A    Correct.

25  Q    Mr. Jimerson asked you about Mr. Warren indicating that

1    they wanted to stay at the -- that they didn't want to go;

2    that's the way he asked you; do you recall that?

3    A    Yes, sir.

4    Q    And, actually, Mr. Warren indicated, didn't he, that he

5    didn't want to go to the car wash, is that right?

6    A    No.  He --

7    Q    I'm sorry.  He didn't want to leave from the car wash to

8    the arrest location?

9    A    Correct.

10   Q    He indicated that briefly?

11   A    Correct.

12   Q    All right.  What did he want to do instead?  Did you have

13   a conversation about that?

14   A    What he wanted to do was he wanted me to take Washington

15   to the car and then to bring that car back to the car wash.

16   Q    Okay.  So he wanted you to come back for him at the car

17   wash?

18   A    Correct.

19   Q    All right.  Ultimately, did he end up following you to

20   the arrest location?

21   A    Yes, he did.

22   Q    And was that after you told him -- and we saw it on the

23   clip -- "It's up to you guys, whatever you want to do"?

24   A    That's correct.

25   Q    You told him that?

1    A    Correct.

2    Q    And what choice did he make?

3    A    He decided to follow me.

4    Q    In this clip we just watched from Exhibit 7, Mr. Warren

5    says, "We are coming in."  Do you recall that?

6    A    Yes, sir.

7    Q    And referring to -- you asked him, "How many guys are

8    going in?"  Do you recall that?

9    A    Yes, sir.

10   Q    What was his response?

11   A    He responded that they were going in, he and Twitty, and

12   that Washington was not going to be entering the residence or

13   the stash house.

14   Q    Right.  Okay.  So he said that he and Mr. Twitty were

15   going in?

16   A    Correct.

17   Q    And, again, this is the same conversation there on the

18   car wash lot?

19   A    Correct.

20   Q    And then he indicated Mr. Washington would not be going

21   in?

22   A    Correct.

23   Q    Do you recall him in that clip turning to Mr. Washington

24   and saying, "You don't need to go in; you don't have one of

25   those things"?

```
 1   A    Correct.

 2   Q    Do you recall that?

 3   A    Yes, sir.

 4   Q    He says, "You ain't got no thing; you ain't coming in" to

 5   Mr. Washington, is that right?

 6   A    That's correct.

 7   Q    He's telling Mr. Washington what his role is that day?

 8   A    Yes, sir.

 9   Q    And he's told you what his role and Mr. Twitty's roles

10   are?

11   A    Yes, sir.

12   Q    I want to go now to that day or any other day during the

13   course of this conversation, did Mr. Warren ever tell you that

14   he did not want to do this robbery?

15   A    He never said that.

16   Q    And if I understand correctly, all of your interaction

17   with Mr. Warren in the course of this case is on videotape?

18   A    That's correct.

19   Q    Referring to another videotape, Mr. Jimerson replayed

20   what the Government played yesterday from Government's Exhibit

21   6.  You have a conversation with Mr. Warren on June 4 of 2013;

22   do you recall that?

23   A    Yes, sir.

24   Q    That was in the 2800 block of Iowa?

25   A    That's correct.
```

Volume 2

27

1  Q    And you and Mr. Warren and Mr. Washington were present

2  there?

3  A    Yes, sir.

4  Q    And that's the -- we saw the clip.  That's the date on

5  which Mr. Warren indicated that his people were skeptical

6  about going in there blind; do you recall that?

7  A    Yes, sir.

8  Q    And he asked you about how many people were in the house?

9  A    Correct.

10 Q    All right.  Did he express that -- that he was skeptical?

11 A    No, sir.

12 Q    Did he express that he was skeptical about doing this

13 robbery at all?

14 A    No, sir.

15 Q    Instead he expressed his people were skeptical about the

16 number of people in the house, is that right?

17 A    Correct.

18 Q    Shortly after that, you asked him what he thought of

19 this, is that right?  You asked, "What do you think?"

20 A    Yes, sir.

21 Q    And his response was, "I think it's pretty good.  It's

22 going to be a shootout, though"?

23 A    Correct.

24 Q    Do you make it a practice to tell people, subjects of

25 your investigations when you're undercover, that you're a

1  police officer?

2         MR. JIMERSON:  Your Honor, I object.  This is

3  improper bolstering at this point.

4         THE COURT:  Overruled.

5  A    Absolutely not.

6  Q    (By Mr. Stevens) Why not?

7  A    Obviously, at that point, they're not going to commit a

8  crime, so it's pretty obvious that I'm not going to tell them

9  I'm a police officer.

10  Q    Would you be concerned about your own safety in the

11  course of an undercover investigation?

12  A    Yes, sir.

13  Q    I want to go back to yesterday.  Mr. Jimerson asked you

14  some things about the informants to -- to start his

15  cross-examination.  Did the informants in this case have any

16  real interaction at all with Mr. Warren?

17  A    No, sir.

18  Q    Okay.  It's my understanding that you testified yesterday

19  they purchased cocaine from Mr. Washington on May 21st.

20  A    That is correct.

21  Q    After that, you were introduced to Mr. Washington?

22  A    That's correct.

23  Q    And what happened to their role versus your role at that

24  time?

25  A    It was diminished.  At that point, I took over as the

1   lead on this, on this case.

2   Q    All right.  And these informants really didn't have much

3   of anything to do with Mr. Warren?

4   A    That is correct.

5   Q    On that note, you then purchased cocaine from

6   Mr. Washington on May 23rd of 2013?

7   A    That's correct.

8   Q    And at some point after that, you've already testified,

9   the focus of this investigation changed, is that right?  Sort

10  of the investigation expanded, is that fair?

11  A    It was another branch of the investigation, yes, sir.

12  Q    Mr. Jimerson asked you yesterday whether it was someone

13  at ATF or someone up in Washington, DC or whatever that

14  decided to expand this investigation.  Do you remember that

15  line of questioning?

16  A    Yes, sir.

17  Q    Will you tell this Jury, who was it that expanded the

18  investigation in this case?

19  A    That was me.

20  Q    All right.  And was that in the course of a conversation

21  with Robert Washington?

22  A    Yes, sir.

23  Q    And why was it that the investigation expanded?

24  A    I was trying to determine if -- if he was involved in

25  this type of crime or if he knew individuals that were

1    involved in this type of crime.

2    Q    And did he tell you he knew individuals who could do this

3    kind of home invasion robbery?

4              MR. JIMERSON:  Objection.  Hearsay.

5              THE COURT:  Overruled.

6    A    Yes, sir.

7    Q    (By Mr. Stevens) All right.  Shortly after that, did he

8    introduce you to the Defendant?

9    A    That's correct.

10   Q    Mr. Jimerson yesterday asked whether you were sure that

11   the Defendant understood you when you were asking him things

12   like, "Do you feel me?  Are we square?  Are we good?"  Do you

13   recall that?

14   A    Yes, sir.

15   Q    Are you confident that he understood you when you asked

16   him, "What do you think about this?"

17   A    Extremely.

18   Q    And when he responded, "It's going to be a shootout"?

19   A    That is correct; he understood me.

20   Q    Did he seem to understand you when you asked him, "Are

21   you ready to go right here and right now?"

22   A    Yes, sir.

23   Q    And what was his response?

24   A    That he was.

25   Q    When you -- did he -- did he seem to understand you when

1    you said that you were concerned that someone might shoot you

2    in the head in the course of this, of this robbery?

3    A    He did not seem concerned.

4    Q    And he seemed to understand what you were saying?

5    A    Absolutely.

6    Q    Did either he or Mr. Washington or Mr. Twitty suggest

7    that they don't know how you would have gotten shot or that

8    there weren't guns involved?

9         MR. JIMERSON:  Your Honor, objection.  This is beyond

10   the --

11        THE COURT:  Sustained.  It's argumentative.

12        MR. STEVENS:  All right.  I'll move on.

13   Q    (By Mr. Stevens) Mr. Jimerson asked you whether this lick

14   that Mr. Washington was referring to could have been a Tootsie

15   Roll pop; do you recall that?

16   A    Yes, sir.

17   Q    Had you been talking to Mr. Washington for approximately

18   10 days at this point now about Tootsie Rolls?

19   A    No, sir.

20   Q    What had you been talking to him about?

21   A    About a robbery.

22   Q    You'd been talking to Mr. Warren about that as well?

23   A    Correct.

24   Q    Just to be clear, Mr. Warren never told you that he did

25   not want to do a robbery?

```
 1   A    That is correct.

 2   Q    And every conversation you had with him is on video, is

 3   that right?

 4   A    Yes, sir.

 5   Q    He instead showed up for three meetings with you?

 6   A    Yes, sir.

 7   Q    Did you bring him to those meetings?

 8   A    No, sir.

 9        MR. STEVENS:  Thank you.

10        Nothing further, Your Honor.

11        THE COURT:  You may step down.

12        THE WITNESS:  Yes, ma'am.

13        THE COURT:  You may call your next witness.

14        MR. STEVENS:  Thank you, Judge.  The Government calls

15   Special Agent Jason Townsend, please.

16        THE COURT:  Mr. Townsend, would you come right over

17   here to the clerk to be sworn, please?

18                      **JASON TOWNSEND**,

19   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

20   FOLLOWS:

21                     DIRECT EXAMINATION

22   BY MR. STEVENS:

23   Q    Will you state your name again, please, for the Jury?

24   A    Jason Townsend.

25   Q    And what is your occupation, sir?
```

1   A    I'm a Special Agent with the Bureau of Alcohol, Tobacco,

2   Firearms and Explosives.

3   Q    Commonly known as ATF?

4   A    Yes, sir.

5   Q    How long have you been an ATF agent?

6   A    Twelve years.

7   Q    Were you involved in an ATF undercover operation on

8   June 5 of 2013?

9   A    Yes.

10  Q    What was your role on that day?

11  A    I was the evidence custodian.

12  Q    All right.  Would that -- would your responsibilities

13  then have included seizing evidence from a blue 2000 Cadillac?

14  A    Yes.

15  Q    I show you what's previously been admitted into evidence

16  as Government's Exhibit 11.  Do you recognize that?

17  A    I do.  That's the blue Cadillac.

18  Q    All right.  And that has license number DH7F2Z; do you

19  see that?

20  A    That's correct.

21  Q    Showing you what's previously been admitted as

22  Government's Exhibit 8, can you identify on Government's

23  Exhibit 8 the location of the Cadillac at the time that you

24  seized evidence from it?

25  A    It would be the far left red dot that's identified as

1    "Arrest Location, June 5."

2    Q    All right.  That would be indicated here?

3    A    Yes.

4    Q    Thank you.  That location is in the city of St. Louis?

5    A    Yes.

6    Q    You're aware that's within the Eastern District of

7    Missouri?

8    A    Yes.

9    Q    And did you seize evidence from the interior of the

10   passenger compartment of that blue Cadillac?

11   A    Yes, sir.

12          MR. JIMERSON:  Mr. Stevens, can you show me that?

13          MR. STEVENS:  Sure, absolutely.

14          May I approach the witness, Judge?

15          THE COURT:  You may.

16          MR. STEVENS:  Thank you.

17   Q    (By Mr. Stevens) Agent Townsend, I want to show you what

18   have been marked as Government's Exhibits 16, 17, 21, 23, 24,

19   and 27.  I'll also show you at this time Government's Exhibits

20   30 and 32.  Do you recognize those photographs?

21   A    I do.  These are all the photographs that were taken at

22   the scene as I was collecting the evidence.

23   Q    All right.  And are these fair and accurate depictions of

24   the contents of the blue Cadillac on June 5th of 2013?

25   A    Yes, sir.

1          MR. STEVENS:  Your Honor, I would offer those

2     exhibits into evidence.

3          THE COURT:  Any objection?

4          MR. JIMERSON:  No objection, Your Honor.

5          THE COURT:  All right.  Then Exhibits 16, 17, 21, 23,

6     24, 27, 30, and 32 are all received into evidence.

7          MR. STEVENS:  Thank you, Your Honor.

8     Q    (By Mr. Stevens) All right.  Agent Townsend, I'm going to

9     show you what's marked as Government's Exhibit 16.  What is

10    that?

11    A    That's a photo of the red bandana, the two knives, and

12    the two pairs of gloves that were seized from the front end of

13    the center console in the blue Cadillac.

14    Q    All right.  When they were found there and you seized

15    them, were they in plain view as they appear here?

16    A    Exactly as they appear there.

17    Q    All right.  They weren't enclosed in a console or

18    anything; they were out in the open?

19    A    That's correct.

20    Q    All right.  And I'm indicating here; is that the red

21    bandana you're referring to?

22    A    It is.

23    Q    And below that, are those the knives?

24    A    That is.  That's the two knives.

25    Q    And what's -- what's below the knives there?

1    A    Those are the pairs of gloves.  There's two pairs of

2    gloves.  It's hard to distinguish them in this particular

3    photo, but there are two pairs of gloves there.

4    Q    Okay.  Two pairs of work gloves?

5    A    Yes.

6    Q    Is it fair to say you did not find a shovel anywhere in

7    the car?

8    A    I did not, no.

9    Q    Thank you.

10          MR. JIMERSON:  I'm sorry.  What was the question?

11   I'm sorry.

12          MR. STEVENS:  Whether he found a shovel in the car.

13   The answer was, "No."

14          MR. JIMERSON:  Okay.  Thank you.

15   Q    (By Mr. Stevens) Government's Exhibit 17, what does this

16   show us, Agent Townsend?

17   A    This is the -- a photo of all the items that were just in

18   the previous photo, except now they're displayed on the hood

19   of the vehicle.

20   Q    All right.  And that you placed them there for display

21   purposes so that the photographs could be taken?

22   A    That's correct.

23   Q    I show you next what I've marked as Government's Exhibits

24   18, 19, and 20 and ask if you can identify Government's

25   Exhibit 18, please.

1    A    This is the evidence bag containing the two knives that

2    were collected from inside the vehicle.

3    Q    And Government's Exhibit 19?

4    A    This is the bag containing the red bandana that was

5    seized from the vehicle.

6    Q    And Government's Exhibit 20?

7    A    These are the two sets of gloves that were seized from

8    the vehicle.

9    Q    All right.  And you seized all of this evidence?

10   A    I did, yes.

11       MR. STEVENS:  Your Honor, I offer Government's

12   Exhibits 18, 19, and 20, please.

13       MR. JIMERSON:  No objection, Your Honor.

14       THE COURT:  All right.  18, 19, and 20 are received

15   into evidence.

16       MR. STEVENS:  Thank you.

17   Q    (By Mr. Stevens) Agent Townsend, that's Government's

18   Exhibit 18.  Those are the two knives you seized from plain

19   view in the passenger compartment of the 2000 blue Cadillac?

20   A    Yes, sir.

21   Q    Next, I'll show you what you've previously identified and

22   has been admitted as Government's Exhibit 21.  What is that a

23   photograph of?

24   A    This is a photograph of the customer invoice from some

25   vehicle repair that was done to the blue Cadillac.

1    Q    Where was that found?

2    A    This was found, I believe, in the center console of the

3    vehicle.

4    Q    All right.  And I'll show you Government's Exhibit 22.

5    Is this the actual invoice that's depicted in that photograph?

6    A    Yes, sir, it is.

7    Q    Thank you.  Is this what you seized on June 5th of 2013

8    from the blue Cadillac?

9    A    Yes.

10            MR. STEVENS:  Your Honor, I offer Government's

11    Exhibit 22.

12            MR. JIMERSON:  No objection.

13            THE COURT:  Exhibit 22 is received.

14            MR. STEVENS:  Thank you, Judge.

15    Q    (By Mr. Stevens) At the top here, does this document

16    indicate the owner of the blue Cadillac?

17    A    Yes, it does.

18    Q    And --

19    A    It identifies Mr. Warren as the owner.

20    Q    Daryl Warren?

21    A    Yes.

22            MR. JIMERSON:  I'm going to object, Judge.  That's --

23    it indicates that his name is on the tag.  He's saying it

24    identifies ownership, and I'm saying that's not true

25    necessarily.

1          THE COURT:  You can cross-examine him on that.

2     Q     (By Mr. Stevens) Yeah.  Agent Townsend, this indicates

3     it's a customer invoice, right?

4     A     It does, yes.

5     Q     And it indicates the customer would be Daryl Warren?

6     A     It indicates that he's the responsible party, yes.

7     Q     All right.  And does this describe the vehicle?

8     A     Yes, it does.

9     Q     And how does it describe the vehicle?

10    A     As the 2000 -- year 2000 Cadillac Deville, which is the

11    same year and model as we searched.

12    Q     All right.  The same year and model as the car you

13    actually found this in?

14    A     Yes.

15    Q     Does it also indicate a license number for the vehicle?

16    A     Yes, sir, and that license number is the same as depicted

17    on the vehicle.

18    Q     All right.  DH7F2Z?

19    A     Yes.

20    Q     Missouri?

21    A     Yes.

22    Q     On Government's Exhibit 11, is that a Missouri tag?

23    A     It is, sir.

24    Q     DH7F2Z?

25    A     Yes, sir.

1    Q    This also indicates the date of service, is that right?

2    A    Yes, sir.

3    Q    And what date was that?

4    A    May 28th, 2013, which is approximately a week or so

5    before this item was seized from the vehicle.

6    Q    I'll show you now Government's Exhibit 23, already

7    admitted into evidence.  Does this depict more evidence that

8    was found inside the interior of the Cadillac?

9    A    Yes, sir.  This is a photo of Mr. Warren's driver's

10   license as it was positioned inside the visor of the driver's

11   side visor.

12   Q    Government's Exhibit 24, already admitted into evidence,

13   what does this show us?

14   A    This is another driver's license of Mr. Warren that was

15   found under the seat of the vehicle.

16   Q    Was that under the driver's seat?

17   A    Yes, sir.

18   Q    Did you seize both of those driver's licenses?

19   A    I did.

20   Q    I'll show you -- excuse me -- Government's Exhibits 25

21   and 26 and ask you if you recognize these as evidence that you

22   seized from the blue Cadillac?

23   A    Yes, sir.  Those are the same two.

24   Q    And what are they?

25   A    These are the two driver's licenses.  One has the issuing

1    date of -- of May 2nd, 2013, and the other one has an older

2    issuing date.  One's, obviously, a little bit different in

3    texture and stuff, but essentially, they're both Missouri

4    driver's licenses for Mr. Warren.

5              MR. STEVENS:  All right.  I offer Government's

6    Exhibits 25 and 26, Judge.

7              MR. JIMERSON:  No objection.

8              THE COURT:  They are received into evidence.

9              MR. STEVENS:  Thank you, Your Honor.

10   Q    (By Mr. Stevens) All right.  You seized these from the

11   Cadillac that day, Agent Townsend?

12   A    Yes, sir.

13   Q    And, again, they both indicate that they are driver's

14   licenses for Daryl Warren?

15   A    Yes, sir.

16   Q    They appear to have a photograph and signature of

17   Mr. Warren?

18   A    Yes, sir.

19   Q    And you indicated that on what is, apparently, the newer

20   of these two was issued on May 2nd of 2013?

21   A    Yes, sir.

22   Q    Approximately one month before the arrest and search of

23   the car?

24   A    That's correct.

25             MR. STEVENS:  Next, I want to show you Government's

1    Exhibit 29, Agent Townsend.

2           Judge, this is a certified record from the Missouri

3    Department of Revenue, Government's Exhibit 29.  It is

4    certified as a record, an official record of the Missouri

5    Department of Revenue, and I would offer it as Government's

6    Exhibit 29.

7           MR. JIMERSON:  No objection.

8           THE COURT:  Exhibit 29 is received.

9           MR. STEVENS:  Thank you, Your Honor.

10   Q    (By Mr. Stevens) Turning to the first page of that

11   exhibit, Agent Townsend, does this indicate the owner

12   information for the 2000 blue Cadillac?

13   A    Yes, sir.  It identifies Daryl Warren.

14   Q    All right.  It also indicates a telephone number here.

15   Do you see that?

16   A    Yes, sir.

17   Q    314-372-63 -- 6037?

18   A    Yes, sir.

19   Q    That's 6037?

20   A    Yes, 6037, yes, sir.

21   Q    All right.  This is a record for a 2000 Cadillac?

22   A    Yes, sir.

23   Q    And indicates a license of DH7F2Z, is that right?

24   A    That's correct.

25   Q    Turning to the next page, that appears to be a signature

1   for Daryl Warren, the owner?

2   A    Yes, sir.

3   Q    And turning to the next page, we again have an owner's

4   name?

5   A    That's correct.  Again, it identifies Daryl Warren.

6   Q    The same telephone number?

7   A    Yes, sir.

8   Q    This has a further description of the vehicle?

9   A    Yes, sir.

10  Q    And how was that described?

11  A    As a 2000 Cadillac, blue in color.

12  Q    And, again, it lists -- this document lists the same

13  license number as was depicted in the photograph, Government's

14  Exhibit 11, right?

15  A    Yes.

16  Q    Signature of the owner there under penalty of perjury

17  appears to be a signature for Daryl Warren?

18  A    Yes, sir.

19  Q    All right.  Now, we've talked about the contents of the

20  actual interior of the Cadillac.  Did you search other areas

21  of the Cadillac?

22  A    Yes, sir.

23  Q    Did that include the trunk?

24  A    It did.

25  Q    And I'll show you what I've marked as Government's

1    Exhibit 30 that's already been admitted into evidence.  What

2    did you find there?

3    A    This particular photo identifies a Ruger .223 assault

4    rifle with a loaded magazine seated just behind it while they

5    both sat inside of a box in the trunk.

6    Q    All right.  Did you seize that rifle from the trunk of

7    that car?

8    A    I did.  I seized -- I seized that particular rifle.  Then

9    once I had it in my hands, I was able to clear it, wrap a band

10   around the chamber of the weapon to keep it safe and prevent

11   it from any type of discharge.

12   Q    Agent Townsend, I want to show you what I've marked as

13   Government's Exhibit 31.  Do you recognize Exhibit 31?

14   A    Yes, sir.  This is the -- the assault rifle that's

15   depicted in the photograph.

16   Q    All right.  And you seized that on June 5th of 2013?

17   A    Yes, sir.

18   Q    From where?

19   A    From the trunk of the vehicle, of the blue Cadillac.

20        MR. STEVENS:  All right.  Thank you, sir.

21        I offer Government's Exhibit 31, Your Honor.

22        MR. JIMERSON:  No objection.

23        THE COURT:  Exhibit 31 is received into evidence.

24   Q    (By Mr. Stevens) You mentioned that you rendered this

25   safe and put a zip tie through so that it's not operable?

1    A    That's correct.

2    Q    Is it still in that condition?

3    A    It is, sir.

4    Q    Thank you.  Next, I want to show you what I've marked as

5    Government's Exhibit 31A.  You mentioned that the magazine of

6    Government's Exhibit 31, the assault rifle, was loaded?

7    A    Yes, sir.

8    Q    I show you Government's Exhibit 31A.  Do you recognize

9    31A?

10   A    Yes, sir.  This is the packaging containing the 23 rounds

11   of .223-caliber ammunition that was removed from the magazine

12   of that particular weapon.

13            MR. STEVENS:  Thank you.

14            Your Honor, I'd offer Government's Exhibit 31A.

15            MR. JIMERSON:  No objection.

16            THE COURT:  31A is received into evidence.

17            MR. STEVENS:  Thank you.

18   Q    (By Mr. Stevens) Agent, you say that these were the

19   rounds that were seized from Government's Exhibit 31?

20   A    Yes, sir.

21   Q    How many were there?

22   A    Twenty-three.

23   Q    Those are a couple of them.  Do you see those there?

24   A    Yes, sir.

25   Q    Next, I want to show you Government's Exhibit 32, already

1    admitted into evidence.  What does that photograph depict?

2    A    This is a photo of the Hi-Point .40-caliber,

3    semi-automatic pistol that was recovered in the rear of the --

4    it was in the trunk, but it was at the far rear of the trunk.

5    As this photo here -- the black covering felt that you see in

6    the background up against the green oil can, that's the back

7    of the rear of the trunk, and then where the white paper is

8    along the bottom, that's actually the bottom of the trunk.

9    The blue square that you can see in this area right in here is

10   actually the back of the rear seat, so it -- this particular

11   cutout or hole that's in the rear of the trunk is actually an

12   area to allow anyone that's sitting in the passenger's

13   compartment of the vehicle to be able to reach directly into

14   the trunk.

15   Q    All right.  And this gun with the handle is pointed

16   towards that armrest opening into the -- into the passenger's

17   compartment?

18   A    That's correct.

19   Q    I'll show you now Government's Exhibits 33 and 33A.

20        MR. JIMERSON:  Yes, sir.

21   Q    (By Mr. Stevens) Do you recognize Government's Exhibit

22   33?

23   A    Yes, sir.  This is the .40-caliber pistol that was seized

24   from the -- from the blue Cadillac that's depicted in the

25   photo.

1    Q    All right.  And Government's Exhibit 33A?

2    A    Yes, sir.  These are the eight rounds of .40-caliber

3    ammunition that were recovered from the magazine that was

4    inside the firearm --

5    Q    All right.  So this gun --

6    A    -- depicted in this photo.

7    Q    This gun was actually loaded with eight rounds of

8    ammunition?

9    A    Yes, sir, and the magazine was actually inserted into the

10   magazine well.

11        MR. STEVENS:  Your Honor, I offer Government's

12   Exhibits 33 and 33A.

13        MR. JIMERSON:  No objection.

14        THE COURT:  Exhibits 33 and 33A are received into

15   evidence.

16        MR. STEVENS:  Thank you.

17   Q    (By Mr. Stevens) You mentioned there were eight rounds of

18   ammunition in Government's Exhibit 33?

19   A    Yes, sir.

20   Q    Are these, several of those there, .40-caliber rounds?

21   A    Yes, sir.

22   Q    After you packaged this evidence, did you place it in ATF

23   evidence bags?

