UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:13-CR-221-CDP |
| | ) |
| DARYL WARREN, | ) |
| | ) |
| Defendant. | ) |

SENTENCING HEARING

BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

JUNE 25, 2014

APPEARANCES:

For Plaintiff:     Cristian M. Stevens, AUSA
                   **OFFICE OF U.S. ATTORNEY**
                   111 South Tenth Street, 20th Floor
                   St. Louis, MO  63102

For Defendant:     Herman L. Jimerson, Esq.
                   **JIMERSON LAW FIRM**
                   225 S. Meramec, Suite 508
                   Clayton, MO  63105


*REPORTED BY:       Gayle D. Madden, CSR, RDR, CRR*
*                   Official Court Reporter*
*                   United States District Court*
*                   111 South Tenth Street, Third Floor*
*                   St. Louis, MO  63102*
*                   (314) 244-7987*

1          (Proceedings began at 9:04 a.m.)

2          (The following proceedings were held in open court and

3    with the Defendant present.)

4               THE COURT:  All right.  Mr. Jimerson, would you step

5    up?  Mr. Warren can remain seated for now.  So we're here in

6    the case of United States of America versus Daryl Warren, and

7    the Defendant is here in person and with his attorney,

8    Mr. Jimerson, and the United States is here through

9    Mr. Stevens, and we're here for sentencing, and there are a

10   number of objections, and there's also a motion for downward

11   variance, but I think probably talking about the objections

12   first makes sense.  The -- so I guess I would ask you,

13   Mr. Jimerson, just to make any statements in support of your

14   objections that you would like.

15               MR. JIMERSON:  Thank you, Your Honor.  Thank you for

16   the opportunity.  Basically, Your Honor, we feel that, as we

17   stated throughout the whole trial process, that the --

18   particularly, the amount of drugs that are alleged in this

19   situation is basically fictitious.  As you know, this case

20   brought out this was a stash house; this was not a real place,

21   and the amount of drugs were not real in itself.

22   Particularly, since that's the occurrence, we feel that to go

23   on a fictitious amount of drugs basically to sentence

24   Mr. Warren to something that did not exist is basically wrong.

25   The other issue, Judge, that I want to bring out is that we --

1   Mr. Warren did not have the capacity to distribute the amount

2   of drugs that -- that was brought out, particularly, in the

3   case, and I believe that was one of the factors that's a big

4   concern here is that -- that, particularly, we're dealing with

5   fictitious amounts of drugs and now we're dealing with some

6   reason to say that he had the ability to distribute drugs in

7   the manner in which the Government through the agents have

8   indicated, Judge, and that is all itself -- that's too

9   far-reaching, so we believe that not only were the drugs

10  itself in this stash house fictitious, the capacity to do

11  something with a fictitious amount basically deprives

12  Mr. Warren of his rights, and we believe that as that

13  situation exists that the conviction shouldn't stand as well

14  as the sentence that the Court may impose subject to the

15  Presentence Investigation should not stand.

16          THE COURT:  Okay.  Now, also, in your motion for

17  downward variance, you said there was an agreement that he's

18  responsible for 3.5 kilograms but less than five kilograms of

19  cocaine, and the Government, obviously, in its response said,

20  no, there was no such agreement, and the Jury was asked in the

21  Jury submission, and one of the elements of the offense was

22  that the quantity was more than five kilograms of cocaine, and

23  the Jury convicted him after being instructed that they had to

24  find that element beyond a reasonable doubt.  So is there -- I

25  mean, what's this about?  Was this just a mistake?

4

1          MR. JIMERSON:  That's a mistake.  Thank you.

2          THE COURT:  Okay.  Okay.  Well, yeah, we all agree

3    that the -- at least the 22 kilograms of cocaine was

4    fictitious, but this is a conspiracy case, and the Defendant

5    was convicted of conspiracy.  The entrapment defense was

6    presented to the Jury, and they rejected it, and so I'm going

7    to overrule the Defendant's objections.  To the extent you're

8    arguing -- which is really arguing the sufficiency of the

9    evidence, and so I will overrule those.  To the extent there's

10   an argument about sentencing entrapment, there's the issue of

11   predisposition, and I guess I would ask you to respond to

12   that, Mr. Stevens, in terms of the -- the argument that, well,

13   he couldn't have been -- had the necessary predisposition to

14   distribute this quantity of drugs because it was too much for

15   him.  He wasn't that big a guy.