24   A    I did, sir.

25   Q    And did you seal those bags with evidence tape?

1    A    I did, sir.

2    Q    And place your initials and date on the seal?

3    A    Yes, sir.

4    Q    And did you sign the evidence identification label on

5    each of these things, each of these evidence bags?

6    A    I did, sir.

7    Q    And then they were submitted to the ATF evidence vault?

8    A    Yes, sir.

9    Q    Where they remained until trial?

10   A    Yes, sir.

11            MR. STEVENS:  Thank you.  Nothing further, Your

12   Honor.

13            THE COURT:  Cross-examination.

14            MR. JIMERSON:  Thank you, Your Honor.

15            THE COURT:  Actually, we'll take our morning recess

16   at this time, even though we got a late start.  So, members of

17   the Jury, please remember the instructions I've given you

18   earlier about this and all other recesses not to discuss the

19   case among yourselves or to communicate in any way about the

20   case and to keep an open mind until you've heard all of the

21   evidence in the case.  Court will be in recess for 15 minutes.

22        (Court recessed from 10:29 a.m. until 10:46 a.m.)

23        (The following proceedings were held outside the hearing

24   and presence of the Jury.)

25            THE COURT:  All right.  You may bring in the Jury.

1          (The following proceedings were held within the hearing

2     and presence of the Jury.)

3               THE COURT:  You may proceed with the

4     cross-examination.

5               MR. JIMERSON:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7     BY MR. JIMERSON:

8     Q     Special Agent Jason Townsend?

9     A     Yes, sir.

10    Q     Good morning, sir.

11    A     Good morning.

12    Q     Your duties, as I heard, was to collect the evidence, is

13    that correct, sir?

14    A     That's correct.

15    Q     Okay.  And, basically, when you went -- you cannot

16    testify as to who put the evidence where?  You just collect

17    it, is that correct?  Let me rephrase for you.  Okay.  We're

18    talking about this car, this blue Cadillac, correct?

19    A     Yes, sir.  Yes, sir.

20    Q     You found evidence in that blue Cadillac, but you can't

21    say how it got there, is that correct, sir?

22    A     That's correct.

23    Q     Okay.  In fact, you've heard -- have you heard the name

24    Michael Twitty and Robert Washington in this matter, sir?

25    A     Yes, sir.

1  Q    Okay.  All right.  And have you heard -- well, let me ask

2  you this.  Do you -- can you say whether or not Robert

3  Washington or Michael Twitty placed evidence in this car, the

4  evidence that you spoke -- that you collected, sir?

5  A    No.

6  Q    Okay.  So you don't know for sure whether that happened

7  or not, is that correct, sir?

8  A    That's correct.

9  Q    All right.  Now, you were shown -- and it was admitted

10 into evidence -- Government Exhibit #32, and I'll show it to

11 you again.  You see that on the screen, sir?

12 A    Yes, sir.

13 Q    Okay.  Again, what is that?

14 A    That is the .40-caliber Hi-Point pistol that was

15 positioned in the rear of the trunk of the blue Cadillac.

16 Q    Okay.  And you said earlier that this compartment up here

17 at the top of the picture is a compartment within the car that

18 you can access the trunk from, sir?

19 A    Yes, sir.

20 Q    And you said that's on the passenger's side, sir?

21 A    No, sir.  That's in the -- this area right here is the

22 back of the rear seat.  There's a little latch that pulls

23 down, like a padded latch that can be pulled down, allowing

24 anyone who's in the passenger's compartment of the vehicle to

25 reach into the trunk.

1    Q    Okay.  That's what I'm getting at.  So anyone who is in

2    the passenger's compartment can reach into the trunk, correct?

3    A    That's correct.

4    Q    Okay.  Not necessarily the driver, is that correct, sir?

5    A    Anyone that's inside the passenger's compartment could

6    get to that, yes.

7    Q    Okay.  Let's take a close look at this gun that you

8    seized.  That's a .40-caliber, you indicated, sir?

9    A    Yes, sir.

10   Q    Look at the direction that it's pointing; do you see

11   that, sir?

12   A    Yes, sir.

13   Q    Okay.  And the handle of that, of that weapon, sir, is

14   pointed to -- it's to the right, is that correct, sir?

15   A    As we're looking at it, yes, sir.

16   Q    Okay.  So a person sitting in the front seat, reaching

17   around, doesn't necessarily -- isn't -- well, let me ask you

18   this.  Isn't it not positioned where a person that's driving

19   the vehicle can reach that weapon, sir?

20   A    Say that again now.

21   Q    Is this weapon positioned where a person that's driving

22   cannot reach this weapon, sir?

23   A    No.  I would think someone who's sitting in the driver's

24   seat could get to this vehicle.

25   Q    All right.  Very good then.

1    A    I mean get to this firearm.

2    Q    Then, again, look at the handle.  The handle is pointed

3    and in a different direction opposed to the driver, is that

4    correct, sir?

5    A    I'm not sure where the question is going.  I mean I guess

6    if I was -- if I was going to reach into this, this vehicle,

7    if I was sitting in the driver's seat, if I was left-handed, I

8    could reach around and that gun would be positioned exactly

9    where I'd want it to if I was a left-handed shooter.

10   Q    All right.  And Mr. Warren is right-handed, so it's --

11   according to what you just testified to, it's not positioned

12   properly for a right-handed person, is that correct?

13   A    Not necessarily.

14   Q    Okay.  I just want to get at it, but, basically, you're

15   looking at this, and it appears to be the position is for a

16   person either sitting on the right-hand side of the car to

17   reach in or a person who is left-handed, is that correct?

18   A    No.  I mean you could reach in that compartment with any

19   hand and grab that gun.  It doesn't necessarily have to be

20   grabbed to fire from that position, so you could just need to

21   get to the gun.

22   Q    Okay.  So you're saying that a person can reach in and

23   grab it in the middle if they wanted to, right, or grab it

24   from the middle portion rather as opposed to grabbing it from

25   the handle?

1  A    I'm just saying the gun is sitting in a position.  It's

2  at the back of the trunk, so that anyone inside the

3  passenger's compartment could reach in and grab it.  It's not

4  positioned way back to the rear of the vehicle --

5  Q    I understand.  I understand.

6  A    -- out of reach.

7  Q    Okay.  Now, we've talked about the -- the -- and you may

8  have answered this already and with my general question.  You

9  had knives that you found in the car and gloves, is that

10  correct, sir?

11  A    That's correct.

12  Q    Again, you don't know who put that there?  I've talked

13  about two other people, is that correct, sir?

14  A    That's correct.

15  Q    All right.  And we also looked at this assault rifle that

16  was also in the back of the trunk, is that correct, sir?

17  A    That's correct.

18  Q    Again, you don't know who placed that there, is that

19  correct?

20  A    No, sir.

21       MR. JIMERSON:  Okay.  I believe that's all, Your

22  Honor.  Thank you.

23       THE COURT:  All right.  Any redirect?

24       MR. STEVENS:  Just one, Judge.

25

1                    REDIRECT EXAMINATION

2    BY MR. STEVENS:

3    Q    Agent Townsend, just to be clear, when you're referring

4    to the passenger's compartment of the -- thank you.  When

5    you're referring to the passenger's compartment of the

6    Cadillac, you're referring to the -- basically, the entire

7    interior of the Cadillac that holds people, right?

8    A    That's correct.  Where the seats are where people sit,

9    not the trunk where you put items, not humans.

10   Q    That would include -- that would include the driver's

11   seat, the front passenger's seat, the back seat?

12   A    That's correct.

13            MR. STEVENS:  Thank you.

14            Nothing further, Your Honor.

15            THE COURT:  All right.  You may step down.

16            You may call your next witness.

17            MR. STEVENS:  Thank you, Judge.

18            MS. BEHRENS:  Judge, the Government's next witness is

19   Jeff Eleveld.

20            THE COURT:  Say that name again.

21            MS. BEHRENS:  Jeff Eleveld.

22            THE COURT:  Okay.  Mr. Eleveld, if you'll step right

23   over here to the clerk to be sworn, please.

24            MS. BEHRENS:  Your Honor, may I inquire?

25            THE COURT:  You may.

1          MS. BEHRENS:  Thank you.

2                          **JEFF ELEVELD,**

3    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

4    FOLLOWS:

5                        DIRECT EXAMINATION

6    BY MS. BEHRENS:

7    Q    Could you state your name again for the Jury, please?

8    A    Jeff Eleveld.

9    Q    And by whom are you employed?

10   A    I'm a Special Agent with the Bureau of Alcohol, Tobacco,

11   Firearms and Explosives.

12   Q    How long have you been employed with ATF?

13   A    Over 13 years.

14   Q    And in the 13 years that you've been employed by ATF,

15   have you been involved in a particular type of investigation?

16   A    Mainly firearms.

17   Q    Okay.  And when you were first hired by ATF, did you

18   undergo any training?

19   A    Yes.

20   Q    And what was that?

21   A    Basic criminal investigator school at the federal academy

22   and then advanced ATF training.

23   Q    And approximately how long did that training take?

24   A    Both were about six months.

25   Q    And did that training include how to identify firearms

1    and how to operate firearms?

2    A    Yes.

3    Q    And in your 13 years with ATF, investigating primarily

4    firearms, did you also develop additional experience in

5    identifying and operating firearms?

6    A    Yes.

7    Q    Approximately how many times would you say you've

8    identified a firearm in the 13 years you've been with the --

9            MR. JIMERSON:  Your Honor, I'm going to -- let me at

10   this point object to his number of times, and for purposes of

11   speeding up this matter, I can stipulate to his credentials,

12   Mr. Eleveld's numbers.  I can stipulate to that if that's what

13   you're trying to establish.

14           THE COURT:  Well --

15           MS. BEHRENS:  I am trying to establish his

16   credentials, Your Honor, but I'd prefer the Jury to hear it.

17           THE COURT:  Yeah, I'm going to overrule the

18   objection.  You can -- I mean I think she's entitled to do

19   this.

20           MR. JIMERSON:  Yes, ma'am.

21           THE COURT:  Okay.

22           MS. BEHRENS:  Thank you.

23   Q    (By Ms. Behrens) So can you approximate how many times

24   you've identified and operated a firearm in the 13 years

25   you've been with ATF?

1    A     It's thousands.

2    Q     Now, I'm using the term "firearm"; you're aware that

3    there is a specific federal definition for what a firearm is?

4    A     That's correct.

5    Q     Can you tell the Jury what that definition is, please?

6    A     Sure.  It's any weapon, to include a starter gun, which

7    will or is designed to or may be readily converted to expel a

8    projectile by the action of an explosive.

9    Q     And how do you go about determining whether a weapon

10   meets the definition of a firearm; that is, how do you

11   determine whether a weapon is capable of expelling a

12   projectile by the action of an explosive?

13   A     Usually, we do what's called a test-fire.

14   Q     And what does that mean?

15   A     Basically, what it is is we would remove the projectile

16   from a live round of ammunition as well as the gunpowder and

17   then we insert that shell into the weapon and then pull the

18   trigger.  If the firing pin hits the primer and activates the

19   primer, we call that a properly functioning weapon.

20   Q     And, therefore, then it would meet the definition of a

21   firearm under federal law, is that correct?

22   A     That's correct.

23   Q     Now, in the past few years with ATF, have you also been

24   given a more specific responsibility?

25   A     Yes.

1   Q     And what is that?

2   A     I'm considered a Certified Nexus Expert.

3   Q     And what does a Certified Nexus Expert do?

4   A     We're -- we're trained to determine where a firearm has

5   been manufactured.

6   Q     Did that require additional training?

7   A     Yes.  ATF has a nexus school.  It's about a week long.

8   Q     You attended that?

9   A     Yes.

10  Q     And that was, you said, approximately two years ago?

11  A     I believe it was March of 2012.

12  Q     And since becoming an examiner, a nexus examiner for ATF,

13  how many firearms approximately have you examined for purposes

14  of determining where the firearms are manufactured?

15  A     Over 50 but probably less than 100.

16  Q     And have you testified as an expert before in the area of

17  nexus determination?

18  A     Yes.

19  Q     Okay.  And how -- explain for the Jury how you go about

20  determining where a firearm is manufactured.

21  A     I first start with the actual firearm, the markings on

22  the firearm as well as the serial number, and that's basically

23  your -- your starting point.  From there, we use resources --

24  public, private, commercial as well as ATF, information that

25  only ATF has.

1  Q    In your capacity as a firearms examiner and a Certified

2  Nexus Examiner, did you -- did the United States Attorney's

3  Office ask you to examine two weapons in the case of United

4  States against Daryl Warren?

5  A    Yes.

6  Q    And, specifically, were you asked to examine two weapons

7  to determine, first, whether they met the definition of a

8  firearm under federal law and, second, to determine where

9  those two weapons were manufactured?

10 A    That's correct.

11         MS. BEHRENS:  Your Honor, may I approach the witness?

12         THE COURT:  You may.

13         MS. BEHRENS:  Your Honor, for the record, as

14 Mr. Stevens established, this firearm has been rendered

15 inoperable, and there's no ammunition with it.

16 Q    (By Ms. Behrens) Agent Eleveld, I've just handed you

17 what's already been admitted into evidence as Government's

18 Exhibit 33.  Do you recognize that exhibit?

19 A    Yes.

20 Q    And if we could just try and keep the gun pointed toward

21 the back, that would be great.

22 A    Oh, sorry.

23 Q    I mean I know it's inoperable, but it's my own

24 personal --

25 A    No.  That's my fault.

1    Q    No.  That's all right.

2    A    I'm used to being alone when I do this.

3    Q    No.  That's quite all right.

4    A    Yes, I recognize it.

5    Q    Okay.  And how is it you're able to recognize it?

6    A    From the markings on the weapon, the serial number, and

7    then my signature on the evidence tag.

8    Q    And is this one of the weapons you were asked to examine

9    by the United States Attorney's Office in this case?

10   A    Yes.

11   Q    You mentioned a serial number.  Can you tell the Jury,

12   please, what that serial number is?

13   A    Yes.  It's going to be X, as in X-ray, 777949.

14   Q    And you mentioned the serial number is one of the ways

15   you're able to tell this was the firearm you examined

16   previously?

17   A    Yes.

18   Q    Okay.  Were you also able to determine the make, model,

19   and caliber of that weapon?

20   A    Yes.  This is a --

21   Q    Okay.  Go ahead.  Sorry.

22   A    It's a Hi-Point Model JCP 40 S&W caliber.

23   Q    Okay.  Now, were you asked to determine with respect to

24   Government's Exhibit 33 whether or not that weapon is a

25   firearm, meaning was it capable of expelling a projectile by

1    the action of an explosive?

2    A    Yes.  I test-fired this weapon.

3    Q    Okay.  And when you test-fired it, you described for us

4    earlier how you go about doing that.  Is that how you

5    test-fired this particular weapon?

6    A    Same exact way.

7    Q    And after you test-fired it, what were you able to

8    conclude?

9    A    That it functioned as designed.

10   Q    And with respect to Government's Exhibit 33, were you

11   also able to determine where it was manufactured?

12   A    Yes.

13   Q    And how did you go about doing that?

14   A    Starting with the markings on the gun as well as the

15   serial number and then referencing the material that's

16   available to us.

17   Q    And you mentioned markings.  I noticed when I was looking

18   at it that there's a marking on there that says Iberia, Ohio.

19   Is that something that you considered?  Is that right, first

20   of all?  Do I have that right?

21   A    Yeah, that's correct.

22   Q    Is that one of the markings you -- you -- you mean when

23   you just said you start with that?

24   A    Yeah, that's correct.  Most firearms are required to put

25   a place of manufacture, and that's a starting point; however,

1    not all guns that are marked -- like in this case, this says

2    Iberia, Ohio.  On some other guns, they might be marked one

3    way, but they might be actually manufactured at another

4    location.

5    Q    In those situations, is typically the marking on the

6    firearm the parent company --

7    A    Usually --

8    Q    -- of that firearm?

9    A    -- yes.

10   Q    But in this particular case, it does say Iberia, Ohio, on

11   it, is that correct?

12   A    That's correct.

13   Q    And you mentioned it was a starting point.  Were you able

14   to determine where in fact this firearm was manufactured?

15   A    It was manufactured in Ohio.

16   Q    And that was based on your experience and training as a

17   nexus firearm examiner?

18   A    That's correct.

19   Q    Let me take that weapon from you, and I'll hand you this

20   one, if I could please.  Thank you.  Agent Eleveld, I've now

21   handed you what's already been admitted into evidence as

22   Government's Exhibit 31.  Do you recognize that exhibit?

23   A    Yes.

24   Q    And how were you able to recognize that exhibit?

25   A    From the markings and the serial number and then my

1    signature on evidence tag.

2    Q    Okay.  And can you tell me again, what is the serial

3    number on that, please?

4    A    That's going to be 18279178.

5    Q    And can you also -- were you also able to determine the

6    make, model, and caliber of this particular weapon?

7    A    Yeah.  This is a Ruger Mini-14, and the caliber is .223.

8    Q    Okay.  Now, were you able to determine whether or not

9    this weapon was capable of expelling a projectile by the

10   action of an explosive?

11   A    Yes.

12   Q    And how did you do that?

13   A    The same way with the handgun, using a live round, taking

14   out the projectile and the powder.

15   Q    And after test-firing it in that manner, were you able to

16   conclude whether this weapon was able to operate as designed?

17   A    Yes, it was.

18   Q    And as a result, are you able to conclude that it meets

19   the definition, federal definition of a firearm?

20   A    Yes.

21   Q    Did you also examine this firearm for the purpose of

22   determining where it was manufactured?

23   A    Yes.

24   Q    And you mentioned earlier that you start with the

25   markings on the firearm, is that correct?

1    A    That's correct.

2    Q    Is that what you did in this case?

3    A    Yes.

4    Q    Now, in this case, it states a place?

5    A    Yes.

6    Q    Is not it stamped on?  What is that?

7    A    It has Southport, Connecticut.

8    Q    Okay.  And is in fact based upon -- did you then do

9    additional research to determine whether this weapon was

10   manufactured in Southport, Connecticut?

11   A    Yes.  This is the example of having the stamp of one

12   state but it's actually manufactured in another location.

13   Q    Okay.  And where were you able to conclude based upon

14   your experience and training that this particular firearm was

15   manufactured?

16   A    This one was manufactured in New Hampshire.

17   Q    Now, let me ask -- I'll take that from you, so you don't

18   have to stand there and keep holding it up.

19   A    I could switch it to there.

20   Q    Thank you.  Now, with respect to these two weapons, Agent

21   Eleveld, when did you conduct your examination approximately?

22   A    I think it was around February 10th I finished.

23   Q    You had not seen either of these firearms prior to that

24   date, had you?

25   A    No.

1  Q    And you -- other than examining these firearms for the

2  purposes we asked, you were not involved in the investigation

3  against Daryl Warren, were you?

4  A    No, I was not.

5  Q    And then let me ask just a couple of final questions.

6  With respect to the two weapons you were asked to example --

7  asked to examine, specifically, Government's Exhibit 31 and

8  33, based on your training and experience, do you have an

9  opinion whether those two firearms meet the federal definition

10  of firearm?

11  A    Yes.

12  Q    And what is that opinion?

13  A    They both would be classified as firearms.

14  Q    Okay.  And do you also have an opinion as to whether

15  those two weapons, Government's Exhibit 31 and 33, are

16  manufactured outside of the state of Missouri?

17  A    They both were manufactured outside the state of

18  Missouri.

19          MS. BEHRENS:  Okay.  Thank you.

20          Your Honor, I have no further questions for this

21  witness.

22          MR. JIMERSON:  No questions, Your Honor.

23          THE COURT:  All right.  You may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may call your next witness.

1          MR. STEVENS:  Thank you, Judge.  At this time, the

2     Government would offer a stipulation.

3          Can I have just a moment, Judge?

4          THE COURT:  Sure.

5          MS. BEHRENS:  Your Honor, may I approach?  May we

6     approach?

7          THE COURT:  Yeah, you may.

8      (A bench conference was held on the record and outside of

9     the hearing of the Jury as follows:)

10          MS. BEHRENS:  The first thing I think he's going to

11     enter is the stipulation.

12          THE COURT:  The *Old Chief* stipulation?

13          MS. BEHRENS:  The *Old Chief*, I believe, but then we

14     need to -- he's going to do 404(b) after that.  I did not

15     provide to you in our packet of instructions the one given

16     during trial.

17          THE COURT:  Yeah.

18          MS. BEHRENS:  I do have the one we've submitted to

19     you if you want to use that as a starting point.  No?

20          THE COURT:  I've got it.

21          MS. BEHRENS:  I just wanted to make sure.

22          THE COURT:  It hasn't changed since this book.

23          MS. BEHRENS:  Well, it hasn't changed.  The question

24     I have for you, though, is the 404(b) that we submitted to

25     you, the instruction for afterwards, also includes, pursuant

1    to the case law that I found, that it's offered for the

2    purposes but it's also offered for the purpose of determining

3    whether the defendant had a propensity to participate in

4    crime.  It's one of the elements we have to prove, so it's

5    offered for that purpose as well.  Do you know what I'm saying

6    with respect to --

7              THE COURT:  Yeah.

8              MS. BEHRENS:  But an entrapment -- the entrapment

9    instruction is given.

10             THE COURT:  Yeah.  No.  I understand.

11             MS. BEHRENS:  Okay.

12             THE COURT:  The problem is the Jury doesn't need to

13   know that unless the entrapment decision is given --

14             MS. BEHRENS:  Correct.

15             THE COURT:  -- or instruction.

16             MS. BEHRENS:  So we don't have to give it.  I guess I

17   was just wondering in terms of what -- then that's fine.  We

18   can leave that out now and then decide whether it's going to

19   be given later.  I don't think it's going to make really a

20   difference at this point.

21             THE COURT:  Yeah, I mean I -- you know --

22             MS. BEHRENS:  I just wanted to make you aware of it.

23             THE COURT:  Yeah, I mean it, obviously, does go to

24   that issue, and so I just -- yeah, I think -- I think I'll

25   just give the standard 404(b) --

1          MS. BEHRENS:  Okay.

2          THE COURT:  -- limiting instruction at this time.

3          MS. BEHRENS:  And that standard 404(b) doesn't

4    include the actual -- I know in our one that we submit to you

5    at the end of trial or that we give to the Jury or you give to

6    the Jury from the trial contains the actual convictions in it,

7    or do you need that information here, or are you just going to

8    go with what --

9          THE COURT:  I'm just going to use the general one.

10          MS. BEHRENS:  Okay.  Thank you.

11          MR. STEVENS:  Judge, what I intend to do right now is

12    do the felon stipulation.  I have the instruction for that.  I

13    don't know if you read that at the time --

14          THE COURT:  Yeah.

15          MR. STEVENS:  -- as far as we've agreed on this.

16          THE COURT:  Yeah.

17          MR. STEVENS:  And so I was going to offer that, and

18    then I was going to offer the 404(b) evidence.

19          THE COURT:  I'll read this beforehand, and then after

20    that, then I'll read the 404(b) one.  Okay?

21          MR. STEVENS:  All right.  Thank you.

22          MS. BEHRENS:  Thank you, Judge.

23     (The following proceedings were held within the hearing

24    of the Jury.)

25          THE COURT:  Oh, yeah.  Sorry.  I just told you I

1    would do this.

2          Members of the Jury, the Government and the Defendant

3    Daryl Warren have stipulated, that is they've agreed, that

4    certain facts are as counsel are about to state to you.  He's

5    going to read you a stipulation.  You must, therefore, treat

6    those facts as having been proven without any further

7    evidence.  You may read the stipulation.

8          MR. STEVENS:  Thank you, Your Honor.  Your Honor, I

9    offer Government's Exhibit 44, the stipulation of facts.

10         THE COURT:  All right.  It's received into evidence.

11         MR. STEVENS:  May I publish, Judge?

12         THE COURT:  You may.

13         MR. STEVENS:  Thank you.  This is Government's

14   Exhibit 44, a stipulation of facts in *United States versus*

15   *Daryl Warren*.  The parties hereby agree and stipulate that the

16   following --

17         THE COURT:  Slow down.

18         MR. STEVENS:  I'm sorry.

19         THE COURT:  The court reporter is still taking it

20   down.

21         MR. STEVENS:  Yes.

22         -- the following facts are true and are to be

23   accepted as proven in this case:  That before June 5, 2013,

24   Defendant Daryl Warren was convicted of one or more felony

25   crimes, that is crimes punishable by imprisonment for a term

1   exceeding one year.

2          And it's signed by myself, Mr. Jimerson, and the

3   Defendant.  Thank you, Judge.

4          THE COURT:  All right.  Hold on just a second.

5   Sorry.  Just a moment.

6          All right.  Members of the Jury, the next thing

7   you're going to hear is you're going to hear some evidence

8   from the Government that the Defendant has certain prior

9   convictions, and you may consider this evidence of the -- the

10  nature of these prior convictions only if you unanimously find

11  it is more likely true than not true, and this is a lower

12  standard than proof beyond a reasonable doubt.  You decide it

13  by considering all the evidence and deciding what evidence is

14  more believable.  If you find this evidence is more likely

15  true than not true or that it has been proved, then you may

16  consider it to help you decide the Defendant's motive,

17  opportunity, intent, plan, and knowledge.  You should give it

18  the weight and value you believe it is entitled to receive.

19  If you find that it has not been proved, you must disregard

20  it.  Remember that even if you find that the Defendant may

21  have committed a similar act in the past, this is not evidence

22  that he committed such an act in this case.  You may not

23  convict a person simply because you believe he may have

24  committed similar acts in the past.  He's on trial only for

25  the crime charged here, and you may consider the evidence of

1    prior acts only on the issues of -- that I have stated above.

2           You may --

3           MR. JIMERSON:  Your Honor, before he -- may I -- if I

4    can renew my objection motions to that matter?

5           THE COURT:  Yes, the objection is renewed, and the

6    ruling is the same.