16          MR. STEVENS:  Uh-huh.  No, Judge, and I understand

17   that concern, certainly, particularly, considering that it was

18   the agent that came up with that amount.  Now, they came up

19   with it after consulting with DEA locally to determine an

20   amount that would be realistic, but I would point out that

21   there are two elements to the analysis, and that is, first,

22   that the government induced this Defendant and, second,

23   whether or not he was predisposed.  He has the burden of

24   establishing both of those elements here.  Now, at trial, the

25   Government had the burden beyond a reasonable doubt to prove

5

1   those to the Jury, and obviously, the Jury rejected that, but

2   I think in particular, Judge, first of all, there's no

3   evidence of inducement here.  The fact that the government

4   gave him an opportunity and he jumped in with both feet,

5   obviously, is not inducement, and in particular, I'd point the

6   Court to the evidence at trial that this Defendant, when

7   directly asked, "Is this something you and the other

8   individuals can handle?" on June 3rd, in the Cadillac, the

9   meeting, actually, where they all sat in the Cadillac, and

10  Agent Zayas asked this Defendant specifically, "Is this

11  something you can handle?"  And he unequivocally said, "Yeah,"

12  and then shortly after that he asked him, "Are you going to

13  have any problems unloading this amount or unloading this

14  cocaine?"  And he says, "No."  Now, they'd already talked

15  about, basically, 25 to 28 kilos of cocaine.  So the Defendant

16  himself in a taped, audiotaped meeting stated unequivocally he

17  would have no problem unloading this amount.

18          He does have, obviously, the six prior drug

19  convictions.  I believe five of those came in during the

20  course of the trial.  Now, admittedly, those are substantially

21  smaller amounts, but what it shows is that this Defendant was

22  involved in the drug trade, he has a trafficking prior

23  conviction, that he's familiar with these types of drugs.  In

24  fact, if you look at his prior convictions, it's all different

25  sorts of drugs, from ecstasy to marijuana to heroin to crack

1   cocaine, and then, in this case, of course, cocaine.

2          So I think -- I think that evidence, at the very

3   least, is enough to, you know, disprove any argument by

4   Mr. Jimerson here that he can prove by a preponderance of the

5   evidence that this Defendant was not predisposed to deal in

6   these amounts of drugs.  The Defendant unequivocally stated

7   that he could, that he would have no problem unloading this

8   amount, and that this was something he and his coconspirators

9   could handle.

10          I would point out also, Judge, as the Court did at

11   the outset, this is a conspiracy.  The understanding between

12   the coconspirators was that they would split all of this up,

13   so that this Defendant would be dealing with probably

14   somewhere around five kilograms himself, but, of course, all

15   of the conspirators are responsible for the amounts that

16   they're conspiring for, and they intended to steal all of it,

17   apparently.  That was the plan.

18          THE COURT:  Yeah, I'm going to -- so I am going to

19   overrule the sentencing entrapment argument, too, or objection

20   because I simply think that there's -- the law supports this

21   quantity and that the law is pretty clear that simply saying

22   to somebody, "Let's go commit a crime, and you can make money

23   if we commit a crime," that's not inducement.  That's just

24   planning to commit a crime and make money from committing the

25   crime.  That's not what they mean by inducement, so I -- I

7

1  will overrule the Defendant's objections that have been filed,

2  and I guess, Mr. Jimerson -- I'm sorry -- Mr. Warren, we're

3  ready for you to step up with your lawyer.  I need to ask you

4  a couple of questions.

5          Mr. Jimerson, move that way.

6          MR. JIMERSON:  Yes, ma'am.

7          THE COURT:  No.  Move the other way, so he can stand

8  on that side of you and have the mike.  There you go.

9          MR. JIMERSON:  Yes, ma'am.

10          THE COURT:  So, Mr. Warren, did you have a chance to

11  go over the Presentence Report and discuss it with your

12  lawyer?

13          THE DEFENDANT:  I went over it yesterday.

14          THE COURT:  Were there any other objections that you

15  wanted -- you heard my ruling on the objections he did file.

16  Are there any other objections that you wanted him to file

17  that haven't been resolved?

18          THE DEFENDANT:  I wanted to file a motion for

19  outrageous government conduct.

20          THE COURT:  For outrageous government conduct?

21          THE DEFENDANT:  Yeah.  I mean I have a couple motions

22  that didn't get filed, a motion in limine, a motion to compel.

23  I never received my discovery.  I haven't seen my affidavit,

24  grand jury transcripts.  A lot of stuff happened in my trial

25  that I believe that should have -- shouldn't have happened

1    because a week before I didn't see -- I didn't see all your

2    own video until a week before trial.  Only one video, he

3    played for me, and that, we couldn't hear it, and I'm in three

4    videos.  I never got any transcripts.  I never got any of the

5    investigative tools I needed to study my case.  I mean I

6    don't -- I just came to trial.  It seemed like everything was

7    unprepared on my side and everybody else had their stuff

8    together, and I feel like I didn't get a fair chance at trial

9    because of that.