7           You may proceed, Mr. Stevens.

8           MR. STEVENS:  Thank you, Your Honor.  I would offer

9    Government's Exhibits 38, 39, 40, 41, and 42.

10          THE COURT:  All right.  And those Exhibits 38, 39,

11   40, 41, and 42 are received into evidence over the objection

12   of the Defendant.

13          MR. STEVENS:  Thank you, Your Honor.  And those

14   are -- Government's Exhibit 38 is a certified record of the

15   22nd Judicial Circuit Court, City of St. Louis, State of

16   Missouri, and Government's Exhibit 38 indicates on the

17   Judgment possession of a controlled substance, two counts on

18   which Mr. Warren was convicted on August 24 of 2007.  It

19   indicates on the second page, on each of Counts I and II, a

20   sentence of 15 years, suspended execution of sentence, and a

21   period of five years of supervision by the Missouri Bureau of

22   Probation and Parole, and that is August 24 of 2007.

23          Government's Exhibit 39, a certified record of the

24   United States District Court for the Eastern District of

25   Missouri, in *United States versus Daryl Warren*, Case No.

1    4:06-CR-287, a conviction for felon in possession of a firearm

2    in violation of 18 United States Code § 922(g)(1).  The date

3    of that conviction and Judgment, July 20th of 2007, the

4    Honorable Jean C. Hamilton.  On this second page, it indicates

5    a sentence of 24 months' imprisonment in the United States

6    Bureau of Prisons and upon release from imprisonment a term of

7    supervised release of two years.  That is July 20 of 2007.

8         Government's Exhibit 40 is a certified record, again,

9    from the 22nd Judicial Circuit Court, City of St. Louis, *State*

10   *versus Daryl Warren*.  This is dated July 2nd of 2001.  These

11   are convictions for trafficking, second degree, and possession

12   of a controlled substance.  On July 2nd of 2001 are the dates

13   of the convictions.  On each of those counts, a term of seven

14   years in the Missouri Department of Corrections.  The

15   indictment page indicates that that was -- the trafficking,

16   the drug trafficking count, was in regards to cocaine base, a

17   controlled substance, and that is Government's Exhibit 40.

18        Government's Exhibit 41, also a certified record from

19   the Missouri -- strike that -- from the 22nd Judicial Circuit

20   Court, State of Missouri.  This shows a conviction, May 17th

21   of 1999, possession of a controlled substance.  Defendant

22   initially was sentenced to a suspended imposition of sentence

23   and two years of probation.  On July 2nd of 2001, the

24   probation was revoked, and this Defendant was sentenced for

25   possession of a controlled substance to seven years in the

1    Missouri Department of Corrections.

2              And, finally, Government's Exhibit 42, the other --

3    from the same dates, this is a certified record of the 22nd

4    Judicial Circuit Court, State of Missouri, again, May 17 of

5    1999, the same date as the previous.  Possession of a

6    controlled substance, cocaine base, is the conviction in *State*

7    *versus Daryl Warren*.  The Defendant was sentenced to two years

8    of probation.  On July 2nd, 2001, that probation was revoked

9    and Mr. Warren was sentenced to seven years in the Missouri

10   Department of Corrections.

11             Your Honor, that concludes the Government's evidence

12   pursuant to Rule 404(b).

13             THE COURT:  All right.

14             MR. STEVENS:  May I have just a moment, Judge?

15             THE COURT:  You may.

16             MR. STEVENS:  May we approach, Judge?

17             THE COURT:  You may.

18             MR. STEVENS:  Thank you.

19         (A bench conference was held on the record and outside of

20   the hearing of the Jury as follows:)

21             MR. STEVENS:  Judge, subject just to making sure that

22   we have the exhibits in that we want in, I am prepared to

23   rest.

24             THE COURT:  Okay.  And then what do we need to do

25   next?

74

1          MR. JIMERSON:  Well, first of all, Judge, I'd like

2    to -- I'll renew my objection regarding 404(b) information.

3          THE COURT:  Yeah.

4          MR. JIMERSON:  And I just want to stand clear on

5    that, and after Mr. Stevens read that, Judge, I particularly

6    want to ask this Court for a mistrial based on that.  I

7    understand your ruling, Judge, but based on after reading it,

8    I think it's unduly prejudicial to that even given your

9    instructions.

10          Once they rest, I'll make my motion for judgment of

11    acquittal, Judge.

12          THE COURT:  Okay.  And then do you expect to present

13    evidence?

14          MR. JIMERSON:  I want to --

15          THE COURT:  I mean I know you --

16          MR. JIMERSON:  I probably want to make a record.  He

17    has not -- because we've gone back and forth -- and I've

18    expressed this to Mr. Stevens -- about his testifying, and so

19    probably outside of the Jury, I may want to put him on the

20    stand and see what he wants to do, Judge, but at the last I

21    heard, he did not.  After probably this, probably he does, so

22    I'm not sure.

23          THE COURT:  Okay.  What I'd like to do is spend some

24    time working on jury instructions over the lunch hour, so it's

25    11:20 now.  I think what I'd like to do is tell the Jury to

1   come back at 1:00.

2            MR. JIMERSON:  Yes, ma'am.

3            THE COURT:  And then hope by then we can have

4   everything done, and if he's going to testify, he'll testify.

5   We can then -- after his testimony, we can take another short

6   break and do a final record on any instructions.

7            MR. JIMERSON:  Okay.

8            THE COURT:  And then -- you know.  And so I'll hear

9   your argument and everything once the Government rests in

10  front of the Jury.

11           MR. STEVENS:  Thanks, Judge.

12           THE COURT:  And you can clean up your exhibits if you

13  left anything out.  I don't think you did based on my --

14           MR. STEVENS:  No.

15           THE COURT:  -- review of it, but you can double-check

16  that over the lunch hour.

17           MR. STEVENS:  Thank you.

18           MR. JIMERSON:  Thank you.

19      (The following proceedings were held within the hearing

20  of the Jury.)

21           THE COURT:  Mr. Stevens or Ms. Behrens.

22           MS. BEHRENS:  No.  It's Mr. Stevens.  I'm sorry.  I

23  was just trying to clear it.

24           MR. STEVENS:  Yes, Judge.

25           THE COURT:  You can proceed.

1        MR. STEVENS:  Thank you, Judge.  The Government has

2  finished its evidence, and at this time, the Government rests.

3        THE COURT:  All right.

4        MR. STEVENS:  Thank you.

5        THE COURT:  Members of the Jury, we're going to take

6  a longer lunch hour right now because of procedural things we

7  have to do at this stage in the case.  I want to remind you of

8  the instruction I gave you earlier that you should not discuss

9  this case among yourselves or with anyone else during this or

10  any other recess or communicate about it in any way and that

11  you should keep an open mind until the case is actually

12  submitted to you, which is not happening right now.  The --

13  I'm going to give you a little longer lunch hour because we

14  need to do this, so I'm going to ask you to be back at 1:00

15  p.m., and then we will see you all, so the Jury is excused

16  until 1:00 p.m.  And, again, just leave your notebooks here on

17  the chair.

18     (The following proceedings were held outside the hearing

19  and presence of the Jury.)

20        THE COURT:  All right. You all may be seated.

21        Mr. Jimerson, you may --

22        MR. JIMERSON:  Thank you, Your Honor.  Your Honor, at

23  this time, I'd like to move for a motion for judgment of

24  acquittal at the close of the Government's evidence.  I ask

25  for leave to file a written motion to that.  Judge, I don't

1    believe the Government's proven their evidence beyond a

2    reasonable doubt at this point, and particularly, given

3    certain motions -- I mean objections I made prior to, we ask

4    that -- that you grant our motion to dismiss for judgment of

5    acquittal.

6              THE COURT:  All right.  And I will note that you --

7    at sidebar, you did ask for a mistrial based on the 404(b)

8    evidence or the prior conviction evidence, and I am denying

9    that motion.  With regard to your motion for acquittal, I am

10   denying that as well at this time.  It's not necessary for me

11   for you to do a written motion, but if you wish to, I'm not

12   going to keep you from it --

13             MR. JIMERSON:  Yes, ma'am.

14             THE COURT:  -- and so -- but I am denying the motion,

15   subject, of course, to your right to reraise it at a later

16   time if necessary --

17             MR. JIMERSON:  Yes, ma'am.

18             THE COURT:  -- or appropriate.  Okay.

19             MR. JIMERSON:  Thank you, Your Honor.

20             THE COURT:  All right.  Now we need to talk about

21   jury instructions.  I know you emailed the jury instructions

22   to us, but I asked you last night to also bring a printed copy

23   for me and defense counsel.  Did you do that?

24             MR. JIMERSON:  Your Honor, may I say something, too,

25   as well?

1          THE COURT:  Yeah.

2          MR. JIMERSON:  I don't know whether you want to get

3    into this now or a little later after Mr. Stevens answers your

4    question, but regarding my movement with my case as to what

5    Mr. Warren wants to do.

6          THE COURT:  I thought I'd let you all talk about that

7    over lunch and tell me when we come back at -- have you all

8    come back about 10 minutes to 1:00.

9          MR. JIMERSON:  Yes, ma'am.

10         THE COURT:  And then we can discuss it then.  That

11   way, you and he can talk.

12         MR. JIMERSON:  Yes, ma'am.  Thank you.

13         MS. BEHRENS:  Your Honor, I'm sorry.  I did not hear

14   the request to bring copies, so she'll make copies and bring

15   one to your chambers and give --

16         THE COURT:  Well, it will be a lot faster for me to

17   just go do it myself.  Why don't you stay here.  I don't want

18   anybody to leave.  I want to start talking about these.

19         MS. BEHRENS:  Okay.

20      (Court recessed from 11:23 a.m. until 11:27 a.m.)

21         THE COURT:  All right.  Mr. Jimerson.

22         MR. STEVENS:  Judge, would you mind if I excuse

23   myself to go upstairs?  Ms. Behrens is going to handle the

24   instructions.

25         THE COURT:  Yeah, I don't -- I mean, no, you can do

 1    what you want.

 2              MR. STEVENS:  All right.  Thank you.

 3              THE COURT:  It's your case.  All right.  Let's go off

 4    the record.  Well, let's stay on the record.  Ms. Behrens, do

 5    you have your instructions we can go over?  Oh, you're going

 6    to get your copy, too.

 7              MS. BEHRENS:  Well, I had a copy I sent up to have

 8    copies made for Mr. Jimerson, so she was -- I didn't realize

 9    you were going to make a copy.  No, that's okay.  We can -- do

10    you -- you don't have the copy I gave you?

11              THE COURT:  Okay.  Stop.

12              MS. BEHRENS:  We can do it --

13              THE COURT:  Just don't talk.  We're on the record.

14    When you talk like that, the court reporter doesn't know if

15    you're supposed to be on the record or not.  Please --

16              MS. BEHRENS:  Okay.

17              THE COURT:  -- don't talk to each other when we're on

18    the record.  Talk to me.  All right.  Now, so we have a

19    package of instructions, and these, the Government has

20    modified these based on what it thinks should happen as the

21    case now stands, right?

22              MS. BEHRENS:  Yes.  Basically, the only

23    modifications -- we're taking all references to Mr. Washington

24    out.

25              THE COURT:  Okay.  Before we go through the -- the --

1    the sort of normal boilerplate and the things that you already

2    did, Mr. Jimerson, as I understand it, before trial, you filed

3    a proposed jury instruction requesting an entrapment

4    instruction, correct?

5              MR. JIMERSON:  Yes, ma'am, I did.

6              THE COURT:  And I know that your client -- your case

7    isn't finished yet, so we'll need to make -- I'm not going to

8    rule on this, but I'd like to hear everyone's arguments about

9    that now, and then if you need to modify them once you know,

10   you know, depending if your client does testify --

11             MR. JIMERSON:  Yes, ma'am.

12             THE COURT:  -- then you could add any further ones

13   you want, but tell me why you believe an entrapment

14   instruction is warranted in this case.

15             MR. JIMERSON:  Well, sure, Your Honor.  I believe

16   that my client has -- my client's case has been met regarding

17   the entrapment instruction.  I'm just talking without looking

18   at construction itself right now.  It has been met,

19   particularly, when you're talking about, you know, questions

20   were presented to the agents about whether or not he was

21   induced and, you know, whether or not Mr. Warren said he

22   didn't want to be involved with the case.  We have all that,

23   Judge, and I believe in front of the Jury.  This is a case

24   basically where, you know, I think you have Mr. -- Special

25   Agent Zayas, who, in my opinion, is overly aggressive.  I mean

1    even though he denies it, you know, I know conduct is not a

2    part of the entrapment.  Outrageous conduct is not a part of

3    it, but basically, he's overly zealous about it.  He's pushing

4    people.  He's pushing my client towards saying yes and no.  We

5    get into all type of nomenclature about "Are you cool with

6    that?  Are you hip with it?" whatever, whatever they said, but

7    I'm trying to say my client believes that he's been entrapped,

8    and if -- if necessary, you know, then he will actually take

9    the stand and -- and -- and -- and say that, Judge, but I

10   believe that we've established that at least a jury can

11   consider as to whether or not that instruction should be

12   considered in terms of -- they should deliberate on it,

13   rather, because of the inducement, the -- his opportunity to

14   get out of it, and -- and I think Special Agent Zayas

15   continually pushing, pushing, pushing, you know, and whether

16   or not we have everything that's listed on the CDs or not,

17   okay, I still believe there's sufficient information on those

18   CDs that I can argue, that I can present to the Jury that that

19   is something that they overstepped their bounds with, and I

20   believe that he's entitled to that defense, Judge, and that's

21   what I'm trying to say.

22            THE COURT:  Okay.  And so does the Government --

23   what's the Government's position on this request?  And, again,

24   I'm not going to make any final rulings right now.  I just

25   want to hear your arguments on the request.

1          MS. BEHRENS:  Excuse me.  May I just -- do you have

2     your proposed instruction on this?

3          MR. JIMERSON:  I'll try and find it.

4          MS. BEHRENS:  I'm sorry.

5          THE COURT:  Yeah.  It --

6          MS. BEHRENS:  Unfortunately, Mr. Stevens -- I

7     apologize, Your Honor.  Mr. Stevens took the instruction

8     packet with him when he went to prepare for his closing

9     argument.  Just from a factual standpoint to start with,

10    though, without even getting to the instruction, Your Honor, I

11    believe the evidence was very clear from Agent Zayas'

12    testimony repeatedly that he gave Mr. Warren repeated

13    opportunities in which to back out, in which to say, "I'm

14    really not interested in this," and in fact, I think the

15    standard phrase that Agent Zayas used was, "I was escalating

16    the level of violence repeatedly through all of the different

17    factual scenarios for the purpose of making it such that we

18    didn't want a person that was going to be interested in doing

19    this that might be down on their luck," which is, I think,

20    what Agent Zayas said, and so --

21         THE COURT:  Yeah, I mean this all goes to -- I

22    understand what you're saying about what he said, but really,

23    the issue of whether I give this instruction, because it is

24    normally an issue of -- it's a question of fact for the Jury

25    unless there's no -- not sufficient evidence to support it,

1    and as I understand it, the things that are important are

2    whether the government induced the conduct and whether the

3    Defendant was, you know, predisposed to commit the crime, and

4    so the instruction that the Defendant proposed is based on

5    901, and so those are the two parts of -- I'd really like to

6    hear the Government's position and argument, and I realize --

7    I'm going to give everybody a chance to argue this again, and

8    I'm not going to rule now, but I thought we could get some way

9    along the way if I knew what your position was, so -- and the

10   issues of, you know, inducement and willingness to commit the

11   crime, predisposition as we refer to it --

12          MR. STEVENS:  Yes, Judge.

13          THE COURT:  -- what do you believe is -- I mean I'd

14   like to hear your position on that.

15          MR. STEVENS:  Yes, Judge.  Thank you.  Regarding the

16   first element, the inducement, Judge, the Eighth Circuit has

17   said in *United States versus Bugh* -- and I cited this to the

18   Court in my pretrial response to Mr. Jimerson's motion --

19   that's Eighth Circuit, 2012 -- that a defendant must

20   demonstrate more than the government solicit --

21          THE COURT:  Slow down.

22          MR. STEVENS:  I'm sorry.

23          -- soliciting, requesting, or approaching him with an

24   opportunity for illegal conduct to establish inducement, and

25   in this case, I would point out, Judge, what we have here --

1    it's interesting with this particular Defendant -- as Agent

2    Zayas testified, he didn't approach Mr. Warren.  When

3    Mr. Warren showed up on June 3rd, he had no idea who he was.

4    It was Mr. Washington that introduced Mr. Warren as someone

5    who could do this home invasion robbery, and so that's how

6    Mr. Warren was introduced.  That certainly goes to the second

7    element of predisposition.  It also goes to the inducement in

8    that he came to Agent Zayas, and then on June 4th and 5th, he

9    came back again to Agent Zayas, and they had these

10   conversations.  Agent Zayas testified that not once did he

11   ever say he didn't want to do this robbery, and what he did

12   is -- is, you know, offer him an opportunity, and, again,

13   according to the *United States versus Bugh*, "It's well settled

14   that the government use artifice, stratagem, and undercover

15   agents in pursuit of criminals," and that's what happened

16   here, and it wasn't anything beyond that, so I don't think

17   this Defendant could even show inducement in this case given

18   the circumstances of how he was introduced into this

19   undercover operation.  The government did not bring him in.

20   The government talked to Robert Washington.  Robert Washington

21   brought him in, and then he met with Agent Zayas on three

22   occasions, coming back each time.

23          Regarding the -- the second element, predisposition,

24   it's clear also from the case law that one way we determine

25   predisposition -- and as I already pointed out, he was

1    introduced as the person who could do this home invasion

2    robbery.  There's already this case moving forward with, "Are

3    you interested in a home invasion robbery?"

4             "Yeah.  Let me introduce you to the guys I know who

5    can do this."

6             And that's when Mr. Warren shows up.  I think that

7    goes to predisposition.

8             Secondly, certainly, his prior convictions go to

9    predisposition as well, and in *United States versus Coleman*,

10   *284 F.3d 892*, Eighth Circuit, 2002, the Eighth Circuit

11   affirmed the admission of prior bad acts to show his

12   predisposition to those bad acts, and that's -- we have those

13   in this case here, and so -- and what the Eighth Circuit has

14   held is that even if a defendant can show inducement, if there

15   is evidence also of predisposition, then he's not entitled to

16   an instruction.  In *United States* --

17            THE COURT:  One of the questions I have to you is

18   that -- is the predisposition to do what.  To possess drugs?

19            MR. STEVENS:  Possess drugs as well as -- as well as

20   a firearm.

21            THE COURT:  Yeah, and so you're saying the

22   predisposition is just to -- limited to the elements of the

23   crime and not to the nature of this?

24            MR. STEVENS:  Well, some of the case read more

25   generally that it's simply a criminal predisposition, that

1    what the court says is --

2         THE COURT:  Yeah, I guess that's what I'm getting at

3    is sort of the flip of that.

4         MR. STEVENS:  Uh-huh.

5         THE COURT:  It's -- if -- do you have to deal with --

6    I mean, is there an argument that, well, even though you might

7    have shown predisposition to possess narcotics, controlled

8    substances, to possess firearms, what you're -- you know, this

9    case is based on a -- the thing that was being proposed as the

10   crime was this potentially violent home invasion robbery.

11   You've said "home invasion robbery" at least 50 times during

12   the course of these two days.  I'm exaggerating.  You've

13   probably said it 15 times, and so do you need to -- does there

14   need to be evidence that he would be predisposed to do some

15   kind of -- this kind of a violent home invasion type robbery,

16   or is it sufficient that he, you know, might have been a guy

17   who stood on a street corner and sold a rock of crack cocaine?

18        MR. STEVENS:  Well, Judge, the cases indicate that

19   when you're talking about -- when you talk about inducement as

20   well as predisposition, they talk about not wanting the

21   government to convince an unsuspecting citizen to commit a

22   crime and -- but what they also say is that it's not

23   prohibited to -- to offer an opportunity to an unsuspecting

24   criminal to commit that crime, and those cases suggest that

25   criminal predisposition of just about any generic kind is

1    sufficient.  In this case, though, to take it one step

2    further, what we have from the prior convictions is

3    predisposition to do crimes very similar to the charged crimes

4    in this case, and I think under any standard that is -- that's

5    sufficient predisposition.  In *United States versus Cooke,*

6    *675 F.3d 1153*, Eighth Circuit, 2012, the court stated -- and I

7    quote -- "The evidence shows that Cooke was predisposed to

8    commit the crime.  The court did not err in refusing to give

9    the entrapment instruction."  And there, the court relied in

10   part on the fact that the defendant had prior convictions.

11   And so I think -- in this case, I think it's clear that the

12   government did little more than offer an opportunity to this

13   particular Defendant who was introduced as someone who could

14   do this kind of crime and who had all these prior convictions

15   and they offered him that opportunity and that doesn't rise to

16   the level of inducement.  Secondly, all of those things go

17   also to his predisposition, and if there's either one of

18   those, either a lack of inducement or predisposition, then

19   he's not entitled to a jury instruction.

20         THE COURT:  All right.  And any response,

21   Mr. Jimerson?

22         MR. JIMERSON:  Sure.  Thank you, Your Honor.  Yes.

23   In fact, I believe it is important that -- that you look at

24   the -- the predisposition level.  In fact, if you look at it,

25   basically, the Government's whole reliance was on violent

1   crimes.  That's -- you know, and the Court, you mentioned

2   that.  Basically, that was mentioned over and over again.  The

3   history that were read even though we objected to it -- the

4   history that was read in the 404 had -- had -- doesn't say

5   anything regarding that in terms of his propensity to commit

6   robberies or use assault weapons or anything of that nature,

7   and I believe that to -- to take that and just stretch it

8   broadly, as the Government wants to do, if you were driving on

9   license suspended and get a felony charge out of it, if it's

10  on that level, then you're a predisposed person.  I don't

11  believe it's that sweeping, and I believe that the language is

12  limited to predisposition to commit these types of crimes, and

13  I believe that that's the thing, but, Judge, factually, you

14  heard and one of the arguments that the Government had was,

15  well, he wasn't approached.  Well, in fact, he was.  In fact,

16  this Officer Zayas, Special Agent Zayas, kept talking about

17  his girlfriend got to move, "We've got to do these things.

18  Come on, man.  Let's do this thing," whatever.  Now you're

19  talking --

20          THE COURT:  So you're arguing that even though it was

21  Mr. Washington who initially brought him to Mr. Zayas that he

22  could still show inducement because of the things he said to

23  him?

24          MR. JIMERSON:  Yes.  And, in fact, you know,

25  inducement doesn't have to -- and I don't have a case to say

1    that, but inducement doesn't have to necessarily be the

2    initial thing.  In fact, Washington was the initial person,

3    but -- but the government then took over.  In fact, you heard

4    Special Agent Zayas say that, "I took control of this."  You

5    know, these -- these confidential informants, they've sold

6    Mr. Washington some cocaine, and now, all of a sudden, after

7    that, he said, "I took it from that point because I was

8    looking at" -- so the inducement actually did come from --

9    Mr. Warren's inducement came from Detective Zayas because he

10   said to him, you know, he mentioned, and if you listen back to

11   the tapes, "I'm going to get half the dope.  I'm going to do

12   this and that.  You're going to give half to my CIs,"

13   whatever, and so I think there was something there that he's

14   pushing Mr. Warren into doing, Judge, so I don't think it's as

15   clear-cut as the Government is trying to make, so there's no

16   inducement.  I believe clearly the facts support that, and if

17   the facts support that, I believe it's a factual issue for the

18   Jury to determine that, Judge, in terms of whether there was

19   inducement then from that standpoint.  Your Honor, I believe

20   there's sufficient information there, you know, and you have

21   instruction there, and I just talked about number one and two,

22   whether or not he's going to do this on his own, I mean, so

23   without that, and you've heard that basically without this,

24   nothing was going to happen.  In fact, his history shows

25   nothing has happened like that.  Okay.  Other than the fact he

1   has these priors that was mentioned in the 404(b), 404

2   information, but nothing has happened like that to say he

3   would have done this on his own.  We don't have that proof,

4   and the Government's trying to take a giant leap here to

5   achieve that, and I believe they can't, Judge.  Thank you.

6          THE COURT:  All right.  Well, I'm going to continue

7   to take this under submission until we've finished all the

8   evidence in the case.  I just wanted to hear what the parties

9   had to say on these basic issues.  Now, on the -- do you all

10  know as you sit here now -- oh, there was also -- are you

11  still requesting a withdrawal instruction, or do you expect

12  to?

13         MR. JIMERSON:  Judge, I expect to submit it, but I

14  expect --

15         THE COURT:  Right.  So I'll tell you now I won't give

16  the withdrawal instruction because I believe the law is clear

17  that if it's -- this instruction is not appropriate unless

18  it's a conspiracy that involves -- that requires overt acts,

19  and even if -- even if it -- I mean there were overt acts

20  committed in this case even though this statute doesn't

21  require them, and I also don't think there's a -- I don't

22  think the evidence would support it, so I'll just tell you

23  right now that's my definitive ruling on that.

24         MR. JIMERSON:  Yes, ma'am.

25         THE COURT:  I'll mark the one you submitted as

1    offered by Defendant and refused and put it in the court file.

2            MR. JIMERSON:  Yes, ma'am.

3            THE COURT:  What other areas of controversy do we

4    have?  I mean a lot of it is just checking the form

5    instructions for the rest of it and making sure they're

6    appropriate.  Do you know of any other major issues?

7            MS. BEHRENS:  I'm not aware of any, Your Honor, no.

8            MR. JIMERSON:  No, ma'am.

9            THE COURT:  Okay.  Mr. Jimerson, you'll have -- I'm

10   going to take a recess.  I'd like you all to be back here at

11   10 'til 1:00, since I told the Jury to be back at 1:00.  At

12   that time, I'll ask the Defendant to tell me about his

13   decision whether to testify.  I also will -- if he -- if the

14   decision is that he won't testify, we'll try to wrap things up

15   and get this to the Jury very quickly after that.  And we will

16   have -- again, I'll expect it will be the 20-minute

17   presumption.  You all can give the clerk your -- how much

18   warnings you want.