10         THE COURT:  Didn't you tell me at trial -- didn't we

11   have an argument that you said the first lawyer that you had

12   in the case, the one who was court-appointed before you

13   retained Mr. Jimerson, he had given you a bunch of discovery.

14   You talked about a video, and there were some other things.

15         THE DEFENDANT:  Yes, ma'am.  He gave -- he gave stuff

16   to my brother to let him review some stuff, so he could -- I

17   guess he was trying to get me to plea out, but he wasn't -- so

18   he never gave me any discovery.  He showed me some discovery.

19   He showed me some audio and video, but he never gave it to me,

20   and he never gave me any transcripts or anything.  I figured

21   they gave it to my lawyer here.  He was supposed to give them

22   to me, but after I waived my evidentiary hearing, I didn't see

23   Jimerson until six months later, until a week before trial.

24         THE COURT:  Well, so when you say he showed it to

25   you, so he came to the jail and sat with you and showed it to

1   you?

2          THE DEFENDANT:  Exactly.

3          THE COURT:  And that's -- I mean do you think he

4   should have given you your own personal copy to keep in the

5   jail?

6          THE DEFENDANT:  Oh, no.  I'm talking transcripts to

7   go over what's on the CDs and stuff like that, affidavits,

8   grand jury, grand jury transcripts.  Just in case if they was

9   misleading on the transcripts, I could have had a *Franks*

10  hearing.  I should have had a suppression hearing.  I should

11  have had a motion filed for a speedy trial, I thought, but I

12  never got anything.  I mean from September until March, I

13  never had any contact with Mr. Jimerson except through my

14  brother.  When I asked my brother to tell my lawyer to come

15  see me, he never came.  I mean, then, obviously, he showed up

16  in March, a week before trial, and was like, "Are you ready to

17  go to trial?"  And I was like, "Well, here comes the video."

18  And you know what I'm saying?  He played the one video for me.

19  Then I was like, "Where's the rest of the videos?"  He said he

20  didn't have the rest of the videos, and I was like, "Well,

21  where's the transcript?"  He said he don't have the

22  transcripts either.  I was like, "Can you get them?"  He said,

23  "It's too late."  You know, I mean -- but I mean other than

24  that, I don't have -- I don't have anything else to say, Your

25  Honor.

1          THE COURT:  Mr. Jimerson, do you want to --

2          MR. JIMERSON:  Yeah.  Thank you, Your Honor.  I -- I

3    really hate to be at conflict with my client in front of the

4    Court, but I -- I -- I -- when me -- when Mr. Warren states

5    that I waited six months to see him, the facts does not bear

6    that out, Judge.  I think the records at the -- at the

7    St. Louis -- St. Charles County Justice Center bears out I

8    seen Mr. Warren multiple times.  I brought documents to him.

9    I filed motions on his behalf.  I believe the record also

10   indicates that, Judge.  I've had a discussion with Mr. Stevens

11   prior to the Court -- prior to this matter coming up to this

12   Court, basically, with those motions, and one of the

13   discussions was if we had a hearing on the motions, then

14   the -- then the enhancement of the charges will be filed by

15   Mr. Stevens, and I had that discussion with Mr. Warren,

16   particularly, and, Judge, we thought it was not feasible at

17   that point to -- to present motions, but motions were filed.

18   I -- I disagree with Mr. Warren, but I believe he has a right

19   to voice his disagreement or discontent with me, but I don't

20   want it to stand that I did not see my client for six months

21   or a week before the trial.  I did bring up tapes to

22   Mr. Warren.  Mr. Warren told me to take them back because --

23   discs, rather -- because he could not play them.  I gave them

24   to his brother as well.  His brother has two sets of discs,

25   apparently, one from the prior attorney, one from me.  I

1   played it.  I played it for Mr. Stevens.  I did -- I mean

2   Mr. Warren.  Your Honor, I did everything that I thought that

3   my representation called for.  Everything that I thought that

4   he wanted at trial, I thought I at least tried to present it

5   to this Court in his defense.

6            THE COURT:  Yeah.  So there was a hearing in front of

7   Judge Baker on the -- because Mr. Jimerson did file motions

8   after he entered his appearance, and then there was a hearing

9   in front of Judge Baker, and so, Mr. Warren, weren't you at

10  that hearing and didn't Judge Baker ask you whether you wanted

11  to have a hearing on those motions?  It was a waiver.

12           THE DEFENDANT:  I thought it was an evidentiary

13  hearing.  I didn't know that was a waiver of my motions

14  hearing.  I didn't understand it.

15           THE COURT:  When she asked you, "Do you understand

16  you have a right to have an evidentiary hearing or a hearing

17  on your motions" and you said, "I understand that, and I agree

18  to waive that right," you're telling me now you didn't

19  understand that?