19           MR. STEVENS:  I'm sorry.  I didn't mean to interrupt.

20           THE COURT:  Yeah.  Go ahead.

21           MR. STEVENS:  I would -- I'd request 30 minutes if I

22   could.  I know that this case has moved pretty quickly, but

23   we've got a conspiracy count here, a lot of elements, and I

24   would just ask for 30 minutes to argue, just 10 additional

25   minutes, just to give me sufficient time to be able to deal

1   with the elements of the conspiracy.  There's a long

2   instruction regarding that, and I'd like to be able to do some

3   explanation of that to the Jury as I go through my -- go

4   through my evidence.

5           THE COURT:  I'll -- I'll take that under

6   consideration, too, but probably you're only going to get 20.

7           MR. STEVENS:  All right.

8           THE COURT:  Okay.  So, you know, I'll think about it,

9   but I don't -- I don't know.  This case took less than a day

10  to get all the evidence in, so I'm not sure that it requires a

11  long argument, but I will -- I will think about that.  Okay.

12  What I'd like you to do -- both counsel -- is look over these

13  instructions.  I don't suppose the Government could prepare me

14  a clean copy without that tail on the end?

15          MS. BEHRENS:  Oh, absolutely, Your Honor.

16          THE COURT:  Okay.  Can you email that to me before 10

17  minutes 'til 1:00?

18          MS. BEHRENS:  Yes, Your Honor.

19          THE COURT:  And bring clean copies for everybody.

20          MS. BEHRENS:  I can do that as well.

21          THE COURT:  And then we can -- well, I tell you

22  what -- never mind.  You don't have -- get one prepared and

23  email it to me.  I don't know if we'll use it or not.

24          MS. BEHRENS:  All right.

25          MR. JIMERSON:  I've got a clean copy if you need it

1   as well, Judge.

2          THE COURT:  Okay.  And yours are short, so I can --

3   that's easy, too.  Yeah, if you have a clean copy, we could

4   put that in, in theirs.

5          So here's the thing.  Mr. Warren, we're taking a

6   break right now.  You have a constitutional right to testify

7   in this case.  You also have a constitutional right not to

8   testify.  If you decide not to testify, I will, if you want me

9   to, tell the Jury that they cannot even consider that in any

10  way or discuss it in any way, and that is the law that the

11  Jury cannot consider it and the prosecutor cannot argue it;

12  however, you also have the right to testify.  This is the one

13  decision -- well, there are two.  One is whether you're going

14  to plead guilty or not, and the other one is whether you're

15  going to testify once you have pleaded not guilty, but this is

16  a decision that you -- is personal to you, for you to make.

17  You need to talk to your lawyer, take his -- you know, listen

18  to his legal advice, but the ultimate decision whether to

19  testify is entirely up to you.  He can't keep you from

20  testifying if you want to do that, and so when we come back at

21  10 'til 1:00, I'm going to ask what the decision is, and we'll

22  make a record of that.

23         MR. JIMERSON:  Yes, ma'am.

24         THE COURT:  Okay.  So court's in -- anything else I

25  need to know right now?

1              MR. JIMERSON:  No, ma'am.

2              THE COURT:  Okay.  Court's in recess until 10 'til

3    1:00.

4         (Court recessed for lunch from 11:46a.m. until 12:49p.m.)

5         (The following proceedings were held outside the hearing

6    and presence of the Jury.)

7              THE COURT:  All right.  Are we ready to resume,

8    Mr. Jimerson?

9              MR. JIMERSON:  We are, Your Honor.

10             THE COURT:  Okay.  Are you going to present evidence?

11             MR. JIMERSON:  No, we're not.  Mr. Warren has

12   indicated he does not wish to testify.

13             THE COURT:  All right.  Mr. Warren, your lawyer has

14   indicated you're exercising your right not to testify in this

15   case and that you do not want to testify, is that correct?

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  And you understand it's your right to do

18   so if you want to?

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  And -- yeah.  And you're giving up that

21   right and agreeing not to testify?

22             THE DEFENDANT:  Yes, ma'am.

23             THE COURT:  All right.  Thank you.

24             Any further record you wish to make?

25             MR. JIMERSON:  No, Your Honor, not in regard to

1    that --

2              THE COURT:  Okay.

3              MR. JIMERSON:  -- but I guess Mr. Stevens is going to

4    make an announcement at this point.

5              THE COURT:  Okay.

6              MR. STEVENS:  That I am?

7              MR. JIMERSON:  No.  Okay.  I'm sorry.  At this point,

8    I'd like to make a motion for judgment of the -- judgment of

9    acquittal at the close of all the evidence, Judge.

10             THE COURT:  Okay.

11             MR. JIMERSON:  On the same grounds I spoke about

12   earlier.

13             THE COURT:  All right.  And I will deny that on the

14   same grounds.  I don't think there's been any showing that the

15   government committed entrapment as a matter of law or that

16   they failed to make a submissible case, and so I will deny the

17   motion for judgment as a matter of law.

18             MR. JIMERSON:  Yes, ma'am.

19             THE COURT:  I will tell you I am troubled by the

20   government conduct in this case, as I think everybody is who

21   hears about this, because it is such a -- it's unusual in our

22   district.  Certainly, we've had a lot of undercover

23   operations, a lot of things of this nature, you know,

24   different types of things where someone asks someone to sell

25   them drugs, et cetera.  There's two aspects of this that

1    bother me.  The first one is just the sort of obvious one that

2    everybody would have when they hear about this case, that

3    there's -- that it was just made up out of whole cloth, that

4    there were no drugs, there were no drug dealers, there was no

5    stash house, and that it's -- you know, that's a -- that's the

6    first thing that sort of is a visceral reaction, and I'm --

7    I'm not sure legally it makes a difference.

8         The other thing is on the entrapment I haven't found

9    many entrapment cases that deal with an entrapment to

10   conspire.  There wasn't actually a crime finished here.  The

11   only crime was the conspiracy.  In most of the entrapment

12   cases, someone really did go forward with a completed crime, a

13   choate crime, if you will, not an inchoate crime like

14   conspiracy, so it's a little unusual, and that is troubling,

15   but I'll hear more arguments about the entrapment.  Actually,

16   before we do that, I'd like to talk about all the

17   instructions, and my first question to the Government is, are

18   you withdrawing your request for a mandatory minimum on Count

19   I and the finding of drug quantity because there's nothing in

20   your instructions that reflects that?

21        MR. STEVENS:  The -- the five-kilogram quantity?

22        THE COURT:  Yeah.

23        MR. STEVENS:  That should be reflected in --

24        MS. BEHRENS:  It wasn't in the original.

25        MR. STEVENS:  Oh, I'm -- it should be, Judge, as

1   count -- as element four of that, that the -- in excess of

2   five kilograms of cocaine.

3          THE COURT:  Well, that was my question.

4          MR. STEVENS:  Yes.

5          THE COURT:  The instructions didn't contain that, and

6   I do -- the ones you proposed, but I mean that's fine if

7   that's what -- I mean I think you've submitted sufficient

8   evidence to submit on that.  Let me then ask you how you think

9   it should be submitted because, as you know, there's a couple

10  of different ways it can be done.  In the *Shepherd* case, which

11  was actually my case, the Eighth Circuit suggested it was

12  harmless error to submit as a special interrogatory, but in

13  later cases, they've sort of ignored that case.  In our

14  district, we seem to think it's important.  I thought they

15  were wrong at the time and still do.  I think it should go on

16  special interrogatories.  It's easier for the jury to

17  understand, but I don't want -- I'm not going to force that if

18  anybody thinks it should go the other way, where you go

19  through all the lesser included stuff.

20         MR. STEVENS:  Well, Judge, I would just ask that it

21  be the fourth element of the crime.

22         THE COURT:  Okay.  And then that way, if they don't

23  find the "more than five kilograms", then he would be not

24  guilty.

25         MR. STEVENS:  That's right.

1          THE COURT:  Okay.  So we'll just add it as a fourth

2    element of the crime.  So there's no lesser included things to

3    worry about?

4          MR. STEVENS:  Yes.

5          THE COURT:  Okay.  That's easy to add.

6          All right.  Then let's go through.  Well, let's talk

7    about the Defendant's requested entrapment instruction.  I --

8    you know, in looking at all these cases, you know, so many

9    cases say that this is a question of fact for the jury,

10   although there are some cases where they've said that it

11   should not have been submitted or didn't have to be, it wasn't

12   error not to submit it, and those deal with the element of

13   inducement.  I understand the arguments here that -- from the

14   Government's point of view -- that he was not brought to the

15   deal initially by the government agent but, rather, by

16   Mr. Washington, but there's no evidence before the Jury about

17   what Mr. Washington did to bring him there, is there?

18         MR. STEVENS:  No, Judge, just that he introduced him

19   as an individual who could do this home invasion robbery.

20         THE COURT:  Well, what did he say that said, "This is

21   somebody who can do the home invasion robbery"?

22         MR. STEVENS:  Well, they had previously met and had a

23   conversation regarding that, and then when Daryl Warren shows

24   up there on the lot, as Agent Zayas testified, he --

25   basically, there's a discussion about, "Are these the guys?

1    Yes, these are the guys."  You know, those are the guys that

2    he had told him about who could do the home invasion robbery,

3    and what he testified to is that they were introduced as those

4    people.

5            THE COURT:  Yeah, I guess -- I guess I don't know --

6    you know, we don't know if -- there's no evidence that would

7    say that Mr. Washington didn't bring him there saying

8    something else, you know, "We're going to meet some guy who's

9    going to sell me a car" or "Let's go sit in his car and talk

10   about it," and then all of a sudden, the agent starts talking

11   about all this other stuff.  I mean, is there any evidence --

12   we don't know what went on between Washington and Warren, do

13   we?

14           MR. STEVENS:  Well, we -- when they first get in the

15   Cadillac and start discussing it, as we played on that tape,

16   they first get in the Cadillac, and Agent Zayas turns to

17   Mr. Warren and Mr. Twitty and says, "He's already, you know,

18   explained this to you," and then he goes on and goes through

19   it in more detail, and again, he's testified that they were

20   introduced as the people who could do this home invasion

21   robbery.

22           THE COURT:  Well, but I mean with Mr. Warren sitting

23   there, at least on the tapes I saw, I didn't hear

24   Mr. Washington saying, "Here's the guy who can do this home

25   invasion robbery."

1          MR. STEVENS:  No.  That's right.

2          THE COURT:  He said, "Here's the guys" or something

3    like that.

4          MR. STEVENS:  Yes.  But he -- when -- when -- as soon

5    as Agent Zayas launches into then the issues with the home

6    invasion robbery, I mean, there's no -- you know, there's no

7    indication by anybody about "What are you talking about?" or

8    "We don't know what you mean" or any of that kind of thing.

9    Instead, the response, as I've argued, is, "You know, well,

10   how many -- how many dudes are in the house?  Where's the area

11   at?"  They get into the discussion about the trap car.

12         THE COURT:  On the very first day, was there any -- I

13   mean, there was not a lot of discussion about that stuff,

14   right?

15         MR. STEVENS:  No.  On June 3rd, the first meeting in

16   which Mr. Warren attended, that was most of the discussion.

17         THE COURT:  They didn't talk about a trap car.

18         MR. STEVENS:  On that day, they did, yes.

19         THE COURT:  They did?

20         MR. STEVENS:  Yes.

21         THE COURT:  A trap car?

22         MR. STEVENS:  Agent Zayas offered them a trap car.

23   Mr. Twitty said, "No, we've got a car," but then Daryl Warren

24   said, "Well, it's got a trap in it?"  And he said, "Yeah, it's

25   got a trap.  I can show it to you."

1          THE COURT:  And that was the first conversation on

2   the 3rd?

3          MR. STEVENS:  Yes, exactly.

4          THE COURT:  Okay.

5          MR. STEVENS:  That first conversation, Judge, from

6   the get-go, they get into the car, and he asks if Washington

7   has told them about this and then says, "Okay.  Well, here's

8   the situation."

9          THE COURT:  But does Warren say, "Yes"?  He doesn't

10  say anything, does he?

11         MR. JIMERSON:  He doesn't say anything.

12         MR. STEVENS:  I don't recall.

13         THE COURT:  Okay.

14         MR. STEVENS:  I don't recall him saying anything, but

15  he then -- I mean that first meeting, those first two minutes

16  in the car, Agent Zayas launches immediately into the scenario

17  and goes entirely through it.

18         THE COURT:  Okay.

19         MR. JIMERSON:  Well, Judge, we can't guess as to what

20  Mr. Washington said, and -- and -- but based on what we heard,

21  nothing was said, I mean, other than Mr. Warren is there.

22  He's there, but Mr. Stevens wants to argue, you know, that,

23  basically, well, he must have said something because you're

24  sitting here now and, therefore, you must have understood

25  everything, and I think we just can't take that leap.

1          MR. STEVENS:  Judge, I think you have an interesting

2    point about the conspiracy, and I understand your concern

3    regarding that, but I would also point out that that kind of

4    cuts both ways in that, you know, inducement to commit a

5    conspiracy -- obviously, a charged conspiracy can't be between

6    Agent Zayas and the Defendant.  It's the Defendant and the

7    other individuals, and, you know, it's -- it's -- I don't know

8    how we could establish inducement for him to conspire with

9    these other individuals or for them to conspire with him.

10         THE COURT:  Is it your position that -- and I know

11   we've talked about the withdrawal instruction.  Is it your

12   position that after the first meeting the crime was already

13   completed, he couldn't -- he couldn't have withdrawn after

14   that first meeting, having that first conversation was

15   sufficient?

16         MR. STEVENS:  Yeah, the -- the -- I mean the

17   agreement is made at that time, yes, and then the -- they

18   continue to come back each time.  So, yeah, after that first

19   meeting, as soon as there's an agreement, the conspiracy is --

20   is committed, and there is --

21         THE COURT:  So nobody can ever back out of a drug

22   conspiracy?  If somebody says, "Will you sell me some drugs?"

23   And you say, "Yeah," and then you call them back and say, "No,

24   I'm not," it doesn't matter; you're done?

25         MR. STEVENS:  That's the law.  It's the -- it's the

1   agreement.  Now, as a practical matter, would we bring that

2   case?

3           THE COURT:  Yeah, but that's -- that's not -- I mean

4   legally is the question.

5           MR. STEVENS:  Yeah.

6           THE COURT:  Have you seen any cases like that?

7           MR. STEVENS:  No, but -- I have not, but, you know, I

8   read the cases that are listed in the -- in the notes to the

9   instructions regarding the withdrawal, and it's very clear in

10  an 846 conspiracy you're not -- we're not required to prove

11  any overt acts at all and that you don't get the withdrawal

12  instruction for that reason.  There cannot be a withdrawal

13  from the agreement.  Either you entered the agreement or you

14  did not.

15          THE COURT:  You know, this is a really close case,

16  and I'm trying to separate out the -- you know, to look at the

17  inducement and what -- I'll tell you what.  I'm going to

18  submit it to the Jury on the entrapment, and the reason is

19  the -- there are so many cases that say it is a jury question,

20  and the Defendant does have an initial -- have to show there's

21  something that would show inducement, but I think the

22  Government's own evidence does show that and that a jury could

23  find inducement.  So I guess I'm going to do it.  I am really

24  not sure about this.  I have to tell you that.

25          MR. STEVENS:  If that is the case, Judge, could I

 1    have that additional 10 minutes to argue?

 2         THE COURT:  Yeah.

 3         MR. STEVENS:  Now I have to prove beyond a reasonable

 4    doubt the lack of entrapment.

 5         THE COURT:  Yeah, I will give you 30 minutes to

 6    argue.

 7         MR. STEVENS:  Thank you.

 8         THE COURT:  The -- and this is only a -- is this --

 9    this is only a defense to Count I, but then it would also be a

10    defense to Count II, of course, because Count II depends on

11    Count I, but it doesn't apply at all to Count III?

12         MR. JIMERSON:  No, not to Count III.  There's a

13    different argument for Count III, but you're talking about a

14    felon in possession of a weapon?

15         THE COURT:  Right.

16         MR. JIMERSON:  Okay.  That's a different argument for

17    that, but Counts I and II, that's what it applies to.

18         THE COURT:  The instruction that the Defendant

19    proposed for the entrapment, do you all have that in front of

20    you?

21         MR. JIMERSON:  Yes, ma'am.

22         THE COURT:  Okay.  Can you show it to defense

23    counsel -- I mean the Government counsel?

24         MR. JIMERSON:  Sure.

25         THE COURT:  Now, so, first of all, Mr. Jimerson, is

1    this the instruction that you think should be used?

2            MR. JIMERSON:  I think so, Your Honor, but I think

3    you just brought up a matter regarding the entrapment.

4            MR. STEVENS:  All three.

5            MR. JIMERSON:  Yeah, all three of them are included

6    in there, so I think we need to take out the felon in

7    possession of a weapon count regarding the entrapment.

8            THE COURT:  I think -- okay.  So I'm going to -- I

9    think it should say, "One of the issues in this" -- and this

10   is straight out of the Eighth Circuit Pattern Instructions,

11   right?

12           MR. JIMERSON:  Yes, ma'am.

13           THE COURT:  So what if I say, "One of the issues in

14   this case is whether the Defendant was" or maybe "One of the

15   issues in this case with regard to Counts I and II" --

16           MR. JIMERSON:  That's fine, Your Honor.

17           THE COURT:  -- "is whether the Defendant was

18   entrapped," and then each time it refers to the felon in

19   possession of a weapon, I take that out, so it would be -- the

20   next -- so it would read, "The Government has the burden of

21   proving beyond a reasonable doubt that the Defendant was not

22   entrapped by showing either, one, the Defendant was willing to

23   commit the conspiracy to distribute" -- isn't it "possess with

24   intent to distribute"?

25           MR. JIMERSON:  I kind of read it off the indictment,

1      I thought.

2            THE COURT:  Or is it both?

3            MR. STEVENS:  Yeah, we had both of those in the

4      indictment, Judge.  I've just elected for "possess with intent

5      to distribute."

6            THE COURT:  Okay.  So "Defendant was willing to

7      commit the conspiracy to possess with intent to distribute

8      cocaine and possess -- and to -- and to commit the crime

9      of" -- because the second -- Count II is not conspiracy.

10           MR. STEVENS:  No.  That's -- Count II would be

11     possession of a firearm in furtherance of a drug trafficking

12     crime.

13           THE COURT:  "And the Defendant was willing to commit

14     the conspiracy to possess with intent to distribute cocaine

15     and to commit the crime of possession of a firearm in

16     furtherance of a drug trafficking crime before he was

17     approached or contacted by law enforcement agents," et cetera,

18     and then make the same change, so "did not -- someone acting

19     for the government did not persuade or talk the Defendant into

20     committing conspiracy to distribute cocaine or possession of a

21     firearm in furtherance."  Or "and"?  Whatever.  Should that be

22     "or" or "and"?  You said "and" earlier.

23           MR. JIMERSON:  I think it's "or", isn't it?  Yeah,

24     it's "or".

25           THE COURT:  Okay.  So I'll make those changes.  Let's

1    go through the rest of the -- and I'll insert that.  You'll

2    need to tell me where you think it should go, but let's look

3    at the other instructions that have been provided.  The first

4    group -- I just want to go through them one at a time.

5    Instructions 1, 2, and 3 are just boilerplate, and those

6    are -- are there any objections to those on the third page?

7            MR. JIMERSON:  No, Your Honor.

8            THE COURT:  Okay.  The fourth page -- and I know you

9    all don't necessarily have page numbers on these, but the next

10   one is "In deciding what the facts are."  It has a tail that

11   says, "You should judge the testimony of a defendant."  Do you

12   see that one?

13           MS. BEHRENS:  And since he's not testifying --

14           THE COURT:  Since he didn't testify, I'll take that

15   out.

16           MR. JIMERSON:  Right, right.  Okay.

17           THE COURT:  And then the next one is the stipulation

18   one, and it says, "The Government and Defendant Daryl Warren

19   have stipulated."  Do you all have these in the same order

20   I've got them?

21           MS. BEHRENS:  I'm going to give him exactly -- yeah,

22   I'm going to give him the copy you have so he can see it in

23   the same order, Judge.

24           MR. JIMERSON:  Okay.

25           THE COURT:  Yeah, because it's -- this instruction,

1   which is the fifth one listed, says, "The Government and

2   Defendant Daryl Warren have stipulated, that is they have

3   agreed, that certain facts" -- and I changed it to say "are as

4   counsel stated to you" because it wasn't really correct the

5   way you had it.  It said "as they've just stated" and they

6   hadn't just stated it, right?  What was your proposal?  Would

7   you put yours on the ELMO, so I can see it?

8           MS. BEHRENS:  Yes.  This is what the amended package

9   was that I sent you, Judge.

10          THE COURT:  "Are as counsel have stated."  Yeah, is

11  that -- I mean, do you -- is that the better language -- "are

12  as counsel have stated"?

13          MS. BEHRENS:  I think so at this point, yes.

14          MR. JIMERSON:  No objection, Judge.

15          THE COURT:  Okay.  Okay.  That's how we'll do it, and

16  the next one is the expert witness, "Persons described as

17  experts"; any objection to that?

18          MR. JIMERSON:  That's fine.  That's fine.

19          THE COURT:  All right.  That will become Instruction

20  #6.

21          MS. BEHRENS:  The next instruction, Your Honor,

22  should be omitted.

23          THE COURT:  Yeah, I was going to say I hadn't heard

24  any evidence about statements.

25          MS. BEHRENS:  I'm sorry to interrupt.  It was there

1    just in case the Defendant testified and it become an issue.

2         THE COURT:  Okay.  Instruction 7 is the 404(b)

3    instruction, and given that we are -- I am going to instruct

4    on entrapment, this does have the entrapment language in it.

5         MS. BEHRENS:  Yes, Your Honor.

6         THE COURT:  And so this is how the Government thinks

7    it should be?

8         MS. BEHRENS:  I believe so, Your Honor.  I think it

9    needs to be separate and apart.  I think the law is clear that

10   we are allowed an instruction on criminal predisposition with

11   respect to the prior convictions.

12        THE COURT:  And so is this the right way to do it?

13        MS. BEHRENS:  As far as I can tell, Your Honor, from

14   the cases I've reviewed.

15        THE COURT:  Okay.  And then the next one says, "The

16   indictment" -- it leads in, "The indictment in this case

17   charges the Defendant with three different crimes," and I --

18   "Count I charges the Defendant with the crime of conspiracy

19   with -- to possess with intent to distribute," and I'll change

20   that to be --

21        MS. BEHRENS:  No, that's correct.

22        THE COURT:  Well, what about the quantity?

23        MS. BEHRENS:  Oh, correct, Your Honor, "over five

24   kilograms -- with intent to distribute over five kilograms of

25   cocaine"?

 1          THE COURT:  Yeah.  Yeah, "in excess of five kilograms

 2  of cocaine," and then the others are the same as are listed in

 3  the Government's draft, and then at the -- at the -- at the

 4  bottom of that page, that instruction does have a tail on it

 5  that is -- says, "There is no burden upon the Defendant to

 6  prove that -- that he is innocent.  Instead the burden of

 7  proof remains on the Government throughout the trial.  The

 8  fact that a defendant did not testify must not be considered

 9  by you in any way or even discussed in arriving at your

10  verdict."  And the way these usually work is that we can

11  give -- it's -- it's the Defendant's option, and we could

12  include the first two sentences alone or all three sentences,

13  and so, Mr. Jimerson, what do you want?

14          MR. JIMERSON:  Your Honor, I believe all three would

15  be appropriate for Mr. Warren.

16          THE COURT:  Okay.

17          MR. JIMERSON:  All three sentences would be

18  appropriate for Mr. Warren.

19          THE COURT:  All three sentences?

20          MR. JIMERSON:  Yes, ma'am.

21          THE COURT:  Okay.  That's fine.

22          All right.  And then the next instruction is the

23  reasonable doubt instruction.  Any objection to that?

24          MR. JIMERSON:  No objection.

25          THE COURT:  Okay.  And then the next instruction is

1    the indictment, and it does include "possess with intent to

2    distribute in excess of five kilograms of a mixture or

3    substance containing a detectable amount of cocaine."  So is

4    there any objection to that instruction?

5            MR. JIMERSON:  No, ma'am.

6            THE COURT:  All right.  The next instruction lists

7    the federal statutes and including conspiracy, and it's just

8    the -- it's just the language of the statutes.  Any objection

9    to that?

10           MR. JIMERSON:  No objection, Judge.

11           THE COURT:  All right.  And then the next one is "The

12   indictment charges the offenses were committed on or about a

13   certain date."  Any objection to that one?

14           MR. JIMERSON:  No, ma'am.

15           THE COURT:  Okay.  The next one is the conspiracy

16   instruction, and --

17           MS. BEHRENS:  That first element --

18           MR. JIMERSON:  I think the first element needs to be

19   amended.

20           THE COURT:  Yeah.

21           MS. BEHRENS:  Well, no, actually, not the first

22   element.  We were going to put that as a fourth element, Your

23   Honor.

24           THE COURT:  Well, you know, that's -- yeah, you tell

25   me how it should be on a conspiracy charge.

1          MS. BEHRENS:  I believe it's a fourth element.

2          THE COURT:  Okay.  Here's -- hold on a second.  Yeah,

3     so it will be the fourth -- well, this is the possession with

4     intent to distribute as opposed to the conspiracy, or at least

5     that's the one I have.  Let me take a look.

6          MS. BEHRENS:  I believe it's probably one in the

7     same.

8          THE COURT:  I think it is, too.  Yep.  So it would

9     be -- so we would add a fourth element, and it would say,

10    "Four, the agreement or understanding involved five kilograms

11    or more of a mixture or substance containing cocaine"?