20           THE DEFENDANT:  I didn't know that if you don't have

21  an evidentiary hearing you can't have your motions.  That's

22  what I didn't understand.  No, I didn't understand it.

23           THE COURT:  So you thought -- well, what did you

24  think was going to happen on the motions?

25           THE DEFENDANT:  Oh, I figured they're going to have a

1   hearing for the motions but waive my evidentiary hearing.  I

2   didn't -- I mean I didn't get explained to it.  I didn't take

3   it in right or something, I mean, but I just figured I

4   didn't -- I was just waiving my evidentiary hearing, not my

5   motions, because he explained to me that I still could file

6   motions but I just don't need the evidentiary hearing.  That's

7   what I was -- that's what I was told.  I mean I didn't know.

8        THE COURT:  Well, we can listen to the recording and

9   see what you were told.

10       THE DEFENDANT:  No.  I mean I'm not talking about

11  with the judge.  Talking to my lawyer, he was like that we

12  could still file motions; it's just that we'd just waive my

13  evidentiary hearing.

14       THE COURT:  Well, Mr. Jimerson had already filed the

15  motions by the time you had that hearing, yeah, so, well, I'm

16  not sure what we should do here today.  You know, obviously,

17  the things you're raising are all issues that go to things

18  that happened before the trial, and they're not things -- you

19  know, you have gone to trial.  You -- I think the record is

20  clear that there was discovery provided, and you had two

21  different lawyers, including who both gave you discovery, and

22  so you've been convicted following a jury trial, and I -- you

23  know, you're arguing about a *Franks* hearing.  There's no

24  search warrant in this case.  That's not something that you --

25  I mean that -- it doesn't apply, and so I think we should go

1    forward with this sentencing.  I understand you're unhappy,

2    and you do have some rights to raise that.  Most people when

3    they're convicted are not happy about being convicted.  You do

4    have some ways to raise that, and you will have a right, of

5    course, to appeal.  Now, complaints about your lawyer,

6    usually, the Court of Appeals doesn't want to hear about

7    those, but -- at the first round, at least, on the direct

8    appeal, but that's between -- you know, you need to get legal

9    advice on what you should raise, but at this point, I'm

10   prepared to go forward with the -- with the sentencing and

11   just tell you that the issues you're raising are -- it's too

12   late to raise those issues.  They will -- they should have

13   been raised when you were waiving your motions if you

14   disagreed with what you were telling the Judge at that time,

15   or when we came to trial, you did raise one discovery issue at

16   trial and we discussed it and I overruled it, and I'm going

17   to, again, overrule the objections you're making about

18   discovery and motions at this time.  That's all things that we

19   could have done earlier and in fact we did do earlier.

20          So we're now here for the sentencing, and so I'm

21   going to adopt the findings of fact and -- or I'm going to

22   adopt the Presentence Report as my findings of fact and my

23   legal conclusions about the advisory Guidelines.  There are

24   some things to go through.  The -- the -- Count I has a

25   10-year mandatory minimum.  Count II has a five-year mandatory

1    minimum that is -- has to be consecutive to the others.

2    Count III is a maximum of 10 years.  The offense level in the

3    case -- the base offense level on Counts I and III, which are

4    grouped together, is 34, and that also ends up being the total

5    offense level; however, in the motion for variance filed by or

6    the -- I guess one of the documents filed, Mr. Jimerson did

7    ask and the Government has agreed that they did not oppose my

8    sentencing the Defendant as if the total offense level in this

9    case was a 32, and that is because the Government is agreeing

10   that I can vary from the Sentencing Guidelines to sentence as

11   if the new Sentencing Guidelines were already in effect.

12   There are new Guidelines that will lower the drug -- the

13   offense levels in drug cases by two levels, and those

14   Guidelines are expected to take place and to become effective

15   in November, and the Government has agreed I can go ahead and

16   sentence Mr. Warren as if that Guideline was already in

17   effect.  This does mean, Mr. Warren, that on that argument you

18   can't come back later and ask for it, ask to have the two

19   levels taken off in some later proceeding because you're

20   already getting the benefit of that.

21          So I'm going -- the actual Sentencing Guidelines is a

22   total offense level of 34 and a criminal history category of

23   III, and the advisory Guidelines range on that is 188 to 235

24   months, and that's on Counts I and III.  Then on Count II,

25   there's an additional 60 months, and so the total Guideline

1   range when those are added together is 248 to 295 months;

2   however, I am going to sentence the Defendant as if his

3   Guidelines were total offense level 32, and that results in a

4   range for Counts I and III of 151 to 188 months.  When the 60

5   months is added for Count III, the range we're actually

6   looking at then is 211 to 248 months, and the -- so that's

7   what we're talking about.