12         MR. JIMERSON:  Yes, ma'am.

13         MS. BEHRENS:  Yes, please.

14         THE COURT:  When you flip back to the indictment --

15         MS. BEHRENS:  Uh-huh.

16         THE COURT:  -- it doesn't say "five kilograms or

17    more"; it says "in excess of five kilograms," so should I

18    change that to be "in excess of five kilograms"?

19         MS. BEHRENS:  For consistency, Your Honor --

20         THE COURT:  Okay.

21         MS. BEHRENS:  -- to avoid confusion, that's -- I'm

22    not --

23         THE COURT:  Yeah, I'll just put "in ex" -- I think

24    that's -- I mean I think, I guess, in the indictment the

25    Government took on an additional burden that it didn't have,

1    right?  I think that's what you did.

2            MS. BEHRENS:  I came into this case late, Your Honor.

3            THE COURT:  Not your -- not your fault?

4            MS. BEHRENS:  I'm not making any representations at

5    this point.

6            MR. JIMERSON:  Okay.

7            THE COURT:  So it will read, "Fourth or four, the

8    agreement or understanding involved in excess of five

9    kilograms of a mixture or substance containing cocaine," and

10   then I'm -- the instructions say then list the instruction

11   number of next ones that are going to explain the elements,

12   and I just said, "The following instructions further explain

13   these elements" because I always forget to read the

14   instruction numbers and it's easier this way.

15           So that's -- so then the next couple of pages of the

16   Government's submission -- oh, well, no, wait.  We've got to

17   add entrapment to this.

18           MS. BEHRENS:  Yes.

19           THE COURT:  So where does entrapment go?

20           MS. BEHRENS:  Well, I think entrapment, Your Honor,

21   would go after Counts I and II, the instructions.

22           MR. JIMERSON:  Where are you?

23           THE COURT:  Well, actually, the entrapment

24   instruction in the Pattern Instruction says we need to modify

25   the verdict director to say -- what you're supposed to do is

1    say something like -- yeah, I need to say -- when it says, "If

2    you find" -- it should say, "If you find these four elements

3    have been proved beyond a reasonable doubt" -- I don't think

4    we need to say "as to the Defendant" because he's the only one

5    here.

6            MR. JIMERSON:  Yes, ma'am.

7            THE COURT:  "And if you find unanimously and

8    beyond" -- yeah, here's -- here's what the Pattern says in the

9    2013 version, and I'm adding in the entrapment stuff.  "If you

10   find these four elements unanimously and beyond a reasonable

11   doubt and if you find unanimously and beyond a reasonable

12   doubt that the Defendant was not entrapped as defined in

13   Instruction blank," which I will have to put the number in,

14   "then you must find the Defendant guilty of the crime charged

15   in Count I," and so that is -- is that language acceptable to

16   the Government?

17           MS. BEHRENS:  Yes.

18           THE COURT:  Okay.  All right.  And then should we --

19   then the elements -- the descriptions of the -- well, how

20   should we modify the others because now we've got four

21   elements and we only --

22           MS. BEHRENS:  Well, I'm not sure -- well, hmm?  I'm

23   not entirely sure, Your Honor, that an explanation needs to be

24   given to the fourth because that's a fairly concrete --

25           MR. JIMERSON:  Well --

1          MS. BEHRENS:  You disagree?

2          MR. JIMERSON:  Yeah, yeah.

3          MS. BEHRENS:  I'm sorry.  I didn't mean to talk

4    directly to you.

5          THE COURT:  Okay.  Hold on a second.  Let's take -- I

6    need to -- I did not grab that instruction out of the new

7    Pattern.  Let me see if I can pull it up quickly.

8          MS. BEHRENS:  I have an extra copy here.

9          THE COURT:  Do you have it of the -- do you have the

10   846 of the 2013 Pattern?  Go ahead and just -- you can put it

11   on the ELMO, and that way you can show it to defense counsel

12   at the same time.

13         MS. BEHRENS:  He has a copy as well.

14         THE COURT:  Okay.  Show me.  Show me what it says

15   with regard to --

16         MS. BEHRENS:  Now you're asking for, Your Honor, the

17   one that explains?

18         THE COURT:  Yeah.  And what I'm really asking for is

19   on the -- the actual -- no, I want the one before that.

20         MS. BEHRENS:  Okay.

21         THE COURT:  And there's not one on -- yeah -- no.  I

22   actually meant the -- I wanted the book.  I didn't want what

23   you proposed.

24         MS. BEHRENS:  Oh, I don't have the book.  I'm sorry.

25         THE COURT:  Well, it's not in a book.  It's online.

1    Hold on just a second.  Let me see if I can pull it up.

2            MS. BEHRENS:  I misunderstood.

3            THE COURT:  I ought to be able to.  Almost there.

4    Sorry.  This is taking me longer than I thought.  I'm pulling

5    this up now, and it's probably not going to help me out, but

6    let me see if it does.  Okay.  Hold on just a second.  I'll be

7    right back.

8            MR. JIMERSON:  Yes, ma'am.

9        (Court recessed from 1:21 p.m. until 1:24 p.m.)

10           THE COURT:  Okay.  I'm sorry I didn't notice this

11   before.  The Government, in its proposed conspiracy

12   instructions, used the conspiracy instructions for a 371, 18

13   U.S.C. § 371 conspiracy, and not for a drug conspiracy.  If

14   we're basing it on the Pattern, I mean, I don't think it's

15   substantively wrong actually, but there are -- if you'll look

16   at your proposal, it's based on 5.06 something or other.

17           MS. BEHRENS:  Okay.  5.06A-1.

18           THE COURT:  Okay.  And the ones dealing with 846

19   conspiracies are based -- found in the Pattern Instructions at

20   6.21.846A, and then it doesn't include all that explanation

21   about the elements.

22           MS. BEHRENS:  Okay.

23           THE COURT:  So is there any -- let me show you what

24   it is.  It's the same as in the previous book.

25           MR. JIMERSON:  It might be easier.  Yeah.  Thank you.

 1           THE COURT:  I mean if you want to see what the 5.06

 2   says, you can flip to that one and you'll see it, the

 3   difference.  This one doesn't start out with "It's a crime for

 4   two or more people to agree."  It just starts out with the

 5   elements.  5.06A-1, I think, was the one you were using.  And,

 6   again, that's the --

 7           MS. BEHRENS:  Well, yeah, because 5.0 --

 8           THE COURT:  Which one do you think is correct,

 9   Ms. Behrens?

10           MS. BEHRENS:  Well, 5.06 has overt acts in the

11   instruction.

12           THE COURT:  Yeah.

13           MS. BEHRENS:  A-1.  I'm sorry.  I'm looking at A.

14           THE COURT:  Okay.  Let's go off the record for a

15   second.

16       (Off record discussion.)

17           THE COURT:  Okay.  Let's quickly go back on the

18   record then, and I think we can do this.

19           THE CLERK:  Judge, the Defendant just stepped out.

20           THE COURT:  I'm sorry?  Oh, the Defendant's gone.

21   It's okay.  This is legal, so it's all right, but thank you

22   for telling me.

23       (Defendant reenters courtroom.)

24           THE COURT:  Now he's back, yeah.

25           Okay.  So we are on the instruction involving the

1    conspiracy verdict directing instructions, and the issue was

2    that the one submitted by the Government was based on a

3    Pattern for a different conspiracy statute, and we think the

4    one we should do is based on the Pattern Instruction

5    6.21.846A.1, and so what it will read would be "The crime of

6    conspiracy as charged in Count I of the indictment has four

7    elements, which are, one, on or before June 5th, 2013, two or

8    more people reached an agreement to commit the crime of

9    possession with intent to distribute in excess of five

10   kilograms of a mixture or substance -- of" --

11        MS. BEHRENS:  Does it have the quantity in this one?

12        THE COURT:  No, it doesn't.  Just say -- yeah, in --

13   yeah, that's right.  So that would say, "One, on or before" --

14   you're right -- "on or before June 5th, two or more people

15   reached an agreement to commit the crime of possession with

16   intent to distribute cocaine; two, the Defendant voluntarily

17   and intentionally joined in the agreement either at the time

18   it was first reached or at some later time while it was still

19   in effect; three, at the time the Defendant joined in the

20   agreement the Defendant knew the purpose of the agreement;

21   and, four, the agreement or understanding involved in excess

22   of five kilograms of a mixture or substance containing

23   cocaine."

24        And then it would say, "If you find these four

25   elements unanimously and beyond a reasonable doubt and if you

1    find unanimously and beyond a reasonable doubt that the

2    Defendant was not entrapped as defined in Instruction Number

3    blank, then you must find the Defendant guilty of the crime

4    charged in Count I.  Otherwise, you must find the Defendant

5    not guilty of the crime charged in Count I."

6         And then we will follow that with the instruction

7    based on Pattern Instruction 5.06B, which explains

8    conspiracies and includes the -- it says, "The Government must

9    prove that the Defendant reached an agreement or understanding

10   with at least one other person.  The agreement or

11   understanding need not be an express or formal agreement or be

12   in writing or carry out all the details."  It goes on.  It

13   also talks about you aren't in a conspiracy just by being

14   present, and so you have to consider all of these things.

15        So let me go add those, and you can look at it, but

16   that's, I think, what we've agreed we'll do, and let's just --

17   and then we would not give the one that was the next one that

18   goes through the elements of -- you know, that explains the

19   elements.

20        Then the next one that the Government proposed is the

21   one that starts out "If you determine that an agreement

22   existed and the Defendant joined the agreement, then acts and

23   statements knowingly done by a member of the agreement during

24   the existence may be considered."  Do you want that

25   instruction still?

1          MR. STEVENS:  I would, Judge, yeah.

2          THE COURT:  Okay.  And what about the bracketed

3    language that says, "Acts and statements which are made before

4    the conspiracy began"?  I don't think that really has any

5    relevance, does it?

6          MR. STEVENS:  No.

7          THE COURT:  Okay.  Do you have any objection to this,

8    Mr. Jimerson?

9          MR. JIMERSON:  Just to the language "acts or

10   relevance," Judge, but I think you're taking it out --

11         THE COURT:  Yeah.

12         MR. JIMERSON:  -- so that's fine.

13         THE COURT:  And then the next one is the verdict

14   directing instruction on Count II, which is the "possessing a

15   firearm in furtherance of the drug trafficking crime," and

16   that one is based on the standard.  Is there any objection?

17         MR. JIMERSON:  No objection, Your Honor.

18         THE COURT:  Oh, and, actually, what we'll do is we'll

19   put the entrapment before that one, right?

20         MR. JIMERSON:  That will work.  That's fine, Your

21   Honor.

22         THE COURT:  The entrapment will go after Count I

23   elements.

24         MS. BEHRENS:  Here's where I'm a little confused then

25   because when you all were talking earlier -- maybe I

1    misheard -- I thought you were saying entrapment with respects

2    to Counts I and II.

3            MR. JIMERSON:  Yeah, you're right, I and II but not

4    three.

5            THE COURT:  Thank you.  So it will go after Count II?

6            MS. BEHRENS:  I think so, Your Honor.  That's fine.

7            MR. JIMERSON:  That's fine.

8            THE COURT:  Okay.  And I'll add that language about

9    "and unless" -- yeah, okay, I know what we're doing.

10           MR. JIMERSON:  That's fine.

11           THE COURT:  Okay.  And then the next one is Count

12   III, the elements and the definition of firearm and the

13   interstate commerce, correct?  So any objection to that one?

14           MR. JIMERSON:  No objection, Your Honor.  That's

15   fine.

16           THE COURT:  The next one is "Regarding Counts II and

17   III of the indictment, the Government must prove the Defendant

18   possessed a firearm.  The issue of who actually owned the

19   firearm is not relevant to the issue of whether Defendant

20   possessed the firearm."  Any objections to that?

21           MR. JIMERSON:  No objection, Your Honor.

22           THE COURT:  Okay.  And then the next one is

23   "Regarding Count III, the mere knowing possession of a

24   firearm," et cetera.  Any objection to that one?

25           MR. JIMERSON:  No objection, Your Honor.

1           THE COURT:  And the next one is the several kinds of

2    possession -- actual, constructive, joint, and sole.  This is

3    the standard instruction.  Any objection?

4           MR. JIMERSON:  No, no objection, Your Honor.

5           THE COURT:  All right.  The next one is "Intent or

6    knowledge may be proved like anything else," and it goes on as

7    discussed.  Any objection to that one?

8           MR. JIMERSON:  No, ma'am.

9           THE COURT:  The next one, Mr. Jimerson, is "The law

10   does not require the prosecution to call as witnesses all

11   persons who may have been present."  Any objection to that

12   one?

13          MR. JIMERSON:  No objection.

14          THE COURT:  And then the final one is how to go about

15   deliberating.

16          MR. JIMERSON:  No objection, Judge.

17          THE COURT:  Okay.  And then the verdict form is the

18   verdict form that was proposed by the United States.  I didn't

19   see anything wrong with it.  Did you all see anything that

20   needed to be changed?

21          MR. JIMERSON:  It looked fine to me, Your Honor.

22          THE COURT:  Okay.  Here's what we'll do.  We're going

23   to make these changes.  We're going to tell the Jury that we

24   expect at 2:00 that we'll be ready for closing arguments.  I'm

25   going to have the clerk tell them that.

1          MR. JIMERSON:  Your Honor, before you withdraw, are

2  you making an on-the-record statement regarding the withdrawal

3  instruction?

4          THE COURT:  Right.  And I am stating at this point

5  that the withdrawal instruction offered by the Defendant is

6  refused.

7          MR. JIMERSON:  Yes, ma'am.

8          THE COURT:  Okay.

9          MR. JIMERSON:  Thank you.

10         MR. STEVENS:  Judge, if I could, at this point, I

11  would just formally object to the giving of the entrapment

12  instruction.  I don't think I did before, but for purposes of

13  the record, I would do so.

14         THE COURT:  All right.  And the Government's

15  objection to the entrapment instruction is noted for the

16  record.

17         So we will tell the Jury to be back at 2:00 and we

18  will begin closing arguments.  That way, maybe they'll know

19  that it won't be -- you know, I don't expect it to be another

20  really long time.  The other issue is, traditionally, you

21  know, I have given the instructions after all of the

22  arguments.  I've recently started doing something suggested by

23  another judge that some lawyers like, which is read all except

24  the very last "how to go about deliberating" instruction

25  before the arguments.  Do you all like that idea?

1          MR. STEVENS:  I think it's a very good idea.

2          MR. JIMERSON:  I prefer it, Your Honor.

3          THE COURT:  Okay.  And then I will bring you out a

4    clean copy of the instructions and the verdict form, and each

5    of you can use them any way you want, including putting them

6    on the ELMO if you want.

7          MR. STEVENS:  Thank you, Judge.

8          THE COURT:  So you're going to have 30 minutes to

9    argue, and you can give Brittany any warnings you want, you

10   know, for that.  Okay.

11         MR. JIMERSON:  Yes, ma'am.

12         MR. STEVENS:  All right.  Thank you.

13         MR. JIMERSON:  Thank you, Your Honor.

14         THE COURT:  We'll be right back.

15         They have to use 16.  You have to use 16 minutes on

16   your 30.

17         MR. STEVENS:  I think I'll do 20 and 10, if I can get

18   a 10-minute warning.

19         THE COURT:  Yeah.  Okay.  Sorry, class, but this was

20   all we had.

21      (Court recessed from 1:43 p.m. until 2:20 p.m.)

22      (The following proceedings were held outside the hearing

23   and presence of the Jury.)

24         THE COURT:  All right.  We just provided you each

25   with a copy of the final instructions along with the verdict

1    form, and if I find any typos as I go along, I'll simply

2    correct them as I go.  I think I got the essential points.  I

3    don't think there are any typos, but there could be.

4            So are we ready?

5            MR. STEVENS:  Yes, Judge.

6            MR. JIMERSON:  We are, Your Honor.

7            THE COURT:  All right.  You may bring in the Jury.

8            MR. JIMERSON:  Question --

9            THE COURT:  Yes.

10           MR. JIMERSON:  -- about the students -- are they

11   gone?

12           THE COURT:  They're gone.

13           MR. JIMERSON:  Okay.

14           THE COURT:  Although they may come back.  I don't

15   know what they're up to today.

16           MR. JIMERSON:  All right.

17           THE COURT:  So there's a possibility they might show

18   up, and if they do, just ignore them.

19        (The following proceedings were held within the hearing

20   and presence of the Jury.)

21           THE COURT:  Members of the Jury, we are now -- oh,

22   Members of the Jury, you have now heard all of the evidence in

23   the case, and so we are ready for the closing arguments of the

24   lawyers and the final instructions about the law.  As I told

25   you earlier, closing arguments are not evidence; they're

1    simply the lawyers' arguments to you about how they believe

2    you should view the evidence.

3            I will now give you some further instructions.  So,

4    members of the Jury, the instructions I gave you at the

5    beginning of the trial and during the trial remain in effect.

6    I now give you some additional instructions.

7            Can you make that just a little bigger, Brittany?

8    Yeah, thanks.

9            You must, of course, continue to follow the

10   instructions I gave you earlier as well as those I give you

11   now.  You must not single out some instructions and ignore

12   others because all are important.  This is true even though

13   some of those I gave you at the beginning of and during the

14   trial are not repeated here.  The instructions I'm about to

15   give you now are in writing and will be available to you in

16   the jury room.  I emphasize, however, that this does not mean

17   they are more important than my earlier instructions.  Again,

18   all instructions, whenever given and whether in writing or

19   not, must be followed.

20           It is your duty to find from the evidence what the

21   facts are.  You will then apply the law as I give it to you to

22   those facts.  You must follow my instructions on the law even

23   if you thought the law was different or should be different.

24   Do not allow sympathy or prejudice to influence you.  The law

25   demands of you a just verdict, unaffected by anything except

1   the evidence, your common sense, and the law as I give it to

2   you.

3       I have mentioned the word "evidence".  The evidence

4   in this case consists of the testimony of witnesses, the

5   documents and other things received as exhibits, and the facts

6   that have been stipulated, that is formally agreed to by the

7   parties.  You may use reason and common sense to draw

8   deductions or conclusions from facts which have been

9   established by the evidence in the case.

10      Certain things are not evidence, and I will list

11  those things again for you now.  One, statements, arguments,

12  questions, and comments by the lawyers representing the

13  parties in the case are not evidence.  Two, objections are not

14  evidence.  Lawyers have a right to object when they believe

15  something is improper.  You should not be influenced by the

16  objection.  If I sustain an objection to a question, you must

17  ignore the question and must not try to guess what the answer

18  might have been.  Three, testimony that I struck from the

19  record or told you to disregard is not evidence and must not

20  be considered.  Four, anything you saw or heard about this

21  case outside the courtroom is not evidence.  Finally, if you

22  were instructed that some evidence was received for a limited

23  purpose only, you must follow that instruction.

24      In deciding what the facts are, you may have to

25  decide what testimony you believe and what testimony you do

1   not believe.  You may believe all of what a witness said or

2   only a part of it or none of it.  In deciding what testimony

3   to believe, consider the witness' intelligence, the

4   opportunity the witness had to have seen or heard things

5   testified about, the witness' memory, any motives that witness

6   may have for testifying a certain way, the manner of the

7   witness while testifying, whether that witness said something

8   different at an earlier time, the general reasonableness of

9   the testimony, and the extent to which the testimony is

10  consistent with any evidence that you believe.  In deciding

11  whether or not to believe a witness, keep in mind that people

12  sometimes hear or see things differently and sometimes forget

13  things.  You need to consider, therefore, whether a

14  contradiction is an innocent misrecollection or lapse of

15  memory or an intentional falsehood, and that may depend

16  whether it has to do with an important fact or only a small

17  detail.

18         The Government and Defendant Daryl Warren have

19  stipulated, that is they have agreed, that certain facts are

20  as counsel have stated.  You must, therefore, treat those

21  facts as having been proved.

22         You have heard testimony from persons described as

23  experts.  Persons who, by knowledge, skill, training,

24  education, or experience, have become expert in some field may

25  state their opinions on matters in that field and may also

1  state the reasons for their opinions.  Expert testimony should

2  be considered just like any other testimony.  You may accept

3  or reject it and give it as much weight as you think it

4  deserves considering the witness' education and experience,

5  the soundness of the reasons given for the opinion, the

6  acceptability of the methods used, and all the other evidence

7  in the case.

8        You have heard evidence that Defendant Daryl Warren

9  was convicted of (a) two counts of possession of a controlled

10  substance, in St. Louis City Circuit Court, on August 24th,

11  2007; (b) felon in possession of a firearm, in the U.S.

12  District Court of the Eastern District of Missouri, on

13  July 20th, 2007; (c) drug trafficking, second degree, and

14  possession of a controlled substance, in St. Louis City

15  Circuit Court, on July 2, 2001; and (d) two counts of

16  possession of a controlled substance, in St. Louis City

17  Circuit Court, on May 17th, 1999.  You may consider this

18  evidence only if you unanimously find it is more likely true

19  than not true.  You decide that by considering all the

20  evidence and deciding what evidence is more believable.  This

21  is a lower standard than proof beyond a reasonable doubt.  If

22  you find this evidence has been proved, then you may consider

23  it to help you decide Defendant Daryl Warren's motive,

24  opportunity, intent, and knowledge.  You may also consider it

25  to help you decide Defendant Daryl Warren's criminal

1   predisposition with respect to Defendant's claim of

2   entrapment.  You should give it the weight and value you

3   believe it is entitled to receive.  If you find that this

4   evidence has not been proved, you must disregard it.

5   Remember, even if you find that the Defendant may have

6   committed similar acts in the past, this is not evidence that

7   he committed such an act in this case.  You may not convict a

8   person simply because you believe he may have committed

9   similar acts in the past.  The Defendant is on trial only for

10  the crime charged, and you may consider the evidence of prior

11  acts only on the issues stated above.

12          The indictment in this case charges the Defendant

13  with three different crimes.  Count I charges that Defendant

14  Daryl Warren committed the crime of conspiracy to possess with

15  intent to distribute in excess of five kilograms of cocaine.

16  Count II charges that Defendant Daryl Warren committed the

17  crime of possessing a firearm in furtherance of a drug

18  trafficking crime.  Count III charges that Defendant Daryl

19  Warren committed the crime of felon in possession of a

20  firearm.  Defendant has pleaded not guilty to each of those

21  charges.  The indictment is simply the document that formally

22  charges the Defendant with the crimes for which he is on

23  trial.  The indictment is not evidence.  At the beginning of

24  trial, I instructed you that you must presume the Defendant to

25  be innocent.  Thus, the Defendant began the trial with a clean

1   slate, with no evidence against him.  The presumption of

2   innocence alone is sufficient to find Defendant not guilty of

3   each count.  This presumption can be overcome as to each

4   charge only if the Government proved during the trial beyond a

5   reasonable doubt each element of that charge.  Keep in mind

6   that you must consider separately each crime charged against

7   the Defendant and you must return a separate verdict for each

8   of those crimes charged.  There is no burden upon a defendant

9   to prove that he is innocent.

10          I left out a word there.

11          There's no burden on a defendant to prove that he is

12  innocent.  Instead, the burden of proof remains on the

13  Government throughout the trial.  The fact that a defendant

14  did not testify must not be considered by you in any way or

15  even discussed in arriving at your verdict.

16          Reasonable doubt is doubt based upon reason and

17  common sense and not doubt based upon speculation.  A

18  reasonable doubt may arise from careful and impartial

19  consideration of all the evidence or from a lack of evidence.

20  Proof beyond a reasonable doubt is proof of such a convincing

21  character that a reasonable person, after careful

22  consideration, would not hesitate to rely and act upon that

23  proof in life's most important decisions.  Proof beyond a

24  reasonable doubt is proof that leaves you firmly convinced of

25  the Defendant's guilt.  Proof beyond a reasonable doubt does

1    not mean proof beyond all possible doubt.

2         Omitting the formal caption and signature blocks, the

3    indictment in this case reads in pertinent part as follows:

4         Count I:  The Grand Jury charges that beginning at a

5    time unknown to the Grand Jury but up to and including

6    June 5th, 2013, in the city of St. Louis, within the Eastern

7    District of Missouri, Daryl Warren, the Defendant herein,

8    acting with others known and unknown to the Grand Jury, did

9    knowingly and willfully conspire, combine, confederate, and

10   agree to commit an offense against the United States, to wit,

11   to possess with intent to distribute in excess of five

12   kilograms of a mixture or substance containing a detectable

13   amount of cocaine, a Schedule II narcotic controlled substance

14   drug, in violation of Title 21 United States Code § 841(a)(1)

15   and 846.

16        Count II:  The Grand Jury further charges that on or

17   about June 5th, 2013, in the city of St. Louis, within the

18   Eastern District of Missouri, Daryl Warren, the Defendant

19   herein, acting with others known and unknown to the Grand

20   Jury, did knowingly possess a firearm in furtherance of a drug

21   trafficking crime, which may be prosecuted in a court of the

22   United States, to wit, conspiracy to possess with the intent

23   to distribute cocaine as charged in Count I herein, in

24   violation of Title 18 United States Code § 924(c)(1).

25        Count III:  The Grand Jury further charges that on or

1    about June 5th, 2013, in the city of St. Louis, within the

2    Eastern District of Missouri, Daryl Warren, the Defendant

3    herein, having been convicted previously of a felony crime

4    punishable by a term of imprisonment exceeding one year, did

5    knowingly possess a firearm which traveled in interstate or

6    foreign commerce during or prior to being in Defendant's

7    possession, in violation of Title 18 United States Code §

8    922(g)(1).

9           The indictment is based on federal statutes, which

10   are federal law.  Count I of the indictment is based upon

11   Title 21 United States Code § 841(a)(1), which reads in

12   pertinent part as follows:  (a) it shall be unlawful for any

13   person to knowingly or intentionally (1) to possess with

14   intent to distribute a controlled substance.  Count I is also

15   based on Title 21 United States Code § 846, which reads in

16   pertinent part as follows:  Any person who conspires to commit

17   any offense shall be sentenced according to law.