8          The -- Mr. Jimerson's sentencing memorandum does ask

9   for additional variances, and, you know, the parties

10  obviously -- the Sentencing Guidelines are only advisory, and

11  so I can -- I'm not required to sentence the Defendant within

12  the -- that 211 to 248 range, although I am required to

13  consider it, and of course, then there are the mandatory

14  minimums, and so that when you take the 10-year mandatory

15  minimum and the five-year consecutive mandatory minimum, that

16  means that the lowest sentence that I could give in this case

17  would be 180 months.

18         And so with all of that said, Mr. Jimerson, I will

19  ask you to make any -- hold on a second.  I need to talk to

20  the probation officer.  Oh, is Count II -- let's see.  Yeah,

21  never mind.  I need to talk to the probation officer.

22         COURT REPORTER:  Off the record?

23         THE COURT:  Yeah, off the record.  Oh, never mind.  I

24  know.  I don't need to after all.  I'm just having trouble

25  with arithmetic.  That's all.  It's fine.  No, I don't need

1  to.  It's just I was having trouble with the -- adding up the

2  counts.

3       So -- so with that said, Mr. Jimerson, I'll ask you

4  to make any statements on your client's behalf you would like.

5  I would like to also say before you do that, though, I did

6  receive a letter on behalf of the Warren family.  It is a

7  letter from Everett Warren, who is the -- as I understand

8  it -- the Defendant's --

9       MR. JIMERSON:  Brother.

10      THE COURT:  -- brother, and it's very supportive of

11  him, and I have considered that.  I'll have that filed under

12  seal in the court file, so the record will be complete of what

13  I've considered.

14      MR. JIMERSON:  Thank you, Your Honor.

15      May I proceed, Your Honor?

16      THE COURT:  Okay.  Yeah, you may.

17      MR. JIMERSON:  Thank you, Your Honor.

18      Your Honor, it's understandable that Mr. Warren is

19  disappointed at this point, and I know you've heard that, and

20  you've addressed him regarding that issue.  I don't want to

21  lose my role, though, as an advocate for Mr. Warren.  The

22  Presentence Report delved into some issues that I believe are

23  very significant in this man's life, particularly, the abusive

24  childhood that he had when he was a teenager, which caused his

25  running away from home, getting in trouble down in -- I

1   believe it was in Mississippi, down in the southern area of

2   this country, Your Honor, and since then, his life has been

3   very tumultuous.  There was abuse by, I believe, a mother's

4   boyfriend or someone of that nature, Your Honor, and in

5   addition to that, Mr. Warren has suffered -- and it's often

6   seen as a connector -- Mr. Warren has suffered mental

7   depressions now regarding that.  He has a diagnosis of bipolar

8   disorder as well as depression, and given that, it's not so

9   unusual to see a person of that abusive background and the

10  psychological connector to that, Judge, having a very troubled

11  life, and even though his brother is very supportive and I

12  think a fine young man, his family is supportive, but his

13  background has not been very supportive of him.  He's -- he's

14  left the south, came up here, Judge, and he's had trouble

15  after trouble, but I think because we now understand better

16  the abusive nature and how things happen after when a person

17  is abused and how that is sometimes suppressed or people act

18  out, not giving excuses for it but just trying to understand

19  the illness and the cause of that, I believe it gives

20  consideration to -- to that.  He doesn't want to talk about

21  it.  He's still suppressing that.  We went out to the

22  St. Charles County Jail; the probation officer tried to

23  attempt to talk about that; he just shut it down.

24          THE COURT:  He told the probation officer he has no

25  current mental health concerns, right?

1          MR. JIMERSON:  Right, yes, ma'am.

2          THE COURT:  Okay.

3          MR. JIMERSON:  And he shut it down, and the record

4    is -- is -- is obvious that he does, but I still think the

5    issue dealing with that is still somewhat really tough for

6    him, and -- and that's a concern, and I believe that this

7    Court can look at that and -- and -- and have consideration

8    for him, and I guess what I'm asking, Judge, is to really --

9    to -- you know, I use the word "mercy", and I don't mean it in

10   any kind of condescending way or in any way that's going to

11   displease anybody but just in terms of just understanding

12   where this man is and not necessarily putting him at the

13   criminal level that we see people with the intent to do really

14   bad things without understanding that.