18          Count II is based upon Title 18 United States Code §

19   924(c)(1), which reads in pertinent part as follows:  Any

20   person who, in furtherance of any drug trafficking crime for

21   which the person may be prosecuted in a court of the United

22   States, possesses a firearm shall be sentenced according to

23   law.

24          Count III of the indictment is based upon Title 18

25   United States Code § 922(g)(1), which reads in pertinent part

1   as follows:  It shall be unlawful for any person who has been

2   convicted in any court of a crime punishable by imprisonment

3   for a term exceeding one year to possess in or affecting

4   commerce any firearm.

5          The indictment charges that the offenses were

6   committed on or about a certain date.  Although it is

7   necessary for the Government to prove beyond a reasonable

8   doubt that the offenses were committed on a date reasonably

9   near the dates alleged in the indictment, it is not necessary

10  for the Government to prove that the offenses were committed

11  precisely on the date charged.

12         The crime of conspiracy as charged in Count I of the

13  indictment has four elements.

14         Oh, my, I made a mistake on that.  Would you pull it

15  back off?  I'm going to correct the typo.  I'll read it to you

16  correctly, and then I'll give you the -- I'll give you a

17  corrected version to go in to you in writing.  So here's what

18  it says.

19         The crime of conspiracy as charged in Count I of the

20  indictment has four elements, which are:  One, on or before

21  June 5th, 2013, two or more people reached an agreement to

22  commit the crime of possession with intent to distribute

23  cocaine; two, the Defendant voluntarily and intentionally

24  joined in the agreement, either at the time it was first

25  reached or at some later time while it was still in effect;

1   three, at the time the Defendant joined in the agreement, the

2   Defendant knew the purpose of the agreement; and, four, the

3   agreement or understanding involved in excess of five

4   kilograms of a mixture or substance containing cocaine.  If

5   you find these four elements unanimously and beyond a

6   reasonable doubt and if you find unanimously and beyond a

7   reasonable doubt that the Defendant was not entrapped as

8   defined in Instruction 17, then you must find the Defendant

9   guilty of the crime charged in Count I.  Otherwise, you must

10  find the Defendant not guilty of the crime charged in Count I.

11          And then, yeah, you can go back.

12          The Government must prove that the Defendant reached

13  an agreement or understanding with at least one other person.

14  The agreement or understanding need not be an express or

15  formal agreement or be in writing or cover all the details of

16  how it is to be carried out, nor is it necessary that the

17  members have directly stated between themselves the details or

18  purpose of the scheme.  You should understand that merely by

19  being present at the scene of an event or merely acting in the

20  same way as others or merely associating with others does not

21  prove that a person has joined in an agreement or

22  understanding.  A person who has no knowledge of a conspiracy

23  but who happens to act in a way which advances some purposes

24  of one does not thereby become a member, but a person may

25  joint in an agreement or understanding as required by this

1   element without knowing the -- all the details of the

2   agreement or understanding and without knowing who the other

3   members are.  Further, it is not necessary that a person agree

4   to play any particular part in carrying out the agreement or

5   understanding.  A person may become a member of a conspiracy

6   even if that person agrees only to play a minor part in the

7   conspiracy as long as that person has an understanding of the

8   unlawful nature of the plan and voluntarily and intentionally

9   joins in it.  You must decide, after considering all the

10  evidence, whether the conspiracy alleged in Count I of the

11  indictment existed.  If you find that the alleged conspiracy

12  did exist, you must also decide whether the Defendant

13  voluntarily and intentionally joined in the conspiracy either

14  at the time it was first formed or at some later time while it

15  was still in effect.  In making that decision, you must

16  consider only evidence of the Defendant's own actions and

17  statements.

18          If you determine that an agreement existed and the

19  Defendant joined in the agreement, then acts and statements

20  knowingly done or made by a member of the agreement during the

21  existence of the agreement and in furtherance of it may be

22  considered by you as evidence pertaining to the Defendant even

23  though the acts and statements were done or made in the

24  absence of and without the knowledge of the Defendant.  This

25  includes acts done or statements made before the Defendant

1  joined the agreement because a person who knowingly,

2  voluntarily, and intentionally joins an existing conspiracy

3  becomes responsible for all the conduct of the coconspirators

4  from the beginning of the conspiracy.

5          The crime of possessing a firearm in furtherance of a

6  drug trafficking crime as charged in Count II of the

7  indictment has two elements, which are:  One, the Defendant

8  committed the crime of conspiracy to possess with intent to

9  distribute cocaine; and, two, the Defendant knowingly

10  possessed a firearm in furtherance of that crime; three -- I'm

11  sorry.  That's it.  The phrase "in furtherance of" should be

12  given its plain meaning, that is the act of furthering,

13  advancing, or helping forward.  The phrase "in furtherance of"

14  is a requirement that the Defendant possess the firearm with

15  the intent that it advance, assist, or help commit the crime,

16  not that it actually did so.  If you find these two elements

17  unanimously and beyond a reasonable doubt and if you find

18  unanimously and beyond a reasonable doubt that the Defendant

19  was not entrapped as defined in Instruction #17, then you must

20  find the Defendant guilty of the crime charged in Count II.

21  Otherwise, you must find the Defendant not guilty of the crime

22  charged in Count II.

23          And then Instruction 17 is:  One of the issues with

24  regard to Counts I and II is whether the Defendant was

25  entrapped.  The Government has the burden of proving beyond a

1  reasonable doubt that the Defendant was not entrapped by

2  showing either, one, the Defendant was willing to commit the

3  crime of conspiracy to possess with intent to distribute

4  cocaine and to commit the crime of possession of a firearm in

5  furtherance of a drug trafficking crime before he was

6  approached or contacted by law enforcement agents or someone

7  acting for the government or, two, the government or someone

8  acting for the government did not persuade or talk the

9  Defendant into committing a -- committing conspiracy to

10  distribute cocaine or possession of a firearm in furtherance

11  of a drug trafficking crime.  If you find that the Government

12  proved at least one of these two things beyond a reasonable

13  doubt, then you must reject the Defendant's claim of

14  entrapment.  If you find that the Government failed to prove

15  at least one of these two things beyond a reasonable doubt,

16  then you must find the Defendant not guilty.  The law -- the

17  law allows the government to use undercover agents, deception,

18  and other methods to present a person already willing to

19  commit a crime with the opportunity to commit a crime, but the

20  law does not allow the government to persuade an unwilling

21  person to commit a crime.  Simply giving someone a favorable

22  opportunity to commit a crime is not the same as persuading

23  him.

24          Instruction 18:  It is a crime for a felon to possess

25  a firearm as charged in Count III of the indictment.  This

1   crime has three elements, which are:  One, the Defendant had

2   been convicted of a crime punishable by imprisonment for more

3   than one year; two, after that, the Defendant knowingly

4   possessed a firearm; and, three, the firearm was transported

5   across a state line at some time during or before the

6   Defendant's possession of it.  You are instructed that the

7   Government and Defendant have agreed that the Defendant has

8   been convicted of a crime punishable by imprisonment for more

9   than one year under the laws of the state of Missouri, and you

10  must consider the first element as proven.  If you have found

11  beyond a reasonable doubt that the firearm in question was

12  manufactured in a state other than Missouri and that the

13  Defendant possessed that firearm in the state of Missouri,

14  then you may but are not required to find that it was

15  transported across a state line.  The term "firearm" means any

16  weapon which will or is designed to or may be readily

17  converted to expel a projectile by the action of an explosive.

18  If all of these elements have been proved beyond a reasonable

19  doubt, then you must find the Defendant guilty of the crime

20  charged in Count III.  Otherwise, you must find the Defendant

21  not guilty of the crime charged in Count III.

22          Regarding Counts II and III of the indictment, the

23  Government must prove that the Defendant possessed a firearm.

24  The issue of who actually owned the firearm is not relevant to

25  the issue of whether the Defendant possessed the firearm.

1           Regarding Count III of the indictment, the mere

2   knowing possession of a firearm by a previously convicted

3   felon is a violation of the laws of the United States.  It is

4   not necessary, therefore, that the Government prove that the

5   Defendant knew that it was unlawful for him to possess the

6   firearm or the Defendant knew that the firearm had traveled in

7   interstate commerce.  It is sufficient if you find beyond a

8   reasonable doubt that the Defendant knowingly possessed the

9   firearm.

10          The law recognizes several kinds of possession.  A

11  person may have actual possession or constructive possession.

12  A person may have sole or joint possession.  A person who

13  knowingly has direct physical control over a thing at a given

14  time is then in actual possession of it.  A person who

15  although not in actual possession has both the power and the

16  intention at a given time to exercise dominion or control over

17  a thing either directly or through another person or persons

18  is then in constructive possession of it.  If one person alone

19  has actual or constructive possession of a thing, possession

20  is sole.  If two or more persons share actual or constructive

21  possession of a thing, possession is joint.  Whenever the word

22  "possession" has been used in these instructions, it includes

23  actual as well as constructive possession and also sole as

24  well as joint possession.

25          Intent or knowledge may be proved like anything else.

1   You may consider any statements made and acts done by the

2   Defendant and all the facts and circumstances in evidence

3   which may aid in a determination of the Defendant's knowledge

4   or intent.  You may but are not required to infer that a

5   person intends the natural and probable consequences of acts

6   knowingly done or knowingly omitted.

7            The law does not require the prosecution to call as

8   witnesses all persons who may have been present at any time or

9   place involved in the case or who may appear to have some

10  knowledge of the matters in issue in this trial, nor does the

11  law require the prosecution to produce as exhibits all papers

12  and things mentioned in the evidence.  The Jury will always

13  bear in mind that the law never imposes upon a defendant in a

14  criminal case the burden or duty of calling any witnesses or

15  producing any evidence and no adverse inferences may be drawn

16  from his failure to do so.

17           All right.  Members of the Jury, at this time, we are

18  ready for the closing arguments.  Following the closing

19  arguments, I will give you some final instructions about the

20  procedures to use.

21           You may proceed.

22           MR. STEVENS:  Thank you, Your Honor.

23           Counsel, Your Honor, ladies and gentlemen of the

24  Jury.

25           "It sounds pretty good.  It's going to be a shootout

1   though."  You've heard that phrase a few times, those two

2   sentences a few times.  Those are these Defendants' words.

3   "It's going to be a shootout though."  Well, what's he talking

4   about there?  "It sounds good.  It's going to be a shootout."

5   What sounds good?  What's going to be a shootout?  The

6   conspiracy, Count I, the conspiracy to go in there and get

7   those kilograms of cocaine and then to distribute them.

8   That's what he's talking about.  "It's going to be a

9   shootout."  That tells you almost everything you need to know

10  about this case, ladies and gentlemen.  It establishes in

11  Count I that we're talking about a conspiracy, that we're

12  going to go in there and get those kilograms of cocaine and

13  then it's going to be a shootout.  What does that mean?  That

14  there are guns involved, Counts II and III, and that he's

15  going to possess those guns in furtherance of the conspiracy.

16  In Count II, that's what he's charged with and that's what

17  we've proven him guilty of.  That he's a felon in possession

18  of a firearm in Count III.  "It's going to be a shootout."  He

19  possessed those guns, ladies and gentlemen, and we've

20  established that he was a felon.  So those two sentences tell

21  you just about everything you need to know, but there's a

22  whole lot more here.

23          Let's talk about -- the Judge just instructed you on

24  all the instructions, including the elements of each of these

25  crimes.  In Count I, the Judge instructed you to the elements,

1    the first element that two or more people reach an agreement

2    to commit the crime of possession with intent to distribute

3    cocaine.  That means that they agreed to possess with intent

4    to distribute in excess of five kilograms of cocaine, not that

5    they actually possessed the cocaine, not that they actually

6    distributed it -- I mentioned this in jury selection

7    yesterday -- but that they agree that they were going to go in

8    there, get that cocaine, possess it, and then distribute it,

9    the 20 to 22 kilograms of cocaine.  That's the first element.

10          THE COURT:  Counsel, would you pull that microphone

11   over to the other side?

12          MR. STEVENS:  Sure, Judge.

13          THE COURT:  Thanks.

14          MR. STEVENS:  The second element -- that the

15   Defendant voluntarily joined the agreement.  Ladies and

16   gentlemen, we've heard a lot about this, and this goes also to

17   this entrapment business that the Defendant has raised.  The

18   Defendant voluntarily joined in the agreement.  Now, he

19   claims -- and you heard it in opening statement -- that this

20   overzealous federal agent, Agent Zayas, drug him into this

21   thing; the government drug him into this thing, right?  Well,

22   that's not what you saw on this video, and let me make this

23   point, ladies and gentlemen.  Not only did the government not

24   drag him into this thing; the government didn't bring him into

25   this at all.  Who brought Daryl Warren into this case?  Robert

1    Washington did.  Robert Washington doesn't work for the

2    government.  Robert Washington's a coconspirator, just like

3    Michael Twitty.  He doesn't work for the government.  He's not

4    the government.  He didn't bring this Defendant into this

5    case, but make no mistake, ladies and gentlemen; neither

6    Robert Washington or anyone else forced this Defendant to do

7    this.  You've seen the video.  You've seen the evidence.  This

8    Defendant chose to show up and meet with these individuals

9    three separate times to do this home invasion robbery, to do

10   this cocaine conspiracy and the other crimes.  Robert

11   Washington brought him in, not the government, but no one

12   forced him, including Robert Washington.  He chose to do this.

13          And I want to point something out, ladies and

14   gentlemen -- the phone calls June 3rd, 4th, and 5th.  You saw

15   those, the phone calls between Robert Washington and Daryl

16   Warren.  Mr. Jimerson, the defense there, made a point with

17   Agent Zayas on the phone that none of those are phone calls to

18   Daryl -- to Agent Zayas.  Agent Zayas never talked on the

19   phone to Daryl Warren.  Robert Washington and Daryl Warren

20   were conspiring on their own.  Now we can't say that every one

21   of those phone calls had something to do with these crimes,

22   but, ladies and gentlemen, June 3rd, 4th, and 5th are the days

23   that they're talking about doing this home invasion robbery.

24   Do you think in the lives of these guys that's an event big

25   enough that you might mention it in a phone call between the

1    two conspirators?  How about the day that they're going to go

2    do the robbery on June 5th?  Do you think in all those phone

3    calls, 12 phone calls that day before they're arrested, they

4    may have mentioned, hey, you know, this conspiracy is going

5    on, this stash house robbery today.  I submit that's what

6    happened, but none of those calls involved Agent Zayas because

7    these two are conspiring without him even being around, let

8    alone dragging them into this, and I'll talk about that more,

9    how we know that they were conspiring on their own without

10   Agent Zayas even present, let alone entrapping anybody.

11           The third element of Count I is that the Defendant

12   knew the purpose of the agreement, and the fourth element,

13   that the agreement involved more than five kilograms of

14   cocaine, and I want to talk in regard to those elements and

15   all four elements about the evidence in more detail now.  This

16   is what the case has been all about, ladies and gentlemen, the

17   four elements in Count I.  All right.  That's what the case is

18   all about.  May 21st and May 23rd, 2013, Robert Washington

19   sells cocaine to the ATF, to Agent Zayas and the informants.

20   On May 29, the focus of this investigation changes because

21   Robert Washington indicates he knows people who will do home

22   invasion robberies.  And who does he introduce him to?  This

23   Defendant, Daryl Warren.  On June 3rd of 2013, Robert

24   Washington introduces this Defendant as the individual and

25   Michael Twitty as the other individual who would do a home

1   invasion robbery, but we don't have to take his word for it

2   because over the next three days we know that that's true.

3   They prove over and over and over again that they're willing

4   to do this robbery and that they're going to do this robbery

5   and that when they rolled onto the lot to meet with Agent

6   Zayas on June 3rd of 2013 they were willing to do this.  The

7   evidence established that beyond a reasonable doubt.

8          So on June 13th they meet, and Agent Zayas, having

9   been introduced to Mr. Warren as the individual who would do

10  this, runs through the scenario.  He's a drug courier for a

11  Mexican drug cartel, picks up five to six kilograms of cocaine

12  at this stash house; he's not paid enough to do it; he's

13  getting ripped off.  He says that there's a guard there at the

14  house, two guards, one that has a pistol.  He says that

15  there's an additional 20 to 22 kilograms of cocaine.  That's

16  the amount we're talking about in this conspiracy, ladies and

17  gentlemen.  It's charged as in excess of five kilograms of

18  cocaine.  We have well in excess of that because the

19  conspiracy was all about the cocaine that was in that house --

20  getting their hands on it, possessing it, and distributing it.

21  All right.  So he tells them these things, and he says, "I'm

22  looking for someone to go into that house and rob the house of

23  that cocaine, and then we can distribute it."  And what's the

24  response from Daryl Warren?  Not, "Hey, I don't want any part

25  of this" or that he was surprised by this in any way.  It's,

1   "How many dudes are in the house?  Where's the area at?"  He

2   wants information he's going to need to do this robbery in two

3   days.  Agent Zayas continues throughout this to give him --

4   far from talking him into this or trying to persuade him to do

5   it, he gives him every opportunity to walk away.  In that

6   first meeting, after he shows interest in this, Agent Zayas

7   asks him, "Is this something you guys can handle?"  What is

8   Daryl Warren's response?  "Yeah, yeah, we can handle this."

9   If he had said no, ladies and gentlemen, the investigation

10  would have ended and none of us would be here, but he didn't

11  say no.  He said, "Yeah, we can handle it," and then Agent

12  Zayas asked him another question.  "Are you guys -- you're not

13  going to have any problem unloading this, are you?"

14          "No."  That was Daryl Warren's response.  "No, we're

15  not going to have any problem distributing these kilogram

16  quantities of cocaine."

17          Those were his responses, those were his words, and

18  he's accountable for them.  He's also accountable for the

19  statements of the other coconspirators like Michael Twitty.

20  Do you remember in that first meeting when they're sitting in

21  the Cadillac; Mr. Twitty's in back, but he says, "Hey, when

22  you get that call, you've got to at least call us."  He wants

23  to be involved.  Daryl Warren is sitting in the seat right in

24  front of him, in the driver's seat, and I think it's somewhat

25  ironic that he's in the driver's seat because, as we see, he

1    is running this thing.  He's in the driver's seat, but Twitty

2    says, "Hey, when you get that call from those Mexicans about

3    the drugs, you've got to call us.  We want to be involved."

4    This is Daryl Warren's coconspirator.  The Judge instructed

5    you that the statements of the coconspirators are evidence

6    against this Defendant, including that statement.

7            Now, at the end of this meeting, what happens?  This

8    is -- and, again, keep in mind this is just the first meeting,

9    June 3rd, 2013.  They shake hands.  Everybody shakes hands.

10   Warren, Daryl Warren, shakes Agent Zayas' hand.  Robert

11   Washington shakes his hand.  They have an agreement here,

12   ladies and gentlemen.  They know what they're going to do two

13   days later.  That's a conspiracy.  The conspiracy is

14   consummated that day.  It doesn't have to be a formal written

15   agreement, as the Judge instructed you.  They've come to an

16   agreement.  The conspiracy is proved, but it doesn't end

17   there.

18           The next day, again, June 4 of 2013, what happens?

19   He comes back again.  No phone call from Agent Zayas.  No

20   tracking him down.  No trying to bring him there.  Agent Zayas

21   sits on a lot, and Daryl Warren -- or shows up on the lot.

22   Daryl Warren and Robert Washington are there.  They're there.

23   They beat him there, and they discuss this home invasion

24   robbery some more.

25           That's the second meeting, June 4 of 2013.  Again,

1  Daryl Warren's there on the lot, and what does he say?  Not

2  "Hey, I'm having second thoughts."  Not "I don't want any

3  part."  I mean he's already showed up there.  He wants the

4  information, again, that he needs to do this robbery.  He's

5  asking about it, and he's obviously -- he's saying, "My people

6  are skeptical about how many people are in that back room.

7  How many people are in this house?"  Why does he need to know

8  that?  Because he's going to do this robbery, to go in there

9  and get the cocaine and distribute it, and that unknown --

10  remember Agent Zayas talked about introducing unknowns because

11  we don't want people who are down on their luck and just get

12  entrapped into these things, and that's why we're talking

13  about 20 kilos of cocaine and we're talking about an armed

14  guard because you don't want just your average criminal,

15  ladies and gentlemen.  You want someone who's willing to do

16  this, and at every opportunity, Daryl Warren showed he was

17  willing to do this.

18        That unknown about how many people -- maybe that's

19  why he brought the assault rifle.  This has 23 rounds in the

20  magazine.  Maybe he thought there were going to be five guys

21  back there and that's why you bring a gun like that instead of

22  just eight rounds in the .40 caliber.  He wasn't deterred by

23  the unknown; he planned for it.  At the end of this meeting is

24  when the Defendant says, "It sounds pretty good.  It's going

25  to be a shootout though."  Again, ladies and gentlemen, I

1  think that tells you everything you need know about this

2  Defendant.  They agreed that they're going to do the robbery

3  the next day, and again, at this point, ladies and gentlemen,

4  they have already agreed that they are going to -- they have

5  agreed they're going to possess with intent to distribute more

6  than five kilograms of cocaine.  The conspiracy, the agreement

7  is done, but again, it doesn't end.

8          What do they do the next day?  They show up to do the

9  robbery.  June 5 of 2013, they show up on the car wash lot.  A

10  third time this Defendant shows up.  Again, the phone records

11  show us that Agent Zayas isn't seeking him out.  They get

12  there on the lot, and do you remember the Defendant saying

13  there, ladies and gentlemen, "If something goes down, I don't

14  want my people taking a fall," and his coconspirator Twitty

15  says, "It's just us."  He knew that if they got arrested they

16  were going to take a fall.  He didn't say, "If something goes

17  down, I'm going to claim entrapment."

18          "If something goes down, we're going to take a fall,"

19  and now here he is trying to avoid exactly the consequences he

20  knew he'd have to pay if he got arrested, if things went down,

21  and here we are.

22          They said on that lot, ladies and gentlemen -- when

23  Agent Zayas asked, "Are you ready right here and right

24  now?" -- you saw the video -- "Yeah, we're ready."  They're

25  ready to go and do this robbery right here and right now.

1          The Defendant's role in this case -- he told you what

2    it was.  "I'm going in, and I'm going to tell them what to

3    do," and he says that Robert Washington is going to be the

4    getaway driver.  There's no conversation between them and

5    Agent Zayas about, "Hey, Richie, what do you think our roles

6    should be" or "Hey, Robert, do you want to be the driver, and

7    I'll go into the house.  Me and Twitty will go into the

8    house."  Do you know why?  Because they're conspiring outside

9    of his presence, ladies and gentlemen.  They're putting this

10   plan together independent of Agent Zayas.  He never asked them

11   to bring guns along.  They get the guns, and they put them in

12   his trunk, and they're ready to do the robbery.  This

13   Defendant is running this, and he told you that.  "I'm coming

14   in, and I'm going to tell them what to do."

15          At the arrest location that day, June 5th of 2013,

16   they show up, and Agent Zayas shows them the trap car.  What

17   possible purpose is there for them to go over there and watch

18   him perform the elaborate things necessary to get that trap to

19   open up that they're going to hide all this cocaine in?  The

20   only reason is because they were going to go in and complete

21   the conspiracy.  Of course, they were arrested first.  They

22   were actually going to possess with the intent to distribute

23   the cocaine.  They've already done the conspiracy.  They were

24   going to complete it, but they never got that far because they

25   were arrested there on that lot after checking out the trap

1    car they were going to need for all their cocaine.

2           Now, ladies and gentlemen, that brings me to Count

3    II, possession of a firearm in furtherance of the cocaine

4    conspiracy.  The first element is that the Defendant committed

5    the conspiracy to possess with intent to distribute cocaine.

6    So when you find this Defendant guilty on Count I, you'd also

7    be finding him guilty of the first element of Count II.  The

8    same evidence proves both.  That brings me to the second

9    element that this Defendant knowingly possessed a firearm in

10   furtherance of the conspiracy.  Let's talk about the evidence

11   of that.  I've already talked about the firearms a little bit

12   because they're part of the conspiracy, but how do we know

13   that he knowingly possessed those firearms in furtherance of

14   the conspiracy?  Well, we can start with Agent Townsend's

15   testimony today that when they searched his car after he

16   pulled it onto the lot -- the same car he had brought to every

17   meeting -- in the trunk, they find Government's Exhibits 31

18   and 33, the two firearms, both firearms in his trunk, the

19   trunk of his car, and, ladies and gentlemen, when you put that

20   in context, isn't it clear what happened here?  In context, he

21   was about to do this home invasion robbery.

22          THE CLERK:  Five minutes.

23          MR. STEVENS:  Thank you.

24          There's been discussion all along about "It's going

25   to be a shootout."  Remember Agent Zayas expressing concern

1   when he says that he's got someone else running around out

2   there?  Agent Zayas expressed his concern about getting shot

3   in the head.  Does Daryl Warren or anyone else say, "What are

4   you talking about?  We're not talking about bringing guns.

5   There aren't any guns here."  Instead, he lies to them and

6   says, "Oh, the tools and the heat and the ammunition are with

7   somebody else."  He knows you have to have guns to do this,

8   and he's got them in his trunk.  So when you put it in

9   context, ladies and gentlemen, it's clear that he knowingly

10  possessed these firearms and he had them for the purpose of

11  this conspiracy.

12          In defense counsel's opening, he suggested to you --

13  this isn't evidence, but he suggested to you that maybe Daryl

14  Warren -- that Michael -- that Michael Twitty had the .40

15  caliber and Daryl Warren handled it briefly and then Twitty

16  put it in his trunk and that Robert Washington had the assault

17  rifle and then he put it in Daryl Warren's trunk.  Well,

18  ladies and gentlemen, even if that were true, it's possession.