15          Judge, the other issue we had is alcoholism.  He

16   was -- around this time, Mr. Warren was consuming a fifth of

17   alcohol a day.  I believe he told a probation officer that,

18   and he was drinking, I believe it was, tequila or vodka or

19   something of that, something of that nature, and that's

20   very -- that's something that I believe the Court should take

21   into consideration.  I think it's still connected to the issue

22   of the abuse that we talked about earlier, though, and

23   particularly, with psychological concerns, many people, you

24   know, if they're not taking the medication, if they're not on

25   something, they self-medicate, do things that suppress the

1    harm that was done to him.  Even though this harm was done to

2    him a long time ago, he's still suppressing that, and he still

3    seeks -- I still think he needs help with that to resolve

4    those issues, Judge.  I'm asking you for the mercy to not

5    necessarily punishment him with the full range of punishment

6    but to vary from what you can give him to something that I

7    think is appropriate for him, which also includes, I believe,

8    if he gets to a facility that can also address his mental

9    issues, can address his -- his dependency issues, can address

10   his psychological issues, and I believe, Judge -- I believe

11   that will go a long way.  Thank you, ma'am.

12          THE COURT:  All right.  And I -- Mr. Warren, let me

13   ask you, do you wish to make any statements?  It's your right

14   to do that at this point, but you're not obligated to do that.

15          THE DEFENDANT:  No, ma'am.

16          THE COURT:  Okay.  Mr. Stevens, on behalf of the

17   United States, do you wish to make any statements?

18          MR. STEVENS:  I do, Judge.  I'd point out first, as I

19   did just a little while ago, the videotapes in this case

20   regarding the conspiracy.  I think it's quite clear from the

21   video in this case that this Defendant was not drunk or high

22   or in any way impaired at the time that he was meeting with

23   this agent and the other individuals and planning this

24   conspiracy.  He was someone with his eyes wide open.  He made

25   it very clear that he understood what was going on and that he

1    was planning to do it.  The Court may recall a conversation on

2    June 5th on video that was played at trial when they met at

3    the car wash and this Defendant was talking about -- he

4    claimed that he had other associates who were in a car nearby,

5    driving around, that would be involved.  I don't -- we don't

6    know if that's the case or not, but what's interesting about

7    that is that he told the agent he was not going to have those

8    individuals come in to meet with the agent because he

9    understood that if something went wrong, if there was a

10   takedown, that he didn't want there to be consequences for

11   them.  At that point, Mr. Twitty chimed in it, "Yeah, it'll be

12   just us."  In other words, they understood what they were

13   doing and that there'd be consequences if they were caught by

14   the police or arrested.  It's very clear from the videotape

15   that this Defendant knew what he was doing, what he was

16   planning to do, and there was no impairment of any kind.

17          More importantly, Judge, regarding the abuse and the

18   childhood issues, obviously, that's unfortunate, but what we

19   have here is a 34-year-old man.  We're talking about abuse

20   when he was a teen, and in the interim, we have somewhere in

21   the neighborhood of 20 convictions.  Now, I don't know how

22   long -- Mr. Jimerson said he's not making excuses, and I

23   understand that, but I don't know how many -- how many

24   convictions and how long we can talk about this abuse as a

25   child as a reason to mitigate the punishment for this

1  Defendant.  He's got this long train of convictions since the

2  time he was 15 until the present, and there's no evidence

3  whatsoever that these childhood issues affected this offense

4  whatsoever, let alone the 20 or so that preceded it.

5          Thank you, Judge.

6          THE COURT:  All right.  Anything further?

7          MR. JIMERSON:  No, Your Honor.

8          THE COURT:  All right.  Well, the Presentence Report

9  does reflect that the Defendant had -- has had some mental

10  health issues in the past, but it also reflects that he does

11  not have those now, and, you know, I realize that being in

12  this situation can cause anyone to have -- have problems, and

13  he had a tough period at least during his childhood.  His

14  substance abuse may well have been -- you know, whether it was

15  self-medicating or just for entertainment, it's -- it's a

16  significant factor and would, I'm sure, have affected his

17  mental health, and I'm sure even today, having used substances

18  so consistently, as indicated in the Presentence Report, is

19  a -- does have a serious effect; however, he has done a

20  variety of things since then, including committing a lot of

21  crimes, but he's also -- he got his GED.  Apparently, although

22  the Probation Office was not able to confirm it, he says that

23  he had graduated or did two years at Vatterott, which is not

24  an easy thing to do, so he's trying to learn skills, so it

25  seems to me that this Defendant is -- you know, has overcome,

22

1   at least to a large extent, the -- any problems he suffered in

2   his childhood.

3          And the seriousness of this crime is one that affects

4   my decision on sentencing.  I -- I will say that it -- it's a

5   very serious crime, and if -- although I am troubled, as is

6   everyone, I think, who has dealt with this kind of case, with

7   the fact that it was a fictional stash house with fictional

8   people, those were real guns that the Defendant showed up

9   with, and those were real people who were all agreeing to take

10  those guns and commit what could have been a -- an extremely

11  violent act for the purpose of getting a large quantity of

12  drugs to sell, so that's a really serious crime, and the

13  Defendant has had plenty of experience with the criminal

14  justice system.  He even has a prior federal conviction where

15  he -- he was sentenced in this court by another judge of this

16  court for being a felon in possession.  He completed a term of

17  supervised release, so he knows the routine and knows what he

18  was getting into when he did this.  So I think that it's a

19  serious crime and there's no -- you know, no excuse or no

20  factors that are truly mitigating.  There's always a few

21  mitigating factors, of course, but none that would make me

22  think that the sentence should be lower because of them.