19  Look at the Court's instructions.  Actual possession -- having

20  something in your hands.  Daryl Warren had the pistol in his

21  hands.  Constructive possession -- his two coconspirators put

22  them in his trunk.  He still possesses those, ladies and

23  gentlemen.  It's constructive possession.  He has the ability

24  to exercise control over those.  He knows they're there, and

25  beyond that, the Court instructed you on joint possession.

1    The simple fact that either Michael Twitty or Robert

2    Washington possessed these doesn't mean that the Defendant

3    didn't also.  It's joint possession.  More than one person can

4    possess any object, including firearms.  The Court instructed

5    you on that, and I ask you to take a look at that instruction,

6    but, ladies and gentlemen, we all know what happened here.

7    This Defendant is talking for three days about the need to

8    have firearms for this.  He possessed those firearms in his

9    trunk.  Whether it was actual possession, constructive

10   possession, joint or sole possession, he possessed these

11   firearms.  I think that's obvious from the evidence.

12          Finally, Count III, felon in possession of a firearm.

13   That the Defendant was previously convicted of a felony crime,

14   we proved that through the stipulation.  The parties have

15   stipulated to that, and you have to accept that as proven.

16   That he knowingly possessed these firearms -- well, I've

17   already talked about the evidence that establishes that.  The

18   same evidence proves the second element of Count III, and

19   finally, the third element that they were transported across a

20   state line, the guns were transported across a state line.

21   Agent Eleveld, the expert, testified that they've been

22   manufactured outside the state of Missouri, and that

23   establishes that element.  And so, ladies and gentlemen, we've

24   proved all three counts in this case beyond a reasonable

25   doubt.

1            I want to say one more thing regarding this

2    entrapment.  The Court read you Instruction #17, and it's the

3    Government's burden to prove either that the Defendant was

4    willing to commit the conspiracy to -- and the crime of

5    possession of a firearm in furtherance of a drug trafficking

6    crime before he was approached by law enforcement, and again,

7    as I've already said, he wasn't -- this doesn't even apply.

8    He wasn't approached by law enforcement.  He wasn't approached

9    by Agent Zayas.  Robert Washington brought him into this --

10   his coconspirator -- and he came in willingly, and when he

11   arrived on that lot on June 3rd of 2013, he was willing to do

12   this.  No one had to talk him into it.  No one had to persuade

13   him to do this.  You saw that from the videos.  There's none

14   of that.  Every opportunity he had to walk away, he didn't.

15   In fact, not only did he not walk away, he continued to come

16   back on June 4th and June 5th.

17           When you get down to the bottom of this

18   instruction -- and the entire instruction is important,

19   obviously, but the upshot is, ladies and gentlemen, that the

20   government can use undercover agents, deception, and other

21   methods to present a person already willing to commit a crime

22   with an opportunity to commit the crime.  If you don't think

23   that Daryl Warren was willing to commit this crime, ladies and

24   gentlemen, then acquit him, but the evidence doesn't show

25   that.  We all know he was willing to commit this crime and he

1    did everything he needed to do to commit this crime.  The law

2    does not allow the government to persuade an unwilling person

3    to commit a crime, and that's not what happened here.  This is

4    not an unwilling person.  Daryl Warren showed you just how

5    willing he was to do this.  He was eager to do this.

6            The last line of the instruction, "Simply giving

7    someone a favorable opportunity to commit a crime is not the

8    same as persuading him."  In other words, there's nothing

9    wrong with the government providing him a favorable

10   opportunity to commit this crime and see what he does, see

11   what he's willing to do.

12           THE CLERK:  Twenty minutes.

13           MR. STEVENS:  Thank you.

14           He was given the opportunity, and he grabbed it with

15   both hands.  He wanted this opportunity, and he took it,

16   ladies and gentlemen, and he's guilty on all three counts.  In

17   a few minutes, I'll have the opportunity to talk to you again.

18   Because I have the burden of proof, I will have the last word

19   in this case.  Thank you.

20           THE COURT:  Take those down, and can you clear the

21   screen, too?

22           All right.  Mr. Jimerson.

23           MR. JIMERSON:  Thank you, Your Honor.

24           THE COURT:  Can one of you all clear the screen,

25   please?

1            THE CLERK:  I've got it.

2            THE COURT:  Thanks, Brittany.  You might move that

3    mike over, yeah.

4            MR. JIMERSON:  May it please the Court.  Mr. Stevens,

5    Ms. Behrens, ladies and gentlemen of the Jury, good afternoon.

6    We're here for the closing argument.

7            THE COURT:  Excuse me, Mr. Jimerson.  Pull the mike

8    down towards you a little bit.

9            MR. JIMERSON:  Okay.

10           THE COURT:  There you go.  That will be better.

11   Thanks.

12           MR. JIMERSON:  Thank you.  We're here for the closing

13   argument, and that's my opportunity to argue to you what I

14   believe that the Government did not prove on behalf of my

15   client, Mr. Daryl Warren.  I always say to the Jury at this

16   point, basically, if I offended you in some kind of manner,

17   please don't take it against Mr. Warren.  I know you won't,

18   but I have to say that.  I did say something in the trial that

19   I regret.  I -- I -- I called Special Agent Zayas a liar.  I

20   mean I said that before, even before I can argue that, but I

21   do want you to consider some things that he said, and he

22   admitted to saying -- saying lies.  I do want you to consider

23   that, and then you can judge him regarding what he said,

24   regarding whether he was telling the truth or not.

25               I want to warn you, and I'm frightened today after

 1   Mr. Stevens' argument.  I'm frightened for us, for the people

 2   of the United States, particularly, in this reason.

 3   Mr. Stevens just told you that any person, any agent can come

 4   up to you and lie and by simply you nodding your head or

 5   saying, "Uh-huh, yeah," whatever, then, basically, you're

 6   involved in a conspiracy that you, basically, can't get out

 7   of.  That's the effect of what he's telling you.  That's the

 8   effect of what Mr. Stevens has just said, that, basically,

 9   that the government can do anything to get you and snare you

10   into committing a crime, and basically, by your simple being

11   there or your verbal acknowledgment or something, you are

12   guilty.  I have something I want to argue against that.  It's

13   called the First Amendment.  You can say what you want to say

14   in this country, whether the government likes it or not, but

15   according to Mr. Stevens, basically, you can't.

16         Now, but we have another -- we have another course,

17   and that's called the court, and that's called justice, and

18   now for Mr. Stevens to stand up and say, "And now he's here,

19   having his trial," how dare him say that?  He's entitled to a

20   trial.  He's entitled to his rights to be heard by you, by a

21   jury, and to say that he's causing all this is trying to take

22   away this man's constitutional rights to have justice in front

23   of you.  You are the justice, ladies and gentlemen of this

24   Jury, and how dare the government go that far, but that's not

25   the only thing they did.

1              They went to ensnare this man into -- into something.

2    They tried to entrap him.  They tried to entrap him.  You

3    heard Mr. -- he's an eloquent speaker, and I'm not going to --

4    I like him, but the bottom line is you can't do unlawful

5    things whether or not you're wearing a suit of the government

6    or you're wearing a suit of somebody who is charged with a

7    crime.  You cannot do unlawful things to do that, and that's

8    what -- exactly what you heard from Special Agent Zayas say.

9    Now, who approached whom?  The question -- that's a question.

10   Now, when -- when Mr. Washington came to that meeting, Mr. --

11   I mean Mr. Warren came to that meeting, Zayas jumped out on

12   him like he was a piece of meat, like a meal.  "Man, I got

13   this, I got that," and he used all kind of profane words that

14   I won't even belittle, I won't even darken this court with

15   anymore, but he used all kind of curse words and just

16   meaningful -- I can't even say the word -- just bad words just

17   to express himself, saying this is how people act.  Well, how

18   dare you on that, Mr. Zayas.  You know, what people are you

19   talking about?  People down on their luck?  Impoverished

20   people?  Minority people?  What people are you talking about?

21             MR. STEVENS:  Your Honor, I'm going to object to that

22   characterization.  I don't think it's consistent, and I think

23   it's -- it's inflammatory.

24             THE COURT:  All right.  I -- I -- I'll sustain that.

25             MR. JIMERSON:  What people are you talking about?

1    Okay.  Now, down on your luck, I don't know.  "Those kind of

2    people," he said that.  You can infer what you want to infer.

3    He said "those kind of people."  I don't know what that means,

4    but I'll tell you it doesn't mean the right thing, but he went

5    on and he jumped all on this man, and he kept saying, "I'm

6    going to do this.  I got this cartel," which is a lie.  "We

7    got this Mexican cartel.  We have this amount of dope, this

8    amount of cocaine."  Lie.

9         Now, let's stop there.  What amounts were they

10   talking about?  What amounts have been proven in this case?

11   You have a burden -- I mean you have the judgment of the facts

12   right here.  What facts do we have to show the amount of

13   cocaine?  Nothing.  It jumped from this amount to a huge

14   amount to stamps amount to whatever, and Mr. Zayas said, "I

15   did that because I wanted to increase the level, increase the

16   level, increase the type of people I could get involved with

17   this."  How dare you?  When you're telling a lie, you don't --

18   what factual basis do we have that, basically, the certainties

19   of what was going to go on, it existed, other than the fact

20   I'm nodding my head, other than the fact I'm going with

21   someone to meet you, okay, other than the fact -- where are

22   you going to meet at?  What house are you going to go to?  We

23   didn't ask for an address particularly.  Well, what house you

24   going to go to?  How much cocaine?  What's there?  What's

25   behind there?  Nothing.

1          We have no certainties in this matter, and yet Zayas,

2     again, like I expressed, like hopped all on this man because

3     he, all of a sudden, decided to change his focus, and I find

4     that interesting as well because now you're here from DC to

5     help the city out with drug situations; all of a sudden,

6     you're here now and you're going to change your focus?  No.

7     He wanted to entrap someone, and he wanted to entrap someone

8     because he wanted to entrap them because he knew there were

9     certain people he didn't want, he didn't want around.

10         He knew that -- well, you heard -- that Mr. Warren

11    had convictions for, you know, and the charges that the Judge

12    read out to you, you heard that, and you also heard that you

13    can't consider that other than the person had the propensity

14    to do something similar to that, and we'll get into that

15    whole, but my question is what -- why are you trying to go

16    after certain people when they're just trying to do nothing,

17    yet other than -- other than this man has done his time and

18    his service that's due on these charges.  He was doing okay.

19    When people do -- when people have paid their price, they're

20    doing okay, why drag somebody else in there?  That's what he

21    did.  That's what he did.  And I think that's unlawful.

22         Now, the instruction says -- and I'll change screens

23    on you for a second.  Instruction #17, you can read this.

24    It's a little bit off, but basically, Instruction 17, the

25    Defendant was -- I'll read it.  One of the issues with regard

1    to Counts I and II is whether Defendant was entrapped.  The

2    Government has the burden of proving beyond a reasonable doubt

3    that the Defendant was not entrapped by showing either, one,

4    the Defendant was -- was -- I'm sorry -- the Defendant was

5    willing to commit the crime of possession of a firearm in

6    furtherance of a drug trafficking crime before he was

7    approached or contacted by law enforcement.  Nothing in this

8    record says that he was willing -- he had the -- he was

9    willing to do that.  Where are they getting that from?

10   They're trying to drag in his past and say he was willing.

11   Well, this man has done other things.  He's -- he's -- he's

12   been okay.  He's not been arrested or -- or, you know, charged

13   with anything at that point.  Why is he willing to do

14   something?  You cannot take it that far.  In that case,

15   anybody can be gotten off the street because they don't like

16   the way you look, they don't like the way that your past has

17   been, and they're going to clean it up for a certain whatever.

18   You came here, Officer Zayas, from DC to do a job, and you

19   didn't do your job, and I'm telling you that.  What he did was

20   change focus and going after people because he wasn't doing

21   his job on the other side.  So now he wants to drag in whole

22   team from DC and all that, whatever.  Well, do your job.  This

23   man was ensnared.  This man was entrapped.  This man did not

24   do it.  You came to him.

25           Now, Mr. Stevens wanted to argue that, okay, well, he

1  came to Mr. Washington.  When Mr. Washington -- when

2  Mr. Warren came to him, again, like I say, it was Zayas who

3  offered him money, offered him half of whatever, give it to my

4  confidential informants.  Now, you also heard, while we're

5  there, about how these confidential informants were not even a

6  part of it.  Well, then, if you're going to do this job, these

7  confidential -- I called them snitches during the trial.  You

8  remember that.  You know, paid snitches, they got about $3,000

9  apiece, and they were out trying to get people to do certain

10  things.  If you're not going to do -- you know, if these

11  people were not part of it, then how, Officer Zayas, after

12  this robbery were you going to give these snitches half his

13  drugs to them, so they can take it to wherever he went to?

14  You're a liar.  Plain and simple, I said it, you're a liar,

15  and he said it to you in front of you.  He said that in front

16  of you, but then it doesn't make sense.

17          Now, the second part, it talks about -- and I'll go

18  here -- is that the government or someone acting, I believe --

19  the government or someone acting for the government did not

20  persuade or talk the Defendant into committing conspiracy to

21  distribute cocaine or possession of a firearm in furtherance

22  of a drug trafficking crime.  Okay.  Well, I think that's

23  easily met.  The government or someone acting for the

24  government did not persuade or talk the Defendant into

25  committing it.  Zayas is a Special Agent.  He's part of the

1    government.  He was there.  You heard the tapes.  You heard

2    the -- you heard the -- I call them tapes.  You heard the CDs,

3    the videos.  You saw the video.  He was saying that, and then

4    he was saying, "That's how I talk, man.  That's how I talk."

5    Well, you know, when you talk like that and you're from -- you

6    know, from certain ways, you're emphatic about it.  You're

7    pushing something.  You know, when you're saying, "I don't

8    want to be part of it," like Warren -- Mr. Warren said, "I

9    don't want to be part of this," what did he do?  "Man, come

10   on.  I've got to make this."

11            MR. STEVENS:  That's inconsistent with the testimony.

12            THE COURT:  I'll -- the Jury will remember the

13   testimony, and you'll have a chance to speak to it.

14            MR. STEVENS:  Thank you.

15            MR. JIMERSON:  "I have got to -- you know, I've got

16   to make this move.  My lady -- I've got to get my lady out.

17   I've got to do this now, now, now.  You can't be late.  You

18   can't do this.  You can't do that."

19            Everything is pushing, pushing, pushing.

20            "I'm not -- I don't feel comfortable about this.

21   I've got bad vibes."

22            "Oh, man, oh, man, are you a cop?"

23            "Hell, no."  He said something more profane than

24   that, but he said that, "No, I'm not a cop," and yet he wants

25   to talk about the street lingo, you know, that people use, and

1   I asked, well, if you're talking about, basically, when people

2   are trying to get out, be clear about it, so you don't have to

3   jive your way literally -- you know, the terms -- your way

4   into something.  Get out.  Say to the people, "You know, hey,

5   you sure you want to do this?"

6          "Are we down?  Are we good?" or some other phrase he

7   used, but I suggest to you that was improper, that was

8   entrapment, and we can go on.

9          And the instruction further goes on to say that if

10  you find the Government proved at least one of these things --

11  guess what?  They didn't prove anything.  They didn't prove

12  any of these things as I just presented to you the facts

13  behind that.  So, you know, we just can't stand behind, you

14  know, something saying, "Well, we did because we're the

15  government."  You didn't do it, and I just showed you the

16  facts on how they didn't do it.  Okay.  Mr. Warren did not

17  participate voluntarily in that.  He was ensnared into that by

18  this -- by this agent of the government, Mr. Zayas, who told

19  you constantly that he lied.  He had heightened the ability,

20  he heightened this up, and then he's trying to get you to

21  admit that there was something -- that something was there,

22  cocaine, five milli -- five kilograms of cocaine.  It was

23  never there, never there.  No stash house.  No cartel.

24  Nothing.

25          I can't speak for Robert Washington.  I wish I could,

1    but I can't, you know, but the Government knows Robert

2    Washington had that gun, and he just spoke about it, whether

3    or not, you know, Washington put it in the trunk of the car.

4    He also knows -- you saw the exhibit -- I believe it was 31,

5    32 -- when I was talking to the agent, the custodian of

6    record, I mean the evidence collector, basically, of how that

7    gun was turned around in the passenger's side.  It was

8    actually turned around from a person sitting in the

9    passenger's side.  Now, I'm the driver, and I -- and I --

10   Mr. Warren, I'll say it to you; you know, basically, you

11   shouldn't have got in that car with people putting guns in

12   your car.  You should know better.  Okay.  You should know

13   better, but he -- he did it anyway, but for -- not for one

14   minute did he possess that gun.  He picked it up at -- at

15   Washington's house.  I mean at Twitty's house, I believe.

16            MR. STEVENS:  Judge, there's no evidence of this.

17            THE COURT:  There's no evidence.  That's correct.

18   The Jury will remember the evidence, but confine yourself to

19   what is in evidence.

20            MR. JIMERSON:  Okay.  Thank you, Your Honor.  But

21   there is no evidence that Mr. Washington -- that Mr. Warren

22   possessed those guns in terms of there.  Okay.  Nothing that

23   says that, and the Government knows that, yet they're going to

24   say, well, he put it in his car; therefore, he's liable for it

25   because it's in his car.  That's really their position.  And

 1   it was a dumb move to have guns in your car with your

 2   background.  I'm saying that to you, and I've said that to

 3   him, and he knows it.  It was a dumb move, but -- but he

 4   didn't possess the guns.  Now, if we want to get legal and

 5   technical about it, then that's -- that's the Government's job

 6   to persuade you, and then you choose what you want to choose,

 7   but Mr. Washington basically caused this.  He's the one that

 8   initiated all these things, okay, and not -- and -- and Zayas

 9   took over.  He took over and he went after the man.  As I said

10   before, he went after him with such a zeal that it caused me

11   to shutter, just sitting up here.  How can you be that callous

12   and cold as an agent of the government, trying to ensnare

13   citizens who are doing okay, trying to get them into trouble,

14   so you can get rid of them?  When you came here to do a

15   certain job, you're shifting your focus all of a sudden from

16   whom?  He chose to.  Zayas chose to or Zayas -- I'm sorry --

17   chose to, to change his focus, and he changed his focus

18   because it's an independent thought when you go after people

19   to put things on them.  Independent thought.  And that is

20   entrapment.  I read to you that, and I read to you why I

21   believe that is not -- those two charges are not appropriate

22   because Mr. Warren was in fact entrapped by that.

23        And let's talk about he's coming here to do

24   something, he's a police officer, and once he found out who

25   Mr. Washington -- I mean Mr. Warren was, you're going to tell

1  me he met him on a humbug and he didn't know anything?  Give

2  me a break.  Give me a break.  You're the guy that coordinates

3  SWAT teams from DC.  You're the guy that coordinates

4  undercover snitches that get paid $3,000, you know, from a

5  certain fund to do certain things or drive your cars around or

6  whatever.  You're going to tell me he didn't know who this man

7  was?  Absolutely not.  He knew who this man was.  And not for

8  one minute do I believe him, and I'm telling you

9  straightforward I believe he's a liar about that because

10  that's not proper police work, and if he is -- and if he's not

11  lying, he's reckless because you don't do that, and I believe

12  any police officer do their background checks before they get

13  involved in anything.  In fact, I believe he did very well.

14  He mikes up everything he does.  He's very procedural.  He

15  does all that.  Okay.  So to say he didn't know who this man

16  was is just -- just flat-out unbelievable at this point, and I

17  suggest that you reject that, that you give the benefit of the

18  doubt, the reasonable doubt, to my client, Mr. Warren, on that

19  issue as well, you know, and I think he knew that -- that he

20  was after this man to --

21          MR. STEVENS:  Judge, if I could, I'm going to object

22  here.  I've let this go for a while.  He keeps expressing his

23  own opinion about what he thinks.

24          THE COURT:  Yeah, sustained.  It's sustained.

25          MR. STEVENS:  Thank you.

1          MR. JIMERSON:  Zayas acted unlawfully, and he acted

2     unlawfully in respect to my client's rights, and we can -- we

3     can say all we want, but that's the bottom line, and you are

4     the arbiters of that, the final people of that.  You can

5     decide whether or not that conduct is right, whether or not

6     that conduct is going to be okay for us, that anybody can say

7     anything to us and because they wear a government hat that,

8     therefore, we are now possible meals for their -- for their

9     grinder.  Okay.  That's not the society I live in.  That's not

10     the government that I vote for, I vote in.  That's not the

11     kind of world that I believe that we're teaching our students

12     that this is how the system works.  It doesn't work that way,

13     and it works to the benefit of people charged with things with

14     the benefit -- with the -- with the doubt, beyond a reasonable

15     doubt.  They get the doubt.  They get the doubt, reasonable

16     doubt.  They get that, but just to say that because you talked

17     to me and now I've got you and whatever -- now notice the rest

18     of these things.  Mr. Warren is trying to withdraw.  He's

19     saying, "Okay.  I'm not feeling -- I've got vibes.  I have bad

20     vibes, or my friend got bad vibes."  He's trying to withdraw.

21     He's also saying, "I'm not going, you know, on that trap car.

22     I'm not following.  I want to stay here at the laundromat."

23          Oh, but Zayas got all mad with that one.  He started

24     pushing again, pushing again.

25          "I want to stay here" simply means "I am not going."

1          "I am not going" means "Get away from me."

2          I've got to leave you alone.  That's what it means.

3          No, but no.  Zayas pushed more, pushed more, pushed

4    more, pushed more, and I believe that the benefit of the doubt

5    should go to my client on that because there's some point that

6    you've got to let it go.  Some point, you have to let it go,

7    not just the Defendant but the government, but the government,

8    and they didn't want that to happen because it looks too good

9    for them with arrests.  He said that.  I was trying to get

10   arrests.  I'm going to tell you a lie because I want arrests.

11   I've got to have -- he said those words.  My words to you are,

12   my question to you is, why, why, when no crime has been

13   committed, no house, no stash house, no dope, no quantities of

14   drugs, no cartel, no anything, and I'll go street with you.

15   No nothing there.  Why?  For one thing, ladies and gentlemen

16   of the Jury.  For reasons that are unlawful, and that's why we

17   have the entrapment defense, the entrapment instruction.  It's

18   not because he's got you here -- his right to have a trial

19   under our Constitution.  It's because he was unlawfully

20   treated by the government.  That's why we're here.  That's why

21   we're here, and that's why you're here.  Right now, right this

22   minute, when you go back there and decide whether that's true.

23   You -- I'm nowhere near as smart as you guys collectively or

24   individually, nowhere, but you can read through these things.

25   You can remember then what you heard of the testimony.  You

1   can recall the videos, you can recall the testimony, and you

2   can look at that man when he told you that, the

3   aggressiveness, the zeal of that, okay, how he turned to you

4   and said what he wanted to say to you.  You can look at that,

5   and you can determine whether that's sufficient for convicting

6   this man for something that he -- that he created

7   fictitiously.

8            Think about that.  We are in trouble when I say that.

9   If that can happen, it can happen to anybody.  It can happen

10  to the least of us.  It can happen to the most of us, but more

11  importantly, it can happen to people who are trying to go

12  about their business, who are trying to go about their

13  business, and going about their business in this world is

14  everything.  Going about your business in this life is

15  everything nowadays.  It's always been because all we want to

16  do is just get along, to move along, and this man is trying to

17  get along with his life, and yet you drag him into something

18  that causes him that he have to sit here and have somebody

19  like me try to plea to you that what that liar did was wrong,

20  and it is wrong.  I can't think of a worse situation to be in

21  from that standpoint when you're trying to prove a lie --

22  unprove a lie.  I think it's impossible, but we have you to

23  balance it, to look at it, and I ask you, please do that.  I

24  have every confidence that you will do that.

25            A few more points and I'll sit down.  I think I may

 1   have said this.  "Heighten the interest.  Take half the money.

 2   Give it to my people" that supposedly didn't have anything to

 3   do with it, okay, but you figure that one out.  "Take half the

 4   money.  I've got to move my woman out of here."  He said some

 5   other bad words about his woman, okay, but he said, "Move

 6   my -- I've got to get out of here because such and such and

 7   such and such," and he went on and on and on, and, you know, I

 8   just feel that, you know, that type of aggression, that type

 9   of anxiety, that type of zeal, that type of "I'm going to get

10   you.  I've got to get you.  I've got to get you.  Take this

11   lie.  Take this lie.  Oh, you won't buy that lie?  Well, take

12   this lie.  Well, you won't buy that lie?  Take this lie."  And

13   he lies and he lies and he lies and he lies because,

14   ultimately, basically, the only thing they really had was,

15   basically, somebody standing at a car wash and saying, "Okay,

16   let's do something."

17           Okay.  Standing at a car wash.  Okay.  What's going

18   on?

19           "I'm not going."

20           "Come on, man.  Come on, come on, come on."  Other

21   words.  Okay.  "I've got to take you to this trap car.  Follow

22   me."

23           "I'm not.  I'm staying here."

24           Zayas says, "Well, no, that's still not good enough."

25           That is good enough.  How good does good enough have

1   to be when nothing really existed anyway?  How great do you

2   have to be, government, when nothing exists anyway?  How good

3   is enough?  I submit to you when you're lying, no good is

4   enough because no matter what, he's got you.  No matter what,

5   the moment you open your mouth, the moment you say

6   something -- and the government knows that -- basically, they

7   can come after you, and that is unlawful, that is improper,

8   and that is, in my opinion, a reason to acquit Mr. Warren,

9   particularly on the issues of the drug house conspiracy, a gun

10  in connection with a conspiracy, and you know and I believe --

11  and I believe, you know, physically, he didn't have those

12  guns.  Okay.  You know, he didn't have them.  I believe that.

13          MR. STEVENS:  Judge, I'm going to object.

14          THE COURT:  Yeah, sustained.

15          MR. STEVENS:  It's irrelevant what he believes.

16          THE COURT:  You can't -- you can't -- it's improper

17  to state your own personal beliefs.

18          MR. JIMERSON:  I understand.  Thank you.  Again, I

19  don't want to go too far, but, you know, at least there's the

20  argument that -- you know, that the guns were from someplace

21  else.  So, anyway, you call it, but I -- but I do believe and

22  I think it's proper here that my client should be acquitted he

23  on those charges.