23         I have looked at all the Guidelines issues, and I

24  don't think there's any grounds for a traditional departure.

25  I am varying by giving him the benefit of the new Guidelines,

1  as I stated, but I am going to sentence him to an aggregate

2  sentence of 211 months.  This is actually the lowest -- the

3  lower end of the advisory Guidelines.  I realize I could give

4  him a lower sentence, but I choose not to.  The Government has

5  asked, in fact, for a higher sentence, and I also am choosing

6  not to do that.  I think that the sentence of 211 months is

7  appropriate when you consider the seriousness of the crime,

8  the Defendant's lengthy criminal history, the fact that he

9  has -- you know, his time in federal prison and his other

10  prior convictions did not teach him, you know, that this was a

11  bad idea or keep him from committing this crime, and so when

12  you consider those things, I think that a sentence of -- an

13  aggregate sentence of 211 months is appropriate to meet the

14  sentencing objectives of providing punishment and reflecting

15  the seriousness of the crime, of providing incapacitation, in

16  other words, keeping the Defendant off the streets, providing

17  deterrence to this Defendant and others to, hopefully, keep

18  them -- teach them not to commit more crimes, and it will also

19  give him the opportunity, if he chooses to take advantage of

20  it, to receive treatment for any drug issues or for any mental

21  health issues that may occur, and he -- he would have that

22  benefit in the Bureau of Prisons, but, of course, he's not

23  required to do that, and I don't know if he will take

24  advantage of it.  So I -- those are the reasons I'm selecting

25  this sentence, and as I said, it is -- it's the low end of

24

1   the -- what would be the advisory Guidelines if the new

2   Guidelines were in effect, so it's a variance to that extent,

3   and then I'm otherwise selecting a sentence within that range

4   because of the seriousness of the crime and the Defendant's

5   prior convictions.

6           I will say that the clerk has just pointed out to me

7   and we made a record of this at the trial, but then I didn't

8   notice that the Presentence Report didn't go along with the

9   indictment.  The indictment -- the Presentence Report refers

10  to Counts I, II, and III, and that's how we submitted this to

11  the Jury because we thought it would be confusing to the Jury

12  to tell them Count III, IV, and V was what was on trial, but

13  it's really Count III, IV, and V, and so I will make sure that

14  the Judgment reflects the actual counts.  The Presentence

15  Report, I think we can use the same record.  This is a good

16  enough record, I think.  I don't think it has to be changed.

17  Well, maybe it does.  Actually, the Bureau of Prisons may get

18  concerned, so I will ask the -- the Probation Office to amend

19  the Presentence Report only to the extent of changing Count I

20  to be Count -- say it's Count III, Count II to be Count IV,

21  and Count -- what is III is V, so it's really Counts III, IV,

22  and V that he was convicted of.  He was not charged in Counts

23  I and II, and we agreed we would not bother the Jury by

24  telling them that because it might confuse them, so the -- and

25  there won't be any other changes to the Presentence Report.

1   It's just those, those changes.

2          So for the reasons I have stated, it's hereby ordered

3   that the Defendant is committed to the custody of the Bureau

4   of Prisons to be imprisoned for an aggregate term of 211

5   months.  This term consists of 151 months on Count III and 120

6   months on Count II to be served concurrently with one another

7   and 60 months -- I'm sorry -- I did that wrong.  It's 151

8   months on Count III and 120 months on Count V to be served

9   concurrently with one another and then an additional 60 months

10  on Count IV to be served consecutively to Counts III and V.

11         Upon release from imprisonment, the Defendant will be

12  placed on supervised release for a term of five years, and

13  this is five years on Counts III and IV and three years on

14  Count V, with all those terms to run concurrently with one

15  another.

16         Within 72 hours of release from custody, the

17  Defendant must report in person to the Probation Office in the

18  district to which he is released.

19         While on supervision, the Defendant must comply with

20  the standard conditions that have been adopted by the Court

21  and with the following additional conditions, and if there are

22  any costs associated with any services provided, the Defendant

23  must pay those costs based on a copayment fee established by

24  the Probation Office.

25         The Defendant must refrain from any unlawful use of a

1   controlled substance and must submit to a drug test within 15

2   days of beginning supervision and at least two periodic drug

3   tests thereafter.

4          The Defendant must abstain from any use of alcohol or

5   other intoxicants during the term of supervision.  The

6   Defendant must participate in a substance abuse treatment

7   program approved by the Probation Office, which may include

8   substance abuse testing, counseling, residential reentry

9   center placement, or residential or inpatient treatment, and

10  the Defendant must participate in a mental health evaluation

11  and follow any recommendations of such or participate in a

12  mental health program approved by the Probation Office.

13         The Defendant must participate in a cognitive

14  behavioral treatment program as directed by the Probation

15  Office and in a vocational services program, which may include

16  job readiness training and skills development training as

17  directed by the Probation Office.

18         The Defendant must submit his person, residence,

19  office, or vehicle to a search conducted by the Probation

20  Office based upon reasonable suspicion of contraband or

21  evidence of a violation of a condition of release, and the

22  Defendant must warn any other residents of his premises about

23  this condition.

24         I do find that the Defendant does not have the

25  ability to pay a fine, and, therefore, no fine is imposed.  It

27

1   is ordered, however, that the Defendant must pay to the United

2   States a special assessment on each of Counts -- of $100 on

3   each of Counts III through V, for a total of $300, and that

4   special assessment is due immediately.

5          This will be the sentence in the case.  I am going to

6   recommend to the Bureau of Prisons that the Defendant be

7   evaluated for participation in the residential drug abuse

8   treatment program, for any mental health treatment that may be

9   available, and for any occupational or educational programs,

10  specifically, electrical work, if that is consistent with

11  Bureau of Prisons policies.

12         Do you want me to recommend any particular location,

13  Mr. Jimerson, or say that as close to St. Louis as --

14         MR. JIMERSON:  Greenville, Your Honor.

15         THE COURT:  Okay.  I'll recommend that he be housed

16  at one of the facilities at Greenville, and that will be up to

17  the Bureau of Prisons.  I don't know if they will follow that

18  recommendation.  I can't order them to do so, but I will make

19  that recommendation.

20         MR. JIMERSON:  May I add something else, Your

21  Honor --

22         THE COURT:  Yeah.

23         MR. JIMERSON:  -- in terms of that?  Did you say

24  Pekin or Beacon?

25         THE DEFENDANT:  Pekin.

1          MR. JIMERSON:  Pekin.

2          THE COURT:  Oh, Pekin.  Okay.  Pekin is --

3          THE DEFENDANT:  Greenville or Pekin.  It don't

4  matter.

5          MR. JIMERSON:  Greenville or Pekin.

6          THE COURT:  Greenville or Pekin?

7          MR. JIMERSON:  Yes, ma'am.

8          THE COURT:  Okay.  Okay.  I'll say Greenville.  I'll

9  put in the recommendation Greenville or Pekin, Illinois, and

10  again, all of these recommendations are simply that.  I can't

11  order the Bureau of Prisons to put you in any particular place

12  or offer you any particular program.  They often try to follow

13  my recommendations, but it -- it depends on a lot of other

14  factors, so I will make that recommendation.

15          MR. JIMERSON:  Yes, ma'am.

16          THE COURT:  Now, you do have the right to appeal your

17  conviction and your sentence, Mr. Warren.  Any appeal by you

18  must be filed within 14 days of today's date.  You have the

19  right to be represented by an attorney in taking an appeal,

20  and if you can't afford a lawyer, one will be appointed for

21  you at no expense to you.  If you request, the Clerk of Court

22  will assist you in filing a Notice of Appeal.  If you do not

23  file a Notice of Appeal within 14 days, you will be forever

24  giving up your right to do so, and the United States also has

25  the right to appeal the sentence.  Anything further at this

29

1  time?

2      MR. JIMERSON:  No, Your Honor.  Anything else?

3      THE COURT:  All right.  Then Defendant is remanded to

4  the custody of the Marshals for imposition sentence, and

5  court's in recess.

6      MR. STEVENS:  Thank you, Your Honor.

7      MR. JIMERSON:  Thank you, Your Honor.

8    (Proceedings concluded at 9:44 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE


        I, Gayle D. Madden, Registered Diplomate Reporter and

Certified Realtime Reporter, hereby certify that I am a duly

appointed Official Court Reporter of the United States

District Court for the Eastern District of Missouri.

        I further certify that the foregoing is a true and

accurate transcript of the proceedings held in the

above-entitled case and that said transcript is a true and

correct transcription of my stenographic notes.

        I further certify that this transcript contains pages

1 through 29 inclusive.

        Dated at St. Louis, Missouri, this 4th day of August,

2014.


                          _____

                              /s/ Gayle D. Madden

                          GAYLE D. MADDEN, CSR, RDR, CRR

                            Official Court Reporter