24          The third charge, he had the gun.  He had it in terms

25  of the car, and you want to look at possession, constructive

1   possession, whatever.  I said what I believe how they got

2   there.  I said what I said, how whatever, you know, but you

3   call it, but on those other two charges particularly, don't

4   let a liar persuade you.  Don't -- don't do it.  Don't do it.

5           My client is innocent.  Please find him innocent.

6           Thank you.

7           THE COURT:  All right.  You may proceed.

8           MR. STEVENS:  Thank you, Judge.  How much time,

9   please?

10          THE CLERK:  You have nine minutes and 40 seconds.

11          MR. STEVENS:  Thank you.

12          Ladies and gentlemen, I think he just admitted his

13  Defendant had the gun as to Count III but not as to Count II.

14  I don't know how that differs.  I mean each one has a knowing

15  possession of a firearm element.  I think he just admitted his

16  client had the guns, but in any event, we've proved it beyond

17  a reasonable doubt whether he admitted it or not.

18          Let me show you one of the first instructions the

19  Judge gave you.  What was Mr. Jimerson doing up here?  I

20  mean -- "Do not allow sympathy or prejudice to influence you.

21  The law demands of you a just verdict, unaffected by anything

22  except the evidence, your common sense, and the law as I give

23  it to you."  I mean, what was he trying to do up here?  What

24  was he appealing to here?  What was he appealing to?  Was he

25  appealing to your reason and common sense?  You're to decide

1  this case based on those things, and that's what I ask you to

2  do.  Follow the instructions, and you'll be fine.

3      I don't know if Mr. Jimerson and I were trying

4  different cases here over the last day or not, but the case he

5  told you about isn't the case that you saw in here.  You

6  remember the evidence.  I mean, to the extent he talked about

7  the facts of this case at all, he got them all wrong.  He

8  talks about -- he talks about the Defendant saying, "I've got

9  bad vibes.  I've got bad vibes."  Well, he claimed that when

10 Agent Zayas was on the stand.  Do you recall that?  And then

11 we show Agent Zayas the transcript, and he's talking about

12 these guys that he has out there he claims that have the other

13 guns having bad vibes and not coming in there.  He doesn't say

14 he had bad vibes.

15      He talks about that -- he said flat-out, ladies and

16 gentlemen, the Defendant said he didn't want to do this.

17 That's what he told you.  Do you remember the evidence?

18 Nowhere anywhere did the Defendant say anything even

19 approaching that.  Okay.  Agent Zayas -- just the opposite,

20 Agent Zayas testified; I asked him, "Everything you did with

21 this Defendant is on videotape, is that right?

22      Yes.

23      Okay."

24      And I asked him, "Did he ever say he didn't want to

25 do this robbery?

1          No, he did not."

2          Did you ever see any video in which he said, "I don't

3    want to do this robbery"?  You didn't because it didn't

4    happen.  And think about that.  If, in fact, he had said, "I

5    don't want to do this robbery," in the context of everything

6    else, would that make any sense?  I mean, he shows up on

7    June 5th, but he didn't say, "I don't want to do this

8    robbery."  He did everything he could to make the robbery

9    happen.  Those facts that he talked about weren't facts at

10   all.  It's just made up.  That's not what the evidence was,

11   and you know that.  It's kind of like the -- you know, he

12   cross-examined Agent Zayas on when Robert Washington refers to

13   "a lick like this," and Agent Zayas explained that "a lick" is

14   a robbery.

15         "Well, couldn't it be a Tootsie Roll pop?"

16         Were they talking for three days about candy, about

17   suckers, about Tootsie Roll pops?  No.  They were talking

18   about a robbery, ladies and gentlemen.  I mean, I think that

19   tells you everything you need to know about this defense.

20   "Couldn't 'a lick' have been a Tootsie Roll pop?"  It's

21   ridiculous, ridiculous.

22         He didn't talk about the facts up here.  He talked

23   about all kinds of made-up things.  He talks about -- you

24   know, I think he admitted that this guy had the gun, but in

25   any event, he's talking about, well, the way the gun was

1   turned in the trunk, the driver could never have possessed it.

2   Well, it's a silly argument in any event, ladies and

3   gentlemen, but if you're the driver of a car and you're

4   stopped and you want to reach around that way, I mean, you'd

5   have to reach with your left hand whether you're right-handed

6   or not.  I mean that occurs to me.  In any event, it's a silly

7   argument.  We all know that this Defendant possessed those

8   guns in the trunk.

9           He talks about on and on and on Agent Zayas is a

10  liar, he's a liar, he's a dirty liar; he's every other bad

11  name you can talk about.  I don't want to meet an undercover

12  agent who isn't willing to tell his cover story to people.

13  How successful is that going to be?  And remember the

14  instruction, ladies and gentlemen.  On and on and on about

15  lying, Agent Zayas is a liar.  The government -- the law

16  allows the government to use undercover agents, deception, and

17  other methods to present a person already willing to commit a

18  crime with the opportunity to commit a crime.  He's attacking

19  every undercover operation that's ever been done.  Every

20  undercover agent has to tell lies to the people he's dealing

21  with.  Agent Zayas told you, "When they asked me -- when

22  Twitty asked, 'Are you the police,'" yeah, he lied to him.

23  He's going to tell this guy that he's the police when he knows

24  that they're ready to go do an armed robbery?  He has no idea

25  if these guys have guns on them, let alone in the car.  "Yeah,

1    I'm the police.  You got me."  Are you kidding me?  That's

2    what the defense is?

3            Ladies and gentlemen, Daryl Warren was willing to do

4    this from the very beginning.  The government didn't seek him

5    out.  He suggests that again, as he did in opening, that he

6    was a felon, he had these prior convictions, so the government

7    went looking for him, and he doesn't believe that they didn't

8    know who he was when he first came on the lot.  Now, you tell

9    me.  When Robert Washington says, "I know a guy who will do

10   this armed invasion robbery, and I'll bring him to meet you,"

11   how are they supposed to determine who he's thinking of?  How

12   would they ever know that?  Satellites?  I mean, are they

13   going to bug his phones at that point?  That's not what

14   happened here.  I don't care what he believes.  Okay.  That's

15   not what happened.  They're doing this investigation.  Robert

16   Washington says he knows these people, and how are they going

17   to determine who the people are?  They're going to meet with

18   them, and Agent Zayas puts his life on the line meeting with

19   Robert Washington and two complete unknowns.  He gets into

20   that Cadillac on June 3rd and sits in a car with these three

21   individuals so that he can conduct his investigation and get

22   them off the street.  These are guys who are going to take an

23   assault rifle in the city of St. Louis and go charging into a

24   house to steal some cocaine.  That's who we're dealing with

25   here.  I ask you to go back there and convict him on all three

1    counts.  Thank you.

2         THE COURT:  All right.  Members of the Jury, I will

3    now give you the instructions on conducting your

4    deliberations, and so in conducting your deliberations and

5    returning your verdict, there are certain rules you must

6    follow, and I'll list those for you now.

7         First, when you go to the jury room, you must select

8    one of your members as your foreperson.  That person will

9    preside over your discussions and speak for you here in court.

10        Second, it is your duty as jurors to discuss this

11   case with one another in the jury room.  You should try to

12   reach agreement if you can do so without violence to

13   individual judgment because a verdict, whether guilty or not

14   guilty, must be unanimous.  Each of you must make your own

15   conscientious decision but only after you have considered all

16   the evidence, discussed it fully with your fellow jurors, and

17   listened to the views of your fellow jurors.  Do not be afraid

18   to change your opinions if the discussion persuades you that

19   you should, but do not come to a decision simply because other

20   jurors think it is right or simply to reach a verdict.

21        Third, if the Defendant is found guilty, the sentence

22   to be imposed is my responsibility.  You may not consider

23   punishment in any way in deciding whether the Government has

24   proved its case beyond a reasonable doubt.

25        Fourth, if you need to communicate with me during

1   your deliberations, you may send a note to me through the

2   Court Security Officer who will be posted outside the door,

3   signed by one or more jurors.  I will respond as soon as

4   possible, either in writing or orally in open court.  Remember

5   that you should not tell anyone, including me, how your votes

6   stand numerically.

7            Fifth, your verdict must be based solely on the

8   evidence and on the law which I have given to you in my

9   instructions.  The verdict, whether guilty or not guilty, must

10  be unanimous.  Nothing I have said or done is intended to

11  suggest what your verdict should be.  That is entirely for you

12  to decide.

13           Now, finally, the verdict form is simply the written

14  notice of the decision you reach in this case, and the form

15  has the caption of the case on it, and then it says "Verdict"

16  and then it reads, "On Count I, we, the Jury, find Defendant

17  Daryl Warren" -- and there's a blank, and you fill in either

18  "not guilty" or "guilty" -- "of the crime charged in Count I

19  of the indictment."

20           "Count II:  We, the Jury, find Defendant Daryl

21  Warren" -- and then there's a blank where you fill in "not

22  guilty" or "guilty" -- "of the crime charged in Count II of

23  the indictment."

24           And then "Count III:  We, the Jury, find Defendant

25  Daryl Warren" -- and there's, again, a blank -- "of the crime

1    charged in Count III of the indictment."

2           You will take this form with you to the jury room,

3    and when you have agreed on your verdict unanimously, the

4    foreperson will fill in the form and sign and date it and

5    advise the Court Security Officer that you're ready to return

6    to the courtroom.

7           So, at this time, the clerk will escort you to the

8    jury room for your deliberations.  In just a moment, we'll

9    send you up a copy of the instructions.  If you want to see

10   any of the evidence, you may send a note asking for us to do

11   that, and I will ask Ms. Toney to simply get your things out

12   of -- if you have a coat or anything in the jury room, bring

13   out whatever you have, and then you'll come back out with

14   Ms. Porter.

15          Okay.  So the case is submitted to the Jury for its

16   deliberations.

17        (Jury out at 3:40 p.m.)

18        (The following proceedings were held outside the hearing

19   and presence of the Jury.)

20          THE COURT:  I will discharge the alternate when she

21   comes back out, and then we'll have the instructions.  I did

22   not -- I'll -- whatever you all -- we didn't discuss how to

23   handle the exhibits beforehand, but if you wanted to send in

24   the documentary exhibits, that's fine.

25          MS. BEHRENS:  I did have a question --

1          THE COURT:  Yeah, go ahead.

2          MS. BEHRENS:  -- about the instructions.  I just

3    noticed something on one of the instructions, on the 924(c)

4    instruction.  The first element talked about conspiracy to

5    possess with intent to distribute, but we didn't have that in

6    excess of five grams.  I don't know whether we need to.

7          THE COURT:  I don't think you need to.  I think

8    it's --

9          MS. BEHRENS:  Okay.

10         THE COURT:  I think it's okay the way it is.  So hold

11   on because I do want -- don't leave.  I want you to make sure

12   the exhibits are all together and only the exhibits that were

13   received in evidence are there and they're all together in

14   case they ask for them.

15         Ms. Toney, I want to thank you very much for your

16   service in this case.  I always think it's hard to be the

17   alternate because you have to sit here and listen to all the

18   evidence and then not get to talk to the other jurors, and I

19   really do appreciate your service.  I am discharging you at

20   this time, but I am asking that you not discuss the case with

21   anyone until you know there has been a verdict rendered, and

22   if you want to, you can get a phone number from one of the

23   clerks to call, so that they'll tell you, yes, there was a

24   verdict or not, and -- but please -- so please don't discuss

25   it.  You can leave, but don't talk about it this afternoon

1  and -- you know, because we want to wait until there is a

2  verdict received, but thank you very much.  If it weren't for

3  people like you willing to serve, we really couldn't have a

4  system of justice like this, so we appreciate it.

5          JUROR #13:  Thank you.

6          THE COURT:  Thank you.  All right.  I will be right

7  back with the instructions cleaned up to give to the -- to

8  send in to the jury room along with the verdict form, although

9  that's all we're going to do.  So if you all want to take

10  the -- once the alternate leaves, if you want to do that, you

11  can.

12          (Court recessed from 3:42 p.m. until 3:44 p.m.)

13          THE COURT:  Counsel, I'll hand you each a corrected

14  copy of page 14 of the instructions, which is the one where I

15  left that little phrase in.

16          MR. JIMERSON:  I'm fine with it.  I'm fine with it,

17  Your Honor.

18          THE COURT:  Yeah, and so I've corrected that, and

19  we'll send that in with the verdict form --

20          MR. JIMERSON:  Yes, ma'am.

21          THE COURT:  -- to the -- to the jury room.

22          MR. STEVENS:  Thank you, Judge.

23          THE COURT:  And then, again, hang around so that

24  Brittany knows where to find you.

25          (Court recessed from 3:45 p.m. until 3:47 p.m.)

1           THE COURT:  We're back on the record now, and I've

2    just discussed with counsel exhibits, and I think there's

3    agreement that if the Jury asks to see exhibits we will

4    automatically send in the documentary exhibits that have been

5    received in evidence, which is the photographs and the pieces

6    of paper.  We will not send in the videos or any of the

7    physical evidence, so the guns, ammunition, glove, knife, none

8    of that stuff will go in.  Just the documentary evidence.

9    Okay.

10          MR. JIMERSON:  Yes, ma'am.

11          THE COURT:  And that's agreeable to both sides?

12          MR. STEVENS:  Yes, Judge.

13          MR. JIMERSON:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you.  Now we're off the

15   record.

16       (Court recessed from 3:48 p.m. until 3:49 p.m.)

17          THE COURT:  Off the record first.

18       (Off record discussion.)

19          THE COURT:  We just received a note from the Jury,

20   and it says, "1." -- as if there was going to be a list -- "3

21   min CD with know caption" -- K-N-O-W -- "Can we have a

22   transcript of what was said during video," and it's not

23   signed, and I don't know which video they're referring to, and

24   I also have a question what you think we should do with regard

25   to the transcript versus replaying the video.  So what's the

1    Government's position on how we should respond?  Do you all

2    think you know what three-minute video they're talking about?

3            MR. STEVENS:  Yeah, it's -- they're referring to the

4    one with no caption.  The only one would be the three minutes

5    that Mr. Jimerson -- the disc that he asked us to play.

6            MR. JIMERSON:  What did the note say?  It said,

7    "3" --

8            THE COURT:  Yeah, here, come look at it.  It says "3

9    min" video with no caption.

10           MR. JIMERSON:  Oh, three-minute video.  Okay.  Okay.

11           THE COURT:  All right.  So as I understand it, that's

12   the only video that didn't have the transcript scrolling

13   across the screen.

14           MS. BEHRENS:  Correct.

15           THE COURT:  And do you all have a transcript of it?

16           MR. JIMERSON:  I don't.

17           MR. STEVENS:  No.

18           THE COURT:  Okay.  So there is no transcript?

19           MR. STEVENS:  Right.

20           THE COURT:  So we can bring them back in and play it

21   to them --

22           MR. STEVENS:  Yes.

23           THE COURT:  -- if that's what they want?

24           MR. STEVENS:  Sure.

25           THE COURT:  So I am going to write on here, "There is

1   no transcript of that video.  If you wish to have it replayed,

2   let me know, and you can come back in the courtroom."

3          MR. STEVENS:  That's fine.

4          MR. JIMERSON:  Mr. Warren doesn't need to be back for

5   that, does he, Your Honor?

6          THE COURT:  Not unless you want him to be.

7          MR. JIMERSON:  No.

8       (Off record discussion.)

9          THE COURT:  Okay.  Back on the record, here's what my

10  note says.  "There is no transcript of that video.  If you

11  wish for the video to be played back to you, please write a

12  note to that effect," and I've signed it "Judge Perry" and

13  dated it and put the time as 3:53 p.m.  Okay.  That's what the

14  response will be.

15      (Court recessed from 3:52 p.m. until 3:56 p.m.)

16         THE COURT:  So on the record now.  So we have

17  received -- they did respond to the note by writing on the

18  bottom of the same note, "Please play back video," and it is

19  signed by one of the jurors whose handwriting I can't exactly

20  read, but I'll try to figure it out, but in the meantime --

21  hold on a second.  Yeah, I think it's signed by Juror #3,

22  right there in the middle, front row.  Anyhow, so if -- as

23  soon as you're ready to play the video, we will be -- we'll

24  bring them back in.  All we'll do is I will say, "This is the

25  portion of the video that you asked to see."  We'll play it,

1   and then I'll say, "You should go back to your deliberation

2   room."  Before I do that, I want to verify, Mr. Jimerson, what

3   you told me off the record.  You do agree that it's okay to do

4   this without your client being present?

5          MR. JIMERSON:  Yes, Your Honor, I do agree.

6          THE COURT:  Okay.  That's fine.

7      (Off record discussion.)

8          THE COURT:  Okay.  Are we agreed that there's a clip

9   up there?  Is that the one we think it is?

10         MR. JIMERSON:  It should be if that's the

11  three-minute one that they're talking about, Your Honor.

12  That's -- although I don't -- yeah.

13         MR. STEVENS:  Okay.  I think we're ready.

14         THE COURT:  Okay.  All right.  We'll bring the Jury

15  in and play this clip.

16         THE CLERK:  Judge, should they bring their notebooks?

17         THE COURT:  They can if they want to.

18     (The following proceedings were held within the hearing

19  and presence of the Jury.)

20         THE COURT:  All right.  Members of the Jury, we will

21  now play the portion of the video clip that you requested.  As

22  I mentioned in the note, there's no transcript with this

23  video, but this is the video.

24     (Video played.)

25         THE COURT:  All right.  I'll ask the Jury to return

1    to the deliberation room at this time.

2        (The following proceedings were held outside the hearing

3    and presence of the Jury.)

4            THE COURT:  Okay.  We're in recess again.

5            MS. BEHRENS:  Judge, I do have one question for you

6    about the exhibits.  You just mentioned not to send back any

7    CDs, and with Government's Exhibit 30 --

8            THE COURT:  Do you want this on the record?

9            MS. BEHRENS:  No, it doesn't need to be.

10            COURT REPORTER:  Oh, I'm sorry.

11            THE COURT:  It's okay.  Yeah, it doesn't.

12            MS. BEHRENS:  It doesn't need to be.  I just want to

13    get a preference.

14            THE COURT:  Okay.

15        (Court recessed from 4:03 p.m. until 4:52 p.m.)

16            THE COURT:  So we have a note from the Jury, and it

17    says, "June 5th?  Car wash transcript where Warren indicated

18    he was going in the stash house," and it's signed by the same

19    juror and dated 3-5-14, and so what the lawyers have

20    proposed -- we have a transcript that's of all the clips, all

21    the June 5th clips that were played.  There is a point on one

22    of them where he says, "I'm going in," and the lawyers agree

23    that we can just send the transcripts of all of the June 5th

24    excerpts in, is that correct, Mr. Stevens?

25            MR. STEVENS:  Yes, Your Honor.

1          THE COURT:  And, Mr. Jimerson, that's okay with you?

2          MR. JIMERSON:  Yes, Your Honor.

3          THE COURT:  And you both agree that even though we've

4    instructed them and that we all know that the actual evidence

5    is the video, that everyone is agreeing it's appropriate to

6    send in the transcripts instead of making them come back out

7    here and listen to the video?

8          MR. JIMERSON:  I agree.

9          MR. STEVENS:  Yes, Your Honor.

10          THE COURT:  Okay.  That's what we'll do.  Just take

11   it and hand it to them.  Put a clip on it, so they can keep

12   the pages in order.

13      (Court recessed from 4:53 p.m. until 5:32 p.m.)

14      (The following proceedings were held outside the hearing

15   and presence of the Jury.)

16          THE COURT:  All right.  We have been informed by the

17   Jury that they have reached a verdict, so I will order the

18   Jury brought in at this time.

19      (The following proceedings were held within the hearing

20   and presence of the Jury.)

21          THE COURT:  All right.  Who is the foreperson?

22          JUROR #3:  I am.

23          THE COURT:  Okay.  Ms. Roberts, I understand the

24   clerk -- you've informed the clerk that you have a verdict?

25          JUROR #3:  Yes.

1          THE COURT:  And you've provided her with the verdict

2     form?

3          JUROR #3:  Yes.

4          THE COURT:  All right.  She'll provide it to me at

5     this time.

6          All right.  The verdict is in the proper format, and

7     so I will ask the clerk to publish it at this time by reading

8     it aloud.

9          THE CLERK:  "Verdict.

10          Count I:  We, the Jury, find Defendant Daryl Warren

11     guilty of the crime charged in Count I of the indictment.

12          Count II:  We, the Jury, find Defendant Daryl Warren

13     guilty of the crime charged in Count II of the indictment.

14          And Count III:  We, the Jury, find Defendant Daryl

15     Warren guilty of the crime charged in Count III of the

16     indictment."

17          And it's signed by the foreperson and dated this

18     date.

19          THE COURT:  All right.  Madam Foreperson, is this

20     the -- is this the Jury's verdict?

21          JUROR #3:  Yes.

22          THE COURT:  All right.  Does either -- do you wish to

23     have the Jury polled?

24          MR. JIMERSON:  Yes, Your Honor.

25          THE COURT:  All right.  So here's what we're going to

1    do.  We're going to ask each one of you if these are your true

2    and correct verdicts.  The clerk will do that by calling your

3    juror number.  So you're #1 here on the front row, and the

4    foreperson is #3, and then it goes up to 6 and then 11.  So

5    she will -- as she -- as she calls your number, please answer

6    the question she asks.

7                 THE CLERK:  Juror #1, is this your true and correct

8    verdict?

9                 JUROR #1:  It is correct.

10                THE CLERK:  Juror #2, is this your true and correct

11   verdict?

12                JUROR #2:  Yes.

13                THE CLERK:  Juror #3, is this your true and correct

14   verdict?

15                JUROR #3:  Yes.

16                THE CLERK:  Juror #4, is this your true and correct

17   verdict?

18                JUROR #4:  Yes.

19                THE CLERK:  Juror #5, is this your true and correct

20   verdict?

21                JUROR #5:  Yes.

22                THE CLERK:  Juror #6, is this your true and correct

23   verdict?

24                JUROR #6:  Yes.

25                THE CLERK:  Juror #7, is this your true and correct

1    verdict?

2           JUROR #7:  Yes.

3           THE CLERK:  Juror #8, is this your true and correct

4    verdict?

5           JUROR #8:  Yes.

6           THE CLERK:  Juror #9, is this your true and correct

7    verdict?

8           JUROR #9:  Yes.

9           THE CLERK:  Juror #10, is this your true and correct

10   verdict?

11          JUROR #10:  Yes.

12          THE CLERK:  Juror #11, is this your true and correct

13   verdict?

14          JUROR #11:  Yes.

15          THE CLERK:  Juror #12, is this your true and correct

16   verdict?

17          JUROR #12:  Yes.

18          THE CLERK:  It's unanimous.

19          THE COURT:  All right.  As the verdict is unanimous,

20   I will accept it and judgment will be entered in accordance

21   with your verdict.  I now want to tell you all as jurors that

22   you will be released from this case at this time, and I want

23   to thank you for your jury service.  It's important you

24   understand I'm thanking you for your service, not for your

25   verdict.  I would say this no matter what your verdict was.

1    Throughout the trial, I have told you you can't discuss the

2    case with anyone, and I wanted you to know you're no longer

3    bound by that instruction.  You are free to discuss this case

4    or not discuss it as you see fit.  We have a local rule in our

5    court that prohibits the parties or the lawyers or anyone

6    associated with the parties or lawyers from attempting to

7    contact jurors in any way to ask you about the -- about your

8    deliberations or ask you anything else about the case, and we

9    enforce that rule.  However, that's no limit on your First

10   Amendment rights to talk to anybody you want to.  You're free

11   to discuss the case if you want, but you also don't ever have

12   to unless I should tell you, and although I do have that power

13   technically, I've exercised it once in 23 years, so it's

14   pretty rare.  So that is -- I will thank you for your service,

15   and I -- if you wish to -- you know, I'd be glad to step into

16   the jury room and thank you personally after we finish some

17   things we have here, but it will be another five or so minutes

18   or 10, so if you want to go home, I certainly understand that.

19   You can just take off, but I'll just check in there.  If

20   anyone's left, I will come in and speak to you.  I do -- but,

21   again, thank you very much on behalf of the system of justice

22   for serving on the Jury as you have, and you are excused at

23   this time.

24        (The following proceedings were held outside the hearing

25   and presence of the Jury.)

1          THE COURT:  All right.  I will set the sentencing in

2    this case for Wednesday, May the 28th, at 2:00 p.m.  The

3    objections to the Presentence Report will be due on or before

4    May the 7th.  So sentencing, Wednesday, May 28th, at 2:00 p.m.

5    Anything else at this time?

6          MR. JIMERSON:  Yes, Your Honor.  I'd like to request

7    just an additional 10 days to prepare my motion for a new

8    trial, Judge.

9          THE COURT:  Okay.  So 10 days from now?

10         MR. JIMERSON:  Yes, ma'am, additional.

11         THE COURT:  Okay.

12         MR. JIMERSON:  Well, I think it's due 10 days, but an

13   additional 10 days.

14         THE COURT:  An additional 10 days?

15         MR. JIMERSON:  Yes, ma'am.

16         THE COURT:  Okay.  That's fine.  You'll have 10 days

17   in addition to whatever the rule requires to file a motion for

18   a new trial.

19         MR. JIMERSON:  Yes, ma'am.  Thank you, Your Honor.

20         THE COURT:  Okay.  That's granted.  All right.  Then

21   the Defendant -- oh, please don't leave until the clerk has

22   worked out anything she needs to with exhibits with you,

23   et cetera, and the Defendant then is remanded to the custody

24   of the Marshals pending sentencing.

25         (Proceedings concluded at 5:39 p.m.)

<u>CERTIFICATE</u>

I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 194 inclusive.

Dated at St. Louis, Missouri, this 3rd day of August, 2014.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter